1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF TEXAS
2         MARSHALL DIVISION

3
     SYNCPOINT IMAGING, LLC    |  DOCKET NO. 2:15CV247
4                              |
                               |  OCTOBER 30, 2015
5    VS.                       |
                               |
6                              |  9:05 A.M.
     NINTENDO OF AMERICA,      |
7    INC., ET AL               |  MARSHALL, TEXAS

8    ------------------------------------------------------------

9         VOLUME 1 OF 1, PAGES 1 THROUGH 132

10   REPORTER'S TRANSCRIPT OF CLAIM CONSTRUCTION HEARING
              AND MOTIONS HEARING

11

12        BEFORE THE HONORABLE ROY S. PAYNE
          UNITED STATES MAGISTRATE JUDGE

13
     ------------------------------------------------------------

14

15   APPEARANCES:

16   FOR THE PLAINTIFF:     JOSEPH PIA
                            PIA ANDERSON DORIUS REYNARD & MOSS
17                          222 SOUTH MAIN STREET
                            SUITE 1830
18                          SALT LAKE CITY, UTAH 84101

19                          ROBERT AYCOCK
                            WORKMAN NYDEGGER
20                          222 SOUTH MAIN STREET
                            SUITE 1830
21                          SALT LAKE CITY, UTAH 84101

22                          SANDEEP SETH
                            SETH LAW OFFICES
23                          1200 SMITH STREET
                            SUITE 1600
24                          HOUSTON, TEXAS 77002

25

CLAIM CONSTRUCTION HEARING 10-30-2015

2

```
 1                            ELIZABETH DERIEUX
                              CAPSHAW DERIEUX LLP
 2                            114 EAST COMMERCE AVENUE
                              GLADEWATER, TEXAS 75647
 3

 4   FOR THE NINTENDO:        GRANT KINSEL
                              PERKINS COIE LLP
 5                            1888 CENTURY PARK EAST
                              SUITE 1700
 6                            LOS ANGELES, CALIFORNIA 90067

 7                            CLYDE SIEBMAN
                              SIEBMAN BURG PHILLIPS & SMITH
 8                            300 NORTH TRAVIS STREET
                              SHERMAN, TEXAS 7509
 9
                              KYLE AMBORN
10                            PERKINS COIE LLP
                              700 THIRTEENTH STREET, NW
11                            SUITE 600
                              WASHINGTON, DC 20005
12

13   FOR PIXART:             DUANE MATHIOWETZ
                              RICK CHANG
14                            LECLAIRRYAN LLP
                              44 MONTGOMERY STREET
15                            18TH FLOOR
                              SAN FRANCISCO, CALIFORNIA 94104
16
                              CLAIRE HENRY
17                            WARD, SMITH & HILL
                              1127 JUDSON ROAD
18                            SUITE 220
                              LONGVIEW, TEXAS 75606
19

20

21   COURT REPORTER:         TONYA B. JACKSON, RPR-CRR
                              FEDERAL OFFICIAL REPORTER
22                            300 WILLOW, SUITE 239
                              BEAUMONT, TEXAS  77701
23

24
        PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
25     TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

1                                    INDEX

2                                                      PAGE

3

4   "EXTERNAL CURSOR"                                   6

5   "INTERNAL CURSOR"                                   6

6   "INTERNAL CURSOR"                                  25

7   "MEANS-PLUS-FUNCTION LIMITATIONS"                  55

8   "PROCESSOR IN COMMUNICATION WITH THE CAMERA        56
    FOR PROCESSING THE IMAGE TO DETECT"
9                                                      82

    "AT LEAST ONE PROPERTY"
10                                                     97

    MOTIONS HEARING

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (OPEN COURT, ALL PARTIES PRESENT.)

2            THE COURT:  For the record, we're here for the

3    Claim Construction Hearing in *SyncPoint Imaging versus*

4    *Nintendo, et al*, which is Case No. 2:15-247 on our

09:05AM  5    docket.

6            Would counsel state their appearances for the

7    record.

8            MS. DERIEUX:  Elizabeth DeRieux on behalf of

9    the plaintiff, your Honor.  With me this morning is Joe

09:06AM  10   Pia, Robert Aycock, Sandy Seth; and we are ready to

11   proceed.

12           THE COURT:  All right.  Thank you,

13   Ms. DeRieux.

14           MR. SIEBMAN:  Your Honor.

09:06AM  15           THE COURT:  Mr. Siebman.

16           MR. SIEBMAN:  Good morning.  How are you doing

17   this morning, your Honor?

18           Your Honor, I'm here, Clyde Siebman for

19   Nintendo.  Also with me is lead counsel Grant Kinsel; and

09:06AM  20   also with Grant and I, we have with us from Japan --

21   Nintendo Japan, we have with us Oshizawa with legal in

22   Japan.  We also have with us as in-house counsel Kris

23   Kiel with -- out of Seattle.  And then also, your Honor,

24   we have with us Kyle Amborn with Perkins Coie as well.

09:07AM  25           THE COURT:  All right.  Thank you,

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 5 of 132 PageID #:   4309
CLAIM CONSTRUCTION HEARING 10-30-2015

5

1 Mr. Siebman.

2 　　　　MS. HENRY:  Good morning, your Honor.  Claire

3 Henry on behalf of Defendant PixArt.  With me today is

4 Duane Mathiowetz and Rick Chang.  Also on behalf of

09:07AM 5 PixArt, Charlie Chang and Enzo Ko.  We are ready to

6 proceed.

7 　　　　THE COURT:  Thank you, Ms. Henry.

8 　　　　All right.  Let me also state for the record

9 that earlier this morning we distributed to counsel for

09:07AM 10 both sides a set of preliminary constructions.  Those

11 constructions are designed to let the parties know where

12 the court is after the initial review of the briefing and

13 the record.  They're not intended to prevent any party

14 from taking any position that they think is appropriate

09:08AM 15 but, rather, to allow you to focus your time and

16 attention where you think is most appropriate based on a

17 review of those preliminary constructions and where you

18 think the court may have most missed the boat.

19 　　　　I do reserve the right to and not uncommonly

09:08AM 20 do revise those constructions based on the arguments

21 received at the hearing.  I hope that you'll take those

22 constructions in that spirit.

23 　　　　I've also reviewed the technical tutorial that

24 was provided in this case.  I'll state that I'm happy to

09:08AM 25 consider any initial presentation or argument that any

1    party has on the patents or the technology and then I'd

2    like to hear the argument on the terms on a term-by-term

3    basis, but you should feel free to group those terms in

4    any order that you think is most efficient and most

09:09AM   5    productive.  So, having said that, I'll turn it over

6    first to counsel for plaintiff.

7              MR. PIA:  Thank you, your Honor.  Would you

8    like us to start then with the Markman terms or with the

9    procedural matters that are before the court this

09:09AM  10    morning?

11              THE COURT:  I would rather take up the claim

12    construction issues first and then turn to the motions

13    afterwards.

14              MR. PIA:  Thank you for this opportunity to

09:09AM  15    talk about what's now known as the '214 patent, an

16    invention created by Karl Hansen.  The way that we were

17    planning to take these claim terms is essentially in the

18    order of the brief -- or of the tentative that was

19    provided by the court.  And thank you for that.  We'll

09:10AM  20    try to focus our attention on those key issues that are

21    raised in that Markman preliminary order.

22              The first is "external cursor" and "internal

23    cursor."  These two terms have a relationship.  The '214

24    patent describes an internal cursor and an external

09:10AM  25    cursor.  The parties also agree that an external cursor

7

1  can be described as an "optical cursor" and that those

2  terms are used interchangeably throughout the patent.

3          We're all aware of what an internal cursor is.

4  We use them every day on our computers.  It's

09:10AM  5  commonplace.  We control the computer.  We operate

6  various functions.  We know where we are on the computer

7  screen.

8          However, an external cursor is a brand-new

9  term.  It's a term that you don't find in any dictionary

09:11AM  10  definition.  It's a term that's not found in other

11  patents, and it's a novel way that the inventor

12  determined to describe his invention.  And in using the

13  term "external cursor," he drew an analogy between

14  external cursor and internal cursor; and essentially that

09:11AM  15  analogy is that both represent position and both are

16  movable in their distinct ways.

17          If we look at claim 1, it helps to show the

18  relationship.  We're looking now at the first limitation

19  and second limitation, "detecting at least one property

09:11AM  20  of an external cursor and position of the external cursor

21  relative to the output from the computer," "generating a

22  command to move the internal cursor."  So, we understand

23  that the external cursor represents position and is used

24  to move the internal cursor, among doing other things.

09:11AM  25          Just as a general overview, Figure 1, as we

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 8 of 132 PageID #:  4312
CLAIM CONSTRUCTION HEARING 10-30-2015

8

09:12AM

1  get into this more, shows a laser pointer light on a

2  screen being reflected.  We also see the output from the

3  computer which is being projected through a projector

4  onto the screen, and we can see that that output is

5  outlined in blue on the computer as well as on that

6  screen.  There's a computer itself with a computer

7  processor; and then there's a camera that's capturing an

8  image and detecting light coming from, in this case, a

9  laser pointer.

09:12AM

10         Now, the patent describes this as an exemplary

11  method and it describes it as one embodiment and then it

12  goes on to describe this particular embodiment.  But

13  there's nothing in the patent that would restrict the

14  entire invention to that one embodiment.  In fact, the

09:12AM

15  inventor explained that the projector and the camera and

16  the screen can be stationary and remain substantially

17  fixed to facilitate calibration.  However -- and this is

18  the second part -- the present invention could also be

19  used in applications where one or more of these devices

09:13AM

20  changes position, although detection of the properties of

21  external cursor becomes more complex and computationally

22  intensive.

23         So, what was the patentee describing there?

24  Well, as you can see, there's a yellow tripod underneath

09:13AM

25  the camera in the first embodiment; but that tripod could

9

1   move.  In fact, the laser pointer could be fixed and the

2   camera could move or the camera could be fixed and again

3   the laser pointer moved, directed at the camera, or you

4   could have a combination of movement between the

09:13AM   5   different devices.  All that happens there, if we go

6   back, is that detection of the properties of the external

7   cursor become more complex and computationally intensive.

8   But these variations are contemplated.

9           Here, just some screens.  We're all aware of

09:14AM  10   different types of screens and output from a computer.

11   Different types of camera.  Although one camera is shown

12   in that figure, we understand it's a generic placeholder

13   for these other types of cameras.  And there are various

14   types of light sources.  We're all aware of laser point

09:14AM  15   light, but there can be infrared light sources and other

16   types.  So, now to get into really how this invention

17   operates.

18           In Figures 1 and 2, we see that light from the

19   laser pointer is reflected off of the screen and into the

09:14AM  20   camera; and then inside the camera in Figure 2, we are

21   seeing a capture card.  That capture card is described in

22   the patent as -- in one instance as a CCD imaging array.

23   That capture card -- you can see a green outline which

24   represents the outer boundaries of that card -- is

09:15AM  25   capturing the blue boundaries in this instance of the

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 10 of 132 PageID #:
4514
CLAIM CONSTRUCTION HEARING 10-30-2015

10

1 screen.  We're aware when we set up a projector that

2 oftentimes a quadrilateral shape appears on the screen

3 and it takes some time to try to key that in and make the

4 lines as straight as we can.  This invention contemplates

09:15AM 5 that the camera and the imaging array itself can offset,

6 through its internal coordinate system, such variations

7 in the length of the sizes and the difference in the

8 angles.  And then what it has is a coordinate system on

9 the imaging array.  That's shown again in Figure 2.

09:15AM 10         Here's an example of how that imaging array

11 tracks, which is a word that's used throughout the

12 patent, the output from the computer.  So, light, in this

13 instance, is reflected off of the screen into the

14 camera's imaging array.  That's mapped onto the imaging

09:15AM 15 array in X,Y coordinates, which is laid out in some

16 substantial math within the patent.  My colleague

17 Mr. Seth will talk more about that.

18         And then where that dot appears on the imaging

19 array and other properties of the dot are then translated

09:16AM 20 to a corresponding position of the internal cursor on the

21 computer output, which that computer output also has its

22 own coordinate system and those two coordinate systems

23 correspond.

24         Now, here's one example of how this could

09:16AM 25 work.  For example, we see a light from a laser being

1  reflected off of the screen and into the camera and we

2  can see in this blowup of the imaging array to the left

3  of the camera that that creates a dot and a mark on the

4  camera's imaging array that corresponds also to the

09:16AM  5  projected image.  When that dot is moved, in this case

6  from left to right, we can see that the coordinates on

7  the imaging array also change.  That's what's described

8  in Figure 2 and in the patent.

9          A motion can be generated by moving the

09:17AM  10  external cursor light in a certain pattern; and when that

11  happens, a command can be generated.  So, we're seeing

12  two things.  We're seeing the movement of position of

13  that cursor on the imaging array, and then we're seeing

14  that movement in a pattern generates a command.

09:17AM  15          So, if we look back at plaintiff's

16  construction and defendants' construction, defendants'

17  construction breaks the term "external cursor" into four

18  parts:  "A visual cue," "to a user," "on the screen,"

19  "generated by some device other than the computer."  What

09:17AM  20  I will say is there's no dispute with the fourth item.

21  Both parties agree that the external cursor is generated

22  by some device other than the computer.  We don't think

23  it necessarily needs to be embedded in the construction,

24  but there's not a disagreement on that.

09:18AM  25          The big disagreement is "visual cue" and, 3,

CLAIM CONSTRUCTION HEARING 10-30-2015

12

1   "on the screen."  And we notice in the court's tentative

2   that it has tentatively said that an external cursor is a

3   movable visible mark; and then it says "indicates a

4   position on the display," which might be equivalent for

09:18AM   5   "on the screen" or the same.  So, let's talk about these.

6           The first disputed limitation is "visual cue."

7   The key in the patent is detecting and tracking.  In

8   fact, "visual" or "visible" is only used twice in the

9   patent; but what is used throughout the patent is this

09:18AM   10   idea of optics.  We see in the title of the patent

11   "Computer Presentation System and Method with Optical

12   Tracking of Wireless Pointer"; Abstract, "optical

13   pointer," "optical tracking"; column 1:9, "wireless

14   optical pointer," "optical pointer" and you can see

09:19AM   15   throughout "optical pointer, such as a laser pointer";

16   "screen is accessible via an optical pointer";

17   "preferably, the external cursor is an optical cursor."

18           In claim 8, down at the bottom, Line No. 10,

19   claim 8 specifically says "directed optical energy,"

09:19AM   20   rather than "laser light" or "laser pointer," which would

21   be easy for the inventor to use because he had used that

22   term in other places throughout the patent.  But he makes

23   a distinction and says "directed optical energy."

24           Claim 19, it talks about an "optical cursor."

09:19AM   25   Again, the parties don't dispute that external cursor is

CLAIM CONSTRUCTION HEARING 10-30-2015

13

09:19AM

09:20AM

09:20AM

09:20AM

09:21AM

1   the same -- has the same meaning as optical cursor.

2           And "optics," as we point out in our brief, if

3   we look at a definition -- on the definition, includes

4   the "visible spectrum" and the "near visible spectrum of

5   light."  We're all very much aware of infrared light and

6   ultraviolet light.  For example, every day we use a

7   television remote control; and nine times out of ten,

8   that television remote is using infrared light.  It's

9   commonly known and understood.

10          When the defendants' expert was asked

11  questions about optics and what does "optical" refer to,

12  he was pointed to those definitions that we just looked

13  at.  And then in the bottom, here's the specific

14  question:  "Would you agree this definition is saying

15  optics involves both visible light or also near visible

16  light, such as infrared or even ultraviolet?"

17          And his definitive answer is "Yes.  Optics is

18  not limited to visible light."

19          In the patent itself in the Background

20  section, it describes right up-front a variety of

21  technologies are known, including ultrasonic, infrared,

22  and radio frequency that have been used to afford users

23  increased mobility relative to the computer processor

24  and/or display screen.  So, infrared was a form of light

25  energy that was known to this patentee at the time of

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 14 of 132 PageID #:
4318
CLAIM CONSTRUCTION HEARING 10-30-2015

14

1  drafting the patent.

2          And, again, we earlier talked about claim 8,

3  "The method of claim 1 further comprising transmitting

4  the external cursor to the screen using a source of

09:21AM  5  directed optical energy."  And we ask the question why

6  was the inventor using the word "optical energy" when he

7  could have very easily used the word "laser pointer"?

8  It's because he was talking about optics.  He wasn't

9  trying to limit his invention to a laser pointer.  He was

09:21AM  10  using it in a way that somebody in the field of optics

11  would use it.

12          And when we look at the properties of the

13  optical cursor or the external cursor in Figure 3, you

14  see there's intensity, color, shape, size, pattern of

09:21AM  15  movement, and position; and note that the only property

16  that's inherently visible is color.  The other

17  properties -- intensity, shape, size, pattern of

18  movement, position -- could all be created using infrared

19  light or another form of optical energy.  So, we

09:22AM  20  shouldn't restrict every property to having this

21  requirement or being loaded with this requirement that it

22  be visual.

23          When defendants' expert Mr. Kitchen was asked

24  the question, "Image processing can be used on infrared

09:22AM  25  light, captured by an imaging array," he had to say, yes,

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 15 of 132 PageID #:
4319
CLAIM CONSTRUCTION HEARING 10-30-2015

15

1    in general systems it can.

2            Now, he went on to say but this patent is

3    different.  He didn't really give a lot of explanation

4    why.  But it's known in the art that light, any type of

09:22AM    5    light in the infrared or visible spectrum or near visible

6    spectrum, can be captured and detected on an imaging

7    array.

8            Throughout the patent it talks about optical

9    tracking, not visible tracking.  We don't see the word

09:22AM   10    "visible tracking" anywhere in the patent -- "Computer

11    Presentation System and Method With Optical Tracking,"

12    "optical tracking and synchronizing a wireless optical

13    pointer," "a still further object of the present

14    invention is to provide a system and method for

09:23AM   15    connectionless optical tracking," and on and on.

16            Why didn't the inventor use the word

17    "visible"?  Because that's not the field with which he

18    was concerned, and the system itself doesn't make a

19    distinction between what's visible and what's optically

09:23AM   20    detected.  The only thing that matters for functionality

21    of this system is that there is light that's optically

22    detected on the camera, the imaging array.

23            And when we look at claim 1, which we'll keep

24    going back to, there's nothing in claim 1 itself that

09:23AM   25    would restrict the light -- the type of light to be

16

1  visible light.

2          THE COURT:  Do you agree that this embodiment,

3  the -- at least the embodiment that is disclosed here,

4  functions based on the user's ability to see where the

5  external cursor is pointing?

6          MR. PIA:  In fact, it doesn't.  And, so, the

7  patent doesn't talk about "to a user" anywhere.  Whether

8  the user sees the light --

9          THE COURT:  I mean, the patent may not talk

10  about a user; but it contemplates that there is a user,

11  right?

12          MR. PIA:  There are user-selected properties

13  of the external cursor.  That's right.

14          THE COURT:  And this invention is designed to

15  be used by a person, right?

16          MR. PIA:  It is.

17          THE COURT:  So, what I'm saying is:  Does this

18  embodiment -- do you agree that that embodiment requires

19  that the user be able to see where the external cursor --

20  I mean, where the pointer is pointing, where the external

21  cursor is located?

22          MR. PIA:  No.  And I'll give you a couple of

23  reasons why.

24          THE COURT:  Okay.  Tell me about that.

25          MR. PIA:  So, first, in Figure 1, which is a

09:24AM (lines 5, 10, 15, 20, 25)

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 17 of 132 PageID #:
4521
CLAIM CONSTRUCTION HEARING 10-30-2015

17

1  preferred embodiment and only one embodiment --

2          THE COURT:  Right.

3          MR. PIA:  -- phantom lines are used to show

4  light emanating from a laser pointer; and then there's a

09:25AM  5  hollow dot on the screen.  It's not filled in.  And I'll

6  show you an example.  I'm just going to skip ahead.

7  Actually this is what I was just saying.  It's not filled

8  in.  It's not showing that it has to be solid visible

9  light.

09:25AM  10          Here's an example.  If infrared light were

11  bounced off the screen like this and reached -- and

12  reflected back into the camera, this system would operate

13  the same as whether there was a laser dot on the screen;

14  and, in fact, it might not be advantageous or desirable

09:25AM  15  to have a laser dot on the screen.  It might interfere

16  with the game play or even a presentation.  For example,

17  if I'm giving a presentation right now and I can control

18  a cursor inside of that screen -- which I can't.  This is

19  a regular laser pointer -- but if I can control an

09:26AM  20  internal cursor and make that move on the screen, I might

21  not want to have two cursors on the screen.  I might not

22  want this laser dot plus an internal cursor.  I might

23  just want to indicate position on the screen using the

24  internal cursor.  And it's a fine distinction, for

09:26AM  25  example, to say that this particular laser pointer that

CLAIM CONSTRUCTION HEARING 10-30-2015

18

1    has visible light is significantly different than if I

2    use the television remote control to point and I had a

3    camera that can detect infrared light in the back of the

4    room.  This would function the same.

09:26AM   5            THE COURT:  But this system functions based on

6    where the external cursor falls on the screen, right?

7            MR. PIA:  Only in one embodiment.  So, let me

8    go back a little bit.  See if I can go back to some other

9    slides here.

09:27AM  10            So, in the common example that we're talking

11   about the preferred embodiment, no doubt about it.  It's

12   talking about light reflected off of a screen.  The

13   patent discusses in depth that you can use a projector

14   screen or you could use an output like a television

09:27AM  15   screen, a dynamic screen.  That doesn't matter.  You can

16   have an external cursor with two dots or an isosceles

17   triangle or other configurations, other shapes, other

18   properties.

19            But there's nothing that would preclude, for

09:27AM  20   example, even shining -- taking that light, walking to

21   the front of the room to do your presentation, and moving

22   the camera.  We talked about those configurations earlier

23   in the patent.  The patentee specifically said there can

24   be other configurations.  They might be more

09:27AM  25   computationally intensive, no doubt; but he contemplates

CLAIM CONSTRUCTION HEARING 10-30-2015

19

1  that there could be other --

2         THE COURT:  Is there anything in the

3  specification that suggests this arrangement that you've

4  mentioned with the camera being the moving part?

09:28AM   5         MR. PIA:  Well, I think yes, there is a

6  section of the patent that says -- and I'll have to look.

7  I think we had that slide a little earlier -- but says

8  that any one of these components could move.  I think

9  that's one of the first slides we talked about.  But it

09:28AM  10  just makes computation more difficult.

11         For example in column 4, lines 8 through 16,

12  it says, "Preferably, projector (when used), camera, and

13  screen are stationary and remain substantially fixed to

14  facilitate the calibration and tracking process.

09:29AM  15  However, the present invention could also be used in

16  applications where one or more of these devices changes

17  position" -- so, he's broadening the way that we look at

18  this patent; they can change position -- "although

19  detection of the properties of external cursor becomes

09:29AM  20  more complex and computationally intensive."

21         And if we try to restrict this invention to

22  this one preferred embodiment that we look at in

23  Figure 1, then the difficulty we have is we can't make

24  sense of the math that he is outlining in this patent in

09:29AM  25  great detail.  He's providing math and an approach that

CLAIM CONSTRUCTION HEARING 10-30-2015

20

1  will allow you to move any one of these components.

2          And, in fact, cited throughout defendants'

3  brief is this phrase that, as used in the application,

4  (reading) external cursor is one which is generated

09:29AM  5  externally relative to the computer; i.e., by some other

6  device, which could include another computer, projector,

7  or the like.  So, the patent -- we all agree the patent

8  talks about a handheld laser pointer in some embodiments,

9  but the patent also says that the external cursor can be

09:30AM  10  generated by another computer or even a projector.

11          This is one example of how an external cursor

12  can be generated by another computer, as we start to

13  think about this.  There's another example where the

14  external cursor is projected.  If you look at that quote

09:30AM  15  from above straight from the patent, external cursor is

16  protected on another screen and it controls an internal

17  cursor.

18          Now, why would you want to do this?  Well,

19  here's an example.  I'm standing at the front of a big

09:30AM  20  presentation.  I have 100 people in the audience, and I

21  don't want to stare at the screen.  I want to stare at

22  them.  So, I use my pointer, whether that's infrared

23  light or visible light, on a screen projection in the

24  back.  They can't see; but, meanwhile, I'm controlling

09:31AM  25  this screen up front.  The inventor contemplated

21

1    improving methods of presentation, and that's what he

2    talks about.

3              Another example is you could have a projector

4    in front near the T.V. screen, or the output in this

09:31AM  5    case, projecting an external light directly into the

6    camera.  He just -- the key is that the inventor doesn't

7    limit the invention to this one preferred embodiment and

8    he provides language in the specification that would

9    broaden that concept.

09:31AM  10             If we look at claim 2, for example -- we talk

11   now about the defendants' "on the screen" limitation that

12   also appears in a form in this tentative, where the

13   tentative of "external cursor" says (reading) and that

14   indicates a position on the display or the computer

09:32AM  15   output.  We have trouble with that additional loading of

16   "external cursor," and here's why.

17             Claim 2 says, "capturing an image of the

18   screen and the external cursor with a camera."  Claim 1

19   doesn't make that requirement.  If we load the term

09:32AM  20   "external cursor" with "on the screen," then it's hard to

21   understand how claim 2 makes sense.

22             Looking further down in claim 19, independent

23   claim 19, it requires in the second limitation

24   "projecting an optical cursor generated by a handheld

09:32AM  25   pointer on the remotely located screen."  No question.

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 22 of 132 PageID #:
4526
CLAIM CONSTRUCTION HEARING 10-30-2015

22

1   That patent requires that limitation.

2           And then "capturing an image of at least a

3   portion of the remotely located screen."  It also has

4   that limitation.  But claim 1 doesn't have that

09:32AM   5   limitation.  Claim 2, dependent from claim 1, does.

6           Claim 17 is another example where limitations

7   2 and 3 require "displaying the external cursor on the

8   output" and then "capturing an image of the output."

9           But why should we limit claim 1 and other

09:33AM   10   claims that don't require that capturing of the output or

11   that the external cursor be reflected on the screen to

12   include that?  And the patent doesn't talk about

13   "reflected," by the way.  It talks about "detected."

14   There's a difference.  Reflected is not a requirement.

09:33AM   15   Detected on the imaging array is a requirement, detected

16   on the camera.

17           The patent also doesn't discuss detected by

18   human eye.  Doesn't say that anywhere in the patent, that

19   the external cursor is detected by a human eye.  What it

09:33AM   20   says is the external cursor is detected by the camera

21   because it's through the camera's imaging array and where

22   that external cursor appears on the coordinate system of

23   that imaging array that a corresponding position is

24   mapped to the internal cursor of the computer screen and

09:34AM   25   also functions are performed.

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 23 of 132 PageID #:
4527
CLAIM CONSTRUCTION HEARING 10-30-2015

23

1    One complaint that the defendants have is that

2    the patent says "an object of the invention."  It says

3    that over and over and over in the specification.  And

4    the defendants cite that for saying an object of the

09:34AM  5    invention is to superimpose a cursor on a screen.  But

6    the case law is well-known and understood that just using

7    the word "an object of the invention" is not restricting

8    the claims to that particular object.  In fact, the

9    presumption is the reverse.  Unless there's a clear and

09:34AM 10    unmistakable disavowal of a certain part of the scope of

11    the claim, the claim should be given its plain language

12    and at the full breadth and scope of the claims.

13          So, when we look at the defendants'

14    construction, we don't see support requiring, again, for

09:35AM 15    loading necessarily the term "external cursor" with

16    "visual."  Visual to who?  All it has to be is detected

17    by the camera.

18          "To a user," the court is absolutely right.

19    User is contemplated, but visual to a user is not

09:35AM 20    contemplated.  Detected by a camera is contemplated.

21          And "on the screen," it's very difficult to

22    make sense of the other claims in this patent if we

23    require "on the screen," as those claim limitations are

24    specifically called out in some but not other claims.

09:35AM 25          THE COURT:  When you say that visual to the

1  user is not contemplated --

2          MR. PIA:  It's not required, is what I meant,

3  your Honor.

4          THE COURT:  And what I am, I guess, struggling

09:35AM  5  for is some indication that in fact invisible to the user

6  is contemplated.  I understand there are places where

7  there is broad language that says "or something else";

8  but what -- where is there something that contemplates

9  that the external cursor, unlike the internal cursor,

09:36AM  10  will not be visible to the user?

11          MR. PIA:  I'm just trying to go fast

12  backtracking here, but I should probably have my help

13  over here.

14          I just wanted to go back to the beginning.

09:36AM  15  Maybe you could help me find the slide where in the

16  Background section of the patent the inventor describes

17  an understanding of infrared light.  And I'll see if I

18  can just find that specific citation right now.

19          This is in column 1, the second sentence --

09:36AM  20  this was omnipresent when the inventor was assisting in

21  the preparation of his patent -- "A variety of

22  technologies including ultrasonic, infrared, and radio

23  frequency have been used to afford users increased

24  mobility relative to the computer processor and/or

09:37AM  25  display screen.  These technologies typically employ

25

1  custom transmitters/receivers to communicate control and

2  status information between the user and the computer

3  which may be used to control the computer." That is the

4  context in which we now get into the term "optical

09:37AM   5  cursor" and "external cursor." The patentee easily could

6  have called the external cursor "external cursor"

7  throughout the entire patent, but he didn't. He said

8  "optical cursor." And then later in claim 8, he says

9  "optical energy." He doesn't say "visible light."

09:37AM  10  That's just as easy for him to do. He's talking about

11  the field of optics. So, that's our argument on that,

12  your Honor.

13           Just with respect to -- are there any more

14  questions on that particular issue that I can assist

09:37AM  15  with?

16           THE COURT: No. I think you've stated your

17  position well.

18           MR. PIA: Thank you, your Honor.

19           Just two comments quickly on "internal

09:38AM  20  cursor." Again, the parties generally agree what is an

21  internal cursor. We just wanted to point out that there

22  are instances when even an internal cursor is not

23  visible. We're all aware of those instances. For

24  example, we have a *Word* document open and we're typing a

09:38AM  25  sentence and then we move the cursor around to point to

            1    something else and we start typing again.  That cursor

            2    which is the triangular-shaped arrow in the middle of

            3    that screen disappears when we start typing.  It's not

            4    gone to the system.  It's very much known that the output

09:38AM     5    has a coordinate system and that internal cursor is still

            6    there.  It's just not visible.

            7              So, to require that an internal cursor be

            8    visible all the time just adds a limitation that might

            9    not always be true, first of all; and it's not commonly

09:39AM    10    understood by the meaning of the term "cursor."  We know

           11    that -- if you have two screens open on a computer, you

           12    might see your cursor on one screen.  That doesn't mean

           13    the cursor on the other *Word* document you're working on

           14    is gone.  You don't see it.  It's still there.  It's

09:39AM    15    known to the system.  And there are various types of

           16    internal cursor.  We're aware that they can be any shape

           17    or size.

           18              Any questions on "internal cursor"?

           19              THE COURT:  But do you dispute that the

09:39AM    20    function of the internal cursor requires that it be

           21    visible?

           22              MR. PIA:  Well, no, not always because if that

           23    were the function, then when we commonly use a cursor,

           24    the cursor would always be visible; but it's not.  At

09:39AM    25    times it certainly is visible.

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 27 of 132 PageID #: 4331
CLAIM CONSTRUCTION HEARING 10-30-2015

27

1          THE COURT:  When it's being used, it's

2    visible.

3          MR. PIA:  When it's being used, it's visible;

4    and when it's not being used, it's not visible.  Most of

09:40AM  5    the time.  Commonly.

6          THE COURT:  Okay.  So, you're not disputing

7    that the function of an internal cursor requires that it

8    be visible.

9          MR. PIA:  When used.  When used.

09:40AM 10         THE COURT:  Okay.  All right.

11         MR. PIA:  I'd just hate for a situation where

12   we say that, well, somebody is not using the internal

13   cursor and, therefore, that falls outside this claim.  I

14   don't see anything in the claim language that requires

09:40AM 15   that the internal cursor be always visible.  It's just

16   not there in the claim language.

17         Anything else, your Honor, on those two?

18         THE COURT:  No.

19         MR. PIA:  Thank you very much.

09:40AM 20         THE COURT:  Thank you, Mr. Pia.

21         MR. KINSEL:  Good morning, your Honor.  Grant

22   Kinsel for Nintendo.

23         THE COURT:  Good morning.

24         MR. KINSEL:  Your Honor, I'll start off, if I

09:41AM 25   may, where the court was last questioning to Mr. Pia.

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 28 of 132 PageID #: 4332
CLAIM CONSTRUCTION HEARING 10-30-2015

28

1    And I think the point that the court was making is really

2    pretty germane to what we're talking about here.  What I

3    think the court's basic concern is why would an inventor

4    use a word "cursor" as an internal cursor and external

09:41AM 5    cursor where that same word would indicate that in one

6    case it's potentially invisible, in the external case,

7    and in the other case be visible.  And the answer is he

8    didn't.  He used the word "cursor" because everybody

9    knows what a cursor is.  They're visible.  That's what

09:41AM 10   they are.  That's the common and ordinary understanding

11   of what a cursor is.

12           And, so, when the inventor used the word

13   "external cursor" and "internal cursor," he was merely

14   distinguishing between the types of devices that generate

09:42AM 15   this cursor.  He wasn't saying that an external cursor

16   has properties unknown to an internal cursor.  He was

17   merely saying that an external cursor is generated by a

18   device external to the computer and an internal cursor is

19   generated by the cursor itself.  And all of this simply

09:42AM 20   falls out directly from the claim language, from the

21   specification, and from the common, ordinary meaning of

22   the words.

23           We've seen a lot of examples about moving

24   cameras and invisible cursors and things of that nature.

09:42AM 25   None of that is described in the specification.  There's

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 29 of 132 PageID #:
4333
CLAIM CONSTRUCTION HEARING 10-30-2015

29

1 not a single embodiment described anywhere in the

2 specification that describes an invisible external

3 cursor.  Not one example in the specification.

4           So, if I may, I'm going to go back through a

09:43AM  5 little bit of this.  And I'd like to begin with just a

6 very quick description, if I can, of the technology of

7 the system just to give us some context for what we're

8 talking about.

9           This is Figure 1.  And what the specification

09:43AM  10 described, the way the system works -- and this is of

11 course the preferred embodiment -- is 24 -- No. 24,

12 Reference No. 24 is a laser pointer.  It points to the

13 screen.  No. 22 is the external cursor.  That's the light

14 dot from the laser pointer, and it's an external cursor.

09:43AM  15 The patent describes common, ordinary laser pointers to

16 do this job.  The patent describes a standard camera

17 taking visible light images of a visible screen, sending

18 those pictures to the computer.  The computer then

19 processes those pictures, figures out where that light

09:44AM  20 dot is in the picture, and moves -- we've got a little

21 finger here to indicate the internal cursor.  That's the

22 internal cursor.  And it just simply moves the internal

23 cursor to where the external cursor is.  That's what this

24 system -- that's what the inventor invented.  He didn't

09:44AM  25 invent anything about these tennis systems like the ones

1   that you saw in the plaintiff's presentation.  None of

2   that is in the patent.  What's in the patent is this.

3           Now, there is another facet to this invention;

4   and that is that the system can detect different

09:44AM  5   properties of this external cursor.  So, for example, the

6   specification describes changing the color of the laser

7   from -- for instance, from red to blue, using a visible

8   light camera to detect that different property and then

9   using that user-selected property, in this case a blue

09:45AM  10  light instead of a red light, to enter some kind of a

11  command.  That's what the invention is about.  That's

12  what's described in the specification.

13          So, with that understanding, let me talk now

14  about why an external cursor is visible.  The court's

09:45AM  15  construction or preliminary construction from that point

16  of view we believe to be correct, and let me describe why

17  it's correct.

18          The specification expressly defines what an

19  external cursor is.  There's no guesswork here.  The

09:45AM  20  specification says, as clearly as it possibly can, "As

21  used in this application, an external cursor is one which

22  is generated externally relative to the computer, i.e.,

23  generated by some other device which could include

24  another computer, projector, or the like."  That's the

09:46AM  25  definition of an external cursor.  We don't need to guess

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 31 of 132 PageID #:
4333
CLAIM CONSTRUCTION HEARING 10-30-2015

31

1    what the construction should be.  He's told us what the

2    construction is.

3          So, let me just focus for a second on this

4    word "one."  "One" is a pronoun.  It stands for the word

09:46AM  5    "cursor."  So, what he's told us in this sentence, in as

6    unambiguous description as I think that one can do, is

7    "As used in the application, an external cursor is a

8    cursor which is generated externally relative to the

9    computer."  And that's the basis for the defendants'

09:46AM  10   construction, because the specification tells us what an

11   external cursor is.

12          Now, the specification also adopts expressly

13   the common and ordinary meaning of the word "cursor."

14   The specification says, in the very first reference to

09:47AM  15   the word "cursor," that a cursor is a visible cue on a

16   computer screen.  That's what a cursor is, and that's

17   what we all know a cursor to be.  And that's I think what

18   was at the root of the court's question a few moments ago

19   to Mr. Pia.  Everyone knows that a cursor is a visible

09:47AM  20   cue to a user on a screen.  That's what it is.

21          And, in fact, the dictionary definitions are

22   all consistent.  So, this is a dictionary definition that

23   was submitted actually by SyncPoint.  It's the Merriam

24   Webster's definition.  It defines a cursor as "a visual

09:47AM  25   cue (as a flashing rectangle) on a video display that

CLAIM CONSTRUCTION HEARING 10-30-2015

32

1   indicates position (as for data entry)."  That's what an

2   external cursor is -- or that's what a cursor is.

3           Now, there is nowhere in the specification or

4   any of the embodiments any description of an invisible

09:48AM  5   cursor; and we know that a cursor, its job is to provide

6   user feedback.  So, when we use it for *Word* or we use it

7   to find something on the Internet, we use it for visual

8   feedback.  That's what it's for; that's its job.

9           Dr. Russ agrees that's what its job is.

09:48AM  10  Dr. Russ is SyncPoint's expert.  He agrees that that's

11  what its job is.  He agrees that -- he was asked:  Can

12  you think of any reason to have a cursor other than to

13  provide feedback for a person who is using the computer?

14          Answer:  I can't think of another one offhand,

09:48AM  15  no.

16          And neither can I because that's what a cursor

17  is.  It's a user feedback device.  And that's a visual

18  cue to a user on a screen.

19          So, what do we have?  We have the common

09:48AM  20  meaning of cursor.  That's a visual cue to a user on the

21  screen.  I think the court's construction is fairly close

22  to that; so, I really don't need to quibble with the

23  specific language.  I think the court's construction on

24  that point is quite clear and correct.  There's an

09:49AM  25  explicit definition in the specification about what an

1  external cursor is, and it's a cursor that's generated by

2  some device other than the computer.  And I think the

3  court's construction is pretty close to that, and I don't

4  think that it needs to be changed really in any material

09:49AM  5  way.

6          A couple of quick points.  Mr. Pia described

7  how the system could use invisible cursors, invisible

8  external cursors, but there is not a single reference to

9  an invisible external cursor in the specification.  So,

09:49AM  10  Figure 1 describes a laser pointer.  That's visible.  It

11  describes a standard camera taking visible light

12  pictures.  It describes a visible projector sending

13  visible images onto a standard scene.

14          The specification also talks about what the

09:50AM  15  picture actually looks like.  And this is Figure 2; and

16  what the specification says about Figure 2 is that

17  Figure 2 represents (reading) a captured image frame that

18  includes a substantial portion of the computer output,

19  represented generally by number 42.  So, what you've got

09:50AM  20  is a visual picture of the output from the computer,

21  along with 22 which is the external cursor superimposed

22  on that.  This is all visual.

23          Now, Mr. Pia a couple of times referenced this

24  section in the Background part; and I think it's

09:50AM  25  important to talk about it just for a second.  Mr. Pia

09:51AM

 1  suggested that this reference here to "infrared"

 2  suggested that the inventor contemplated using infrared

 3  systems.  In fact, if you read the entire paragraph, it's

 4  the opposite.  What actually happened is the inventor

 5  taught away from using infrared.  So, he says, in the

 6  first part that I've highlighted, "A variety of

 7  technologies including ultrasonic, infrared, and radio

 8  frequency have been used to afford users increased

 9  mobility relative to the computer."

10          But then he goes on -- and this is the part

11  that Mr. Pia didn't show us -- "Likewise, these systems

12  require complex and often expensive equipment which may

13  not be readily adaptable to different forums having

14  audiences ranging from a few individuals to a filled

15  auditorium."

16          So, what he's saying is that the infrared

17  systems from the prior art don't do what he wants them to

18  do.  He's teaching away from using something like an

19  infrared system, an invisible system; and he actually

20  said that.  He says the present invention provides a

21  number of advantages relative to the prior art systems,

22  the infrared prior art systems.  One such advantage is

23  that it provides the ability to use a conventional

24  optical pointing device such as a laser pointer.  That's

25  what we're talking about here, conventional laser

1   pointers.

2         There is not a single word in the

3   specification that would suggest that the inventor had

4   possession of an invention using an optical pointer that

09:52AM 5   was anything other than visible light.  There's not a

6   single word anywhere in the specification to suggest

7   that.  Instead, what he's saying is use a conventional

8   optical pointer, which we of course all know are visible.

9         So, the fact that the specification describes

09:53AM 10   optics and optical pointers and the fact that in its sort

11   of broadest, most technical sense of the word "optical"

12   could potentially include nonvisible light doesn't

13   suggest for a moment that the optical pointer that this

14   inventor was talking about was anything other than a

09:53AM 15   standard, conventional optical pointer.

16         In fact, he says -- this is a page from the

17   Brilliant Points website.  This is obviously outside the

18   scope of the patent, but I think it's important for

19   context.  This is Brilliant Points and Brilliant Points

09:53AM 20   is the inventor's company and this is the inventor

21   talking about his own invention in his own words and

22   here's what he says about what pointers are.  He says,

23   "If you can see the pointer, the camera can see the

24   pointer.  If the camera can see the pointer, you control

09:54AM 25   your computer."  He's talking about conventional laser

1 pointers.  That's what he was talking about here.  That's

2 what he was talking about throughout the specification

3 and in every single embodiment.

4        Let me talk for a second about this example of

09:54AM 5 the hidden cursors.  This came up a second ago with

6 Mr. Pia.  He said, "Look, there are some times when you

7 have invisible cursors."  So, what I did is I recorded

8 myself while I was writing on two documents.  And, so,

9 you see he's right.  As you're -- in one document you're

09:54AM 10 using one on one side -- you've got a cursor -- and then

11 the cursor that was formerly on the other side isn't

12 there until you click on it and there it is again and you

13 can continue typing.

14        What's happening here, what's understood to be

09:54AM 15 happening here is exactly what the court has hinted at.

16 When you're not using a cursor on one of these documents,

17 you don't need it; and, so, it's hidden temporarily until

18 you need it again.  It's a little like saying -- if I

19 take this and I stick it in my pocket, you can't see it

09:55AM 20 anymore; and I have now proven the existence of an

21 invisible controller for my computer.  It's just simply

22 hidden.  The reason one hides a cursor is because it is a

23 visible mark on the screen, exactly as the court's

24 construction has described.

09:55AM 25        Now, I think it would be good to talk just

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 37 of 132 PageID #:
4541
CLAIM CONSTRUCTION HEARING 10-30-2015

37

1   briefly about SyncPoint's construction because we haven't

2   talked about that; and I won't belabor it because the

3   court has already made its preliminary position clear on

4   this.  But SyncPoint's construction is unadoptable as a

09:55AM  5   matter of law.  It would be error to adopt this

6   construction, and there's at least three reasons for

7   that.

8            First, there is nothing in the specification

9   or the common, ordinary meaning of any of these terms

09:56AM  10  that suggests an imaging array, which is a key part of

11  the SyncPoint construction, "imaging array."  "Imaging

12  array" is a term that SyncPoint created.  Now, I know

13  that it may be common in the art; but there's no "imaging

14  array" anywhere in the specification.  There's no

09:56AM  15  "imaging array" anywhere in this express definition of

16  "external cursor."  There's no "imaging array" anywhere

17  in the common and ordinary meaning of the word "cursor."

18  Instead, it's a term that SyncPoint has sort of

19  manufactured for purposes of this litigation.  It's not

09:56AM  20  from the specification.

21            In fact, SyncPoint suggests that it is; so,

22  this is an excerpt from their brief.  They say that

23  (reading) Figure 2 depicts an imaging array 40, and then

24  it goes on and says that Figure 2 shows coordinates of

09:57AM  25  the external cursor 22 relative to an imaging array 40.

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 38 of 132 PageID #:
4542
CLAIM CONSTRUCTION HEARING 10-30-2015

38

1  But, in fact, imaging array 40 doesn't exist.  What

2  actually the specification describes is that 40, which is

3  from Figure 2, which we looked at a few minutes ago, is a

4  picture.  It's not an imaging array.

09:57AM  5          So, "imaging array" doesn't exist in the

6  specification.  It doesn't exist in the common and

7  ordinary meaning of any of the words that we're

8  construing.

9          More to the point, it writes embodiments into

09:57AM 10  the claims that don't exist.  So, claim 1 says you detect

11  at least one property of an external cursor and the

12  position of the external cursor relative to the output

13  from the computer.  This claim doesn't say how you have

14  to detect it.  It doesn't require an imaging array.  It

09:57AM 15  doesn't require a camera.  It doesn't require a CCD.  It

16  requires detecting.

17          So, under SyncPoint's construction, we now

18  require a physical device that, A, isn't called for

19  anywhere in the specification and, B, hasn't been

09:58AM 20  described in the common and ordinary meaning.  So, it's

21  clearly inappropriate.

22          SyncPoint's construction necessarily is

23  contrary to everything in the specification.  So, what

24  the specification describes and what the court's

09:58AM 25  construction captures is that the external cursor exists

1   out here on the screen; but SyncPoint's construction puts

2   the external cursor inside the camera on the imaging

3   array.  So, this is what Dr. Russ said about where the

4   external cursor is.

09:58AM  5           He says, "Okay.  Where" -- "So where is the

6   external cursor as reflected in Figure 1?"

7                   "It is on the imaging array for the camera."

8                   "Is there a number associated with that?"

9                   "Well, the camera is number 14."

09:59AM  10          "Okay.  So is it your testimony that

11  number 14, the imaging array, 14, is where the external

12  cursor is in this picture?"

13                  "Yes."

14                  "Okay.  Is there anywhere else where the

09:59AM  15  external cursor is?"

16                  The answer is "No."

17          So, SyncPoint's expert says the cursor lives

18  in this camera; and that's directly contrary to what the

19  specification says.  The specification says the external

09:59AM  20  cursor lives over here on the screen at 22.  That's what

21  it expressly says.  So, while the specification says the

22  cursor is here, SyncPoint says the cursor is here and

23  that's wrong and it also results in making the claims

24  into nonsense.

09:59AM  25          So, let's use SyncPoint's construction and

40

1   look at some of these claims and how they would work out.

2   Again, under SyncPoint's construction, the cursor is here

3   inside the imaging array on the camera.  Claim 1 requires

4   "generating a command to move the internal cursor to a

10:00AM   5   position on the screen corresponding to the position of

6   the external cursor."  You can't move the internal cursor

7   to a position corresponding to the position of the

8   external cursor under SyncPoint's construction because

9   the imaging array has the external cursor.

10:00AM   10          Same thing with the claim 8, "transmitting,"

11   transmitting to the screen.  You have to transmit the

12   external cursor to the screen.  SyncPoint's construction

13   is the opposite.  The external cursor is inside the

14   camera.  It's not transmitted anywhere.

10:00AM   15          Same thing with claim 17.

16          I should stop here and just pause for a couple

17   of quick seconds on an argument that SyncPoint has made

18   with respect to the defendants' construction on claim 8.

19   SyncPoint has said, "Well, look, claim 8 says that you

10:01AM   20   have to send the external cursor using directed source

21   optical imaging; and if defendants' construction of

22   'external cursor' is right, then this claim is not

23   properly differentiated."  That seems to be essentially

24   their argument.  The problem for SyncPoint, however, is

10:01AM   25   that that's an improper reading of what this claim is

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 41 of 132 PageID #: 4545
CLAIM CONSTRUCTION HEARING 10-30-2015

41

1  talking about.

2          Claim 1 sends an external cursor to the

3  screen; and the specification talks about how an external

4  cursor can be generated by a laser pointer, a camera, a

10:01AM  5  computer, all sorts of different things.  You can do them

6  by all sorts of different things.  Claim 1 allows you to

7  create that external cursor, generate that external

8  cursor with any of those devices -- camera, computer,

9  projector, any of those other devices -- whereas claim 8

10:02AM  10  limits it to a directed source of optical energy like a

11  laser pointer.  So, that's the limitation of claim 8.

12  It's not that "optical energy" is somehow being

13  differentiated from "external cursor."  It's that the

14  device that's generating the cursor is different.  It's

10:02AM  15  more narrow in this claim.

16          So, for all of those reasons, SyncPoint's

17  construction is simply unadoptable.  The defendants'

18  construction, which I think the court's modifications are

19  fine on, I think they're appropriate, is accurate and

10:02AM  20  correct and should be adopted.

21          THE COURT:  Thank you, Mr. Kinsel.

22          MR. PIA:  Your Honor, for the other terms, we

23  are sharing those; and I think any rebuttal comments I

24  would have can be brought up by Mr. Seth who is

10:03AM  25  addressing the next claim limitation, if that's okay with

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 42 of 132 PageID #:
4546
CLAIM CONSTRUCTION HEARING 10-30-2015

42

1  the court.

2         THE COURT:  Yes.

3         MR. PIA:  Thank you.

4         MR. SETH:  Your Honor, I detected a number of

10:03AM  5  inaccuracies in Mr. Kinsel's argument.  Hopefully we'll

6  be able to address all of these in the presentation.

7         But I think what we should start with is a

8  little bit of a review of what this patent is about and

9  what this system is about.  The court seems to be

10:03AM  10  concerned with the idea that a user of the invention

11  should have some visual feedback.  And as Mr. Pia agreed,

12  that visual feedback is going to be provided by the

13  internal cursor, generally speaking, when it's active.

14  And as we see in Figure 1 of the patent, there is an

10:04AM  15  internal cursor.  It's not detected by the imaging array

16  of the camera.  Doesn't need to be.  But it is displayed

17  on the screen, and it is a visual feedback to the user.

18         The issue becomes whether or not the external

19  cursor also must provide visual feedback to the user.

10:04AM  20  And in the preferred embodiment of the patent, there is a

21  laser pointer that's used and it's directed at the screen

22  and it's reflected off the screen.

23         Now, the patent says that the -- the patent

24  specifically says that "In one embodiment" -- and I'm at

10:04AM  25  column 3 of the patent, at line 28 -- "In one embodiment,

10:05AM

external cursor is generated by a handheld optical pointer" and then at line 35 it says, "In one preferred embodiment, optical pointer is a laser pointer."  And I just want to note that even in the specification it doesn't say that that laser pointer must be visible light.  Infrared laser pointers do exist.  You can -- in fact, Mr. Pia described that very common back at the day of this patent, a laser pointer -- an infrared laser pointer was your T.V. remote control.  You can point it at your T.V., it shoots infrared light, and it's detected by the sensor on the T.V.

So, even in the preferred embodiment which uses a laser pointer, it's not limited to a visual light laser pointer that's detectable -- or that's visual to a user.  What is critical, of course, is that the light is detectable by the camera.

So, one of the issues that I think has been already resolved by the tentative is whether or not -- well, there are other properties of the external cursor that the camera detects and which are used to generate additional commands.  So, the first property that the system will use is the position of the external cursor detected on the imaging array of the camera; and there is a very specific mathematically driven, if you will, approach that the '214 patent teaches regarding how we're

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 44 of 132 PageID #: 4548
CLAIM CONSTRUCTION HEARING 10-30-2015

44

1   going to take the position on the imaging coordinate

2   system of the external cursor and then we're going to

3   transfer or translate that to a coordinate position of

4   the internal cursor on the computer output.

10:07AM   5   THE COURT:  Well, it's -- I guess it -- we're

6   still talking about the issue of whether the external

7   cursor is visible.  I'm struggling to understand --

8   although know it's certainly possible to have a -- to

9   have the effect of the external cursor not be visible.

10:07AM   10   How does -- is there anything in this specification that

11   indicates that that was contemplated?  Because everything

12   else indicates that the user is move -- controlling the

13   external cursor for the purpose of affecting its position

14   or some other property of it.  And if the user doesn't

10:08AM   15   know what that is, how is -- how is that -- how does that

16   help carry out the purpose of this system?

17   MR. SETH:  Your Honor, so, with regard to the

18   first part of your question -- and I think I have to

19   refer to Slide 27 of our deck.  Throughout the patent,

10:08AM   20   the word "optical" is used to describe the pointer.

21   Okay?  And nobody disagrees that optical light includes

22   near visible light.  In other words, it's not detectable

23   by me as a human being, by my eye; but it's detectable by

24   the camera.  And this is a critical distinction, your

10:09AM   25   Honor, because it is the relative movement of the

1    external cursor as captured on the imaging array of the

2    camera.

3              Which, by the way, I just want to point out --

4    Mr. Kinsel says we don't describe an imaging array in the

10:09AM  5    patent, and we do.  It's at column 8, line 12, "An image

6    of the computer output is captured as represented by

7    block 54.  Preferably, a camera which includes a CCD

8    array is used in conjunction with an appropriate frame

9    capture card."

10:09AM  10             And, your Honor, it -- what's critical is that

11   the user -- you're absolutely correct.  The user has to

12   be able to control properties of the external cursor.

13   And why is that important is because the external cursor

14   is an input into the system.  It's a control into the

10:10AM  15   system.  Okay?  The user has to be able to control it.

16   And one of the things that the user has to be able to do

17   is control it -- where is it detected on the imaging

18   array because where it's detected on the imaging array is

19   going to be mathematically transformed.  And this is all

10:10AM  20   described in columns 5 through 7.  It's going to be

21   mathematically transformed to a corresponding position of

22   the internal cursor that is displayed on the computer, on

23   a screen.

24             So, as we move the camera or we move the light

10:10AM  25   source, there's a relative motion that's detected by the

46

camera and that relative motion is going to drive the

movement of the internal cursor and then also the camera

is going to detect other properties which could be a

pattern of motion, for example, and those other

10:11AM 5 properties are going to be used to generate other

commands.  And that was the brilliance of this system.

We're not just going to move the internal cursor relative

to the position of the external cursor, but we're also

going to generate other commands.

10:11AM 10        So, if we can go back to the slide there,

please; and we can see that -- you can advance.

        So, in claim 1 -- and this is also very

critical.  There's nothing in claim 1 regarding

projecting an external cursor onto a screen.  What is

10:11AM 15 critical here is that you're detecting the position of

the external cursor relative to the output from the

computer.

        And we see in Figure 2 of the patent that you

see external cursor dot 22.  That position on the imaging

10:12AM 20 array is what we're going to need to first figure out.

And we have to figure it out relative to the computer

output.  So, how do we do that?

        You're going to see C1 prime, C2 prime, C3

prime, C4 prime.  These are four dots, and these are

10:12AM 25 reference coordinates that the system uses to represent

10:12AM

1    the computer output so that what we can do is when we

2    detect the position of the external cursor on the imaging

3    array, we can then calculate its relative position to one

4    of these reference coordinates.  And why we want to do

5    that is we want to say, "Well, you know, we're detecting

6    the external cursor, you know, 10 percent down from C1

7    prime and, you know, 27 percent over from C1 prime" and

8    we're going to take that proportional measurement and

9    say, "Okay.  Well, we're going to go take -- move the

10:13AM   10    internal cursor down 10 percent and over 27 percent."

11    That's what we're doing.  And it's just math.  It's just

12    math.  It's two columns of math.  It's very complex math

13    because in this preferred embodiment the inventor wanted

14    to be able to handle all kinds of situations including

10:13AM   15    dynamically moving coordinates.  And that's fine.  But at

16    the basic level, what you're doing is you're capturing a

17    position of the external cursor, 22, on the imaging

18    array.

19              And, your Honor, Mr. Kinsel cited Dr. Russ,

10:14AM   20    saying that the external cursor only exists on the

21    imaging array.  That's absolutely correct.  I mean, the

22    light of the external cursor can exist obviously from the

23    point that it emits from its light source.  That light

24    exists.  But at what point does it become a control in

10:14AM   25    the system?  It does not become an input into the system

1  until it's actually detected by the camera, processed by

2  the imaging processor and its -- and its properties

3  detected so that they can be used as a control in the

4  system to then do interesting things like play a game.

10:14AM  5  So, it doesn't in fact -- the light exists outside of the

6  imaging array, of course.  But when does it become

7  operative in the system?  When it's detected by the

8  imaging array and its properties calculated, including a

9  mathematically derived position relative to some

10:15AM  10  reference coordinates that we're going to use to

11  represent computer output.

12          THE COURT:  I understand the way the patent

13  describes that the science works on that.  I -- do you

14  agree that there is a definition of "external cursor" in

10:15AM  15  the spec?

16          MR. SETH:  I do, your Honor, 100 percent agree

17  with you.  And the only requirement in that definition is

18  that it's generated outside of the computer that's being

19  controlled.

10:15AM  20          THE COURT:  So, that is the difference between

21  the external cursor and the internal cursor, is where

22  it's generated.

23          MR. SETH:  That's not the only difference,

24  your Honor.

10:15AM  25          The patent does say that the -- as a

1  requirement, that the external cursor is generated

2  outside of the computer that's being controlled.  That is

3  not the only difference, however.

4           THE COURT:  If the definition says that the

10:16AM  5  external cursor is a cursor generated outside that --

6           MR. SETH:  Right.

7           THE COURT:  -- where is there an indication

8  that there's another difference?

9           I mean, the -- perhaps the essence of the

10:16AM 10  internal cursor is that it's visible to the user.  How

11  can I conclude that the external cursor doesn't have that

12  feature when the definition says that the difference is

13  where it's generated?

14           MR. SETH:  Your Honor, I would like to perhaps

10:16AM 15  use the defendants' slide on this to answer your

16  question.

17           THE COURT:  All right.

18           MR. SETH:  And I understand what -- the

19  struggle the court is having but -- and if we can go

10:17AM 20  to -- I don't know if we can go to defendants' Slide 7.

21  But I think that the --

22           MR. KINSEL:  Sure.  Give me a second; and I'll

23  put it up for you, if you'd like.

24           MR. SETH:  Thanks.  That's fine, 7.

10:17AM 25           Okay.  I understand the struggle that the

CLAIM CONSTRUCTION HEARING 10-30-2015

50

1  court is having and -- but the struggle presumes

2  something that ain't necessarily so, and that is that

3  that definition B applies to the term "cursor" --

4  okay? -- "a visual cue." It is our position that the

10:18AM  5  movable item used to mark a position is the one common

6  property, if you will, or aspect of the cursor between

7  the internal cursor and the external cursor that have two

8  very different functions within the system.

9        And Mr. Kinsel cited to a portion of Dr. Russ'

10:18AM 10  deposition that was talking about the internal cursor

11  being a visual cue. Okay? But the one property that

12  both cursors have in common is that -- and this is very

13  clear through the math of this patent, is that each one

14  is marking the position. Okay? The internal cursor has

10:19AM 15  a position on the display coordinate system. The

16  external cursor has a position on the imaging coordinate

17  system. And we're going to now mathematically tie these

18  two positions together and transform one position to

19  another so that we can use the external cursor as an

10:19AM 20  input to moving the internal cursor. This is the one

21  common characteristic.

22        THE COURT: What do you say to the portion of

23  the specification under Disclosure of the Invention,

24  column 1, that says "used to superimpose a cursor or

10:19AM 25  visual cue"? I mean, how is that consistent with your

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 51 of 132 PageID #:
4355
CLAIM CONSTRUCTION HEARING 10-30-2015

51

1    saying that there's no understanding that this cursor is

2    visual?

3            MR. SETH:  I think that that -- well, first of

4    all, the two are used -- the two are used as an

10:20AM  5    alternative in that phrase.  I don't think you can say

6    the two are synonymous in that phrase.  That's one

7    answer.

8            And the second answer is that it is no

9    question that one object of the -- one object of the

10:20AM  10   invention that was achieved through the preferred

11   embodiment -- and I don't think, by the way, it was

12   the -- it was the best mode contemplated by the inventor

13   at the time and he disclosed the best mode that he knew

14   of at the time and that was perhaps to have two visual

10:20AM  15   cues.  Okay?  But that is not to say that that's the

16   optimal way of practicing the invention, and that is not

17   to say that that's the only way of practicing the

18   invention.  And the purpose of the external cursor in

19   the -- even in the preferred embodiment, if -- reading

10:21AM  20   the entire specification, is not to provide a visual cue.

21   It is to provide an input into the system that the user

22   can control.  And I can make a circle, your Honor, and a

23   circular pattern of movement.  I don't need to see the

24   external cursor to do that.

10:21AM  25           THE COURT:  I understand if you're playing a

52

1   game, that it -- you may not -- the system may not care

2   that much how accurate the placement of the cursor is

3   because it's a game and there are winners and losers.

4   It's hard for me to take this presentation system and

10:21AM   5   assume that the inventor was not concerned with whether

6   the external cursor would be where the user wanted it to

7   be, and I -- I just -- I think it's quite a stretch to

8   try and build all that into the word "cursor."  But,

9   anyway, that's what I'm struggling with.

10:22AM   10           MR. SETH:  I sensed this, your Honor; and what

11  I can say to you is that the internal cursor is

12  undisputedly a typical cursor which is typically visually

13  seen.  The internal cursor.  And it provides the

14  positional feedback in the system already.  You don't

10:22AM   15  need additional visual feedback, nor does the

16  specification state that you need additional feedback

17  from the external cursor to know the position of the

18  internal cursor.  You already know it.  You can already

19  move it to exactly where you want to without seeing the

10:23AM   20  external cursor.

21           Infrared pointers are not visual.  They're --

22           THE COURT:  And, yet, in column 1 he's

23  describing the use of the external cursor; and he refers

24  to it as "a visual cue."

10:23AM   25           MR. SETH:  Your Honor, I think that there is a

53

very good argument that in this preferred embodiment --

and we saw it also in his actual embodiment -- the laser

pointer that he used did have visible light, and you had

two visual cues.  Okay.  I thought personally, when I saw

10:23AM  it, it was a distraction; but it was the best mode he

contemplated at the time.  That is not to say, however,

that the use of the word "optical" is now limited to the

preferred embodiment or that the use of the word

"external cursor" is limited to a visual cursor, which is

10:24AM  not what the claim language says and it's not what the

specification says.

          There is a difference between a preferred

embodiment that may have two visual cues, may have

visible light of a laser pointer --

10:24AM          THE COURT:  I don't ever restrict the claims

to the preferred embodiment.  That's something I do not

do.  But here I've got the word "cursor" which the

inventor used.

          MR. SETH:  Right.

10:24AM          THE COURT:  And I don't see any indication in

the specification that he intended that its use with

"external" would be different in that essential

characteristic than it's used with "internal."  And I

understand that in terms of the science you can certainly

10:24AM  construct it that way, but I don't see any indication

54

1  that he claimed that and -- so...

2       MR. SETH:  Your Honor, I think that the best

3  response to that from the specification standpoint is

4  that he -- I think it was 22 times, when we counted it --

10:25AM  5  referred to an "optical pointer" or to an "optical

6  cursor."  The parties do not disagree that "external

7  cursor" and "optical cursor" are synonymous.  Okay?

8  They're synonymous.

9       THE COURT:  The problem is the word "cursor."

10:25AM  10      MR. SETH:  Only if you -- only if you require

11  that the cursor in all cases be a visual cue.

12      THE COURT:  Which is the only cursor that I

13  see any indication of in this specification.  I mean, I

14  think it's a serious change to say that we're going to

10:26AM  15  construe his use of "cursor" as something not visible to

16  the user when all of the indications point the other way.

17      MR. SETH:  Your Honor, given the tentative

18  rulings, I'm happy to discuss why other properties don't

19  require -- the other properties that are claimed can be

10:26AM  20  based on position, for example, pattern of movement; but

21  I can see from the initial rulings that that part of the

22  defendants' construction was not adopted.  I'm happy to

23  address that if the court wishes.

24      THE COURT:  I don't think you need to.  I'm

10:26AM  25  comfortable with that issue.

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 55 of 132 PageID #:
4559
CLAIM CONSTRUCTION HEARING 10-30-2015

55

1          MR. SETH:  Okay.  Then -- and I -- likewise,

2  the "instruction" claims and the claims that were

3  asserted to be means-plus-function, that argument was

4  rejected.  I'm happy to discuss that as well if the court

10:27AM  5  wishes.

6          THE COURT:  Well, how about if I just let you

7  respond to any argument that the defendants make?

8          MR. SETH:  Wonderful.  Perfect.  Thank you.

9          THE COURT:  Thank you.

10:27AM 10          And before we move to the next term, we'll

11  take the morning recess.  Be back in a few minutes.

12  Thank you.

13          (Recess, 10:27 a.m. to 10:44 a.m.)

14          THE COURT:  I think we're ready for the next

10:44AM 15  term, Mr. Kinsel.

16          MR. KINSEL:  Thank you, your Honor.

17          With your permission, your Honor, I'd like to

18  move -- to jump ahead a little bit --

19          THE COURT:  That's fine.

10:45AM 20          MR. KINSEL:  -- to talk about claims 24, 25,

21  and 26.  These are all the means-plus-function -- or what

22  we consider to be the means-plus-function limitations.

23  I'm assuming I've already convinced you, but let me give

24  it a shot.  I'd like to see if I can.  I think that when

10:45AM 25  we take a step back and we look at these claims -- and

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 56 of 132 PageID #: 4860
CLAIM CONSTRUCTION HEARING 10-30-2015

56

1 these really are kind of narrow claims and this is a

2 relatively narrow issue, but it's relatively

3 self-contained.  So, let me just try to knock through it

4 real quick.

10:45AM 5          What are we talking about -- let's start with

6 claim 24.  It's a "processor in communication with the

7 camera for processing the image to detect" a bunch of

8 stuff.

9          And the question on the table is whether this

10:45AM 10 claim limitation, a "processor for processing," is

11 effectively a means-plus-function limitation.  And I know

12 the word "means" doesn't appear there.  And there used to

13 be a pretty heavy presumption against us and we'd be

14 fighting uphill on this, but that has changed.  The law

10:46AM 15 has changed on that.  *Williamson en banc* decision came

16 down 2015 and changed the presumption.  So, now the

17 question is, just like it would be for a

18 means-plus-function -- a claim limitation that said

19 "means" in it, the question is:  Does this limitation

10:46AM 20 import enough structure to perform the functions that are

21 disclosed?

22          So, I'm just going to give you a little --

23 couple of bullet points that we'll walk through quickly.

24 Is it a means-plus-function limitation governed by

10:46AM 25 112(6)?  We'll talk about that.  The specification, as we

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 57 of 132 PageID #: 4S61
CLAIM CONSTRUCTION HEARING 10-30-2015

57

1  will see, does not disclose any algorithm for performing

2  these functions.  So, as a matter of law, this claim is

3  indefinite.  As I say, we'll walk through each one of

4  these.

10:47AM  5  First of all, what is the test -- what is the

6  test for when something is a means-plus-function

7  limitation when the word "means" doesn't appear?  So,

8  this is the *Williamson* decision.  Just as I've stated, it

9  just came down.  And it describes for us what we have to

10:47AM  10  look at to figure out whether a term is a

11  means-plus-function term.  Now, what it says is if the

12  claim limitation "recites function without reciting

13  sufficient structure for performing that function," then

14  it's a means-plus-function limitation regardless of

10:47AM  15  whether the word "means" appears in there.  So, this is

16  our -- this is our test.  We have to look at the

17  "processor for processing" limitation and figure out

18  whether that limitation recites function without reciting

19  sufficient structure for performing that function.

10:48AM  20  So, let's look at the limitation and talk

21  about whether it does.  We've got -- I've highlighted the

22  two functions here, one in yellow and one in green.  The

23  one in yellow we're going to call later on.  We'll call

24  that the "detecting function."  The one in green is a

10:48AM  25  "converting function."  But these are all functions.

1      And I don't think -- I don't think it's

2  disputed between the parties that all of the language

3  that I have just highlighted is functional language.  And

4  what I mean by that is everything with a red underline

10:48AM   5  under it describes what the processor is supposed to do.

6  None of this is structure, and I don't think the

7  plaintiffs will disagree with that -- we'll see, but I

8  don't think that they will -- because that's all

9  functional language.

10:48AM  10      So, that means the question really comes down

11  to whether "a processor in communication with the camera

12  for processing" gives you enough structure to perform all

13  of those functions, those two functions, the detecting

14  function and the converting function.  That's the test

10:49AM  15  under *Williamson*.  So, we need to figure out whether or

16  not there's enough structure.

17      So, what does it mean for there to be

18  structure?  Well, the parties agree -- the parties'

19  experts, at least, agree on one point; and that is that a

10:49AM  20  processor by itself cannot perform these two functions.

21  In other words, you have to specifically program your

22  computer to perform these functions.  It won't do it by

23  itself.

24      So, Gary Kitchen -- he's our expert -- he

10:49AM  25  testified in his declaration that "A general purpose

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 59 of 132 PageID #:
4363
CLAIM CONSTRUCTION HEARING 10-30-2015

59

1  processor could not perform the claimed functions without

2  special programming."

3          Dr. Russ agreed.  "Can a general-purpose

4  computer without any special programming perform the

10:50AM  5  functions that we've described from claim 24?"

6          "I believe the answer to that question is no.

7  At a minimum, require the algorithm shown in Figure 3."

8          Now, we'll talk about that Figure 3 in just a

9  few minutes; but the point that I want to focus you on,

10:50AM  10  judge, is his first answer, "I believe the answer to that

11  question is no," meaning that a processor by itself

12  cannot perform the functions that are described in

13  claim 24.  That's what he said.  That's what our expert

14  says.

10:50AM  15          So, what does that mean?  Well, it means that

16  we need to find some way to perform this function.  It

17  has to be an algorithm of some kind.  And there's no

18  algorithm disclosed in the claim; so, the claim by itself

19  doesn't impart sufficient structure to perform either one

10:51AM  20  of these two limitations -- to perform either one of

21  these two functions.

22          Now, SyncPoint in their briefing has pointed

23  to this language here, "A processor in communication with

24  the camera," as supposedly providing the structure for

10:51AM  25  performing these two functions; but we all know that a

60

1    camera by itself and a computer by itself can't perform

2    these two functions.  Your Honor may have a camera on the

3    computer in front of him.  My laptop has a computer on

4    it.  We can plug in a webcam to any of these computers,

10:51AM    5    and none of them will be able to do either one of these

6    two functions without special programming.  It's the

7    special programming that's key.  Both sides' experts

8    agree that you have to have it, and it's not in the

9    claim.  So, there's no structure for this processor to

10:52AM    10    perform either one of these functions.

11              Now I want to make two last points on why

12    112(6) controls.

13              First point, if we look at the language of the

14    claim itself, we see that it's actually drafted in sort

10:52AM    15    of traditional means-plus-function language.  So, if we

16    just cross out "processor" and put in "means," we see

17    that the limitation doesn't change.  We don't know any

18    more now about what device is performing these two

19    functions than we did before.  We still don't know how

10:52AM    20    you have to program the computer to perform either one of

21    these functions.  So, this -- even though the word

22    "means" doesn't appear, this limitation is drafted in

23    classic means-plus-function format.  That's Point 1.

24              Point 2 comes from Judge Clark's decision in

10:53AM    25    *Personal Audio versus Apple*, and I think it's a really

1  informative decision that really should sort of control

2  the outcome here.  So, let me put up some language.

3  Here's what Judge Clark said.  "The functions described

4  in the claim terms at issue" -- and he lists them -- "are

10:53AM  5  special-purpose functions that cannot be accomplished by

6  a general-purpose computer or processor in the absence of

7  appropriate programming or software."  Now let me stop

8  there.

9           I've just shown you that that's exactly where

10:53AM  10  we are.  Both sides' experts agree you must have

11  appropriate programming or software to perform the two

12  functions disclosed in that claim.  That's where we are.

13           Then Judge Clark goes on, "To construe these

14  terms such that any processor, regardless of how it is

10:53AM  15  programmed, would infringe the claims of the '178 patent

16  so long as it performed the functions described would be

17  tantamount to permitting pure functional claiming."

18  That's exactly the problem that we're facing here because

19  what we would be saying under the court's current

10:54AM  20  construction is that any processor, so long as it

21  performed those two functions, the detecting and

22  converting functions, regardless of how it was

23  programmed, would meet that limitation.  But that's

24  tantamount, as Judge Clark says, to pure functional

10:54AM  25  claiming.  You can't do that.  You can't do that.  And

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 62 of 132 PageID #: 4566
CLAIM CONSTRUCTION HEARING 10-30-2015

62

1    that's why 112(6) applies.

2            And, so, once we see that you've got to have a

3    special purpose program to perform these functions and we

4    see that 112(6) applies, then it's going to follow

10:54AM  5    automatically that this claim is indefinite.

6            Why?  Well, we have to define the function --

7    well, take it one quick step back.  If 112(6) applies,

8    there's a two-step claim construction process.  And

9    that's first you have to define the function, and then

10:55AM  10   you have to find the structure that performs that

11   function.

12           Now, the parties have some disputes over what

13   the defined function is.  This is all set out in the

14   briefing; so, I won't belabor it.  The point here really

10:55AM  15   is just that SyncPoint's purported function doesn't

16   include all the functional language.  That's wrong as a

17   matter of law.  So, if the court decides to adopt a

18   112(6) interpretation, the court would have to adopt the

19   defendants' construction function as a matter of law.

10:55AM  20           Now, let me turn to the more important point,

21   is there structure.  Because if we find that this is a

22   112(6) claim term, then we've got to find if there's

23   structure; and the only structure that SyncPoint has

24   identified is a processor.  That's their purported

10:56AM  25   structure from the 4-5 disclosure.  This is wrong as a

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 63 of 132  PageID #:
4567
CLAIM CONSTRUCTION HEARING 10-30-2015

63

1  matter of law.  You have to identify an algorithm.  The

2  Federal Circuit has said that in enumerable cases,

3  starting way back when but -- you know, several come to

4  mind:  *Triton Tech of Texas versus Nintendo*, the

10:56AM  5  *Aristocrat* line of cases, *WMS Gaming*.  All of these cases

6  say you can't just say a processor performs this

7  function.  If 112(6) applies, you have to identify an

8  algorithm.  There's no in between.

9        And this is a quote that I wanted to share

10:56AM  10  with the court from *Eon Corp.*, another almost brand-new

11  case, "A microprocessor or general purpose computer lends

12  sufficient structure only to basic functions of a

13  microprocessor.  All other computer-implemented functions

14  require disclosure of an algorithm."  So, I put this up

10:57AM  15  for two reasons:  One, to illustrate the point that

16  SyncPoint's conception of a structure as a processor is

17  inadequate as a matter of law -- it's what the Federal

18  Circuit is saying -- but, No. 2, that the Federal Circuit

19  has clearly identified processors as requiring algorithms

10:57AM  20  to have structure.  A processor all by itself simply

21  doesn't have any structure.  That's what the Federal

22  Circuit is saying.

23        THE COURT:  Once a determination is made that

24  112(6) applies.

10:57AM  25        MR. KINSEL:  Even before that determination.

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 64 of 132 PageID #:
4368
CLAIM CONSTRUCTION HEARING 10-30-2015

64

1    The first determination -- there is -- the law is,

2    unfortunately, overlapping; and the test for determining

3    112(6) is almost exactly the same as determining whether

4    there's structure in the specification.  And the Federal

10:57AM    5    Circuit has pointed this problem out in a couple of

6    cases.  But essentially what you do to determine whether

7    there's 112 -- whether 112(6) applies is you have to look

8    at the claim language and you have to look at the

9    specification and you have to decide whether in light of

10:58AM    10    that specification does this claim term identify enough

11    structure to perform those functions.  Now, that's very

12    similar to the test of determining whether or not the

13    specification describes an algorithm, a specific

14    algorithm for performing the structure -- for performing

10:58AM    15    a function once the 112(6) analysis is done.  But the

16    analysis does run into each other -- do run into each

17    other.  They are similar.

18           So, that's why I put this up here, because it

19    goes to really both points.  A processor by itself, as

10:58AM    20    matter of law almost, is not sufficient structure,

21    certainly not to perform these complicated functions that

22    we've just looked at.

23           So, let's look at these functions.  There's

24    two of them.

10:59AM    25           THE COURT:  I think that the gap between where

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 65 of 132 PageID #:
4869
CLAIM CONSTRUCTION HEARING 10-30-2015

65

1    you are and where I am on this issue has to do with the

2    issue of the sufficiency of the structure before a

3    determination is made that 112(6) applies, which I

4    understand to be different than the determination that

10:59AM    5    applies after a determination that 112(6) applies.

6                MR. KINSEL:  It is slightly different.  It's

7    the same analysis.  We can go back to -- let me go back

8    to *Williamson*.  This is the analysis -- this is what the

9    Federal Circuit has said -- "does it recite function

10:59AM   10    without reciting sufficient structure for performing that

11    function?"  And when you're talking about a processor,

12    you have to have an algorithm to have that structure.

13                Now, there are -- there's a line of cases

14    starting in -- from the *Katz* case that the court may be

11:00AM   15    familiar with and what *Katz* says is there is a very

16    narrow exception to where you don't need an algorithm for

17    performing -- for a processor and that's if you're

18    talking about a function that's really a standard,

19    bread-and-butter kind of function of a processor, adding,

11:00AM   20    subtracting, that sort of thing.  You don't necessarily

21    need an algorithm for those.  But when we're talking

22    about two complex functions like this, you have to have

23    an algorithm to perform it.

24                Now, if this claim limitation had said a

11:00AM   25    processor with the following algorithm for performing

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 66 of 132 PageID #: 4370
CLAIM CONSTRUCTION HEARING 10-30-2015

66

1    these two steps, then I would agree that it's not a

2    112(6).  But that's not what it says.  All it says is any

3    processor that performs these two functions, regardless

4    of how it's programmed, would be covered here.  That's --

11:00AM    5    that is the essence of functional claiming, and that's

6    exactly the point that Judge Clark was making in *Personal*

7    *Audio* here.  It's exactly what he's saying is these two

8    functions are special purpose functions.  You have to

9    program the computer to perform them.  And if we don't

11:01AM   10    put some limitation on how they are performed as being

11    covered by the claims of the patent, then you're talking

12    about pure functional claiming, which is exactly what

13    we're talking about here.  Without an algorithm, without

14    applying 112(6), the court's construction would apply

11:01AM   15    literally to any processor that performs those two

16    functions in any way regardless of whether it's disclosed

17    in the specification and --

18         THE COURT:  Judge Clark was writing there

19    before the Circuit provided some clarification about

11:02AM   20    *Aristocrat* in the *Apple/Motorola* case.

21         MR. KINSEL:  I agree.  I agree.  But I don't

22    think -- I don't think that that clarification impacts

23    this part of the discussion.  I --

24         THE COURT:  Well, the clarification made it

11:02AM   25    clear that before a determination or before invocation of

1    112(6), the algorithm was not required to be in the

2    claim.

3              MR. KINSEL:  I agree.  I agree.

4              THE COURT:  Well, your example suggested that

11:02AM    5    you felt the algorithm did need to be in the claim in

6    order to avoid that.

7              MR. KINSEL:  No.  I'm sorry.  I was trying to

8    give an example of the kind of limitation that would not

9    draw 112(6) scrutiny.  I agree with the court's reading

11:02AM    10    of the *Apple* case and *Motorola/Apple* case.  I agree with

11    that.

12             THE COURT:  Okay.

13             MR. KINSEL:  But *Apple/Motorola* didn't go so

14   far as to say that any processor, regardless of how it's

11:03AM    15   claimed, regardless of how it's programmed, could be

16   construed as just a simple processor when all you have is

17   functional language in a claim.  And that's what we have

18   here, is just pure functional language in a claim.  The

19   parties agree that there's no -- other than the camera

11:03AM    20   and the processor itself, there's no structure of any

21   kind.

22             THE COURT:  I don't think that the Circuit has

23   yet indicated that a processor is not structure.

24             MR. KINSEL:  I agree with that, too.  I agree

11:03AM    25   with that, too.

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 68 of 132 PageID #: 4572
CLAIM CONSTRUCTION HEARING 10-30-2015

68

1        And the analysis that the court has looked to

2   is the analysis that I've just described, which is you

3   start with the claims and you look at the specification

4   and you decide whether or not the specification has given

5   you enough information that the word "processor" imparts

6   a structure for performing those particular functions in

7   the claim.  That's the way the analysis works.

8        So, to go to your earlier question aren't

9   these -- isn't this the same kind of a discussion as

10  we're going to look at if we decide 112(6) applies, the

11  answer is yes; but we have to look at the specification.

12  The Federal Circuit tells us to look at the

13  specification.  If the specification gives you some

14  guidance as to how this processor is or what this

15  processor is, if it gives it some structure, then maybe

16  112(6) doesn't apply; but here there is no structure.

17  There's no structure identified anywhere.  The

18  specification doesn't describe any.  The plaintiffs

19  haven't described any.  There's simply no indication as

20  to how one would perform any of the functions that are

21  described in this claim other than to simply program them

22  in any way that you feel fit.  So, that's why 112(6) does

23  apply.  Even though the word "processor" -- everybody

24  knows what a processor is.  We can open up our computer

25  and we can point to a processor, but that doesn't impart

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 69 of 132 PageID #: 4573
CLAIM CONSTRUCTION HEARING 10-30-2015

69

11:05AM

enough structure to tell you how to perform the two

functions, the detecting and the converting function.

These are -- that's what we have to perform.  The

computer on your desk couldn't perform either one of

these functions.  It has a processor, but it couldn't

perform either one of these functions until you program

it.  That's why you have to look at the specification;

and that's why in this case, because there is nothing in

the specification that tells you how to perform these

11:05AM

things, the "processor for processing" limitation is a

112(6) limitation and indefinite as a result.

THE COURT:  Thank you, Mr. Kinsel.

MR. SETH:  Your Honor, in general, we'll just

rest on our briefing with regard to this issue.

11:06AM

Mr. Kinsel states that one wouldn't know what device it

is.  It's a device, the processor; it's connected to the

camera; and it performs the recited functions.

If there is -- with regard to the issue of the

algorithm in support, we have provided an algorithm as an

11:06AM

alternative to claim 26.  The functions are the same in

claim 24 as well.  So, I think we'll just rest on our

briefing on that.

THE COURT:  All right.

MR. MATHIOWETZ:  Duane Mathiowetz, your Honor,

11:07AM

on behalf of PixArt Imaging.  I'm going to address what

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 70 of 132   PageID #:
4374
CLAIM CONSTRUCTION HEARING 10-30-2015

70

1  has been identified on the court's preliminary

2  constructions as terms 4, 5, and 6.  They're related.

3  So, I'll just address them all together.

4           So, the -- just looking at 4 as an example,

11:08AM  5  "detecting the position of the external cursor relative

6  to the output from the computer," this term in fact

7  requires two actions.  First, you must detect the

8  presence of the external cursor and the output from the

9  computer.  Then once they are both detected, the computer

11:08AM  10  determines where the position of the external cursor is

11  in relation to the output of the computer.

12           Now, the court has suggested it will adopt

13  SyncPoint's construction which is plain and ordinary

14  meaning.  The problem with the plain and ordinary meaning

11:08AM  15  is we really don't know what that means when you look at

16  it in terms of the claim language itself because we need

17  to know do we have -- does it require two actions.  How

18  do we know it requires two actions?  Well, now we have to

19  go back to the prosecution history.

11:09AM  20           The patentee's response to the examiner's

21  office action rejecting the claims during prosecution

22  history actually supports defendants' position.  There

23  were two primary pieces of prior art on which the

24  examiner rejected the application.  First there was

11:09AM  25  Hauck, office action in August of 2009 *[sic]*.  Hauck

1  discloses a system that generates images on a screen and

2  a user pointing to a position on the image.  So, the

3  pointer and the output from the computer are both

4  captured by a sensor and then processed to determine the

11:09AM  5  position of the cursor relative to the output.  So, we

6  can see that in Figure 1 of Hauck.

7          The second prior art reference that was relied

8  on by the examiner was Arita.  In Arita, Arita discloses

9  an information presentation apparatus where a pointer

11:10AM  10  remotely points to a large screen.  The image on the

11  screen is picked up by a monitor camera, and an image

12  processing unit extracts the features of the pointer to

13  identify the position of the cursor.

14          So, what does it involve?  Both the external

11:10AM  15  cursor and the output from the computer are captured by a

16  sensor.  So, there's a capture -- they're detected,

17  they're captured by the sensor, and then they're

18  processed.

19          So, here (indicating) we see Figure 1 from

11:10AM  20  Arita which has -- which basically just shows what was

21  described.

22          Now, in distinguishing over Hauck, the

23  patentee argued that its invention claimed more than just

24  detecting the position of the cursor superimposed on the

11:11AM  25  screen.  We see in the highlighting here the applicant

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 72 of 132  PageID #: 4576
CLAIM CONSTRUCTION HEARING 10-30-2015

72

says, "In contrast, applicant's invention as disclosed
and claimed uses various properties of an external cursor
generated by a pointer, for example, to remotely control
a computer."  And he describes this as being "distinct
from detecting the mere presence of a cursor at a
particular position on the screen."

          And in overcoming Arita, a similar argument,
"the control is based on the position of the cursor and
not the characteristic of the cursor."  He's referring to
Arita; but he says, in my system, the applicant's system,
it is "based on at least one user selectable property of
the external cursor in addition to the position of the
external cursor."

          What's the significance of that?  When the
examiner raised its argument, the applicant didn't
attempt to traverse the rejection by simply -- by saying,
"Well, we only detect one, whereas Hauck and Arita have
to detect two."  In order to distinguish over the prior
art, he said, "We do -- what we do is we have this
additional -- we find this additional feature."  So, the
patentee made no argument at all that its invention
needed to capture both the external cursor and the output
as in Hauck; and that is what, you know, SyncPoint is
alleging.  He never distinguished the Hauck and Arita
feature.  He accepted those features and then moved on to

73

1  say that his invention is different because not only did

2  he do that but he also has another characteristic of the

3  pointer that he -- that they find.

4          So, the specification actually supports this

11:13AM   5  understanding.  We know that, describing his invention,

6  the inventor says -- he keeps referring to comparing

7  "with a projected image of the computer screen."

8          So, all the embodiments in the specification

9  show the camera detecting both the external cursor and

11:13AM  10  the output from the computer.  So, we've identified here,

11  you know, four specific examples that are set out in the

12  specification.

13          Example 1, the camera captures the image of

14  the projected computer output on which a pointer has

11:14AM  15  superimposed an external cursor.  So, you see both the

16  cursor and the output.

17          Example 2, same thing.  The camera captures a

18  substantial portion of the image generated by the

19  computer and the external cursor.  The computer then

11:14AM  20  processes the captured image to detect where the position

21  of the external cursor is on the screen.  So, we can see

22  we've -- here you've captured both of them, not just the

23  cursor but also the output from the computer.

24          Example 3, the computer generates fiducials to

11:14AM  25  calibrate the image captured by the computer.  Such

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 74 of 132  PageID #:
CLAIM CONSTRUCTION HEARING 10-30-2015
4578

74

1  fiducials delineate the active region where the external

2  cursor is detected.  But, again, both the image and the

3  external cursor are detected.

4           And finally, example 4, which is really a

11:15AM  5  combination of 2 and 3, the camera captures a substantial

6  portion of the image generated by the computer and the

7  external cursor, the computer generates fiducials to

8  calibrate the image captured by the computer, and then

9  the computer processes the captured image to detect where

11:15AM  10  the position of the external cursor on the screen is

11  relative to the captured fiducials.

12           And again if you look at Figure 3, Figure 3 is

13  a flowchart that just describes how capturing the image

14  and the external cursor then leads to processing the

11:15AM  15  image.  But, again, it captures an image of the output

16  and the external cursor.

17           There is nothing in the specification that

18  contradicts defendants' construction.  So, the

19  construction that defendants have proposed is the correct

11:15AM  20  one.  The patentee understood this term to mean that the

21  presence of the external cursor and the output from the

22  computer are detected.  Once they are both detected, the

23  computer then determines where the position of the

24  external cursor is in relation to the output from the

11:16AM  25  computer.

1    So, in summary, in order to understand this,

2    you have to go beyond the specification back into the

3    file history; and it's clear in the file history that the

4    patentee amended the claims to overcome the prior art,

11:16AM  5    specifying that the distinguishing feature was the

6    detection of a property based on position and a property

7    not based on position.  But he understood that what Hauck

8    and Arita taught were the same as what he taught, but now

9    he adds the additional limitation on.  So, he never

11:17AM  10   distinguished over Hauck and Arita.  He accepted that

11   aspect of Hauck and Arita and then added the additional

12   feature.

13        So, all the embodiments support this; and we

14   urge the court to adopt the construction so that there is

11:17AM  15   clarity of what this term means because, you know, truly

16   without -- by just saying it's plain and ordinary

17   meaning, we are not going to have the clarity that will

18   be necessary going forward.

19        THE COURT:  Thank you, Mr. Mathiowetz.

11:17AM  20        MR. SETH:  Your Honor, I won't belabor this.

21   I think that the defendants' construction --

22        THE COURT:  I would like to hear your response

23   on it.

24        MR. SETH:  I will.  I will give you a

11:18AM  25   response.

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 76 of 132 PageID #: 4586
CLAIM CONSTRUCTION HEARING 10-30-2015

76

1          THE COURT:  All right.

2          MR. SETH:  All right.  The portions that you

3    see in red are what we believe to be imported into the

4    claim language that is not required by the claim.  What

11:18AM   5    the claim requires -- what the claim requires is

6    detecting -- well, there's two things that the claim

7    requires.  One of the things that the claim requires is

8    detecting the "position of the external cursor relative

9    to the output from the computer."  That is the claim

11:18AM   10   language.  That is what the public is given notice of

11   that they can't do without infringing the claim if they

12   meet the other limitations.

13          We discussed earlier how this is done in --

14   how this is taught to be done in the patent; and, again,

11:19AM   15   I -- not to belabor it, but the way that this is done in

16   the patent is by using these four -- in this preferred

17   embodiment, there's four reference point coordinates, C1

18   prime through C4 prime, that are on the imaging

19   coordinate system that are representing the computer

11:19AM   20   output.

21          One way of doing that, deriving those four

22   coordinates, is the use of something called "fiducials,"

23   which was the preferred way or best mode that the

24   inventor used to derive four reference point coordinates

11:19AM   25   that would then be used in the math to determine the

1    location of the external cursor on the imaging coordinate

2    system relative to these coordinates representing the

3    computer output.

4              And what the -- what columns roughly 6 and 7

11:20AM  5    of the patent describe in excruciating detail but which

6    is actually kind of simple at the end when you can wade

7    through it is that you're going to get a relative

8    position to these reference coordinates and it was a

9    scale position actually where what you're going to

11:20AM  10    measure is if C1 prime to C4 prime is your entire Y axis

11    from 0 to 1, you're going to measure that position how

12    far down, 10 percent down from C1 prime are you, and that

13    scaled value is then going to be applied to your display

14    coordinate system.

11:21AM  15              So, if you have a 640-by-480 display, you're

16    going to go down 10 percent on your 640; and you're going

17    to go over 27 percent on your 480.  That's all it is.

18    And that's how you're getting the reference position

19    relative to the output from the computer -- I'm sorry --

11:21AM  20    the position relative to the output from the computer.

21              So, it's your external -- as your user is

22    moving around either the pointer or the camera to change

23    that relative position, the system is then calculating

24    how that relative position is changing, you know -- for

11:21AM  25    example, if I'm moving the camera up and relative

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 78 of 132  PageID #:
4382
CLAIM CONSTRUCTION HEARING 10-30-2015

78

1  position is moving down, the system is tracking what

2  percentage -- you know, how much has it changed.  And

3  then what we'll do is we'll take that percentage and

4  we'll apply it to the display coordinate system and we'll

11:22AM  5  move the internal cursor to that position.  In fact --

6  and this is also referenced as an exemplary method for

7  determining the position.  And I won't belabor the math

8  that goes into it.  I think it's sufficiently described.

9          The experts agree that the position of the

11:22AM  10  external cursor on the imaging coordinate system is then

11  transformed to a position for the internal cursor in the

12  display coordinate system, and sometimes we refer to it

13  as the "computer output coordinate system."

14          And, again, the experts agree that the way

11:23AM  15  that you're getting this position is by measuring

16  relative to the reference coordinates represented in the

17  preferred embodiment as C1 prime through C4 prime.

18          And I just want to go to Figure 1, please, of

19  the patent for a second.  And I think this goes to the --

11:23AM  20  do we have the figure blown up?

21          Yeah, you can see, your Honor, that there --

22  there's some argument that was made at one point -- I

23  think it's been largely abandoned, but let me address

24  it -- that somehow the -- what you're doing is you're

11:24AM  25  shooting this external cursor and you're sort of moving

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 79 of 132  PageID #:
4583
CLAIM CONSTRUCTION HEARING 10-30-2015

79

1 the internal cursor in a superimposed relationship to the

2 location of the external cursor and none of that is even

3 close to being the case.

4          There is a position of the external cursor on

11:24AM  5 the imaging plane coordinate system, the imaging

6 coordinate system, and then there's a corresponding

7 position of the internal cursor on the display coordinate

8 system, but the two are not in any way superimposed on

9 one another even in the preferred embodiment.

11:24AM  10          Can we go back to Slide 40?  -- I apologize,

11 to Slide 77.

12          So, what we -- again what we see is you have a

13 position on the imaging coordinate system that's captured

14 in Figure 2; and then as the user is moving something,

11:25AM  15 laser pointer or camera -- in this case the laser

16 pointer -- the internal cursor is correspondingly moving.

17 And that works regardless of whether you're using visible

18 light or invisible light.  It doesn't perhaps show a dot

19 on the screen but which again it's captured on the

11:25AM  20 imaging array so that you can make the same exact

21 measurement relative to the C1 prime and C4 prime.

22 Because as long as the camera can capture the position of

23 the external cursor and the user can move it, the system

24 functions exactly the same way.  And that's true whether

11:26AM  25 you're using invisible light and moving the camera, using

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 80 of 132 PageID #:
4584
CLAIM CONSTRUCTION HEARING 10-30-2015

80

1  visible light and moving the pointer.  Doesn't matter.

2  Works the same way.

3          And that's what we have -- oh, there was a

4  point made regarding prosecution history estoppel, I

11:26AM  5  believe.  We actually have that same quote from the

6  prosecution history.

7          If you could go to Slide 87, please.

8          And there was an argument made regarding some

9  of the prior art that was discussed in prosecution of

11:26AM  10  these claims; and the distinguishing feature -- and I

11  just want to point this out briefly -- the distinguishing

12  feature that the patentee was talking about was the fact

13  that in the '214 patent, you did not have to point at

14  anything specifically in order to generate a command,

11:27AM  15  that there were two aspects of the system.  One was that

16  you can move the relative position of the external cursor

17  and then use that to move the position of the internal

18  cursor and that there was also in this '214 patent other

19  properties that the camera could detect that the image

11:27AM  20  processing system could process that could then be used

21  to generate additional commands.  And that's all that's

22  being said here.

23          So, there was no disclaimer of pattern of

24  movement.  There's no disclaimer of whether or not you're

11:27AM  25  using direct light or indirect light or visible or

1  invisible light.  All the patentee was doing was saying,

2  "Look, my system has" -- and in relation to the amended

3  claims, "My system specifically has both this change in

4  position that generates a command or position that

11:28AM  5  generates a command to move the internal cursor and it

6  also has other optical properties that are captured,

7  detected, and used to control the computer and that's

8  what's great about my patent."  And that's all the

9  applicant was saying there.

11:28AM  10           So, if there's no other questions, that's my

11  presentation.

12           THE COURT:  All right.  Thank you, Mr. Seth.

13           MR. PIA:  Your Honor, just one point, if I

14  may.

11:28AM  15           THE COURT:  Go ahead.

16           MR. PIA:  Sorry.

17           MR. SETH:  We're not done --

18           MR. PIA:  Oh.  Well, I didn't...

19           THE COURT:  Do you have another point on these

11:28AM  20  terms?

21           MR. PIA:  Well, I do.  I just want to note

22  something for the court that I think is very -- related

23  to these terms, your Honor.  It will just take me one

24  minute.

11:29AM  25           THE COURT:  All right.

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 82 of 132 PageID #:
4586
CLAIM CONSTRUCTION HEARING 10-30-2015

82

1       MR. PIA:  If you can pull up that last screen.

2   Maybe less than a minute.

3       I just want to show the court something.  The

4   court -- we have been talking about detecting the

11:29AM   5   external cursor.  You can see this laser pointer on your

6   wall right there (demonstrating), your Honor.  If I move

7   this over to the screen, you don't see it.  See that?

8   It's still on.  The reason why you're not seeing that is

9   because there's interference with the visible light

11:29AM  10   coming from the screen.  That doesn't mean under this

11   patented invention that it doesn't work.  And the patent,

12   for example, in column 4, lines 31 through 41, talks

13   about filtering the captured image in order to detect the

14   external cursor particularly where there's other light

11:29AM  15   interference; and then there are claims that specifically

16   deal with that filtering, dependent claims 4, 5, 6, 7,

17   and 8 that talk about that filtering.

18       So, we've discussed *ad nauseam* now the

19   visibility aspect of that, of the external cursor.  I

11:30AM  20   just wanted to show that to the court that if "visible"

21   is allowed to stay in the construction, then this

22   application doesn't -- is not covered, although that

23   external cursor would still be detected by the camera.

24       THE COURT:  All right.  Thank you, Mr. Pia.

11:30AM  25       I think the only remaining term was the "at

CLAIM CONSTRUCTION HEARING 10-30-2015

83

least one property" term.

MR. KINSEL:  That's correct, your Honor.  Greg Kinsel.  I was just fumbling to get to my slides here for that issue.  I'll try to be brief on this one as well.

11:31AM  Judge, the real -- where the rubber meets the road on this issue is the question of "pattern of movement."  And what we're talking about here -- just for some point of clarity, what we're talking about here is properties of the external cursor that are detected by this system.  As I mentioned at the very beginning of my discussion, there are two facets of this invention.  The first facet is moving the internal cursor to the place where the external cursor is.  We've talked about that. This is the second facet, and that's detecting a property of the external cursor.

And, so, where I think the issue on this is is that the defendants' construction excludes any property of the cursor that's based on position, whereas SyncPoint's construction would not necessarily exclude a property that's based on position but would exclude those that are a position.  So, let me just put a touch of meat on what we're talking about here so that we can get some context.

Claim 11 claims -- is a dependent claim, depends from claim 1 -- it claims "detecting at least one

CLAIM CONSTRUCTION HEARING 10-30-2015

84

1  property of the external cursor comprises detecting a

2  pattern of movement of the external cursor."  So, the

3  question is if a property -- at least one property is not

4  based on position, can it detect one of these properties

11:32AM  5  of movement?  And I think the examples that have been

6  given in the briefing thus far would be something like

7  this kind of Z shape, like a gesture, for instance.  If I

8  move my external cursor in a Z and the system detects

9  that change in position, is that a pattern of movement

11:33AM  10  that should be covered by claim 11?

11        Under defendants' construction, it's not

12  because this gesture -- this sort of gesture-based

13  movement is based on position; and it wouldn't be covered

14  by defendants' construction.  And there's a reason for

11:33AM  15  that, and it's because it shouldn't be covered.

16        Let me back out of this and talk about the

17  claim terms.  What we're talking about here is a property

18  of the external cursor.  A gesture like this Z position

19  that we saw is not a property of the external cursor;

11:33AM  20  it's a property of the person using the external cursor.

21  So, let me give you some examples of what are properties

22  of the external cursor.

23        You've got color or shape or size or

24  intensity, illumination pattern, motion.  These are all

11:34AM  25  properties of the cursor, and those are the kinds of

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 85 of 132 PageID #: 4389
CLAIM CONSTRUCTION HEARING 10-30-2015

85

1  properties that are supposed to be detected.

2          If we think about it like this, we think about

3  a car.  Okay?  This car has certain properties.  It has a

4  color and it has a number of wheels and it has a number

5  of doors, et cetera.  Those are all properties of the

6  car.  But if we think about the route that I drove to get

7  here to court, that's not a property of the car; that's a

8  property of the driver.  And that's what we're talking

9  about.  That's the distinction between these

10  gesture-based positions, these gesture-based properties

11  of movement, and the properties of movement that are of

12  the external cursor.  A gesture isn't a property of the

13  external cursor.

14          Now, we've already talked a little bit about

15  the file history and how the inventor distinguished his

16  claim -- his claims over Arita.  I just want to talk it

17  through just very quickly.  What the inventor said about

18  Arita is that Arita detects these shapes of the cursor,

19  but it doesn't use those shapes to control the computer.

20  So, he says, "To the extent any control to the computer

21  is provided, the control is based on the position of the

22  cursor and not the characteristic or property of the

23  cursor."

24          By contrast, his system, he says, "controls

25  the computer based on at least one user selectable

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 86 of 132  PageID #: 4390
CLAIM CONSTRUCTION HEARING 10-30-2015

86

1    property of the external cursor in addition to the

2    position of the external cursor."  So, he's disclaiming

3    positions, patterns of movement, and other things that

4    are based on position.

11:35AM    5        Let me focus here on "user selectable

6    properties."  He's talking about properties of the

7    external cursor.  So, if we think about my car example

8    again, I go to a car lot, I can go to the salesperson,

9    "I'd like a red four-door car."  Those are all user

11:36AM    10    selectable properties.  But what I can't do, without

11    getting a strange look from the salesperson, is go up to

12    them and say, "I'd like a car that drives from my hotel

13    to the courthouse."  That's not a user selectable

14    property.  User selectable property is an intrinsic

11:36AM    15    property of the cursor.  That's what we're talking about,

16    and that's why defendants' construction which excludes

17    properties based on position is the right one because

18    he's excluded all other kinds of properties and because

19    the claim terms require it.

11:36AM    20        THE COURT:  How does the fact that it's user

21    selectable make a difference here?  The user would be the

22    one that caused it to move?

23        MR. KINSEL:  Agreed, but the user isn't

24    selecting anything.  In that context -- so, if I'm doing

11:37AM    25    a Z pattern, I'm not selecting any characteristic of the

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 87 of 132 PageID #:
4591
CLAIM CONSTRUCTION HEARING 10-30-2015

87

1    cursor.  I'm using the cursor just as it is here.

2    Whereas if I select the color or I select the size of the

3    cursor or I select the number of dots for the cursor --

4    the court may recall, in the technology tutorial that we

11:37AM    5    submitted, seeing Mr. Hansen's demonstration of the

6    system.  And if you go back and you look at that system,

7    what you'll see is when he's right clicking, two dots pop

8    up and when he's left clicking, three dots pop up.  And I

9    may have those reversed.  But in any event, the number of

11:37AM    10    dots change.  Those are user selectable properties.

11                 There's no indication anywhere in the

12    record -- there's not a single line anywhere in the

13    specification that would suggest that this inventor

14    invented gesture-based detections.  There's nothing in

11:37AM    15    the record that would suggest that.

16                 So, the fair question I guess is:  So, what

17    kinds of cursors are here?  What is the pattern of

18    movement that's actually controlled?  And there is in the

19    record some evidence that there were cursors that

11:38AM    20    exhibited a pattern of movement that was not based on

21    property.  So, for instance, in a Mac system, the

22    spinning beach ball of death; the Windows system, the

23    rotating cursor.  In either case, those are cursors that

24    exhibit a pattern of movement that's not based on

11:38AM    25    position.

88

 1    THE COURT:  Doesn't Figure 3 include pattern

 2  of movement as one of the properties?

 3    MR. KINSEL:  Yes, your Honor, it does.

 4    THE COURT:  And you're suggesting that we

11:38AM  5  should restrict that to the examples that you have just

 6  indicated of the spinning hourglass or the color wheel?

 7    MR. KINSEL:  No, your Honor, I'm not.  All

 8  I'm -- I am merely giving examples of the kinds of

 9  patterns of movement that could be included.  Any pattern

11:39AM 10  of movement is okay so long as it's not based on the

11  position of the cursor.

12    THE COURT:  Well, why isn't a movement that is

13  selected by the user a pattern of movement that would be

14  covered as a property?

11:39AM 15    MR. KINSEL:  In the example of, for instance,

16  the Z shape, is that --

17    THE COURT:  All right.

18    MR. KINSEL:  So, in the example of a Z-shaped

19  pattern, for example, that's not a property of the

11:39AM 20  cursor.  Again --

21    THE COURT:  I mean, that's based on a

22  definition of "property" that you're supplying; but the

23  patent describes "property" as including pattern of

24  movement.

11:39AM 25    MR. KINSEL:  And we're not excluding patterns

1  of movement in any way.

2          THE COURT:  Except for a Z shape.

3          MR. KINSEL:  The only properties that are

4  excluded under our construction are those that are based

11:39AM  5  on position, and not all patterns of movement are based

6  on position.  My pinwheel and the hourglass are just two

7  examples of the kinds of patterns of movement that would

8  not be position based.

9          THE COURT:  All right.  So, tell me where you

11:40AM  10  derive the limitation that the pattern of movement cannot

11  be based on position.

12          MR. KINSEL:  In two places.  One, from the

13  file history that we just looked at.  So, that's the

14  Arita; and I can go back there, your Honor, if you like.

11:40AM  15          THE COURT:  Is there something clear and

16  unambiguous in that file history that says that a pattern

17  of movement cannot be based on position?

18          MR. KINSEL:  Oh, it doesn't speak to -- I'm

19  sorry.  I misunderstood your question, your Honor.

11:40AM  20          This disclaimer doesn't speak to a pattern of

21  movement directly.  Rather, what it says is that the

22  properties based on position are excluded.  Again, we're

23  not -- I want to make sure that I am being clear because

24  I perhaps am not being as clear as I could be.  We are

11:40AM  25  not suggesting that a pattern of movement is not among

1  the perfectly acceptable "at least one property."  It is.

2  It's claimed specifically in claim 11.  It's disclosed in

3  the specification.  There's no question that pattern of

4  movement can be one of the detected properties.

11:41AM  5        The question on the table is whether the

6  detected properties can be based on position.  That's the

7  question.  And, so, we were using this pattern of

8  motion -- and maybe I've gotten things a little bit

9  confused.  I raised that because that was really the

11:41AM 10  SyncPoint counter-example to why it can't be based on

11  position, why the "based on position" limitation is

12  inappropriate.

13        The "based on" limitation comes directly from

14  the file history.  That's what the inventor said his

11:41AM 15  invention was.  He says Arita -- and I can put up

16  Figure 1 for the court if the court would be interested

17  in that.  But Figure 1 from Arita shows two different

18  cursors.  One is a plus sign, and one is a dot.  And the

19  inventor says, "Look, Arita has these different shaped

11:42AM 20  cursors.  It identifies different shaped cursors, which

21  is a property of the cursor; but it doesn't use those to

22  control the computer.  Instead, it uses position.  Its

23  control is based on position."  He says, in the next

24  paragraph, "My system, by contrast, is not based on

11:42AM 25  position.  My system for selecting properties is based on

11:42AM

1  the property of the cursor, a user selectable property of

2  the cursor."  So, that's where the "based on" language

3  comes from, your Honor.  It comes literally directly from

4  the file history.  These are their words.  This is what

5  the inventor said his invention was covering.  That's why

6  we used those words.

7          But to make myself clear, pattern of movement

8  is perfectly acceptable.  It is one of the "at least one

9  properties."  It just can't be a property that's based on

11:43AM  10  position.

11          THE COURT:  All right.  I understand your

12  position.

13          MR. SETH:  As Mr. Kinsel says, the essential

14  dispute is what does the -- what does this term mean,

11:43AM  15  these other properties, because the claim requires

16  position and it requires at least one other property.

17  The specification -- oh, and just to focus the dispute,

18  we're okay with "property."  So, the two constructions

19  can both be "property," property that is not position

11:44AM  20  versus property not based on position.

21          And the specification is very clear that

22  position was a property and pattern of movement was a

23  property -- another property of the external cursor; and

24  we see that in Figure 3, because in block 60 we're

11:44AM  25  processing to detect property of the external cursor and

1    various examples are given.  Intensity is one, color is

2    one, shape is one, size is one, pattern of movement is

3    one, position is one.  And they're all different

4    properties of the external cursor.

11:44AM   5        The specification here -- we're at column 8,

6    lines 32 to 85 *[sic]* -- again we're talking about the

7    "Cursor properties may include intensity, color, shape,

8    or size, as represented by blocks 62, 64, 66, and 68.  In

9    addition, cursor properties may include a particular

11:45AM  10   pattern of movement as represented generally by reference

11   70."  And then it goes on to distinguish "Position of the

12   external cursor, represented by block 72, is preferably

13   also detected relative to the position of the fiducials"

14   that generated those reference coordinates.

11:45AM  15        The experts agree that the Figure 3

16   distinguished pattern of movement from position and that

17   pattern of movement is another property.

18        THE COURT:  And they are relying primarily on

19   that prosecution history.  What's your response to that?

11:45AM  20        MR. SETH:  Yes.  I'm going right to that, your

21   Honor.

22        If we can just jump to Slide 87.

23        So, again we're distinguishing some prior art;

24   and in distinguishing the prior art -- and mind you, the

11:46AM  25   inventor had just amended the claim to include these

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 93 of 132 PageID #: 4597
CLAIM CONSTRUCTION HEARING 10-30-2015

93

1    other properties because the prior art used position but

2    did not use other properties.  So, the examiner -- or I'm

3    sorry -- the applicant is saying (reading) the invention

4    as disclosed and claimed in the amended claims uses an

11:46AM    5    external cursor having a plurality of properties and then

6    gives the example of movement pattern as one of the

7    properties that it has that the prior art didn't.  That

8    was an additional property that was being used to control

9    the system.

11:46AM    10    So, in other words, prior art already had

11    movement of internal cursor based on movement of external

12    cursor.  It did not have these additional properties that

13    were optically detected and were also used to generate

14    commands.  One of those properties that you could use was

11:47AM    15    the movement pattern to generate a command, like the

16    example we gave of a circular movement pattern hitting

17    the tennis ball.

18    So, what the applicant was distinguishing was

19    that you're not just using position; you're using

11:47AM    20    additional properties.  One of those properties could be

21    pattern of movement.  It could be other properties as

22    well.  So, there's no clear disclaimer in the prosecution

23    history of pattern of movement.

24    Grant, can I have your Slide 43, please?

11:47AM    25    MR. KINSEL:  Sure.

1    MR. SETH:  And just to make it very clear,

2  your Honor -- and I appreciate you don't have full

3  context here; but, again, this -- this is now one page

4  later.  We've gone from page 6 to page 7 of the office

11:48AM  5  action response.  And for the record, your Honor, that

6  office action response was the November 9th, 2000, office

7  action response.  I think it was Exhibit 2 to our Markman

8  brief.

9    And in distinguishing the patent, Arita was

11:48AM  10  only generating the command based on position.  That's

11  it.  There was no other property that was being used to

12  generate a command.  So, the applicant is simply stating

13  here, okay, your commands in Arita based on position;

14  mine are based on position plus additional other

11:48AM  15  properties, including pattern of movement, as we saw in

16  figure -- in page 6, the page before that, where pattern

17  of movement was a specific additional property that was

18  used in the '214 system to generate a command that Arita

19  did not use.  And that's all that was.  So, it's a

11:49AM  20  linguistic argument; but it's just factually incorrect.

21    If we go back to Slide 88 for a minute.  And I

22  think this will just be my final point.  These are the

23  claims that were allowed over the argument and the

24  prosecution history, including claim 11 in which a

11:49AM  25  pattern of movement is specifically one of those

95

1  additional properties.  The patent office allowed that

2  because the difference between Arita and '214 was that we

3  had additional properties, including pattern of movement,

4  that were used to generate commands and weren't just

11:49AM  5  based on just a -- a command just based on position

6  alone.

7  THE COURT:  All right.  Thank you, Mr. Seth.

8  MR. SETH:  Thank you.

9  THE COURT:  Anything further?

11:50AM  10  MR. KINSEL:  Your Honor, I would just note

11  very quickly -- and I don't have much rebuttal here --

12  but just that it is not the case that pattern of movement

13  is excluded by defendants' construction.  All of this

14  argument about pattern of movement was allowed is

11:50AM  15  correct.  It was allowed.  It's part of the claims.

16  There's no disputing that.  We're not disputing that.

17  The question is what kind of pattern of

18  movements are in?  Are they all in, or are they based on

19  properties -- or based on position?  That's really the

11:50AM  20  issue.

21  THE COURT:  I do understand that.

22  MR. KINSEL:  Thank you, your Honor.

23  THE COURT:  Thank you.

24  All right.  We have several motions that were

11:50AM  25  set for today as well.  Have the parties made any

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 96 of 132 PageID #:
4400
CLAIM CONSTRUCTION HEARING 10-30-2015

96

 1    progress on any of those, or are those still where they

 2    were at the time of the briefing?

 3            MR. KINSEL:  They're still where they were at

 4    the time of the briefing, your Honor.

11:51AM  5            MR. PIA:  That's correct.

 6            THE COURT:  All right.  Well, I think maybe

 7    it's best then if we take those up after lunch.  I don't

 8    know.  I -- unless the parties think we can move through

 9    them particularly quickly.

11:51AM 10            MR. KINSEL:  From Nintendo's perspective --

11    and I don't want to speak for my friends PixArt because

12    there are some PixArt motions pending as well.  But from

13    the Nintendo side of the table, I think we can move it

14    pretty quickly.  I think the issues are pretty

11:51AM 15    self-contained.  My colleagues, Mr. Amborn and

16    Mr. Siebman, are going to address them and are prepared

17    to address them promptly; but obviously if the court and

18    the court's staff would prefer to take lunch, that's

19    fine.  But I do believe we can get through them rather

11:52AM 20    quickly.

21            THE COURT:  Mr. Pia, what about your side?

22            MR. PIA:  We likewise think that's the case.

23    We just don't know what "relatively quickly" is.

24            THE COURT:  Well, trust me, I'm not sure I

11:52AM 25    would believe you if you tried to specify that.  Why

1   don't we go ahead and take them up then now, and we'll

2   see what kind of progress we make.

3           Is there any argument in addition to what's in

4   the briefs that the parties want to offer about the

11:52AM   5   motions relating to arbitration?

6           MR. MATHIOWETZ:  If I could, your Honor.

7   Duane Mathiowetz for PixArt.

8           Your Honor, I believe where the court got off

9   the rails in deciding this motion was failing to

11:53AM   10   recognize that the parties' agreement to proceed pursuant

11   to the AAA rules put the question of arbitrability

12   squarely in the hands of the arbitrator and took it away

13   from the court.  And, specifically, the Fifth Circuit

14   case of *Petrofac versus DynMcDermott Petroleum Operations*

11:53AM   15   cited in our brief -- but it's 687 F.3d 671 -- controls.

16   And that case makes it very clear that when the parties

17   adopt the AAA rules, including Rule 7(a), that the

18   arbitrator is the one who makes the decision with respect

19   to arbitrability.  Instead, by deciding on its own that

11:54AM   20   the scope of the arbitration clause was limited to the

21   amount of royalties in dispute, the court avoided

22   altogether the application of the Federal Arbitration Act

23   and denied the stay relying on the court's inherent

24   authority to control the docket.  But that's really --

11:54AM   25   you know, it ties back to in the first instance that

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 98 of 132 PageID #: 4402
CLAIM CONSTRUCTION HEARING 10-30-2015

98

1   decision should be made by the arbitrator.

2          THE COURT:  Do you have any authority that you

3   would cite that involves an arbitration agreement that

4   has an express provision limiting the authority of the

11:54AM   5   arbitrator like this one does?

6          MR. MATHIOWETZ:  I think, your Honor, it's --

7   it comes straight from the -- if I'm understanding the

8   question, it really comes straight from the *Petrofac*

9   decision because the party -- its clear that the parties

11:55AM  10   have adopted the AAA rules.  And *Petrofac* just says as

11   soon as you've adopted the AAA rules, it's now the

12   mediator who makes the decision on arbitrability.

13          So, that's -- you know, we didn't -- it was

14   interesting because there was no discussion whatsoever by

11:55AM  15   SyncPoint of the *Petrofac* case; and we think there's a

16   reason for that, because *Petrofac* is very clear.  It's

17   Fifth Circuit law that controls and it says this decision

18   should first go to -- should be made by the arbitrator

19   and because it's a decision to be made by the arbitrator,

11:56AM  20   you now have to invoke the Federal Arbitration Act which

21   says if there is a question that is, you know,

22   arbitrable, the court should stay the action so that the

23   arbitration can move forward on those issues.

24          So, that's our position, your Honor; and

11:56AM  25   that's just where we think the court went wrong in its

1  decision.

2            THE COURT:  So, I'm taking it from that that

3  you don't have any authority that deals with an agreement

4  that expressly limits the role of the arbitrator.

11:56AM  5            MR. MATHIOWETZ:  Well, I guess it depends on

6  what you mean by the agreement "expressly limits the role

7  of the arbitrator" as it applies to this particular

8  decision.

9            THE COURT:  Then let me be specific.

11:56AM  10  Something along the lines of the term in -- that says the

11  power of the arbitrator shall not extend to any other

12  matters; all other disputes shall be subject to

13  litigation.  That's the -- that's what I'm talking about

14  as an express limitation.

11:57AM  15            MR. MATHIOWETZ:  Right.  And it's not really a

16  question, we believe, your Honor, of whether or not this

17  is a general or limited scope.  The fact that the parties

18  have invoked the AAA rules trumps the fact that there is

19  this additional language in the arbitration clause.  And

11:57AM  20  I would point to -- there is other language that suggests

21  that this is not a narrow term.  There's broad permissive

22  language like "any dispute should be arbitrated

23  concerning," "any dispute concerning," and "shall be."

24            THE COURT:  Any dispute concerning the amount

11:58AM  25  of royalties --

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 100 of 132 PageID #:
4404
CLAIM CONSTRUCTION HEARING 10-30-2015

100

1    MR. MATHIOWETZ:  Yes.  That's any dispute.

2    THE COURT:  -- payable under this agreement.

3    MR. MATHIOWETZ:  Right.

4    THE COURT:  Okay.

11:58AM  5    MR. MATHIOWETZ:  But it's also clear from the

6    case of *Rhone-Polenc* that even though there is an

7    infringement matter involved, that doesn't mean that

8    that's something that's apart from the royalties.  Here

9    you have a case where the -- there's just an intertwining

11:58AM  10   of royalties and other decisions that have to be made;

11   and it's clear even from the language that was written by

12   Mr. Hansen, who, you know, drafted the agreement, that

13   anything related to royalties has to be decided in an

14   arbitration.

11:59AM  15      The fact that it brings up other issues

16   doesn't mean that those issues that are related to the

17   royalty cannot be decided by the arbitrator.  And here --

18   and I think really, again, looking at the *Rhone-Polenc*

19   case, it tells you that if you have issues in a patent

11:59AM  20   infringement matter and you have a royalty dispute,

21   those -- all those issues that relate to how you

22   calculate the royalty have to be decided in the

23   arbitration; and that's definitely the situation we have

24   here.

11:59AM  25      THE COURT:  Okay.  And not to beat a dead

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 101 of 132 PageID #:
4405
CLAIM CONSTRUCTION HEARING 10-30-2015

101

1    horse.  Do you have any authority that deals with an

2    arbitration agreement that expressly limits the authority

3    of the arbitrator?

4             MR. MATHIOWETZ:  Nothing beyond what's already

11:59AM    5    in our briefing, your Honor.

6             THE COURT:  Okay.  All right.  Thank you,

7    Mr. Mathiowetz.

8             MR. AYCOCK:  Hello, your Honor.  Robert Aycock

9    for SyncPoint.

12:00PM    10            I don't believe there is any authority; and

11    when we look at the provision of 10.1.2, it specifically

12    does limit what will be arbitrated.  And if we were to

13    accept PixArt's proposition that all issues -- and

14    counsel for PixArt said "some issues," but they're now

12:00PM    15    asking for all issues -- there would be no meaning to

16    these terms.

17            THE COURT:  Are you seeking royalties for

18    infringement that you allege occurred during the term of

19    this agreement?

12:01PM    20            MR. AYCOCK:  That position is being continued

21    to be evaluated by the damages expert on our side, your

22    Honor.

23            THE COURT:  All right.  I think there's either

24    a "yes" or "no" on that.  Are you seeking it, or are you

12:01PM    25    not seeking it?

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 102 of 132 PageID #:
4406
CLAIM CONSTRUCTION HEARING 10-30-2015

102

1          MR. PIA:  If I may respond.  So, there --

2    thank you, your Honor.  Joe Pia.

3          There are royalties that are required to be

4    paid under the contract if the contract is breached, and

12:01PM  5    there's separate royalties that could be assessed for

6    infringement.  And those can be separable issues.  So, we

7    have a breach of contract claim, and we also have an

8    infringement claim.  We might seek royalties for both in

9    both contexts.  The intention is to do that, and

12:01PM 10    discovery is ongoing.

11          THE COURT:  So, are you -- you're saying that

12    you are in this lawsuit seeking royalties for

13    infringement that you allege occurred during the term of

14    this agreement.

12:02PM 15          MR. PIA:  Yes, and for royalties not paid for

16    breach of the contract.

17          THE COURT:  And why do you contend, then, that

18    the arbitration clause shouldn't govern the amount of

19    those royalties?

12:02PM 20          MR. PIA:  The arbitration agreement would not

21    govern the amount of royalties in the infringement

22    context because there's nothing about that in that

23    agreement.  What that agreement governs is the amount of

24    royalties per the terms of that contract.

12:02PM 25          THE COURT:  And are you seeking royalties per

CLAIM CONSTRUCTION HEARING 10-30-2015

103

1    the terms of that contract in this lawsuit?

2           MR. PIA:  Yeah.  We're seeking -- well,

3    royalties and damages, which are in addition to

4    royalties, but yes.  As one aspect of this case, there

12:03PM    5    are -- there will be -- we are asserting that there are

6    royalties that were not paid.  There are also other

7    damages related to breach of contract, and then there are

8    infringement damages.

9           THE COURT:  So, why wouldn't the amount of

12:03PM   10    those royalties which arise from this contract be subject

11    to that arbitration clause?

12           MR. PIA:  And that might be possible when we

13    get to that point in the proceedings; and as I recall,

14    the court's order -- prior order was that the arbitration

12:03PM   15    motion would be denied without prejudice and could be

16    raised at a later point in time.  Once we have been

17    through that whole process, it might end up being that

18    our damages and royalties are limited to infringement or

19    some other basis.  But yes, currently we are alleging

12:03PM   20    that there are royalties due under the contract.  So,

21    we'd just ask the court to affirm its prior decision and

22    say that the arbitration motion is denied without

23    prejudice and PixArt can raise that issue again.

24           THE COURT:  All right.  Thank you, Mr. Pia.

12:04PM   25           MR. MATHIOWETZ:  May I briefly respond, your

1  Honor?

2          THE COURT:  Yes.

3          MR. MATHIOWETZ:  The problem with that

4  scenario that's been proposed by Mr. Pia is that that

12:04PM  5  clearly requires the court to ignore the Federal

6  Arbitration Act.  The Federal Arbitration Act says that

7  if there's an arbitratable issue, the court must stay the

8  action so that the arbitration can be completed and those

9  issues can be resolved.  So, it's flipping it.  It's

12:04PM  10  putting the cart before the horse.  So, really what

11  should happen is the case should be stayed, the

12  arbitration resolved.  That may take care of everything.

13  At least as to the damages that occurred during the

14  contract period.

12:05PM  15          THE COURT:  Well, it clearly can't take care

16  of everything.

17          MR. MATHIOWETZ:  It can't take care of

18  everything, but it will take care of a lot.  And the case

19  law is -- or -- and I'll just paraphrase it; but the case

12:05PM  20  law says that even if there are other issues that need to

21  be resolved, the arbitration should go forward and that

22  resolution should be done first.

23          THE COURT:  Well, I guess one option under

24  your theory would be to sever the claim for royalties

12:05PM  25  based on the agreement during its term and send those to

CLAIM CONSTRUCTION HEARING 10-30-2015

1  arbitration.  Why should we stay the rest of the case?

2  It is clearly excluded by the express terms of the

3  contract.

4           MR. MATHIOWETZ:  I think that's a matter of

12:06PM  5  judicial efficiency, your Honor.  Because what the court

6  should allow to happen is the arbitration would resolve

7  the issue of whether or not any royalties were due during

8  the contract period.  That issue will necessarily also

9  impact whether or not there are any royalty -- or there

12:06PM  10  would be any damages due to infringement that occurred

11  after the contract period.

12           THE COURT:  How would it necessarily impact

13  that?

14           MR. MATHIOWETZ:  Well, I think what happens is

12:06PM  15  you then have the -- let's say that the arbitrator

16  decides that there is no infringement; therefore, no

17  royalties are due.  Okay.  You now have a decision that

18  there were no royalties due.  I think that is at least --

19  you know, whether or not the plaintiff wants to come back

12:07PM  20  and challenge that decision, you've already got a

21  decision on whether or not there should be any royalties

22  or damages, however you want to phrase it, with respect

23  to the period that occurred -- or during the contract

24  period.

12:07PM  25           Let's say the flip side of that.  The

1  arbitrator comes back and says, "I think there's

2  infringement."  Well, how many units did you sell; and

3  what's the appropriate royalty rate?  So, those things

4  will then get decided by the arbitrator.  They no longer

12:07PM  5  have to be decided by the court.

6            THE COURT:  What would be your authority for

7  the proposition that the arbitrator's decision on those

8  issues would in any way be binding in the litigation?

9            MR. MATHIOWETZ:  I would have to find some for

12:07PM  10  you, your Honor.  That's not an issue that we briefed.

11            THE COURT:  Okay.  I don't think that's the

12  case but I understand your argument on it and I will

13  consider that.

14            MR. MATHIOWETZ:  Thank you.

12:08PM  15            THE COURT:  Thank you, Mr. Mathiowetz.

16            What is the next motion that the parties want

17  to address?

18            MR. KINSEL:  Your Honor, from Nintendo's point

19  of view, the protective order motion I think would be --

12:08PM  20  regarding source code would be effective and appropriate

21  and relatively condensed.

22            THE COURT:  Okay.

23            MR. KINSEL:  So, that would be my suggestion.

24            THE COURT:  All right.  Thank you, Mr. Kinsel.

12:08PM  25            MR. KINSEL:  Thank you.

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 107 of 132 PageID #:
4411
CLAIM CONSTRUCTION HEARING 10-30-2015

107

                    MR. SIEBMAN:  Your Honor, Clyde Siebman for

Nintendo.

                    In the spirit of moving things along, this

motion may actually be moot if the plaintiffs do not

12:09PM  intend to amend their infringement contentions through

use of source code.

                    THE COURT:  And I tell you, Mr. Siebman, that

I have interpreted and understood that 3-1(g) to be an

option that a plaintiff can choose if they feel that they

12:09PM  don't have a sufficient basis without source code to

provide infringement contentions on an issue.  They can

opt to wait for the source code discovery, and then they

are required within 30 days thereafter to amend their

contentions and not stand on their previous answer which

12:09PM  was a deferral.  But if the plaintiff does not opt to

wait -- in other words, if the plaintiff provides

infringement contentions in advance of source code

review -- that 3-1(g) does not require them to amend

within 30 days after the review.

12:10PM  Now, naturally, if they're going to change

their contentions, they have to do it on a timely basis;

and they have to be diligent about it and obviously make

sure their contentions are seasonably supplemented.

                    But in any event, I wasn't sure whether your

12:10PM  motion was based on a different belief about the effect

1   of 3-1(g).

2           MR. SIEBMAN:  I think 3-1(g) is an election

3   that the plaintiffs would make and that if they're going

4   to change their infringement contentions based on source

12:11PM  5   code, they've got to do that within 30 days.  That's --

6           THE COURT:  Did they elect the 3-1(g) option

7   at the time they served their contentions?

8           MR. SIEBMAN:  It's our interpretation that

9   they did.

12:11PM  10           THE COURT:  Okay.

11           MR. SIEBMAN:  And that's the reason that I

12   began my presentation by saying this may be moot if --

13   if, in effect, if -- I mean, at this late date -- here we

14   are at the end of October, almost November.  If at this

12:11PM  15   late date -- I would assume at this late date that maybe

16   they're not going to amend their infringement contentions

17   based on source code because it is so unseasonably late.

18   So, if that is the case, if they're not going to amend

19   their infringement contentions based on source code, then

12:11PM  20   this would be moot and no need to take it up.

21           THE COURT:  Okay.  All right.  Well, let's

22   hear from the plaintiff on that.

23           MR. SETH:  Your Honor, it is our belief that

24   we can -- we should supplement our infringement

12:12PM  25   contentions and we are trying to do that and we've made

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 109 of 132 PageID #: 4413
CLAIM CONSTRUCTION HEARING 10-30-2015

109

great strides in being able to do that.  We have had

Nintendo make available their source code and also

provide the printouts that our experts need so that we

can do that, and we have been through that review

12:12PM  process.

We have just one little issue I think with

regard to source code remaining; and that is that PixArt

has not produced the printouts that we've requested, 10

PDF files out of about 250, that are relevant to our

12:12PM  infringement contentions.  We have been trying to

convince them to do that; and as soon as we have those

printouts, we can update our infringement contentions

probably within 5 days.  They're substantially ready, but

they -- we just have a little tweak that we need the

12:13PM  printouts for on the PixArt code.

THE COURT:  Well, let me just say, Mr. Seth,

that you can't wait until you get all of your discovery

to amend those contentions.  If you have a basis to do so

now, I would encourage you to do so because you'll need

12:13PM  to show diligence in making those amendments to your

contentions.  So, I -- I don't want you to think that the

fact that there may be some additional discovery yet to

be obtained gives you a certain basis to withhold

amendments until that's completed.  So, I -- but I'm not

12:14PM  going to say that you're required to do it within 30

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 110 of 132 PageID #:
4414
CLAIM CONSTRUCTION HEARING 10-30-2015

110

1  days, as 3-1(g) would say, because -- well, unless you

2  tell me -- it was my understanding that you did not

3  exercise that option, that you provided contentions in

4  advance.

12:14PM 5          MR. SETH:  We did, your Honor.  We did provide

6  infringement contentions.

7          THE COURT:  And are you representing that you

8  did not rely upon 3-1(g) in those?

9          MR. SETH:  We did not.

12:14PM 10         THE COURT:  Okay.  Well, unless the defendant

11  shows me otherwise, I'll just encourage you to move

12  promptly on your amendment so that we don't have an issue

13  when you serve them.

14         MR. SETH:  Your Honor, I appreciate the

12:14PM 15  guidance.

16         THE COURT:  All right.  Mr. Kinsel, do you

17  have something to offer on that?

18         MR. KINSEL:  I do, your Honor.  I'm just

19  trying to find my copy of the initial contentions.  The

12:15PM 20  initial contentions expressly invoked 3-1(g).  If you'll

21  just bear with me just for one moment, your Honor.

22         The contentions expressly invoked 3-1(g) on

23  the very first page.  Bear with me for one moment, your

24  Honor.  I apologize.

12:15PM 25         THE COURT:  All right.

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 111 of 132 PageID #:
4415
CLAIM CONSTRUCTION HEARING 10-30-2015

111

1    MR. KINSEL:  I can't get my fingers on them

2    here.

3         We could always provide them, but I will

4    represent to you that in fact they did invoke 3-1(g)

12:15PM   5    expressly.  More to the point, we have been talking about

6    3-1(g) as --

7         Clyde, I don't want to usurp your discussion

8    here.

9         MR. SIEBMAN:  Go ahead.

12:16PM   10    MR. KINSEL:  But we have been talking about

11    3-1(g) because the plaintiffs invoked it.  They said that

12    they were entitled to amend their infringement

13    contentions because they were relying on 3-1(g).  What's

14    happened here is the plaintiffs supplemented -- filed an

12:16PM   15    initial infringement contention series.  They then

16    amended those infringement contentions shortly thereafter

17    without leave of court.  We didn't object because we

18    didn't think it was necessary to do so.  But those

19    amended contentions invoked 3-1(g).  We had previously

12:16PM   20    produced the source code.  SyncPoint didn't come and

21    review it for many months, and their time under 3-1(g)

22    ran.

23         So, this is not a case where they didn't elect

24    3-1(g).  They expressly elected 3-1(g).  So, it is

12:17PM   25    certainly true that they provided infringement

1  contentions --

2          THE COURT:  Well, I guess what we need is to

3  see the contentions.  So, perhaps if you can file those

4  supplementally, that would help.

12:17PM   5          MR. KINSEL:  Your Honor, we have them now

6  available.  I can put them up on the screen.

7          THE COURT:  Are they in the record at this

8  point?

9          MR. KINSEL:  They are, your Honor.  I don't

12:17PM  10  know why we don't have it with us.

11          MR. PIA:  I don't think they're in the record.

12          MR. AMBORN:  I think they're part of this

13  motion, actually.

14          MR. PIA:  All of our infringement contentions?

12:17PM  15          MR. AMBORN:  No, not all of your infringement

16  contentions.  The cover pleading --

17          MR. PIA:  Just for the record, your Honor, I

18  don't believe the infringement contentions have been made

19  part of the record.

12:17PM  20          MR. KINSEL:  Well, we can solve the problem

21  relatively easy, judge.  We're happy to supplement the

22  record.

23          THE COURT:  All right.  Why don't you do that.

24          MR. KINSEL:  We can find it.  But the point

12:18PM  25  being that the contentions -- we can plug it into the

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 113 of 132 PageID #:
4417
CLAIM CONSTRUCTION HEARING 10-30-2015

113

1   computer perhaps while we're taking a quick break to

2   fumble around here.  I don't want to fumble around while

3   we're wasting the court's time.

4           But the net -- here it is.  3-1(g) was

12:18PM  5   expressly invoked, and that date has come and gone.

6           THE COURT:  All right.

7           MR. KINSEL:  I think we've got it now.

8           MR. SIEBMAN:  Your Honor, the part of this

9   that is so frustrating to Nintendo is that we expedited

12:18PM  10  production of technical documents -- about 60,000

11  pages -- in June.  In addition, we made our source code

12  available on July 2nd, which was very early on; and they

13  didn't even give us notice of who their consulting

14  experts would be for the purpose of looking at source

12:19PM  15  code until well beyond the 30-day time period for that.

16          As your Honor can see on the overhead, this is

17  in fact a copy of their infringement contentions where

18  they do in fact expressly invoke Patent Rule 3-1(g),

19  contrary to their representations.

12:19PM  20          THE COURT:  The question I guess that I need

21  to determine by looking at the contentions is whether

22  they have done anything other than list 3-1(g) and all

23  other applicable rules or whether they in fact relied

24  upon it in lieu of providing infringement contentions on

12:19PM  25  any of the claims.  So -- but in any event, if the -- are

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 114 of 132 PageID #:
4418
CLAIM CONSTRUCTION HEARING 10-30-2015

114

1  these in the record now, the ones that you're -- you have

2  on the screen?

3          MR. SIEBMAN:  If they're not, your Honor,

4  we'll supplement the record and make sure that they are.

12:20PM  5          THE COURT:  Okay.

6          MR. SIEBMAN:  With respect to your Honor's

7  last question, we corresponded with them in early August

8  and asked them to supplement their infringement

9  contentions because we thought that they were inadequate;

12:20PM  10  and they told us at that point that they intended to rely

11  upon source code.  That's really when this issue arose

12  with respect to the protective order because it was our

13  position that they had already had their 30 days to look

14  at the source code, it having been provided in July.  So,

12:20PM  15  they expressly in their correspondence at that point --

16  and that is in the record, the correspondence where

17  you've got counsel corresponding back and forth about the

18  inadequacy of their contentions and their representing

19  that they want to look at source code.

12:20PM  20          So, the thing that makes it even much more

21  egregious, also in the record on the protective motion is

22  a declaration from -- I believe it's from their own

23  expert.  I know their expert's declaration is in the

24  record, whether it's on that motion or another motion.

12:21PM  25  But their expert admits that he had seen and had access

1  to Nintendo source code until beyond 30 days before now.

2  In other words, I think that even based on his

3  representation of when he actually had access and

4  actually reviewed the source code, their 30 days was up

12:21PM  5  on that sometime in September.

6  And, so, what they have done is held those

7  infringement contentions -- without filing a motion for

8  leave or without serving them on Nintendo, they've held

9  onto those.  They've represented to the court today that

12:21PM  10  they're almost ready to go but, yet, we have not seen

11  them and we're now here at the Markman hearing.  Expert

12  discovery is starting promptly.  So, we think it's far

13  too late -- it's far too late for them to be moving for

14  leave to amend infringement contentions.

12:22PM  15  THE COURT:  Well, I'll just say that if

16  they're going to amend, they need to do it promptly; and

17  if they do it without an agreement, then they should file

18  a motion and we'll resolve whether or not they're timely

19  amendments.

12:22PM  20  MR. SIEBMAN:  Thank you, your Honor.

21  THE COURT:  All right.  Let's take up the

22  matter involving PixArt, I believe it is, the -- is

23  that -- there is a motion.

24  MR. PIA:  There's a motion to compel, I think

12:22PM  25  is the last.

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 116 of 132 PageID #:
4420
CLAIM CONSTRUCTION HEARING 10-30-2015

116

1    THE COURT:  All right.  And that's the

2  plaintiff's motion?

3    MR. PIA:  That's the plaintiff's motion.

4    THE COURT:  I think there was some reference

12:23PM  5  to a motion to quash.  Is there --

6    MR. PIA:  And there was a motion to quash

7  filed in the Western District of Texas.

8    THE COURT:  Which has been transferred here.

9    MR. PIA:  Which was also transferred here.  I

12:23PM  10  think the briefing just completed on that.

11    THE COURT:  Those two are the same issue?

12    MR. PIA:  Maybe due on Monday.  I can't

13  remember.

14    They're on similar issues, overlapping issues.

12:23PM  15  And we included that motion to quash as one of our

16  exhibits.

17    THE COURT:  Your motion to compel is asking

18  the court to require Nintendo to produce what you are

19  also seeking directly from PixArt?  Is that --

12:23PM  20    MR. PIA:  From Retro.

21    THE COURT:  Retro.  I'm sorry.  Retro.

22    MR. PIA:  Yes, in part.  So, there are two

23  things that we're seeking.  We're seeking, No. 1,

24  documents and, No. 2, oral testimony from Retro Studios.

12:24PM  25    THE COURT:  And is Retro represented here

1  today?

2           MR. PIA:  It is.  Nintendo's counsel

3  represents Retro -- Retro Studios is Nintendo's

4  wholly-owned subsidiary, and they represent Retro.

12:24PM  5           THE COURT:  All right.  Mr. Kinsel, are you

6  prepared to address the motion to quash regarding Retro?

7           MR. KINSEL:  We are prepared to address both.

8  Yes, your Honor.

9           THE COURT:  Well, let me hear from you, then,

12:24PM  10  Mr. Kinsel, about that.

11           MR. KINSEL:  Thank you, your Honor.  I'm going

12  to turn it over to Mr. Amborn, if that's all right.

13           THE COURT:  Of course.

14           MR. AMBORN:  I'm sorry, your Honor.  I didn't

12:24PM  15  catch that.  Do you want to start with the motion to

16  quash or both motions at the same time?

17           THE COURT:  Well, I -- it's my rough

18  understanding that the information that's at issue is

19  very similar at least.  Is that a fair understanding?

12:25PM  20           MR. AMBORN:  Yes, your Honor.  They --

21  SyncPoint is moving to compel the testimony that Retro

22  Studios previously moved to quash.

23           THE COURT:  Okay.  Well, then, why don't we

24  take it up on your motion to quash.

12:25PM  25           MR. AMBORN:  Okay.  So, starting with the

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 118 of 132 PageID #: 4422
CLAIM CONSTRUCTION HEARING 10-30-2015

118

1    motion to quash, then, it's actually a fairly narrow

2    issue.  SyncPoint served a 30(b)(6) deposition notice on

3    Retro Studios, and it stated three topics.  Retro Studios

4    then designated a witness to testify -- sorry.  It stated

12:25PM    5    four topics, and Retro Studios designated a witness to

6    testify on three of those four topics.  So, only the

7    fourth topic is subject to the motion to quash at this

8    point.

9            And that fourth topic is one that relates

12:26PM    10    exclusively to technical information; and that technical

11    information is highly detailed, including all of the

12    source code for Nintendo's accused products and the

13    source code for any Retro Studios' products that in any

14    way interface with Nintendo's accused products.  And, so,

12:26PM    15    Retro has moved to quash that principally -- not because

16    they will not provide such testimony but because it's

17    improper to force a third party -- or I should say a

18    nonparty -- like Retro Studios to provide that burdensome

19    and expansive discovery before seeking such discovery

12:26PM    20    from a party such as Nintendo.  Nintendo is the proper

21    party for SyncPoint to seek that discovery from.

22            But SyncPoint has said that it's unfair for

23    them to have to go to Japan to depose Nintendo's

24    witnesses.  So, instead, they'd like to depose Retro

12:26PM    25    Studios first; and that is not what the federal rules

1  allow.  In fact, Rule 45, which is the basis for

2  SyncPoint's subpoena, expressly says that undue burden is

3  a ground that the court must quash the subpoena over; and

4  the notes to the rules and substantial case law explain

12:27PM  5  that one ground for undue burden is forcing a nonparty to

6  provide discovery that's available from a party and not

7  seeking that discovery from a party first.

8          THE COURT:  So, it's Retro's position that all

9  of the discovery being sought from Retro is available

12:27PM  10  through Nintendo?

11          MR. AMBORN:  Yes, your Honor, all of the

12  discovery that is relevant to this case.  So, there's

13  some ambiguity in SyncPoint's discovery request.  So,

14  they principally -- Topic 4 talks about arguably two

12:27PM  15  things.  One, it clearly covers Nintendo's accused

16  products.  For instance, one of the subpoints to it says

17  that Retro is supposed to provide testimony on all of the

18  source code for all of the accused products.  So, that

19  clearly relates to Nintendo's products; and Nintendo's

12:27PM  20  witnesses are prepared to testify on that and are really

21  the proper witnesses to testify on that.

22          Additionally, SyncPoint's discovery request

23  arguably applies -- or I would say clearly applies to

24  Retro Studios' own products which are not accused of

12:28PM  25  infringement in this case.  They have not been mentioned

12:28PM

1    in the complaint; they have not been mentioned in

2    SyncPoint's infringement contentions, despite the fact

3    that as of the time that SyncPoint filed its infringement

4    contentions, it was well aware of Retro Studios, as

5    evidenced by a document that is cited in those

6    contentions.

7              THE COURT:  All right.  Mr. Amborn, let me

8    interrupt you now.  I want to hear from them and see what

9    our points of agreement are, and I'll give you a chance

10   to respond.

11             MR. AMBORN:  Thank you, your Honor.

12             THE COURT:  Thank you.

13             Mr. Pia, do you agree that the information

14   you're seeking from Retro would also be available from

15   Nintendo?

16             MR. PIA:  Some may, but certainly not all.  We

17   included, as a part of our motion to compel and

18   opposition to the motion to quash, a copy of the

19   deposition subpoena that we issued to Retro.  This is

20   Tab D on my binder.  Let me see if that's what it was in

21   the -- might have been Exhibit D.  I think it was

22   Exhibit D in SyncPoint's motion to compel.

23             And this Category 4 includes Subparts A

24   through K.  And the reason why it's difficult for

25   SyncPoint to determine what the overlap is is because the

121

1  Retro Studios' games are developed exclusively for

2  Nintendo and then Nintendo uses those in various

3  products, including the accused Wii and Wii U products in

4  this case.

12:30PM  5          THE COURT:  Well, why shouldn't you proceed

6  first with your discovery from Nintendo and determine

7  what, if any, further discovery you need from Retro?

8          MR. PIA:  We have.  We have.  And at this

9  point in time, the substantial close of fact discovery is

12:30PM 10  December 15th; and Nintendo has produced about 80,000

11  pages of documents.  We've reviewed all of that.

12  Nintendo has also provided the source code, as we've

13  talked about; and we've reviewed all of that.  And now

14  there are remaining topics for deposition that we still

12:30PM 15  should have an opportunity to get from Retro because

16  Retro's games practice the methods.  They create the

17  software that then generates commands on the hardware

18  that --

19          THE COURT:  And have you narrowed your

12:30PM 20  discovery request to Retro to only the information that

21  you can't get from Nintendo?

22          MR. PIA:  We have -- we haven't touched the

23  subpoena that we originally issued.  We can narrow that

24  request.  What we don't -- the game has been -- that

12:31PM 25  we've been involved in is the topics are too broad or the

122

1  topics are too relevant or the topics are irrelevant, the

2  topics are off topic.  So, we don't really want to get

3  involved in all that.

4          I think what should happen is that Nintendo

12:31PM  5  should designate -- it already has its own 30(b)(6)

6  notices now.  So, it can designate its witnesses to

7  answer the 30(b)(6) topics that its own witnesses can

8  answer to and then -- because it shares the same counsel

9  and they're highly integrated.  In fact, Nintendo, for

12:31PM 10  the one -- the deposition we did have, they appointed

11  their own patent attorney to speak on behalf of Retro

12  with respect to some topics.  Then Nintendo can identify

13  which of these topics should be responded to by Retro.

14          But clearly, for example, Subparts I, J, and K

12:32PM 15  of this Topic No. 4, "materials and resources for Retro's

16  products and services related to the accused products or

17  development for the accused products, such as guidebooks,

18  manuals, APIs, SDKs, documentation, software tools, or

19  development platforms" --

12:32PM 20          THE COURT:  What exhibit are you looking at?

21          MR. PIA:  I am looking at Exhibit D to

22  SyncPoint's motion to compel, the subpoena.

23          THE COURT:  All right.

24          MR. PIA:  And I'm looking at Topic 4, Subparts

12:32PM 25  I through K.  Those certainly are Retro-specific.

1        There are others, such as B, "Retro's

2   development of games and software that make use of data

3   from the CMOS imaging array module in the Wii remote,"

4   that a Retro witness should be prepared to testify to.

12:33PM   5   So, at least those.

6        And we're happy to issue another subpoena that

7   we think is even more specific to Retro, but we don't

8   want to -- we want to try to avoid being back here again

9   on this same issue.  We're simultaneously seeking the

12:33PM  10   discovery from Nintendo and from Retro.  We already know

11   what Nintendo has.  We plan to depose them.

12        THE COURT:  All right.  I'm still looking for

13   your -- Exhibit D to Document 141?

14        MR. PIA:  Exhibit D to Document 141.

12:33PM  15        THE COURT:  It's a 28-page document.

16        MR. PIA:  Let me just make sure that's right.

17        THE COURT:  That appears to be the subpoena to

18   Retro.

19        MR. PIA:  That's right.  Then it is the

12:34PM  20   correct document.

21        And at the end of the subpoena -- I believe

22   it's the last page -- are the topics.  The other

23   information is -- includes definitions and general

24   process and procedure.

12:34PM  25        But then we get to page ID 2362, is what I'm

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 124 of 132 PageID #:
4428
CLAIM CONSTRUCTION HEARING 10-30-2015

124

 1    showing.  I think it's the last page.

 2              THE COURT:  There's a protective order

 3    attached to it as Exhibit A1?

 4              MR. PIA:  Let's see here.  That's actually the

12:34PM   5    document subpoena.

 6              I think I led the court astray on accident.

 7    It's Exhibit G.  I'm sorry.

 8              So, there's a document subpoena; and there is

 9    a deposition subpoena.  Exhibit G is the deposition

12:35PM  10    subpoena.

11              THE COURT:  All right.  And that's the

12    deposition subpoena for Retro?

13              MR. PIA:  That's right.

14              THE COURT:  And it is the fourth topic that

12:35PM  15    the parties are disagreeing about?

16              MR. PIA:  That's right, which is the

17    technical -- it's the meat of the topics.  The previous

18    topics are more venue related.  I'd have to say all of

19    these are really venue related if you think about it

12:36PM  20    because the location of technical information that goes

21    to infringement is important for venue.

22              But Topic 4 is what's disputed.  Topic 4,

23    Nintendo would not provide a witness for -- Retro would

24    not provide a witness for.

12:36PM  25              THE COURT:  All right.  Thank you.  Let me

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 125 of 132 PageID #:
4429
CLAIM CONSTRUCTION HEARING 10-30-2015

125

1    hear from Mr. Amborn again about Topic 4.

2             MR. AMBORN:  Your Honor, first I'd just like

3    to acknowledge something that Mr. Pia said.  You know, we

4    agree that they did not want to engage in a discussion

12:36PM   5    with us about our objections to their discovery.  In

6    fact, that's really the problem underlying all of these

7    discovery disputes.  So, I think that his statement that

8    that was something that they just didn't want to deal

9    with was very telling and significant.

12:36PM   10            But specifically on Topic 4, Mr. Pia made

11   another interesting admission.  He said that some of this

12   information is in fact available from Nintendo and should

13   be provided by Nintendo.  The problem with that statement

14   is that SyncPoint knew that this information was not only

12:37PM   15   available from Nintendo but had been provided by Nintendo

16   when it served this discovery and the document subpoena

17   that it served on Retro as well.  And, yet, it has

18   continued to object that Retro has not provided

19   duplicative discovery of what Nintendo has already

12:37PM   20   provided.

21             THE COURT:  And this is a 30(b)(6) notice.

22             MR. AMBORN:  That's correct.

23             THE COURT:  Not a document production notice.

24   So --

12:37PM   25             MR. AMBORN:  Yes, your Honor.  I apologize.  I

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 126 of 132 PageID #:
4430
CLAIM CONSTRUCTION HEARING 10-30-2015

126

was speaking about a related document production subpoena

that they also -- Mr. Pia was discussing.

With respect to this 30(b)(6) deposition

notice, Mr. Pia said that a number of these topics, like

12:37PM  K, are clearly directed to Retro and Retro's products.

There are two issues there.

First of all, we disagree with that.  If you

look at Subtopic K, it says that the deponent is to

provide testimony on the source code for the accused

12:38PM  products.

THE COURT:  Well, are there subtopics that you

are agreeable to providing a witness on?

MR. AMBORN:  Your Honor, Retro's position is

twofold on that topic.  One, again, they need to depose

12:38PM  Nintendo on Nintendo topics; and, two, to the extent

there are topics here that do not relate to Nintendo that

Nintendo cannot provide testimony on, they aren't

relevant to this case.

THE COURT:  So, I guess my question is:  Are

12:38PM  there topics here that you do agree to provide a witness

on?

MR. AMBORN:  At this point in time, no, your

Honor.  Again, Retro's position is that to the extent

there is anything relevant here, the relevant information

12:38PM  is requests related to Nintendo's products.  If after

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 127 of 132 PageID #:
4431
CLAIM CONSTRUCTION HEARING 10-30-2015

127

1  Retro -- or sorry -- if after SyncPoint deposes

2  Nintendo's witnesses regarding Nintendo's products it

3  concludes that there is some aspect of Nintendo's

4  products that Nintendo could not provide adequate

12:39PM  5  testimony on, then yes, Retro would be willing to provide

6  a witness to testify to the extent it had relevant

7  information.  But there are many aspects of this subpoena

8  that are irrelevant to this case.

9       THE COURT:  You have given, you know, them a

12:39PM  10  big target to shoot at.  You're saying there's nothing in

11  Topic 4 that you believe is proper discovery; so, that's

12  fine.  I'll just -- if they show me there is, then I'll

13  go from there; but that's --

14       MR. AMBORN:  No, no, that -- we're not...

12:39PM  15       Your Honor, I'm sorry.  I was speaking with my

16  co-counsel.

17       That's not what we're saying.  What we're

18  saying is not that we will not -- that Retro Studios will

19  not provide testimony on any of those topics.  Some of

12:39PM  20  these topics are most certainly relevant to this case,

21  but those topics that are relevant or those aspects of

22  these topics that are relevant to this case are all

23  topics that are more appropriately addressed to Nintendo.

24  So, to the extent that SyncPoint first takes the

12:39PM  25  depositions of Nintendo -- which, by the way, they just

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 128 of 132 PageID #: 4432
CLAIM CONSTRUCTION HEARING 10-30-2015

128

1    noticed technical witnesses from Nintendo for the very

2    first time this week in a case where discovery has been

3    proceeding for many months.  They have not yet noticed

4    the depositions of any of Nintendo's technical witnesses

12:40PM    5    until this week, despite the fact that they noticed Retro

6    for these topics many months ago.

7           So, Retro's position is that if SyncPoint

8    deposes Nintendo first on the relevant topics and if

9    SyncPoint concludes that Nintendo was somehow unable to

12:40PM    10   provide all relevant information, then Retro will happily

11   sit for a deposition on whatever is left.

12          THE COURT:  Okay.  Well, I -- I'm not going to

13   say that Retro has no obligation to provide discovery

14   until after Nintendo's discovery has been completed.  So,

12:40PM    15   what's your next position?

16          MR. AMBORN:  Well, and, your Honor, to be

17   clear here, Retro has provided discovery in this case.

18   Retro has provided, as I said, a witness to testify on

19   the first three topics already; and those topics are ones

12:41PM    20   that Retro believed were --

21          THE COURT:  Has that deposition occurred?

22          MR. AMBORN:  Yes.  That deposition occurred

23   the day before this deposition was scheduled to occur.

24   That deposition occurred on August 31st.

12:41PM    25          THE COURT:  And you say this deposition was

Case 2:15-cv-00247-JRG-RSP   Document 184   Filed 11/10/15   Page 129 of 132 PageID #:
4433
CLAIM CONSTRUCTION HEARING 10-30-2015

129

1  scheduled to occur the next day?

2         MR. AMBORN:  It was.

3         THE COURT:  And why did it not?

4         MR. AMBORN:  It did not because Retro moved to

12:41PM  5  quash this deposition -- which, by the way, was noticed

6  about 7 days prior to the scheduled date -- specifically

7  Topic 4.  Retro noticed -- or provided a witness to

8  testify on Topics 1, 2, and 3.  Topic 4, because it

9  covers extensive, highly technical, highly confidential,

12:41PM  10  detailed information that frankly would be impossible to

11  prepare for on 7 days' notice, Retro moved to quash that

12  subpoena because SyncPoint would not --

13         THE COURT:  Okay.  Well, we've resolved the

14  notice.  You've had a lot more than seven days now.  The

12:41PM  15  fact that it's highly confidential can be handled by the

16  protective order.

17         I am -- I am sympathetic to the argument that

18  it should be tailored, but I'm not sympathetic to the

19  argument that they have to jump through the hoop of

12:42PM  20  finishing their discovery from Nintendo.  I mean, after

21  all, you're proposing that they go through that and then

22  if they still think they want it, they can come to you.

23  Well, I expect they're still going to think they want it.

24         MR. AMBORN:  Well, your Honor, if SyncPoint

12:42PM  25  will tailor their discovery to topics that are specific

Case 2:15-cv-00247-JRG-RSP  Document 184  Filed 11/10/15  Page 130 of 132  PageID #: 4434
CLAIM CONSTRUCTION HEARING 10-30-2015

130

1   to Retro and relevant to this case, Retro would provide a

2   witness to testify on that.

3               THE COURT:  Okay.  Well, let's talk about

4   that.

12:42PM   5               I tell you what, why don't you gentlemen

6   confer on that, see if you can reach agreement on any of

7   these points; and we'll come back and take this back up

8   at 1:30.

9               MR. AMBORN:  Okay.  Thank you, your Honor.

12:43PM  10               THE COURT:  Thank you.  And we're in recess.

11               (Recess, 12:43 p.m. to 1:46 p.m.)

12               THE COURT:  Good afternoon.  Please be seated.

13               Mr. Pia.

14               MR. PIA:  We came to an agreement on how to

01:46PM  15   handle the motion to compel and the motion to quash.

16               THE COURT:  All right.

17               MR. PIA:  And specifically what we agreed to

18   is that the -- that Retro Studios will provide to us

19   source code for the game Metroid Prime 3 and related

01:46PM  20   technical documents and then a witness to testify -- a

21   30(b)(6) witness to testify as to that information as

22   well as how Nintendo collaborates with Retro Studios on

23   this game.

24               And then we would reserve our right for

01:46PM  25   additional discovery at that time, but this would get us

CLAIM CONSTRUCTION HEARING 10-30-2015

131

1   through the pending motions.

2          THE COURT:  And can you identify that game for

3   me one more time?

4          MR. PIA:  It's Metroid, M-E-T-R-O-I-D, Prime

01:47PM  5   3.

6          THE COURT:  Okay.  All right.  Thank you.

7          Mr. Kinsel?

8          MR. KINSEL:  Yes, your Honor.  We do have that

9   agreement.  So, we're there.  Just a couple of fine

01:47PM  10  housekeeping notes on that.

11         No. 1, we tend to view this production as

12  unrelated to the question of 3-1(g) compliance.  So, in

13  other words, our production -- Retro's production of this

14  source code, from our point of view, shouldn't be viewed

01:47PM  15  as a get-out-of-jail-free card on infringing

16  infringement -- amending infringement contentions beyond

17  the 3-1(g) deadline that Mr. Siebman discussed and that I

18  suppose will come up in a motion for leave to amend those

19  infringement contentions.  But I just didn't want the

01:48PM  20  record to be silent that we were somehow acceding that

21  Retro's production of those materials would ameliorate

22  that issue.

23         THE COURT:  All right.  I don't interpret this

24  as waiving your position on that.

01:48PM  25         MR. KINSEL:  Thank you, your Honor.

CLAIM CONSTRUCTION HEARING 10-30-2015

1          THE COURT:  All right.  Then I think we have

2     accomplished what we need for this afternoon.  I will get

3     a ruling out on the issues that we argued earlier as well

4     as on the claim construction as soon as possible.  And I

01:48PM  5     thank you for your participation today.

6          We're adjourned.

7

8          (Proceedings adjourned, 1:48 p.m.)

9

10

11     COURT REPORTER'S CERTIFICATION

12          I HEREBY CERTIFY THAT ON THIS DATE,

13     NOVEMBER 6, 2015, THE FOREGOING IS A CORRECT TRANSCRIPT

14     FROM THE RECORD OF PROCEEDINGS.

15

16

17                    /s/_____
                    TONYA JACKSON, RPR-CRR
18

19

20

21

22

23

24

25