Exhibit 7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re:<br><br>KARL C. HANSEN AND LISA H. HANSEN,<br><br>Debtors | CHAPTER 7<br>CASE NO. 12-11907-JMD |

### STIPULATION CONCERNING PATENT RIGHTS

THIS STIPULATION is made on the 21st day of February, 2017, by and between Olga L. Gordon, the duly-appointed Chapter 7 Trustee for the above-captioned bankruptcy estate (the "Trustee"), and SyncPoint Imaging LLC ("SyncPoint"), Karl C. Hansen and Lisa H. Hansen.

#### Background

A.    Karl C. Hansen and Lisa H. Hansen (the "Debtors") commenced this case by filing a voluntary petition under chapter 7 of the Bankruptcy Code on June 11, 2012 (the "Petition Date"), along with their schedules of assets and liabilities (the "Schedules").   The Trustee was appointed as chapter 7 trustee, the Debtors were examined by the Trustee at the meeting of creditors held pursuant to section 341 of the Bankruptcy Code (the "341 Meeting"), and the case was closed with no dividend to creditors.

B.    On September 3, 2015, the case was reopened and the Trustee was reappointed the next day.  Notice of the reopened case, including the deadline to file proofs of claim (the "Bar Date"), was sent to all creditors listed in the Schedules.   Claims in the total amount of $19,316.69 were filed on or before the Bar Date (the "Unsecured Claims").   In addition, the estate is liable for administrative expenses including the Trustee's commission (if any) and the fees and reimbursable expenses of her counsel (the "Administrative Expenses").

C.    On the Petition Date, Debtor Karl C. Hansen ("Hansen") owned the following domestic and foreign patents: US6275214B1, US6952198B2, US7091949B2, EP1200955B1,

DE60023900T2,  CA2378154C,  JP2003504705A(JP4822643B2),  and  AU200057549A,  which
Hansen licensed to PixArt Imaging, Inc. ("PixArt") on or about June 26, 2008, pursuant to a
Non-Exclusive  License  Agreement,  and  all  rights  associated  with  such  patents  (all  of  the
foregoing, the "Patent Assets").  After this case was closed and before it was reopened, Hansen
conveyed the Patent Assets to SyncPoint, and SyncPoint brought suit against PixArt, Nintendo
and others for patent infringement and other causes of action in the United States District Court
for the District of Texas, Marshall Division (Case No. 2:15-cv-247) (the "Patent Case").  PixArt
denied liability and the Patent Case remains pending.

       D.      Disputes have arisen between Hansen and the Trustee concerning, *inter alia*, (i)
whether the Patent Assets were properly disclosed in the Schedules and at the 341 Meeting, (ii)
whether, in consequence, the Patent Assets belong or must be turned over to the Trustee, or
whether SyncPoint owns the Patent Assets free and clear of any interest of the Trustee, (iii)
whether the Trustee's conduct concerning the Patent Assets, including attempting to sell the
Patent Assets to PixArt, was proper and if not, whether the Trustee should be removed (the
"Pending Disputes").  This Court has scheduled a hearing on the Pending Disputes to take place
at 1:30 p.m. on April 11, 2017 (the "Scheduled Hearing Time").

       E.      There appear to be two available paths to the potential realization of value from
the Patent Assets: (i) the Patent Assets could be sold to PixArt for $150,000 pursuant to the
Purchase and Sale Agreement between the Trustee and PixArt dated January 21, 2016 (the
"PixArt P&S"), or a higher or better cash purchase offer made pursuant to a sale process
conducted under section 363 of the Bankruptcy Code; or (ii) the Patent Case could be litigated to
a conclusion, whether through judgment or settlement; the damages claimed are contractual in
nature and to date exceed $35,000,000.00.  Instead of litigating the Pending Disputes, and in full

settlement thereof, the parties have executed this Stipulation to establish a process for this Court to determine whether the Patent Assets should be sold or the Patent Case should be litigated to conclusion for the benefit of the estate as well as SyncPoint.

### Agreement

NOW, THEREFORE, the Trustee, the Debtors and SyncPoint hereby stipulate and agree as follows:

1.      <u>Sale Motion</u>.  The Trustee shall file, in time to be heard by the Court at the Scheduled Hearing Time without shortening the 21-day notice period under Fed. R. Bankr. P. 2002(a)(2), a motion pursuant to section 363 of the Bankruptcy Code to sell the Patent Assets to PixArt pursuant to the PixArt P&S, subject to higher or better offers in accordance with the practice in bankruptcy sales (the "<u>Trustee Motion</u>"), *provided, however,* that SyncPoint's proposal pursuant to the following paragraph (the "<u>SyncPoint Proposal</u>") shall be deemed a qualifying counterbid and shall be submitted to the Court at the hearing on the Trustee Motion for consideration as to whether it is the highest or otherwise best offer for the Patent Assets, taking account of the best interest of creditors and, , the best interest of the Debtors (for which purpose a benefit to SyncPoint shall be deemed synonymous with a benefit to the Debtors) to the extent required by applicable law in light of the value of the Patent Rights as determined by the Court.

2.      <u>SyncPoint Proposal</u>.  SyncPoint hereby proposes that (a) title to the Patent Assets shall remain with SyncPoint, (b) SyncPoint and Hansen shall use reasonable diligence to continue to pursue the Patent Case (including any related proceedings such as appeals or arbitrations), whether to judgment or settlement, (c) from the first amounts received directly or indirectly on account of the Patent Assets (including proceeds from judgment or settlement of the

Patent Case, after payment of the fees and reimbursable expenses of SyncPoint's counsel in the case), SyncPoint shall pay the Trustee an amount equal to the total amount in which Administrative Expenses and Unsecured Claims are allowed by this Court including interest thereon at the federal judgment rate (the "Estate Amount"), (d) as security for payment of the Estate Amount, the Trustee shall have a first priority lien on the Patent Assets and proceeds thereof (including any and all amounts to which SyncPoint may be entitled pursuant to any judgment or settlement in the Patent Case) (the "Trustee Lien") subject only to such lien as may be provided under applicable law to SyncPoint's counsel in the Patent Case for fees and reimbursable expenses (the "Attorney's Lien"), (e) control of and decisions concerning the Patent Case and all other matters concerning realization of value from the Patent Assets shall be the sole purview of SyncPoint, but SyncPoint shall provide a written report to the Trustee (i) concerning any material event in the Patent Case or otherwise concerning the Patent Assets, within five business days after such event occurs, and (ii) whenever requested by the Trustee, within five business days after such request.

3.    Implementation of SyncPoint Proposal.  If the SyncPoint Proposal is approved by the Court as the highest or otherwise best offer for the Patent Assets, the Trustee shall (a) immediately execute such instrument as SyncPoint may reasonably request confirming SyncPoint's title to the Patent Assets and disclaiming any interest of the bankruptcy estate in the Patent Assets other than the Trustee Lien, and (b) subsequently execute such further instruments as SyncPoint may reasonably request to state, evidence of record, or otherwise confirm that SyncPoint is the sole holder of the Patent Rights (subject to the Trustee Lien).

4.    Implementation of Sale.  If the Court approves the sale of the Patent Assets, whether to PixArt pursuant to the PixArt P&S or pursuant to another offer (other than the

SyncPoint Proposal) that the Court determines to be the highest or otherwise best offer for the Patent Assets (the "Approved Sale"), SyncPoint and Hansen shall (a) immediately execute such instruments as the Trustee may reasonably request transferring to the Trustee all right, title and interest of SyncPoint and Hansen in the Patent Assets, and (b) subsequently execute such further instruments as the Trustee may reasonably request to state, evidence of record, or otherwise confirm that the Trustee or (at and after consummation of the Approved Sale) the purchaser at the Approved Sale is the sole holder of the Patent Rights.

5.     Representations and Warranties.  SyncPoint and Hansen hereby represent and warrant to the Trustee that (a) Hansen controls the limited liability company interests in SyncPoint, (b) the execution and performance of this Stipulation have been duly authorized by all necessary action of SyncPoint, and (c) SyncPoint owns and has good and clear record and marketable title to the Patent Rights free and clear of any lien, claim, adverse interest or the assertion thereof, other than the Attorney's Lien and the interest in the Patent Rights asserted by the Trustee in Adversary Proceeding No. 16-01010-JMD (before it is dismissed pursuant to the following paragraph).

6.     Court Approval of Stipulation.  The Trustee shall promptly file a motion for this Court to approve this Stipulation (the "Approval Motion").  If the Approval Motion is granted, then upon entry of the Court's order to that effect, (a) Adversary Proceeding Nos. 16-01010-JMD and 16-01045-JMD, and the Motion of Debtors seeking removal of the Trustee [Docket No. 66] (the "Pending Proceedings") shall be dismissed with prejudice and without costs, (b) the Trustee's pending motion in the Patent Case shall be withdrawn with prejudice and without costs, (c) SyncPoint and the Debtors shall execute and deliver to the Trustee, and the Trustee shall execute and deliver to SyncPoint and the Debtors, a general release in a form acceptable to

their respective counsel, acting reasonably.   Until the Approval Motion is determined, all deadlines and other requirements for either party to act in the Pending Proceedings shall be tolled.  If the Court denies the Approval Motion, all such deadlines shall be reset by agreement of the parties, acting reasonably, and subject to judicial approval where required.

7.   <u>Complete Agreement</u>.  This Stipulation constitutes the full, final and complete settlement of any and all disputes between the parties hereto, and supersedes all other written or oral exchanges, arrangements or negotiations between them concerning such disputes.

8.   <u>No Reliance on Representations</u>.  In executing this Stipulation, none of the parties has relied upon any representation, either oral or written, other than those specifically set forth herein.   There have been no inducements of any type or character made to any of the parties other than those specifically set forth in writing herein.

9.   <u>Amendment</u>.  This Stipulation may not be altered or amended except by an agreement in writing executed by all of the signatories listed below, and subject to approval of the Court if such agreement entails a burden upon or detriment to the bankruptcy estate.

10.   <u>Exclusive Jurisdiction</u>.  This Court shall have exclusive jurisdiction, to which each of the parties irrevocably consents, to determine any disputes arising under or related to this Stipulation.

11.   <u>Headings</u>.  Headings in this Stipulation are for convenience only and shall not be used in construing the document.

12.   <u>Successors and Assigns</u>.  This Stipulation shall be binding upon and inure to the benefit of the parties' respective heirs, successors and assigns.

13.  <u>No Third Party Beneficiaries</u>.  Except as set forth in the preceding paragraph, this Stipulation is intended solely for the benefit of the parties hereto.  The parties do not intend to confer the rights of a third party beneficiary upon any person or entity.

14.  <u>Counterparts</u>.  This Stipulation may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  Facsimile or PDF signatures shall be deemed original signatures.  Electronic delivery of a signed counterpart of this Stipulation shall have the same legal effect as though a counterpart of this Stipulation signed in ink were delivered in person.

EXECUTED as of the date first above written.

SYNCPOINT IMAGING LLC, KARL C. HANSEN AND LISA H. HANSEN

By their attorneys,


/s/ Joseph G. Pia
Joseph G. Pia
joe.pia@padrm.com
Utah State Bar No. 9945 (pro hac pending)
Robert Aycock
Utah State Bar No. 8878
raycock@padrm.com
PIA ANDERSON DORIUS REYNARD & MOSS
136 E. South Temple, 19th Floor
Salt Lake City, Utah 84111
Telephone: (801) 350-9000
Facsimile: (801) 350-9010

Carl D. Hanson
carl@hansonandnolin.com
HANSON AND NOLIN, LLP
276 Newport Road
Suite 204 The Gallery
New London, NH 03257

OLGA L. GORDON, CHAPTER 7 TRUSTEE

By her attorneys,


/s/ Daniel C. Cohn
Daniel C. Cohn, BNH 03239
Murtha Cullina LLP
99 High Street
Boston, Massachusetts 02110-2320
Telephone:  (617) 457-4000
Facsimile:   (617) 482-3868

Exhibit 8

**2017 BNH 005**      Note:  This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.

---

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                          Bk. No. 12-11907-JMD
                                                                Chapter 7
Karl C. Hansen and
Lisa H. Hansen,
              Debtors

*Daniel C. Cohn, Esq.*
*Murtha Cullina LLP*
*Boston, Massachusetts*
*Attorney for Chapter 7 Trustee*

*Thomas K. McCraw, Jr., Esq.*
*Duane Mathiowetz, Esq.*
*Rick C. Chang, Esq.*
*LeClairRyan LLP*
*Boston, Massachusetts and San Francisco, California*
*Attorneys for PixArt Imaging, Inc.*

*Joseph G. Pia, Esq.*
*Robert Aycock, Esq.*
*Pia Anderson Moss Hoyt*
*Salt Lake City, Utah*
*Attorneys for Debtors and SyncPoint Imaging, LLC*

## **MEMORANDUM OPINION**

### I. INTRODUCTION

On March 22, 2017, Olga L. Gordon, the chapter 7 trustee for the above-captioned bankruptcy case (the "Trustee"), filed a Motion for Sale or Other Disposition of Patent Assets (Doc. No. 103) (the "Motion").  The Motion was filed pursuant to the terms of a Stipulation Concerning Patent Rights (Doc. No. 99) (the "Stipulation"), which the Court approved on March 21, 2017 (Doc. No. 101).  Through the Motion, the Trustee seeks authority to sell to PixArt

Imaging, Inc. ("PixArt") certain patent assets[1] (the "Patent Assets") free and clear of all liens, encumbrances, or adverse interests, pursuant to the terms of a purchase and sale agreement dated January 21, 2016 (the "PixArt Offer"). In accordance with the terms of the Stipulation, SyncPoint Imaging LLC ("SyncPoint") made a counteroffer (the "SyncPoint Offer") to the PixArt Offer. The Court scheduled a hearing on the Motion for April 12, 2017, in order to consider the competing offers and to take evidence on the relevant issues.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire. This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. BACKGROUND

Debtor Karl Hansen owned various domestic and foreign patents, previously identified as the Patent Assets, on the date he filed chapter 7 bankruptcy on June 11, 2012. Prior to bankruptcy, the Debtor[2] had licensed the Patent Assets to PixArt pursuant to a non-exclusive license agreement dated on or about June 26, 2008 (the "License Agreement").[3] After the Debtor's bankruptcy case was closed on January 2, 2013, and before it was reopened on September 3, 2015, the Debtor conveyed the Patent Assets to SyncPoint, a Texas company that the Debtor controls. On February 20, 2015, SyncPoint brought suit against PixArt, Nintendo,

---

[1] The patents are US6275214B1 (referred to by the parties as the "214 Patent"), US6952198B2, US7091949B2, EP1200955B1, DE60023900T2, CA2378154C, JP2003504705A(JP4822643B2), and AU200057549A.

[2] The License Agreement was made between the Debtor and PixArt with Brilliant Points, Inc. ("Brilliant Points") acting as the Debtor's authorized agent with respect to licensing the Patent Assets. License Agreement at p. 3. The Debtor was Brilliant Point's president at the time the License Agreement was executed.

[3] In accordance with its terms, the License Agreement terminated on September 30, 2012. PixArt did not extend the license.

and others for patent infringement[4] and other causes of action in the United States District Court for the Eastern District of Texas, Marshall Division (the "Texas Federal Court"), Case No. 2:15-cv-247 (the "Patent Case"). PixArt denies liability in the Patent Case[5] and the Patent Case remains pending. SyncPoint asserts that the damages claimed in the Patent Case are contractual in nature and to date exceed $28 million. Once the bankruptcy case was reopened, a dispute arose between the Trustee and the Debtor as to whether the Patent Assets, and any causes of actions arising from ownership of the Patent Assets, were properly disclosed on the Debtor's schedules and at the first meeting of creditors held on July 11, 2012.[6] That dispute was resolved by the Stipulation. After the bankruptcy case was reopened, creditors were advised to file proofs of claim. Creditors filed claims totaling $19,316.69 with the Court.

## III.  COMPETING OFFERS

### A.  PixArt Offer

The PixArt Offer provides as follows:

1.      PixArt will pay the Trustee $150,000.00 for the Patent Assets.

---

[4] Note, as the result of recent decisions by the Patent Office and the Patent Trial and Appeals Board, SyncPoint's claims that PixArt, Nintendo, and the other defendants infringed the 214 Patent are essentially worthless as those decisions have held that the "claims" of the 214 Patent are invalid. A "claim" is a sentence at the end of a patent that defines, in technical terms, the scope of the legal protections conferred by the patent. According to the parties, most patents have multiple claims. The 214 Patent has twenty-six claims. In patent infringement litigation, "patent infringement" refers to a cause of action alleging infringement of one or more patent claims. However, the invalidity of the patent claims is not a defense to any contract claims arising under the License Agreement before the ruling on invalidity of such claims.

[5] The parties report that no answer has yet been filed in the Patent Case. Despite this, the Patent Case has proceeded with both fact and expert discovery. The Patent Case was eventually stayed on January 7, 2016, at SyncPoint's request, pending disposition of the proceedings before this Court regarding ownership of the Patent Assets.

[6] See 11 U.S.C. § 341.

3

2.   PixArt has paid a $50,000.00 deposit, which the Trustee is holding.  The deposit will be applied to the purchase price at the closing.  If, however, the Court were to approve another offer for the Patent Assets, PixArt would be entitled to the return of its deposit.

3.   The sale will be consummated within seven days of an order of the Court approving the PixArt Offer.  There are no conditions to consummation; the parties are required to close the sale even if an appeal from the sale order is pending.

4.   The sale is AS IS and WHERE IS, with a disclaimer of warranties as permitted by law.  From and after the closing, PixArt will indemnify the bankruptcy estate from any liability arising on account of post-closing events.

If a sale to PixArt were approved, the following would occur:

1.   Allowed prepetition claims would be paid in full as the Trustee has committed to subordinate that portion of her commission and counsel's fees and expenses as is necessary to assure that the allowed prepetition claims are paid in full.

2.   Administrative expenses would be paid nearly in full.[7]

3.   No money would be distributed to and no assets would revert to the Debtors.

4.   PixArt would move to dismiss the Patent Case.

**B. SyncPoint Offer**

Pursuant to the SyncPoint Offer:

1.   SyncPoint would retain ownership of the Patent Assets.[8]

2.   SyncPoint would be permitted to litigate the Patent Case (including any related proceedings such appeals or arbitrations) to conclusion, whether through judgment or settlement.

---

[7]  As of March 22, 2017, Trustee's counsel's fees and expenses totaled approximately $130,000.00.  The trustee commission on $150,000.00 would be $10,700.00.  Thus, along with creditor claims of nearly $20,000.00, administrative and creditor claims total about $160,000.00 (not including further counsel's fees and expenses that would accrue through the date of the sale closing).

[8]  Pursuant to the Stipulation, if the Court approves a sale to PixArt, SyncPoint will transfer the Patent Assets to the Trustee.  Apparently, until that time, ownership of the Patent Assets remains with SyncPoint.

    3.     Control of and decisions concerning the Patent Case and all other matters concerning the realization of value from the Patent Assets would be the sole purview of SyncPoint but SyncPoint would be required to provide a written report to the Trustee concerning any material event in the Patent Case, or otherwise concerning the Patent Assets, and whenever requested by the Trustee.

The following would occur if the SyncPoint Offer were approved:

    1.     If there is no recovery in the Patent Case, neither the creditors nor the administrative expenses of the bankruptcy estate would be paid.  In addition, SyncPoint would not recover the $10,000.00 it has advanced for costs in the Patent Case.  SyncPoint's attorneys, Pia Anderson Moss Hoyt ("PAMH"), would not recover money it has advanced for costs or the fees it has incurred, which to date total approximately, $242,120.00 and more than $2 million, respectively.

    2.     If there is a recovery in the Patent Case, the first funds would be paid to the Trustee to cover her fees and costs and the amounts owed to creditors, including interest at the federal judgment rate.

    3.     If the recovery exceeds the amounts necessary to pay administrative and unsecured creditors of the bankruptcy estate, the recovery would be split pursuant to the terms of a contingency fee agreement between SyncPoint and PAMH.  That fee agreement provides that, first, SyncPoint would recover the $10,000.00 it has advanced for costs in the Patent Case and, then, PAMH would recover its costs.  PAMH would next recover its fees.  SyncPoint and PAMH would then split the remainder of the award 40% and 60%, respectively.[9]

## IV. LEGAL STANDARDS

Motions to sell are governed by 11 U.S.C. § 363.  Section 363(b) provides that "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

---

[9] Pursuant to the Stipulation, any benefit to SyncPoint is to be considered a benefit to the Debtors.  Thus, under this scenario, the Debtors would receive funds, in essence a "surplus" in bankruptcy parlance.  It is this potential for a surplus that gives the Debtors standing to object to the Motion (Doc. No. 118).  See Licata v. Coan (In re Licata), 659 Fed. Appx. 704, 706 (2nd Cir. 2016) ("A Chapter 7 debtor has standing to object to a sale of the asset 'only if there could be surplus after all creditors' claims are paid.'  To establish standing, the Chapter 7 debtor has the burden of showing that there is at least a reasonable possibility of a surplus." (citations omitted)); see also Spenlinhauer v. O'Donnell, 261 F.3d 113, 119 (1st Cir. 2001); Kowal v. Malkemus (In re Thompson), 965 F.2d 1136, 1143 n.12 (1st Cir. 1992); In re Matthews, No. 10-96519-MGD, 2014 WL 1277874, at *3 (Bankr. D. N.D. Ga. Mar. 11, 2014) ("Courts generally agree that a debtor has no standing to object to the manner in which the trustee administers the bankruptcy estate, except in a case where a surplus is in prospect.").

### 3. Defenses

At the hearing, PixArt indicated that it will raise the following defenses to SyncPoint's breach of contract claim: (a) lack of personal jurisdiction; (b) judicial estoppel; (c) lack of standing; (d) equitable estoppel; and (e) statute of limitations. If successful, any one of these defenses may preclude a recovery by SyncPoint. SyncPoint contends that PixArt would not be able to raise any of these defenses in an arbitration proceeding since the License Agreement provides that "[t]the power of the arbitrators shall be limited to resolving the specific issues stated by determining the royalties [PixArt] owes or should receive credit for, if any, under this AGREEMENT. The power of the arbitrators shall not extend to any other matters." License Agreement § 10.1.2. The Court disagrees that PixArt will be unable to raise any defense to SyncPoint's entitlement to royalties in the Patent Case. It is nonsensical that PixArt would be prohibited from raising any challenges to its claimed liability in the Patent Case. As PixArt has pointed out, the License Agreement contains the following additional language: "All other disputes shall be subject to litigation in a court of competent jurisdiction." Id. The Court does not believe the License Agreement precludes consideration of PixArt's defenses. Such defenses will undoubtedly be raised by PixArt in the Patent Case and will be considered by the arbitrator or the Texas Federal Court.

#### a. Lack of Personal Jurisdiction

PixArt has already filed a motion in the Patent Case to dismiss SyncPoint's claim on the grounds that the Texas Federal Court lacks jurisdiction over it. The Texas Federal Court did not rule on the motion before it issued its stay of the Patent Case, and PixArt indicates it will renew that motion if/when the stay is lifted. PixArt states that it sells and delivers its CMOS sensors to Nintendo outside of the United States and has no control over Nintendo's use and importation of

14

those sensors into the United States.  According to PixArt, the Texas Federal Court has no personal jurisdiction over it as it has not purposely directed activities in the forum.  Without deciding the merits of this defense, it is clear that if the Patent Case continues, PixArt will pursue it.

### b. Judicial Estoppel

PixArt also contends that SyncPoint should be judicially estopped from pursuing its breach of contract claim based on the statements of its principal, the Debtor, in the bankruptcy proceedings.  When the Debtor filed for bankruptcy in June 2012, the Debtor did not list the Patent Assets under the "Patents, copyrights, and other intellectual property" category in Schedule B.  Instead, under the "Stock and interest in incorporated and unincorporated businesses" category, he listed his "100% Stock Ownership in Brilliant Consulting Service; Service oriented business.  Has 3 U.S. Patents but subject to fees/costs/expenses of use in France, Great Britain, Germany, Canada, Japan, and Australia" and he listed the value as zero.[12]  In addition, the Debtor did not list his interest in the License Agreement on Schedule B nor did he list any claims against PixArt, Nintendo, and others.

At the first meeting of creditors, during a discussion about the License Agreement, the Trustee asked the Debtor specifically whether he had "any basis to bring litigation against anyone for anything," and the Debtor replied, "No."  Despite such a statement, the Debtor, through SyncPoint, filed litigation against PixArt, Nintendo, and others in 2015.

PixArt makes a strong argument that the Debtor should be estopped from claiming damages in the Patent Case when he failed to disclose that claim in his bankruptcy case and in

---

[12] Brilliant Consulting Service appears to be the same entity as Brilliant Points mentioned in footnote 2, i.e., the Debtor's authorized agent with respect to the License Agreement.

fact took a position in his bankruptcy case that was inconsistent with the position he and SyncPoint now take in the Patent Case. See Browning Mfg. v. Mims (In re Coastal Plains, Inc.), 179 F.3d 197, 208 (5th Cir. 1999) ("Courts in numerous cases have precluded debtors or former debtors from pursuing claims about which the debtors had knowledge, but did not disclose, during the debtors' bankruptcy proceedings."); Brandon v. Interfirst Corp., 858 F.2d 266, 268 (5th Cir. 1988) ("Judicial estoppel is a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position."); see also Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987) ("[T]he very purpose of certain sections of the law . . . is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction.").

### c. Lack of Standing

PixArt asserts that SyncPoint does not have standing to sue for breach of contact since, at the time SyncPoint filed the Patent Case, the 214 Patent had not yet been assigned to SyncPoint. SyncPoint disputes this point. PixArt states that discovery is continuing; however, it believes that SyncPoint and its counsel engaged in fraudulent post-filing creation of patent assignment documents to cover up SyncPoint's failure to properly obtain an assignment of the Patent Assets from the Debtor prior to filing the complaint. The Debtor testified that while the assignment documents were re-done to correct an omission, they were completed prior to the filing of the Patent Case. At this point, it is difficult to discern whether there is merit to the lack of standing defense; however, as the Trustee stated at the hearing it will be "a hotly contested issue."

#### d. Equitable Estoppel

PixArt also intends to defend the Patent Case on the grounds that SyncPoint should be equitably estopped from pursuing the breach of contract claim as the Debtor believed he had an infringement claim as early as 2007, according to his own testimony, and he knew that PixArt was not paying him royalties based on sales of the CMOS sensors to Nintendo during the entire term of the License Agreement from July 2008 through September 2012. If PixArt had been made aware of the Debtor's claim during the term of the License Agreement, it could have challenged that claim or the validity of the 214 Patent itself. If PixArt had won that challenge, it would not have been required to pay any royalties going forward. By not acting, the Debtor lulled PixArt into inaction as well, never having the opportunity to challenge the 214 Patent and the Debtor's assertion that he was owed royalties. As noted earlier in this opinion, licensees cannot obtain a refund of royalties paid if a patent is later determined invalid. In the Trustee's view, PixArt has asserted a strong argument for equitable estoppel.

#### e. Statute of Limitations

PixArt intends to raise a statute of limitations defense to SyncPoint's breach of contract claim. PixArt contends that the 3-year statute of limitations provision of NH RSA 508:4(I)[13] applies in the Patent Case, given the choice of law provision in the License Agreement which provides that "[t]his AGREEMENT shall be construed, governed, interpreted, and applied in

---

[13] RSA 508:4(I) provides:

Except as otherwise provided by law, all personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of, except that when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.

accordance with the laws of the State of New Hampshire (United States of America)." License

Agreement § 12.8. SyncPoint disagrees that New Hampshire's statute of limitations provision

would apply because (1) in its view the 4-year statute of limitations of the forum state, Texas,

would apply instead;[14] and (2) RSA 508:4(I) only applies to "personal actions" and not to

arbitration proceedings, like the one the parties now agree will take place to determine

SyncPoint's entitlement to royalties.

Given the choice of law provision in the License Agreement, the Court believes that the

statute of limitations of New Hampshire and not Texas would apply.  Second, the Court notes

that SyncPoint raised its cause of action in the Texas Federal Court, i.e., in the context of a

"personal action," and, for that reason, RSA 508:4(I) would still apply even though the matter

will likely move to arbitration.

The statute of limitations defense matters because it greatly affects any determination of

damages.  SyncPoint claims it is owed $28 million in unpaid royalties for the entire License

Agreement term.  However, that liability may be reduced to zero.  From the Debtor's testimony,

it is clear that he believes that Nintendo has infringed his patent since as early as 2007.

However, PixArt's liability under the License Agreement could not have occurred any sooner

than the end of the first quarter after which a royalty payment was due under that agreement.

The first quarter ended September 30, 2008.  PixArt submitted its first royalty calculation report

on or about October 13, 2008, and it shows that less than fifty units were sold and that PixArt's

sales did not include any sales to Nintendo for the Wii.  Thus, the Debtor was aware as of

October 14, 2008, that he was not paid any royalties for CMOS sensors sold to Nintendo during

---

[14] If the 4-year statute of limitations applies, SyncPoint asserts that the unpaid royalties would total $3,927,217.00 with interest.  The amount owed would be much less if a 3-year limitations period were to apply.

the first reporting period.  Accordingly, this was the first purported breach of the License

Agreement by PixArt.  Neither the Debtor nor SyncPoint brought suit within three years of that

date, i.e., by October 14, 2011.  Therefore, the Court could find that SyncPoint's claim for

breach of contact is completely barred as the Patent Case was not filed until February 20, 2015.

SyncPoint apparently intends to argue that the License Agreement is a form of

installment contract whereby the statute of limitations would run only against each installment as

it became due.  See General Theraphysical, Inc. v. Dupuis, 118 N.H. 277, 279 (1978)) ("[W]hen

an obligation is to be paid in installments the statute of limitations runs only against each

installment as it becomes due even though the creditor has the option to declare the whole sum

due on default of an installment.").  If the License Agreement were an installment contract, and

because SyncPoint filed the Patent Case on February 20, 2015, SyncPoint would be able to assert

a claim for royalties for the 3-year period before February 20, 2015, i.e., from February 20, 2012,

forward.[15]

PixArt disputes that the License Agreement is an installment contract and that a separate

breach could have occurred each quarter when royalty payments were made.  Instead it contends

that if PixArt breached the License Agreement, it breached it only once, at the commencement of

the contract, when PixArt apparently decided that sales to Nintendo were not covered by the

License Agreement.  The Trustee agrees with this analysis.  See McNamara v. City of Nashua,

629 F.3d 92, 96 (1st Cir. 2011) (suggesting the "installment contract rule" does not apply to "a

---

[15] Of course the License Agreement terminated on September 30, 2012, so SyncPoint would only
be able to recover damages for a relatively short period of time, i.e., from February 20, 2012, through
September 30, 2012.  According to SyncPoint, the unpaid royalties for the first, second, and third quarters
of 2012 total $770,712.00 with interest.  PixArt contends that the maximum payment for this period
would be $462,426.00 with interest, as a substantial percentage of the CMOS sensors were used in
Nintendo Wiis outside of protected countries and/or in products that were not licensed products within the
meaning of the License Agreement.

claim based on a single distinct event which has ill effects that continue to accumulate over time").

The Court need not decide which side has the stronger argument on this issue or whether the License Agreement is in fact an installment contract. The Court concludes only that PixArt has a strong statute of limitations defense that would likely reduce any liability under the License Agreement from the $28 million claimed by SyncPoint to an amount that would be less than a $1 million, which would not result in any surplus to the Debtors.

### 4. Conclusion

Given the foregoing, the Court finds it problematic that SyncPoint would recover on its breach of contract claim in the Patent Case, let alone obtain a recovery sufficient to generate a surplus for the benefit of the Debtor. First, there may be difficulties with its basic claim of infringement. Second, PixArt has raised numerous defenses, any one of which could derail the Patent Case. Thus, the Court does not believe that SyncPoint has established a "reasonable chance of prevailing on its claims" against PixArt in the Patent Case. See C.R. Stone, 346 B.R. at 50. The Court finds this Jeffrey factor does not weigh in favor of the SyncPoint Offer but rather in favor of approving the PixArt Offer.

### C. Collectability

Neither PixArt nor SyncPoint really addressed whether any difficulties would be encountered in collecting a judgment against PixArt if SyncPoint were successful in the Patent Case. No one presented any evidence as to PixArt's financial condition or whether it has any assets in the United States. As noted by the Trustee, PixArt is headquartered in Taiwan. The Trustee questioned whether SyncPoint would be forced to go to Taiwan to collect. In the

20

Court's view, this <u>Jeffrey</u> factor does not weigh either in favor of approving or disapproving the Motion.

### D.  Complexity, Expense, and Delay of Litigation

As discussed above, the Patent Case first involves the determination of whether PixArt infringed the 214 Patent before a court or arbitrator can determine whether PixArt owes any royalties for use of the 214 Patent.  Thus, the infringement claims involves a technical analysis but it does not seem overly complex.  If infringement were found, the Patent Case would next involve a determination as to the amount of royalties that were due under the License Agreement.  This will involve contract law and, again, does not seem overly complex.

As for the expense of litigating the Patent Case, that weighs in favor of the SyncPoint Offer since SyncPoint and its counsel are bearing the full expense for pursuing the case. SyncPoint and PAMH have been fronting the costs and will continue to do so.  PAMH has taken the case on a contingent fee basis, which places the burden of litigating on them and removes any burden from the bankruptcy estate.

With respect to delay, unlike the SyncPoint Offer, which depends on success in the Patent Case and which might take years to complete given the possibility and likelihood of appeals, the PixArt Offer would provide creditors with "an immediate and certain payment" of one hundred percent of the unsecured debt in this case.  <u>See</u> <u>Jeffrey</u>, 70 F.3d at 187 (explaining the lower court did not abuse its discretion in approving a compromise that "would provide creditors with an immediate and certain payment of a large percentage of the outstanding debt"). Thus, the issue of delay goes against SyncPoint and in favor of PixArt.  As courts have noted, "[t]he bankruptcy system works because it processes cases expeditiously." <u>In re Adams</u>, 424 B.R. 434, 437 (Bankr. N.D. Ill. 2010).

Thus, the <u>Jeffrey</u> factor regarding the complexity of the litigation involved, and the expense, inconvenience, and delay attending it, appears neutral.

### E.  Parties' Interests

Despite being provided with notice of the Motion and the hearing thereon, no creditor filed a response to the motion or appeared at the hearing in order to offer any creditor views on the matter pending before the Court.  PixArt argues that creditors' interests would be best served by approval of the PixArt Offer.  In its view, creditors will not get paid if SyncPoint is allowed to continue the Patent Case while they are certain to get paid under the PixArt Offer.

The Trustee contends that this factor is neutral.  While the creditors have an interest in getting paid, the Debtors have a competing interest in pursuing a possible surplus.  In her view, apparently neither interest supercedes the other.

SyncPoint contends that it and the Debtor will lose out if the Motion is granted.  The Debtor and his family have invested hundreds of hours in the Patent Case.  PAMH has invested thousands of hours and incurred legal fees totaling more than $2 million.  SyncPoint focuses on the Debtor's interest in a surplus to support its position that his interests would be best served by approval of the SyncPoint Offer.  The Debtor and SyncPoint emphasize that any current value to the Patent Assets was clearly created by SyncPoint after the Debtor's bankruptcy discharge as they have invested their own precious time and resources to pursue their claims against PixArt. The Court notes that the Debtors and SyncPoint only had that opportunity because it appears the Debtor failed to properly disclose his claims while in bankruptcy; if he had, the Trustee could

have pursued them on behalf of the bankruptcy estate before the bankruptcy case closed.[16]  Thus, the Debtor's argument in this regard is disingenuous.

The Bankruptcy Code sets forth a scheme for distributing property in chapter 7 cases.  11 U.S.C. § 726.  Pursuant to that scheme, unsecured creditors must be paid, with interest, before any property of the estate is returned to debtors.  11 U.S.C. § 726(a)(2), (5), and (6).  Explicitly the Bankruptcy Code provides for priority in payment to creditors over payment to debtors.[17]  Given that policy, the Court finds that the certainty of payment to creditors through the PixArt Offer over the uncertainty of payment to creditors and a surplus to the Debtors through the SyncPoint Offer warrants a finding that this <u>Jeffrey</u> factor weighs in favor of approving the PixArt Offer.

**F.  Summary**

All together, the <u>Jeffrey</u> factors support approval of the compromise the Trustee has put before the Court.  The Court agrees with the Trustee's assessment that SyncPoint does not have a high probability of success on its breach of contract claim.  As for the factors concerning collectability and the complexity, expense, and delay of litigation, the Court finds they are neutral.  With respect to the last factor, consideration of the creditors' interests, as well as the Debtor's interest in a possible surplus in this case, the Court finds that this factor weighs in favor of approval of the Motion as the Bankruptcy Code's distribution scheme supports the Court's

---

[16]  The Debtor testified that prior to filing bankruptcy he believed he had a claim against PixArt under the License Agreement, but that he could not afford to pursue it.  If he had made his belief known to the Trustee and she had determined not to pursue the claim, the Trustee would not be pursuing this matter now.

[17]  See <u>Czyzewski v. Jevic Holding Corp.</u>, 137 S. Ct. 973 (2017) (holding a bankruptcy court may not approve a structured dismissal of a chapter 11 case that provides for distributions that do not follow the Bankruptcy Code's ordinary priority rules without the affected creditors' consent).

23

conclusion that, while it must consider both the creditors' and Debtors' interests, the creditors' interests are paramount and the PixArt Offer provides a certain and immediate recovery to creditors while the SyncPoint Offer does not.

## VI. CONCLUSION

Given the Trustee's many years of experience, and her and her counsel's professional competence, the Court will defer to the Trustee's business judgment that it is in the best interests of the parties to effectively settle the Patent Case by selling the Patent Assets to PixArt in order to provide a certain and immediate recovery to the Debtors' creditors. The Court agrees that the settlement of the Patent Case reasonably reflects the value of resolving any claim SyncPoint has for royalties and securing funds to pay creditors without the time, cost, and risk of further litigating the Patent Case. The Court also finds that the Jeffrey factors weigh in favor of approving the Trustee's settlement. While the Debtor's possibility of receiving a surplus will be lost, in the Court's view, SyncPoint's possibility of recovery in the Patent Case is slim. The Court is certain that the SyncPoint Offer and the Patent Case do not provide a recovery to unsecured creditors that exceeds what they will recover from the PixArt Offer in just seven days. For those reasons, the Court shall enter a separate order authorizing the Trustee to sell the Patent Assets to PixArt pursuant to the terms of the PixArt Offer. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:   April 25, 2017                     /s/ J. Michael Deasy
                                           J. Michael Deasy
                                           Bankruptcy Judge

24

Exhibit 9

1

```
1                UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF TEXAS
2                     MARSHALL DIVISION

3
     SYNCPOINT IMAGING, LLC     |  DOCKET NO. 2:15CV247
4                               |
                                |  OCTOBER 30, 2015
5    VS.                        |
                                |
6                               |  9:05 A.M.
     NINTENDO OF AMERICA,       |
7    INC., ET AL                |  MARSHALL, TEXAS

8    ------------------------------------------------------

9           VOLUME 1 OF 1, PAGES 1 THROUGH 132

10     REPORTER'S TRANSCRIPT OF CLAIM CONSTRUCTION HEARING
                    AND MOTIONS HEARING
11

12           BEFORE THE HONORABLE ROY S. PAYNE
               UNITED STATES MAGISTRATE JUDGE
13
     ------------------------------------------------------
14

15   APPEARANCES:

16   FOR THE PLAINTIFF:     JOSEPH PIA
                            PIA ANDERSON DORIUS REYNARD & MOSS
17                          222 SOUTH MAIN STREET
                            SUITE 1830
18                          SALT LAKE CITY, UTAH 84101

19                          ROBERT AYCOCK
                            WORKMAN NYDEGGER
20                          222 SOUTH MAIN STREET
                            SUITE 1830
21                          SALT LAKE CITY, UTAH 84101

22                          SANDEEP SETH
                            SETH LAW OFFICES
23                          1200 SMITH STREET
                            SUITE 1600
24                          HOUSTON, TEXAS 77002

25
```

2

```
 1                          ELIZABETH DERIEUX
                            CAPSHAW DERIEUX LLP
 2                          114 EAST COMMERCE AVENUE
                            GLADEWATER, TEXAS 75647
 3

 4  FOR THE NINTENDO:       GRANT KINSEL
                            PERKINS COIE LLP
 5                          1888 CENTURY PARK EAST
                            SUITE 1700
 6                          LOS ANGELES, CALIFORNIA 90067

 7                          CLYDE SIEBMAN
                            SIEBMAN BURG PHILLIPS & SMITH
 8                          300 NORTH TRAVIS STREET
                            SHERMAN, TEXAS 7509
 9
                            KYLE AMBORN
10                          PERKINS COIE LLP
                            700 THIRTEENTH STREET, NW
11                          SUITE 600
                            WASHINGTON, DC 20005
12

13  FOR PIXART:             DUANE MATHIOWETZ
                            RICK CHANG
14                          LECLAIRRYAN LLP
                            44 MONTGOMERY STREET
15                          18TH FLOOR
                            SAN FRANCISCO, CALIFORNIA 94104
16
                            CLAIRE HENRY
17                          WARD, SMITH & HILL
                            1127 JUDSON ROAD
18                          SUITE 220
                            LONGVIEW, TEXAS 75606
19

20

21  COURT REPORTER:         TONYA B. JACKSON, RPR-CRR
                            FEDERAL OFFICIAL REPORTER
22                          300 WILLOW, SUITE 239
                            BEAUMONT, TEXAS  77701
23

24
        PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
25     TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

Case 2:15-cv-00247-JRG-RSP   Document 293-2   Filed 02/23/18   Page 29 of 40 PageID #:
9221
CLAIM CONSTRUCTION HEARING 10-30-2015

97

1    don't we go ahead and take them up then now, and we'll

2    see what kind of progress we make.

3         Is there any argument in addition to what's in

4    the briefs that the parties want to offer about the

11:52AM  5    motions relating to arbitration?

6         MR. MATHIOWETZ:  If I could, your Honor.

7    Duane Mathiowetz for PixArt.

8         Your Honor, I believe where the court got off

9    the rails in deciding this motion was failing to

11:53AM  10   recognize that the parties' agreement to proceed pursuant

11   to the AAA rules put the question of arbitrability

12   squarely in the hands of the arbitrator and took it away

13   from the court.  And, specifically, the Fifth Circuit

14   case of *Petrofac versus DynMcDermott Petroleum Operations*

11:53AM  15   cited in our brief -- but it's 687 F.3d 671 -- controls.

16   And that case makes it very clear that when the parties

17   adopt the AAA rules, including Rule 7(a), that the

18   arbitrator is the one who makes the decision with respect

19   to arbitrability.  Instead, by deciding on its own that

11:54AM  20   the scope of the arbitration clause was limited to the

21   amount of royalties in dispute, the court avoided

22   altogether the application of the Federal Arbitration Act

23   and denied the stay relying on the court's inherent

24   authority to control the docket.  But that's really --

11:54AM  25   you know, it ties back to in the first instance that

98

1   decision should be made by the arbitrator.

2          THE COURT:  Do you have any authority that you

3   would cite that involves an arbitration agreement that

4   has an express provision limiting the authority of the

11:54AM   5   arbitrator like this one does?

6          MR. MATHIOWETZ:  I think, your Honor, it's --

7   it comes straight from the -- if I'm understanding the

8   question, it really comes straight from the *Petrofac*

9   decision because the party -- its clear that the parties

11:55AM  10  have adopted the AAA rules.  And *Petrofac* just says as

11  soon as you've adopted the AAA rules, it's now the

12  mediator who makes the decision on arbitrability.

13          So, that's -- you know, we didn't -- it was

14  interesting because there was no discussion whatsoever by

11:55AM  15  SyncPoint of the *Petrofac* case; and we think there's a

16  reason for that, because *Petrofac* is very clear.  It's

17  Fifth Circuit law that controls and it says this decision

18  should first go to -- should be made by the arbitrator

19  and because it's a decision to be made by the arbitrator,

11:56AM  20  you now have to invoke the Federal Arbitration Act which

21  says if there is a question that is, you know,

22  arbitrable, the court should stay the action so that the

23  arbitration can move forward on those issues.

24          So, that's our position, your Honor; and

11:56AM  25  that's just where we think the court went wrong in its

1    decision.

2              THE COURT:  So, I'm taking it from that that

3    you don't have any authority that deals with an agreement

4    that expressly limits the role of the arbitrator.

11:56AM   5              MR. MATHIOWETZ:  Well, I guess it depends on

6    what you mean by the agreement "expressly limits the role

7    of the arbitrator" as it applies to this particular

8    decision.

9              THE COURT:  Then let me be specific.

11:56AM  10    Something along the lines of the term in -- that says the

11    power of the arbitrator shall not extend to any other

12    matters; all other disputes shall be subject to

13    litigation.  That's the -- that's what I'm talking about

14    as an express limitation.

11:57AM  15              MR. MATHIOWETZ:  Right.  And it's not really a

16    question, we believe, your Honor, of whether or not this

17    is a general or limited scope.  The fact that the parties

18    have invoked the AAA rules trumps the fact that there is

19    this additional language in the arbitration clause.  And

11:57AM  20    I would point to -- there is other language that suggests

21    that this is not a narrow term.  There's broad permissive

22    language like "any dispute should be arbitrated

23    concerning," "any dispute concerning," and "shall be."

24              THE COURT:  Any dispute concerning the amount

11:58AM  25    of royalties --

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
|         | 1  | MR. MATHIOWETZ: Yes. That's any dispute.                     |
|         | 2  | THE COURT: -- payable under this agreement.                  |
|         | 3  | MR. MATHIOWETZ: Right.                                        |
|         | 4  | THE COURT: Okay.                                             |
| 11:58AM | 5  | MR. MATHIOWETZ: But it's also clear from the                 |
|         | 6  | case of *Rhone-Polenc* that even though there is an          |
|         | 7  | infringement matter involved, that doesn't mean that         |
|         | 8  | that's something that's apart from the royalties. Here       |
|         | 9  | you have a case where the -- there's just an intertwining    |
| 11:58AM | 10 | of royalties and other decisions that have to be made;       |
|         | 11 | and it's clear even from the language that was written by    |
|         | 12 | Mr. Hansen, who, you know, drafted the agreement, that       |
|         | 13 | anything related to royalties has to be decided in an        |
|         | 14 | arbitration.                                                 |
| 11:59AM | 15 | The fact that it brings up other issues                      |
|         | 16 | doesn't mean that those issues that are related to the       |
|         | 17 | royalty cannot be decided by the arbitrator. And here --     |
|         | 18 | and I think really, again, looking at the *Rhone-Polenc*     |
|         | 19 | case, it tells you that if you have issues in a patent       |
| 11:59AM | 20 | infringement matter and you have a royalty dispute,          |
|         | 21 | those -- all those issues that relate to how you             |
|         | 22 | calculate the royalty have to be decided in the              |
|         | 23 | arbitration; and that's definitely the situation we have     |
|         | 24 | here.                                                        |
| 11:59AM | 25 | THE COURT: Okay. And not to beat a dead                      |

1  horse.  Do you have any authority that deals with an

2  arbitration agreement that expressly limits the authority

3  of the arbitrator?

4          MR. MATHIOWETZ:  Nothing beyond what's already

11:59AM  5  in our briefing, your Honor.

6          THE COURT:  Okay.  All right.  Thank you,

7  Mr. Mathiowetz.

8          MR. AYCOCK:  Hello, your Honor.  Robert Aycock

9  for SyncPoint.

12:00PM  10         I don't believe there is any authority; and

11  when we look at the provision of 10.1.2, it specifically

12  does limit what will be arbitrated.  And if we were to

13  accept PixArt's proposition that all issues -- and

14  counsel for PixArt said "some issues," but they're now

12:00PM  15  asking for all issues -- there would be no meaning to

16  these terms.

17         THE COURT:  Are you seeking royalties for

18  infringement that you allege occurred during the term of

19  this agreement?

12:01PM  20         MR. AYCOCK:  That position is being continued

21  to be evaluated by the damages expert on our side, your

22  Honor.

23         THE COURT:  All right.  I think there's either

24  a "yes" or "no" on that.  Are you seeking it, or are you

12:01PM  25  not seeking it?

Case 2:15-cv-00247-JRG-RSP  Document 293-2  Filed 02/23/18  Page 34 of 40 PageID #:
9226
CLAIM CONSTRUCTION HEARING 10-30-2015

102

|         |    |                                                         |
|---------|----|---------------------------------------------------------|
|         | 1  | MR. PIA:  If I may respond.  So, there --               |
|         | 2  | thank you, your Honor.  Joe Pia.                        |
|         | 3  | There are royalties that are required to be             |
|         | 4  | paid under the contract if the contract is breached, and|
| 12:01PM | 5  | there's separate royalties that could be assessed for   |
|         | 6  | infringement.  And those can be separable issues.  So, we|
|         | 7  | have a breach of contract claim, and we also have an    |
|         | 8  | infringement claim.  We might seek royalties for both in|
|         | 9  | both contexts.  The intention is to do that, and        |
| 12:01PM | 10 | discovery is ongoing.                                   |
|         | 11 | THE COURT:  So, are you -- you're saying that           |
|         | 12 | you are in this lawsuit seeking royalties for           |
|         | 13 | infringement that you allege occurred during the term of|
|         | 14 | this agreement.                                         |
| 12:02PM | 15 | MR. PIA:  Yes, and for royalties not paid for           |
|         | 16 | breach of the contract.                                 |
|         | 17 | THE COURT:  And why do you contend, then, that          |
|         | 18 | the arbitration clause shouldn't govern the amount of   |
|         | 19 | those royalties?                                        |
| 12:02PM | 20 | MR. PIA:  The arbitration agreement would not           |
|         | 21 | govern the amount of royalties in the infringement      |
|         | 22 | context because there's nothing about that in that      |
|         | 23 | agreement.  What that agreement governs is the amount of|
|         | 24 | royalties per the terms of that contract.               |
| 12:02PM | 25 | THE COURT:  And are you seeking royalties per           |

Tonya B. Jackson, RPR-CRR
409.654.2833

CLAIM CONSTRUCTION HEARING 10-30-2015

103

1    the terms of that contract in this lawsuit?

2              MR. PIA:  Yeah.  We're seeking -- well,

3    royalties and damages, which are in addition to

4    royalties, but yes.  As one aspect of this case, there

12:03PM   5    are -- there will be -- we are asserting that there are

6    royalties that were not paid.  There are also other

7    damages related to breach of contract, and then there are

8    infringement damages.

9              THE COURT:  So, why wouldn't the amount of

12:03PM  10    those royalties which arise from this contract be subject

11    to that arbitration clause?

12              MR. PIA:  And that might be possible when we

13    get to that point in the proceedings; and as I recall,

14    the court's order -- prior order was that the arbitration

12:03PM  15    motion would be denied without prejudice and could be

16    raised at a later point in time.  Once we have been

17    through that whole process, it might end up being that

18    our damages and royalties are limited to infringement or

19    some other basis.  But yes, currently we are alleging

12:03PM  20    that there are royalties due under the contract.  So,

21    we'd just ask the court to affirm its prior decision and

22    say that the arbitration motion is denied without

23    prejudice and PixArt can raise that issue again.

24              THE COURT:  All right.  Thank you, Mr. Pia.

12:04PM  25              MR. MATHIOWETZ:  May I briefly respond, your

104

1  Honor?

2          THE COURT:  Yes.

3          MR. MATHIOWETZ:  The problem with that

4  scenario that's been proposed by Mr. Pia is that that

12:04PM  5  clearly requires the court to ignore the Federal

6  Arbitration Act.  The Federal Arbitration Act says that

7  if there's an arbitratable issue, the court must stay the

8  action so that the arbitration can be completed and those

9  issues can be resolved.  So, it's flipping it.  It's

12:04PM  10  putting the cart before the horse.  So, really what

11  should happen is the case should be stayed, the

12  arbitration resolved.  That may take care of everything.

13  At least as to the damages that occurred during the

14  contract period.

12:05PM  15          THE COURT:  Well, it clearly can't take care

16  of everything.

17          MR. MATHIOWETZ:  It can't take care of

18  everything, but it will take care of a lot.  And the case

19  law is -- or -- and I'll just paraphrase it; but the case

12:05PM  20  law says that even if there are other issues that need to

21  be resolved, the arbitration should go forward and that

22  resolution should be done first.

23          THE COURT:  Well, I guess one option under

24  your theory would be to sever the claim for royalties

12:05PM  25  based on the agreement during its term and send those to

Case 2:15-cv-00247-JRG-RSP  Document 293-2  Filed 02/23/18  Page 37 of 40 PageID #:
9229
CLAIM CONSTRUCTION HEARING 10-30-2015

105

1  arbitration.  Why should we stay the rest of the case?

2  It is clearly excluded by the express terms of the

3  contract.

4           MR. MATHIOWETZ:  I think that's a matter of

12:06PM  5  judicial efficiency, your Honor.  Because what the court

6  should allow to happen is the arbitration would resolve

7  the issue of whether or not any royalties were due during

8  the contract period.  That issue will necessarily also

9  impact whether or not there are any royalty -- or there

12:06PM  10  would be any damages due to infringement that occurred

11  after the contract period.

12           THE COURT:  How would it necessarily impact

13  that?

14           MR. MATHIOWETZ:  Well, I think what happens is

12:06PM  15  you then have the -- let's say that the arbitrator

16  decides that there is no infringement; therefore, no

17  royalties are due.  Okay.  You now have a decision that

18  there were no royalties due.  I think that is at least --

19  you know, whether or not the plaintiff wants to come back

12:07PM  20  and challenge that decision, you've already got a

21  decision on whether or not there should be any royalties

22  or damages, however you want to phrase it, with respect

23  to the period that occurred -- or during the contract

24  period.

12:07PM  25           Let's say the flip side of that.  The

Case 2:15-cv-00247-JRG-RSP  Document 293-2  Filed 02/23/18  Page 38 of 40 PageID #: 9230
CLAIM CONSTRUCTION HEARING 10-30-2015

106

1    arbitrator comes back and says, "I think there's

2    infringement."  Well, how many units did you sell; and

3    what's the appropriate royalty rate?  So, those things

4    will then get decided by the arbitrator.  They no longer

12:07PM  5    have to be decided by the court.

6              THE COURT:  What would be your authority for

7    the proposition that the arbitrator's decision on those

8    issues would in any way be binding in the litigation?

9              MR. MATHIOWETZ:  I would have to find some for

12:07PM  10   you, your Honor.  That's not an issue that we briefed.

11             THE COURT:  Okay.  I don't think that's the

12   case but I understand your argument on it and I will

13   consider that.

14             MR. MATHIOWETZ:  Thank you.

12:08PM  15             THE COURT:  Thank you, Mr. Mathiowetz.

16             What is the next motion that the parties want

17   to address?

18             MR. KINSEL:  Your Honor, from Nintendo's point

19   of view, the protective order motion I think would be --

12:08PM  20   regarding source code would be effective and appropriate

21   and relatively condensed.

22             THE COURT:  Okay.

23             MR. KINSEL:  So, that would be my suggestion.

24             THE COURT:  All right.  Thank you, Mr. Kinsel.

12:08PM  25             MR. KINSEL:  Thank you.

Exhibit 10



LECLAIR RYAN

Duane H. Mathiowetz
415.913.4904
Duane.Mathiowetz@leclairryan.com

**Subject to FRE 408**

November 25, 2015

**VIA EMAIL**

Joseph G. Pia
Counsel for SyncPoint Imaging, Inc.
Pia Anderson Dorius Reynard & Moss
222 South Main St., Suite 1830
Salt Lake City, Utah 84101

   Re: ***SyncPoint Imaging, LLC v. Nintendo of America, Inc. et al.***
     **USDC, Eastern District of Texas Case No. 2:15-CV-00247-JRG-RSP**

Dear Joe:

Thank you for your letter of November 24, 2015, setting forth SyncPoint's settlement demand. As I stated at the mediation on November 23, but which apparently did not come across as a "counter," PixArt is willing to settle the case under the following conditions: SyncPoint immediately dismisses PixArt with prejudice, with each side to bear its own costs and fees. PixArt will forego filing affirmative claims against SyncPoint and Karl Hansen, and will not seek its attorney fees and costs.

Please note that this offer will only remain open until such time as PixArt has to incur further fees and costs, which is no later than Wednesday of next week.

     Sincerely,

     /s/ Duane Mathiowetz

     Duane H. Mathiowetz
     Attorney at Law

E-mail: Duane.Mathiowetz@leclairryan.com
Direct Phone: (415) 913-4904
Direct Fax: (415) 391-8766

44 Montgomery Street, Eighteenth Floor
San Francisco, California 94104
Phone: 415.391.7111 \ Fax: 415.391.8766

CALIFORNIA \ COLORADO \ CONNECTICUT \ GEORGIA \ MARYLAND \ MASSACHUSETTS \ MICHIGAN \ NEW JERSEY \ NEW YORK \ PENNSYLVANIA \ TEXAS \ VIRGINIA \ WASHINGTON, D.C.