# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| SYNCPOINT IMAGING, LLC,<br><br>　　　Plaintiff,<br><br>vs.<br><br>NINTENDO OF AMERICA INC., et al.,<br><br>　　　Defendants. | **No. 2:15-cv-00247-JRG-RSP**<br>[Jury Trial Demanded]<br><br>[REDACTED VERSION FILED PURSUANT TO PROTECTIVE ORDER] |

### Nintendo's Motion for Exceptional Case Attorney Fees
### Under 35 U.S.C. § 285

# TABLE OF CONTENTS

**Page**

INTRODUCTION................................................................................................... 1

1.    Facts ........................................................................................................ 2

    1.1    Mr. Hansen knew, for almost a decade, that the Wii could not
        infringe; he sued anyway. ........................................................... 2

    1.2    SyncPoint pursued an unreasonable invisible-cursor theory, and
        Nintendo warned SyncPoint of the consequences........................ 5

    1.3    The Court confirmed that the claims require a visible external cursor........ 6

    1.4    SyncPoint conceded it could not show literal infringement or
        damages against Nintendo, but still refused to dismiss because it
        knew it was exposed for fees. ...................................................... 7

2.    SyncPoint litigated the case in bad faith......................................................... 9

    2.1    Mr. Hansen and the Pia Firm manufactured evidence to cover-up a
        perceived error in standing. ........................................................ 9

        2.1.1  The three assignments.................................................... 9

        2.1.2  Mr. Hansen signed the assignments in the wrong order, and
              he and his lawyers worked to cover it up. .................... 10

    2.2    The fight over venue was colored by Mr. Hansen and the Pia Firm's
        factual misrepresentations. ...................................................... 13

3.    35 U.S.C. § 285 allows a Court to award fees to a prevailing party in an
    exceptional case. ......................................................................................... 16

    3.1    Nintendo is the prevailing party. ............................................. 16

    3.2    This case was exceptional within the meaning of 35 U.S.C. § 285. .......... 17

    3.3    Mr. Hansen knew the Wii could not infringe, conducted essentially
        no pre-filing investigation, and sued Nintendo anyway........................... 17

    3.4    Mr. Hansen and the Pia Firm engaged in serious litigation
        misconduct. .............................................................................. 19

4.    A fee award pursuant to 35 U.S.C. § 285 can run against parties other than
    the plaintiff. ............................................................................................... 21

    4.1    SyncPoint is a shell whose intended purpose was to establish venue in
        this Court, shield Mr. Hansen and the Pia Firm from personal
        responsibility for this frivolous case, and to wither away if things
        went wrong. .............................................................................. 21

**TABLE OF CONTENTS**
**(continued)**

Page

4.2   Mr. Hansen and the Pia Firm were responsible for the conduct that makes this case exceptional. ................................................................. 25

4.3   Equity demands that Mr. Hansen and the Pia Firm be made parties. ....... 27

4.4   Adding Mr. Hansen and the Pia Firm as third-party defendants satisfies due process. ................................................................. 27

5.   Nintendo's fees are reasonable. ........................................................ 27

5.1   Nintendo's fees were reasonable under the lodestar method. ................... 28

CONCLUSION ................................................................................. 30

# TABLE OF AUTHORITIES

**Page**

CASES

*Highmark Inc. v. Allcare Health Mgmt. Sys.*,
   __ U.S. __, 134 S.Ct. 1744 (2014) ............................................................. 17

*Highway Equip. Co., Inc. v. FECO, Ltd.*,
   469 F.3d 1027 (Fed. Cir. 2006) ............................................................. 16

*Iris Connex, LLC v. Dell, Inc.*,
   235 F.Supp.3d 826 (E.D. Tex. 2017) ..................................................passim

*Lumen View Tech. LLC v. Findthebest.com, Inc.*,
   811 F.3d 479 (Fed. Cir. 2016) ............................................................. 28

*MyHealth v. ALR Techs., Inc.*,
   Case No. 2:16-cv-00535-RWS-RSP, Dkt. 131 (Dec. 19, 2017) ........................... 16, 17

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   __ U.S.__, 134 S.Ct. 1749 (2014) ............................................................. 17

*Opal Run LLC v. C & A Marketing, Inc.*,
   Case No. 16-cv-0024-JRG-RSP (E.D. Tex. Nov 29, 2017) ....................................... 20

*Oplus Techs., Ltd. v. Vizio, Inc.*,
   782 F.3d 1371 (Fed. Cir. 2015) ............................................................. 17

*SUFI Network Servs., Inc. v. United Sates*,
   785 F.3d 585 (Fed. Cir. 2015) ............................................................. 28

STATUTES

35 U.S.C. § 285 ............................................................................passim

## INTRODUCTION

This case stands out, and fees should be awarded under 35 U.S.C. § 285, not just because it was substantively weak when filed—although it was, because there was never any possibility that the accused product could infringe the asserted patent. What makes this case stand out is that SyncPoint filed it even though Karl Hansen—SyncPoint's alter ego—*knew* for the better part of a decade that the accused Nintendo product *could not* infringe, and, as SyncPoint admitted in interrogatory responses, neither SyncPoint nor its lawyers did *any* pre-filing diligence intended to overcome that decade-long understanding. Filing a substantively weak case is one thing. But filing a case the plaintiff *knows* cannot succeed, and then compounding that error by eschewing pre-filing diligence, makes this case stand out.

This case also stands out in view of the unreasonable way in which it was litigated. SyncPoint and its lawyers engaged in serious and pervasive misconduct affecting virtually every aspect of this case, ranging from knowingly misrepresenting banal facts like where Mr. Hansen lived and whether SyncPoint had an office or employees, to serious  misconduct such as manufacturing evidence ███████████████████████████████████ ███████ and then electronically editing the false document to give the impression that SyncPoint had standing to maintain this case. SyncPoint and its lawyers' anything-goes litigation tactics are contrary to this Court's high expectations of litigants, and also make this case stand out.

This Motion includes several parts. In Part I, Nintendo demonstrates that this case is exceptional and that Nintendo is entitled to its attorney fees under 35 U.S.C. § 285. In Part II, Nintendo demonstrates that SyncPoint is, and was always intended to be, an empty shell used to manipulate venue and shield Mr. Hansen and his lawyers (the "Pia Firm") from personal responsibility for filing this frivolous case. Nintendo, thus, moves to join Mr. Hansen and the Pia Firm as third-party defendants and to request that fees be awarded jointly and severally against all three. And finally in Part III, Nintendo demonstrates

that the amount of fees requested in this Motion—████████████—is reasonable under the lodestar test and should be awarded in full.

<u>PART I</u>

## THIS CASE IS EXCEPTIONAL, AND NINTENDO IS ENTITLED TO ITS ATTORNEY FEES UNDER 35 U.S.C. § 285

1.    **Facts**

1.1   **Mr. Hansen knew, for almost a decade, that the Wii could not infringe; he sued anyway.**

Mr. Hansen knew and confirmed several times between 2007 and 2013—including once under oath—that the accused Nintendo product, the Wii, did not use his technology. Yet, he sued anyway.

The supposed key innovation of the patent-in-suit ("'214 patent") was the use of two *visible* cursors—an "internal" cursor and an "external" cursor—to control a computer. The '214 patent disclosed a computer-presentation system in which a user controlled a computer with an external pointer, such as a laser pointer. The user pointed the laser pointer—the "external cursor"—at the computer's screen. The claimed system used a camera to capture the location of the external cursor, and then moved the standard computer cursor—what the patent called the "internal cursor"—to the external cursor's position.[1] Because the external cursor was *the* central element of the '214 patent, *every* claim featured an external cursor or a type of external cursor called an "optical cursor."

In 2007, about a year after the Wii was initially released, Mr. Hansen investigated the Wii to determine whether it infringed the '214 patent. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[1] '214 patent at (54), (57), 1:56-60 (Dkt. 145).

[2] *See* ████████████████████████████████████████████████

Unless otherwise noted, all exhibits are to the declaration of Kevin A. Zeck in support of this motion.

[REDACTED]

Mr. Hansen's understanding of his technology—and that the Wii did not use it—did not change over the next approximately six years. [REDACTED]

[REDACTED]

---

[3] [REDACTED]

[4] The document in which Hansen makes these statements was produced multiple times in the litigation—originally pursuant to Nintendo's third-party subpoena and later by one of Mr. Hansen's alter ego entities, Brilliant Points. SyncPoint has attempted to claw the document back on privilege grounds. Nintendo has concurrently filed a motion for a finding that the document is not privileged, and has lodged the document with the Court. [REDACTED]

[5] [REDACTED]

[6] [REDACTED]

[7] [REDACTED]

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

During his 2012 bankruptcy, Mr. Hansen again confirmed his understanding that the Wii did not use his technology, this time under oath. In a 2012 hearing before the bankruptcy trustee, Mr. Hansen confirmed that the '214 patent required a visible external cursor. The trustee asked him "what are the patents for?," and he testified, "using a laser pointer and a web cam to control your computer."[9] The trustee also asked "do you have a right to bring litigation against anyone," and he replied simply, "no."[10] This sworn testimony—if true—shows Mr. Hansen knew he had no right to sue Nintendo for infringement.

One year later, in 2013—and six years after Mr. Hansen ██████████████████ ████████████████████████—Mr. Hansen's understanding of his technology and the Wii still had not changed. ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████ ██████████████████████████████████████████████

---

[8] █████████████████████████████████████████████████████████
[9] 7-11-2012 Tr. *In re Karl C. Hansen & Lisa H. Hansen* at 6:16–18 (Ex. D).
[10] *Id.* at 4:21–23, 8:11–13.
[11] ████████████████████████████████████████████████████ ████████████████████

███████████████████████████████████████

████████████████████████████

Three facts are, thus, indisputable: (1) Mr. Hansen *knew* that his patent required a visible, external cursor; (2) Mr. Hansen *knew* that the Wii did not have ███████████████; and (3) Mr. Hansen *knew* that Nintendo had never added ████████████ to the Wii.

## 1.2   SyncPoint pursued an unreasonable invisible-cursor theory, and Nintendo warned SyncPoint of the consequences.

Despite his recognition from 2007 through 2013 that the Wii did not use his technology, in 2015, Mr. Hansen, through his corporate shell SyncPoint, sued Nintendo for patent infringement. Mr. Hansen's decision to sue was not based on serious, and required, pre-filing diligence. To the contrary, the full extent of Mr. Hansen and the Pia Firm's pre-filing diligence was: "In 2014, Chris [Hansen, Karl's son] told KH [Karl] that they should re-evaluate the Wii as a potentially infringing product. Karl Hansen and his sons looked at Internet videos explaining how Wii remote works and showing a little bit of reverse engineering. KH and his sons decided to seek out a law firm to pursue this litigation."[12]

Rather than conduct the required meaningful diligence, Mr. Hansen simply changed how he viewed the patent and his understanding of what an external cursor was. So, contrary to the written description of his invention, the common and ordinary meaning of the word "cursor," every embodiment of Mr. Hansen's invention, and most importantly, Mr. Hansen's own demonstrated understanding of his invention between 2007 and 2013, Mr. Hansen created a new theory: The invisible-cursor theory.

SyncPoint was never able to exactly explain how the invisible-cursor theory worked in light of the specification of the '214 patent, and SyncPoint's explanations shifted throughout the case. Still, as near as can be determined from SyncPoint's infringement contentions, SyncPoint seemed to claim the Wii's infrared Sensor Bar, which projects *invisible* infrared light *away* from the display screen, created an external cursor when that in-

---

[12] 11-11-2015 SyncPoint Response to Inter. No. 8 (Ex. F)

visible light was sensed by a sensor in the Wii Remote.[13] In essence, SyncPoint's invisible-cursor theory called for exactly the *opposite* of what the '214 patent disclosed—where the patent disclosed and claimed a *visible* external cursor *on* the display screen,[14] SyncPoint's invisible-cursory theory described *invisible* light on a sensor *off* the display screen.

With its newly minted invisible-cursor theory, SyncPoint accused Nintendo's Wii, Wii U, and all of Nintendo's games that used the Sensor Bar of infringing the '214 patent.[15] But, in fact, the Wii did not—and could not—infringe, just as Mr. Hansen concluded back in 2007. So, approximately two months after SyncPoint filed its Complaint, Nintendo sent SyncPoint a letter describing the Wii's technical details. Nintendo pointed out that the Wii uses invisible infrared light from the Sensor Bar directed away from the display, and does not use an external cursor. Nintendo also told SyncPoint that nothing in the '214 patent indicated that Mr. Hansen "possessed an invention involving something other than a visible, external cursor, or that [he] acted as his own lexicographer, giving 'cursor' anything other than its common, ordinary meaning."[16] Nintendo told SyncPoint that pursuing the case would expose SyncPoint to potential sanctions for frivolous litigation, and invited SyncPoint to dismiss the case without consequence.[17] SyncPoint refused, and did the opposite: It aggressively pursued the case.

## 1.3   The Court confirmed that the claims require a visible external cursor.

The Court's claim construction confirmed that SyncPoint's invisible-cursor theory was baseless because cursors are visible—just as Mr. Hansen recognized in at least 2007, 2010,

---

[13] SyncPoint [Proposed] First Suppl. P.R. 3-1 & 3-2 Disc's at 9 (of 90) (Dkt. 189-1) ("The external light bar generates two 'spots' of infrared light …. These two light spots are an external cursor when detected on the imaging array of Wii remote …."; SyncPoint P.R. 3-1 & 3-2 Disc's at 8 (of 89) (Dkt. 181-1).

[14] '214 patent at 1:56-60, 2:23-43.

[15] *See* Dkt. 190-1 at 2 (accusing the "distribution, promotion, and sales of the Wii and Wii-U platform … and game software titles designed to be used therewith").

[16] *See* 2015-04-14 Kinsel letter to Pia at p. 6 (Dkt. 267-2).

[17] *Id.*

2012, and 2013 and just as Nintendo pointed out following service of the complaint. At the claim-construction hearing, the Court said it would work "a serious change" "to construe [the patent's] use of 'cursor' as something not visible to the user when all of the indications point the other way."[18] The Court explained that while an invisible external cursor may be possible, the Court did not "see any indication that [Mr. Hansen] claimed that."[19] The Court's claim-construction order summarized the deep flaws in SyncPoint's theory in much the same language as Nintendo had: "There is no lexicography or disavowal that supports Plaintiff's special definition of 'cursor' as an invisible indicator of position."[20]

## 1.4 SyncPoint conceded it could not show literal infringement or damages against Nintendo, but still refused to dismiss because it knew it was exposed for fees.

Following claim construction, even SyncPoint recognized the futility of its position and gave up trying to demonstrate literal infringement or damages against Nintendo. ███████████████████████████████████████████████████████████████ ███████████████████████████████ ███████████████████████████ █████████████████████████████████████████████████████████████ Not surprisingly, given that SyncPoint had given up against Nintendo, Nintendo contacted SyncPoint and demanded that SyncPoint dismiss Nintendo with prejudice. SyncPoint's counsel acknowledged that dismissal with prejudice was appropriate, but refused to stipulate to a dismissal with prejudice unless Nintendo waived all of its costs and its right to seek fees as a prevailing party.[23] Nintendo rejected SyncPoint's demand,[24] and turned to

---

[18] 2015-10-30 Cl. Const. Hearing Tr. at p. 54 (Ex. G).

[19] *Id*. at pp. 53-54.

[20] Cl. Constr. Order at 21 (Dkt. 230); *see also id*. at 19-20.

[21] ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████

[22] ████████████████████████████████████████

[23] 1/8/2016 Letter from Kinsel to Pia at 1 (Ex. J).

[24] *Id*. at 2.

preparing for trial, which was only approximately five months away in May 2016.

But shortly after SyncPoint's refusal to dismiss Nintendo without waiver of fees, the Court stayed this case pending resolution of ownership issues in the New Hampshire bankruptcy court.[25] At bottom, the bankruptcy proceedings were the result of Mr. Hansen having misled the bankruptcy court about his ownership of the '214 patent during his personal bankruptcy. His misrepresentations resulted in the trustee filing an adversary action against him, clawing back the '214 patent, and eventually selling the '214 patent to co-defendant PixArt to satisfy Mr. Hansen's personal debts.[26] While the bankruptcy dispute was playing out, all of the claims of the '214 patent became unenforceable through an IPR filed by PixArt and an *ex parte* reexamination filed by an unknown third party.[27]

After all claims in the '214 patent were invalidated and the bankruptcy court had confirmed the patent's sale to PixArt, the parties again met and conferred about dismissal. Nintendo and PixArt offered to stipulate to dismissal with prejudice, but SyncPoint again refused, unless Nintendo and PixArt waived their right to seek fees and costs.[28] That bears repeating because it is incredible: SyncPoint had long ago abandoned literal infringement and damages claims against Nintendo, SyncPoint no longer owned the patent, and all of the claims in the patent had been invalidated, and yet SyncPoint *still* refused to dismiss the case with prejudice unless SyncPoint, Mr. Hansen, and the Pia Firm were insulated from an attorney fees claim. Needless to say, Nintendo and PixArt again refused to waive their right to seek fees. Ultimately, SyncPoint filed a motion to dismiss the case without prejudice, falsely suggesting to the Court that the case was "moot"[29] and the result of a "set-

---

[25] Dkt. 233.
[26] *See* Dkts. 267-8 (Bankr. Ct. Order Authoring Sale), 267-9 (Assignment to Trustee).
[27] Dkts. 267-11 (*Ex Parte* Reexam. Cert.), 267-12 (*Inter Partes* Review Final Decision).
[28] May 2017 Email Chain between Pia, Kinsel and Mathiowetz (Ex. K).
[29] Dkt. 260

tlement."[30] The Court rejected the motion, and on February 9, 2018, the Court adopted Magistrate Payne's Report and Recommendation to dismiss the case with prejudice.[31]

## 2.    SyncPoint litigated the case in bad faith.

SyncPoint's claimed damages—potentially tens if not hundreds of millions of dollars—necessitated a robust defense. As a result, this case was always destined to be expensive. But because SyncPoint and the Pia Firm took liberties with the truth, they caused the case to be substantially more complex and expensive than it needed to be. Two of the most egregious examples of this involved manufacturing evidence surrounding ownership of the '214 patent and making material misrepresentations about venue.

## 2.1   Mr. Hansen and the Pia Firm manufactured evidence to cover-up a perceived error in standing.

From this case's inception, SyncPoint was less than forthcoming about how it obtained the '214 patent. In fact, for almost a full year after filing this case, SyncPoint did not file any purported assignments with the PTO. SyncPoint also refused to voluntarily produce the assignments in discovery until Nintendo threatened a motion to compel.[32] The evidence shows why: Mr. Hansen and his lawyers ███████████████████████ ████████████████████████████████ SyncPoint, Mr. Hansen, and the Pia Firm therefore actively tried to cover ██████ up, even going so far as to manufacture and doctor evidence ██████ producing it to Nintendo.

### 2.1.1  The three assignments.

SyncPoint claimed standing based on three assignments: (1) a November 2014 assignment from Mr. Hansen to SyncPoint (the "Original Assignment"); (2) a February 2015 reassignment from SyncPoint back to Mr. Hansen (the "Reassignment"); and (3) a

---

[30] *Id.* at 2–3 ("The claims in this case were effectively settled when the patents [sic] and associated claims were purchased by one of the Defendants for $150,000."). This caused the motion to be "erroneously granted." Dkt. 264.

[31] Dkt. 283.

[32] Zeck Decl. at ¶¶ X-X.

February 2015 assignment from Mr. Hansen back to SyncPoint (the "Clean-up Assign-ment").[33] The reason for the three assignments is that the Original Assignment was defec-tive; it did not assign to SyncPoint either the right to sue for past damages or the right to pursue PixArt for supposed breach of contract.[34] The Reassignment was intended to reas-sign the rights back to Mr. Hansen so he could use the Clean-up Assignment to fix the er-ror. This fix, in theory, was simple enough. But to work, the assignments needed to be ex-ecuted in a particular order—first the Reassignment and *then* the Clean-up Assignment. ███
████████████████████████████████████████ SyncPoint would lack standing.[35] As it turns out, ████████████████████, and this is where the cover-up begins.

### 2.1.2   Mr. Hansen signed the assignments in the wrong order, and he and his lawyers worked to cover it up.

The cover-up concerns, at least, the timing of the execution of the Reassignment. This is the assignment intended to send the rights SyncPoint obtained via the defective Original Assignment back to Mr. Hansen so Mr. Hansen would have the necessary rights to assign back to SyncPoint. Mr. Hansen claims ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████

SyncPoint's privilege logs show that on February 19, the day *after* Mr. Hansen and SyncPoint represented the Reassignment was executed, a Pia Firm lawyer replied to an email from Mr. Hansen regarding, according to the subject line: "Question on assignments – looks reversed on one."[36] SyncPoint refused to disclose what was "reversed," but what-ever it was, ████████████████████████████████████████████████

---

[33] *See*, *e.g.*, SyncPoint Resp. to RFA No. 26 (Ex. L).

[34] ████████████████████████████

[35] ████████████████████████████████████████

[36] SyncPoint 3d Supp. Priv. Log at 16 (Ex. O); ████████████████████████████████



To cover-up this break in the assignment chain, Mr. Hansen and his lawyers spent much of the case beclouding the fact ███████ Thus, ████████████

The Pia Firm went further, manufacturing and producing *a third* version of the Reassignment that they doctored to make it appear as if it had been executed on February 18 ("Reassignment-V3").[42] By July 2015—about five months after filing the complaint— SyncPoint had not filed its supposed assignments with the USPTO, and had not produced evidence of ownership of the '214 patent.[43] On July 2, 2015, with Nintendo preparing to file its Motion to Transfer, the parties met and conferred, and during the meet and confer, Nintendo inquired about the missing assignments. The Pia Firm said it would follow up on July 8.[44]

---



[42] ████████████████████████████ SYNCPOINT000402-10 (Ex. S).

[43] Zeck Decl. at ¶¶ 13-18.

[44] *See* 7/2/2015 Kinsel to Pia email (Ex. T).

On July 8, ██████████████████████████████████████

███████████████████ ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████As

shown in the metadata (right), user "lbutler"—the paralegal—inserted "18" on July 8,

2015,[47] the same day SyncPoint

produced the document to Nin-

tendo as the *actual* reassignment.



Unfortunately, Nintendo was

never able to get complete infor-

mation about the full circumstances leading to the Pia Firm's creation of Reassignment-V3

because SyncPoint and the Pia Firm obstructed all uncomfortable discovery, withholding

*all communications* relating to this episode under specious claims of privilege and refusing

to allow the paralegal to be deposed.[48] Further, after the Pia Firm's scheme came to light—

and after SyncPoint had spent nearly *six months* claiming that Reassignment-V3 was the

*actual* reassignment—SyncPoint tried to quash the entire incident by claiming that Reas-

signment-V3 is actually "inadvertently produced work product," a claim which it only

abandoned on the eve of this motion being filed.[49] The case was stayed—and now dis-

missed—before Nintendo was able to file motions to compel designed to ferret out all of

the information underlying the Pia Firm's scheme.

---

[45] ████████████████████████████████████████████

[46] ██████████████████████████████████

[47] The Court can see this for itself by opening the "Comments" Pane in Adobe Acrobat ██
██████████████████

[48] *See* Nov. 2015 Email Chain (Ex. W); 12/21/2015 Letter from Shapiro to Kinsel (Ex. X).

[49] 12/21/2015 Letter from Shapiro to Kinsel (Ex. X); Zeck Decl. at ¶ 89.

## 2.2 The fight over venue was colored by Mr. Hansen and the Pia Firm's factual misrepresentations.

Mr. Hansen and the Pia Firm also misrepresented evidence directly to the Court. The most egregious example is in connection with Nintendo's Motion to Transfer Venue.

Neither Mr. Hansen nor Nintendo are at home in this District. Instead, the only connection to this District was SyncPoint's formation here a few months before the case was filed. Nintendo moved to transfer the case to the Western District of Washington where its home is, and SyncPoint resisted. SyncPoint argued that transfer to Washington would be inconvenient because, in the Pia Firm's words "Mr. Hanson [sic] resides in New Hampshire."[50] ███████████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

██████████████████████████████ But, in fact, while Mr. Hansen and the Pia Firm represented to the Court that Mr. Hansen "reside[d] in New Hampshire," Mr. Hansen and his wife had actually ████████████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████
████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

---

[50] Dkt. 133 at 5 (SyncPoint's Sur-Reply in Opp. to Motion to Transfer).

[51] ████████████████████████████████████████████████

[52] ██████████████████████████████████

██████████████████████████████████████████
███████████████████████
████████████████████████████████████

Neither Mr. Hansen nor the Pia Firm could be trusted with even basic facts. For instance, according to Mr. Hansen's declaration, SyncPoint had several ██████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

But the truth was different.

Before SyncPoint was formed, Mr. Hansen's other alter ego called "Brilliant Points" purported ██████████████████████████████████████
██████████████████████████████████.[55] Nintendo subpoenaed Brilliant Points, and in response, Brilliant Points claimed that much of Mr. Hansen's email had been lost in an ISP "server crash."[56] So Nintendo subpoenaed the ISP for the Brilliant Points' email. The ISP—unlike SyncPoint and Mr. Hansen—was able to produce Mr. Hansen's email, including the email supposedly "lost" in the server crash.

Among the records the ISP produced was an ████████ █████████████████████
██████████████████████████████████ and ██ months after the litigation was filed—from Mr. Bland, one of the so-called consultants. In that email, ████████████████████████████████████████
████████████████████████████████████████████
█████████████ █████████████████████████████

─────────────────────────

[53] ██████████████████████████████████████

[54] ██████████████████████████████

[55] ████████████████████████████████████████████

█████████████████████

[56] Brilliant Points, Inc.'s 1st Supp. Objs. & Resps. to Subpoena at 4 (Ex. AC).

[57] ████████████████████████████████

██████████████████████████████████████████" Also in the ISP's
production was a ██████ 2015 ██████████████████) email exchange
between Mr. Hansen and ██████████████████████████████
██████████████████████ In the email, Mr. Hansen explained████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████



The Pia Firm made its own misrepresentations relevant to venue. The Complaint, filed
on February 20, 2015, alleged that "SyncPoint is a Texas Limited Liability Company with
its principal place of business in the Eastern District of Texas."[59] Yet, when asked in dis-
covery where this place of business was, SyncPoint ultimately produced ████████████
█████████████████████████████████████ backdated to ████████ Thus,
even though the Pia Firm told the Court in February 2015 that SyncPoint had a "place of
business" in this District, it was not until six months later—and only when facing Ninten-
do's Motion to Transfer—that the Pia Firm and SyncPoint ████████████████████

---

[58] █████████████████████████████████

[59] Dkt. 1 at ¶ 1.

[60] ████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████.[61]

## ARGUMENT

**3.     35 U.S.C. § 285 allows a Court to award fees to a prevailing party in an exceptional case.**

35 U.S.C. § 285 gives a court the power to award fees to the prevailing party in an exceptional case: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."[62] To be entitled to fees, the moving party must show that (1) it is the "prevailing party"; and (2) the case is "exceptional." Both requirements are met here.

### 3.1   Nintendo is the prevailing party.

There can be no reasonable dispute that Nintendo and PixArt are the prevailing parties under section 285. The Court has dismissed SyncPoint's complaint with prejudice. The effect of that dismissal with prejudice on the legal requirements of an award under 35 U.S.C. § 285 is decided as a matter of Federal Circuit law.[63] Under Federal Circuit law, a Rule 41 dismissal with prejudice—even if it results from the plaintiff's lack of standing—is sufficient to find the defendant is the prevailing party under 35 U.S.C. § 285. As the Federal Circuit in *Highway Equipment Co., Inc. v. FECO, Ltd.* put it, a dismissal with prejudice, whether for lack of standing or otherwise, has "sufficient judicial imprimatur to constitute a 'judicially sanctioned change in the legal relationship of the parties.'"[64] The Court's dismissal with prejudice constitutes, as a matter of law, the judicially sanctioned change in the legal relationship to render Nintendo (and PixArt) prevailing parties.

---

[61] ██████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████ MyHealth.com Contact Info (Ex. AH); *MyHealth v. ALR Techs., Inc.*, Case No. 2:16-cv-00535-RWS-RSP, Dkt. 131 (Dec. 19, 2017);██
██████████████
[62] 35 U.S.C. § 285.
[63] *Highway Equip. Co., Inc. v. FECO, Ltd.*, 469 F.3d 1027, 1032 (Fed. Cir. 2006).
[64] *Id.* at 1034.

3.2    **This case was exceptional within the meaning of 35 U.S.C. § 285.**

In *Octane Fitness*, the Supreme Court clarified what constitutes an exceptional case for purposes of a fee award: [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."[65] After *Octane Fitness*, the party seeking Section 285 fees must show that it is entitled to them by a preponderance of the evidence, which the Federal Circuit recognized as a "change in the law lower[ing] considerably the standard for awarding fees."[66] Review of a fees award is based on the deferential abuse-of-discretion standard.[67]

3.3    **Mr. Hansen knew the Wii could not infringe, conducted essentially no pre-filing investigation, and sued Nintendo anyway.**

As this Court recently found in *My Health, Inc. v. ALR Techs., Inc.*[68]—a case in which the Pia Firm represented the Plaintiff—exceptionality can be found where, among other things, the plaintiff should have known about the objective weakness of its litigation position. In *My Health*, it was the plaintiff's refusal to recognize its objectively weak position on patentability. Here, it was SyncPoint's and the Pia Firm's refusal to recognize its objectively weak position on infringement.

From 2007 through at least 2013,



It is, thus, indisputable that Mr. Hansen knew the Wii did not and could not infringe his patent.

---

[65] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, __ U.S.__, 134 S.Ct. 1749, 1756 (2014).
[66] *Oplus Techs., Ltd. v. Vizio, Inc.*, 782 F.3d 1371, 1374 (Fed. Cir. 2015).
[67] *Highmark Inc. v. Allcare Health Mgmt. Sys.*, __ U.S. __, 134 S.Ct. 1744, 1747 (2014).
[68] Case No. 2:16-cv-00535-RWS-RSP (Lead), Dkt. 131 (E.D. Tex. Dec. 19, 2017).
[69] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Neither Mr. Hansen nor his lawyers conducted any factual or legal pre-filing investigation that could possibly justify filing this case when Mr. Hansen knew the Wii could not infringe. Indeed, Nintendo expressly asked for SyncPoint's complete description of its pre-filing diligence to which SyncPoint responded in full,

> In 2014, Chris [Hansen, Karl Hansen's son] told KH [Karl Hansen] that they should re-evaluate the Wii as a potentially infringing product. Karl Hansen and his sons looked at Internet videos explaining how Wii remote works and showing a little bit of reverse engineering. KH and his sons decided to seek out a law firm to pursue this litigation.[70]

In addition to failing to do any meaningful factual investigation, SyncPoint and the Pia Firm did no meaningful legal investigation to determine whether its invisible-cursor theory was legally defensible. Had they done so, they would have seen that nothing in the specification supported the theory that an external cursor could be invisible. Indeed, as the Court put it, a visible cursor is "the only cursor" of which there is "*any* indication" in the specification, and "*all* of the indications" pointed away from an invisible cursor.[71] The Court recognized that SyncPoint's invisible-cursor theory would work "serious change" to the scope of the patent,[72] and that SyncPoint's invisible-cursor construction "conflict[ed] with the meaning of the term 'cursor' as used in the patent and . . . the relevant extrinsic evidence."[73] ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████. This would have—and should have—been SyncPoint's conclusion had either Mr. Hansen or the Pia Firm conducted a meaningful factual or legal pre-filing investigation.

---

[70] 11-11-2015 SyncPoint Response to Interrog. No. 8 (Ex. F).
[71] 2015-10-30 Cl. Const. Hearing Tr. at 53-54 (Ex. G) (emphasis added).
[72] *Id.* at 54.
[73] Cl. Const. Order at 20 (Dkt. 230).

This case also has much in common with *Iris Connex, LLC v. Dell, Inc.*[74] In *Iris Connex*, Judge Gilstrap awarded section 285 fees, in part because he found that the plaintiff's claim construction was unreasonable as it was "divorced from the claim language and the specification, and was an attempt to turn the claim language on its head."[75] In essence, *Iris Connex* proposed a claim construction that was the opposite of what the claims and specification actually disclosed. The same is true here: SyncPoint's invisible-cursor theory was not only factually contrary to Mr. Hansen's own demonstrated understanding of his patent, it was diametrically opposed to the claims, the written description, and the common and ordinary meaning of the English word "cursor." Like *Iris Connex*, SyncPoint sought to turn the claim language on its head by reading the claims on a system that worked in precisely the opposite way disclosed in the specification and claimed in the claims. No reasonable litigant would have taken such a position.

### 3.4    Mr. Hansen and the Pia Firm engaged in serious litigation misconduct.

This case also stands out because of demonstrable litigation misconduct that plagued it from the beginning. Mr. Hansen and the Pia Firm ████████ had erred in securing standing for SyncPoint. To cover this up, they manufactured evidence: ██████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████. None of this was voluntarily disclosed to Nintendo. Instead, Nintendo had to spend hundreds of hours reconstructing the facts, identifying flaws in documents, and taking follow-up discovery to bring it to light, and once it was brought to light, SyncPoint and the Pia Firm sought to squash it with frivolous work-product claims.[76] This is the epitome of bad-faith litigation.

But the bad faith did not stop at manufacturing standing evidence. Instead, Mr. Han-

---

[74] 235 F.Supp.3d 826 (E.D. Tex. 2017).
[75] *Id*.at 848.
[76] *See generally* Zeck Decl. at ¶¶ 2-113.

sen and the Pia Firm misrepresented facts directly to the Court, such as the false claim that ███████████████████████████████████████████, the false claim that ██████████████████████████████ and the false claim that SyncPoint had a place of business in this District when it did not. And while the convenience of this Court as a venue is, at this point, water under the bridge, the salient fact is that SyncPoint and the Pia Firm misrepresented basic facts, forcing Nintendo to spend time and money to investigate the true facts, vastly complicating the case and making it much more expensive than it otherwise needed to be.

Even the dispute over dismissal demonstrates SyncPoint, Mr. Hansen, and the Pia Firm's bad faith. SyncPoint had at least two opportunities to dismiss Nintendo with prejudice and at both points refused to do so unless Nintendo waived its claim for attorney fees. This is similar to this Court's decision in *Opal Run LLC v. C & A Marketing, Inc.* where the Court found that a plaintiff's refusal to dismiss with prejudice absent a waiver of fees "suggests exposure to an 'exceptionality' finding was on its mind."[77] Here, SyncPoint, Mr. Hansen, and the Pia Firm's understanding that this case is exceptional is not a mere suggestion as it was in *Opal Run*; it is the manifest conclusion. SyncPoint refused to dismiss with prejudice without a waiver of fees even though it had (1) waived its literal infringement and damages claims against Nintendo, (2) lost ownership of the patent, and (3) all claims of the patent had been invalidated. SyncPoint then tried to mislead the Court into entering a dismissal without prejudice. The *only* plausible reason SyncPoint would go to this extent is a recognition of the likelihood of an exceptionality finding.

This Court sets a high bar for the integrity of the parties appearing before it. Yet, SyncPoint, Mr. Hansen, and the Pia Firm actively pushed its conduct far below those expectations throughout the case by misrepresenting basic facts to the Court and manufacturing key evidence. This conduct not only injured Nintendo by drastically increasing the

---

[77] Case No. 16-cv-0024-JRG-RSP (E.D. Tex. Nov 29, 2017) (slip op. at 6).

costs and complexity of the case, it undermined the legitimate expectations of this Court as to how all litigants should behave. It is now time to put things right and find that this case is exceptional within the meaning of section 285.

**PART II**

**THE COURT SHOULD JOIN MR. HANSEN AND THE PIA FIRM AS THIRD-PARTY DEFENDANTS**

**4.      A fee award pursuant to 35 U.S.C. § 285 can run against parties other than the plaintiff.**

In *Iris Connex LLC v. Dell Inc.*, Judge Gilstrap described both the legal underpinnings and the policy reasons supporting the imposition of a fee award against parties other than the plaintiff.[78] Judge Gilstrap found that "the statutory text, current case law, and statutory purpose behind the Patent Act and Section 285 all support assessing direct Section 285 liability against non-parties, so long as (1) the actor is responsible for conduct that makes the case exceptional, (2) the actor is afforded due process, and (3) it is equitable to do so."[79]

**4.1      SyncPoint is a shell whose intended purpose was to establish venue in this Court, shield Mr. Hansen and the Pia Firm from personal responsibility for this frivolous case, and to wither away if things went wrong.**

SyncPoint was not, and was never intended to be, an operating entity; its corporate existence, supposed consultants, and even supposed office were all a sham, intended merely to establish venue and then disappear if things went bad.

SyncPoint was formed as a Texas LLC in November 2014, about three months before SyncPoint filed this case.[80] As reflected in its formation documents, Mr. Hansen was SyncPoint's sole managing agent and organizer.[81] Mr. Hansen did not live in Texas when

---

[78] 235 F.Supp.3d 826 (E.D. Tex. 2017).
[79] *Id.* at 843.
[80] ███████████████████████████████████
[81] ██.

he formed SyncPoint, and a ██████████████████████████████████████████
████████████████████████████████████████████████████████████████.[82]

SyncPoint never had any actual employees other than Mr. Hansen. ████████



███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
██████████████████"[83]

SyncPoint's physical office, ██████████████████ was pure fiction. SyncPoint's com-
plaint alleged that it was an LLC "with its principal place of business in the Eastern Dis-
trict of Texas."[84] But neither the complaint nor SyncPoint's Texas Certificate of Formation
listed an address in the Eastern District.[85] Instead, the only address listed was for the regis-
tered agent—Adam Hoyt, a lawyer working for the Pia Firm—out of the Pia Firm's
Grapevine, Texas "office."[86] Given the lack of connections, Nintendo moved to transfer,
and that motion triggered an avalanche of activity by Mr. Hansen and the Pia Firm de-
signed to manufacture evidence to mislead Nintendo and the Court into believing that an
office existed when it did not.

On July 2, 2015, counsel for Nintendo met and conferred with members of the Pia
Firm to discuss Nintendo's intended Motion to Transfer venue.[87] During that meeting,

---

[82] He currently has his "home" in Orem, Utah, and is apparently working in Boston.

[83] ████████████████████████████████████████████████

[84] Dkt 1 at 1.

[85] ████████████████████████████████████████████████

[86] Dkt. 1 at 1; Hoyt Profile (Ex. AJ). Mr. Hoyt's Grapevine address (on the Certificate of
Formation) is for an apartment complex.  Resort at 925 Main Website (Ex. AK).

[87] 7/2/2015 Kinsel email to Pia (Ex. T).

Nintendo asked whether SyncPoint had an office in the Eastern District and counsel for SyncPoint said that he "believed" SyncPoint had an address in Plano.[88] In fact, SyncPoint had no such office—and the Pia Firm knew that to be the case. So, the Pia Firm and Mr. Hansen rushed off to manufacture the appearance of one.



██████████████ But by the July 2015 meet and confer on Nintendo's motion, PetAware had settled its on-going litigation, and had no reason to maintain a supposed presence in this District.[89] ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████[92]

The Preston Road address that SyncPoint supposedly took ████ has an unseemly history. ████████████████████████████████████████

████████████████████████████████. But the Preston Road address was also home to another Pia Firm client: MyHealth, which was recently sanctioned by this Court for its own exceptional case. MyHealth, like ████████ and SyncPoint—all Pia Firm clients prosecuting patent-infringement cases in this District—used the same Preston Road address to pretend that they were at home in this District. ████████████

---

[88] *Id.*

[89] Case No. 2:14-cv-00656-JRG-RSP, Dkt. 48 (stipulated dismissal, 4/7/2015).

[90] ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

[91] ████████████████████████

[92] ██████████████

███████████████████████ [93]

As expected, discovery revealed that there was no SyncPoint business at Preston Road. ████████████████████████████████████████████████████████████

██████████████████████████████████ ███████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████ ████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████ ██████████████████████████████████

███████████████████████████████████████████

Mr. Hansen viewed SyncPoint as his alter ego, and the record does not reflect that the corporate formalities were ever observed. The local rules of this Court require parties to produce relevant records without awaiting document requests. But SyncPoint never voluntarily produced any corporate documents, save its publicly available corporate formation document. Because SyncPoint refused to voluntarily turn these documents over, SyncPoint's corporate records, including its bylaws, partnership agreement, operating agreement, minutes of any meetings, any documents concerning the appointment or election of company officers or management, any documents concerning any annual or regularly scheduled meeting of the management of SyncPoint, and all corporate books and records were requested.[97] Yet, SyncPoint objected that the requests were "irrelevant" and "overbroad," and refused to produce *any* corporate records at all.[98] SyncPoint is, thus, now married to the record it created, which demonstrates that SyncPoint and Mr. Hansen

---

[93] ███████████████████████████████████

[94] █████████████████████████████████████████████

[95] ████████████████████

[96] ████████████████████████

[97] SyncPoint's Objs. & Resps. to PixArt's RFPs 82, 84, 87, 89, 91, 94, 96, 98 (Ex. AQ).

[98] *Id.*

*never* observed the corporate formalities.

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████[99]

### 4.2 Mr. Hansen and the Pia Firm were responsible for the conduct that makes this case exceptional.

Mr. Hansen treated SyncPoint as his alter ego and the exceptional conduct in this case was the result of Mr. Hansen and the Pia Firm. SyncPoint was merely the puppet through which they acted.

Mr. Hansen—not ████████████████████████████ ████████████████████████ Mr. Hansen, not SyncPoint, backdated ████ ███████████████████████████████████████ █████████████████████ Mr. Hansen signed and submitted to this Court █████████████████████ And Mr. Hansen knew—all along— that he could never establish infringement against Nintendo because the Wii simply did not have an external cursor. Mr. Hansen at all times viewed SyncPoint as his alter ego. In short, SyncPoint *was* Mr. Hansen and Mr. Hansen *was* SyncPoint. As a consequence, the conduct that was exceptional here falls on Mr. Hansen's shoulders.

The Pia Firm, like Mr. Hansen, was up to its neck in the exceptional circumstances of this case. The Pia Firm had its own obligations to undertake pre-filing diligence to determine that this case could be prosecuted in good faith. Yet, it did nothing, relying instead on Mr. Hansen's review of Internet videos showing "a little bit of reverse engineering." But it was the Pia Firm's job to ensure that this case was both legally and factually supportable, and the Pia Firm did nothing to ensure that. Had it done so, this case would never

---

[99] █████████████████████████████████████

have been filed, or at a minimum, would have been dismissed shortly after it was filed when Nintendo provided Wii technical information showing that the Wii could not possibly infringe. But the Pia Firm went further than failing to conduct its own diligence. The Pia Firm manufactured evidence of standing ██████████████████████ ████████████████████████████████████ and only when it got caught, claimed that the whole thing was a mistake. Similarly, ███████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████ Like Mr. Hansen, the Pia Firm made material misrepresentations directly to the Court. The Pia Firm represented that Mr. Hansen "reside[d] in New Hampshire," when he lived in Utah. And in the very first document presented to the Court, the Complaint, the Pia Firm told the Court that SyncPoint had "its principal place of business in the Eastern District of Texas" when SyncPoint had *no place of business*.

Finally, and perhaps most importantly for the Pia Firm's responsibility for what happened here, the Pia Firm had much more control over this case than a typical law firm. The Pia Firm was the majority owner of this case. While the underlying engagement letter between Mr. Hansen and the Pia Firm has not been produced, and thus, the Pia Firm's full interest in the outcome is unknown, the Pia Firm did present testimony during Mr. Hansen's bankruptcy proceeding describing the basics of its arrangement. That testimony demonstrates that the Pia Firm had a 60% contingency interest in the outcome of this case.[100] Thus, the Pia Firm had an even greater interest in the outcome of this litigation than Mr. Hansen. The implication is clear: The litigation misconduct was driven, at least in part, by the Pia Firm's desire to collect on its majority interest in the case. Surely, given these circumstances, the Pia Firm can be held responsible for the case's exceptional nature.

---

[100] Tr. of Apr. 12, 2017 Bankruptcy Hearing: Aycock Testimony at 6:5-19 (Ex. AS); Mem. Op., Case No.12-11907-BAH, Dkt. 148 at 5 (Bankr. D.N.H. Apr. 25, 2017) (Ex. AT).

4.3    **Equity demands that Mr. Hansen and the Pia Firm be made parties.**

SyncPoint has nothing; it has no revenue; it has no property (its principal assets were transferred to PixArt in a forced sale); it has no income of any kind; it has nothing against which to execute a judgment for fees. The moment the Court enters a judgment imposing costs and fees on SyncPoint, it is likely to disappear into the wind, leaving Nintendo holding the bag for more than ██████████████████ *because of* Mr. Hansen and the Pia Firm's bad-faith conduct. And, of course, this is precisely the point of why SyncPoint was set up in the way that it was—to ensure Nintendo had no recourse in the event Nintendo defended itself and prevailed. Thus, failure to impose a fee award jointly and severally against Mr. Hansen and the Pia Firm would grossly undermine the purpose behind 35 U.S.C. § 285. As Judge Gilstrap put it in *Iris Connex*: "Congress has chosen to increase the risk borne by those who assert frivolous and exceptionally weak claims thereby incentivizing parties … to defend against such claims. If that risk can be side-stepped by the use of an empty shell to front for the real actor, simply because the real actor was not originally named as the plaintiff, then Section 285 means nothing."[101]

4.4    **Adding Mr. Hansen and the Pia Firm as third-party defendants satisfies due process.**

Mr. Hansen and the Pia Firm can answer this brief. They will have their day in court if they are made parties to this case. Indeed, Judge Gilstrap in *Iris Connex*, specifically recognized that adding the owner of a shell plaintiff and its counsel as third-parties defendants satisfied the requirements of due process. Such is the case here too.

## PART III

### NINTENDO'S REQUESTED FEES AND COSTS ARE REASONABLE

5.    **Nintendo's fees are reasonable.**

Nintendo seeks ██████████████████ As demonstrated below, these amounts are based on reasonable hourly rates charged for reasonable tasks. More general-

---

[101] 235 F.Supp.3d at 845.

ly, they are reasonable in light of the damages SyncPoint sought, and the work SyncPoint forced Nintendo to do to defend itself. Indeed, as shown below, these fees are ████ ████████████████████████████████████████████████████████████ ████████████████████████████

## 5.1    Nintendo's fees were reasonable under the lodestar method.

An award of fees under section 285 is typically calculated by "multiplying a reasonable hourly rate by the reasonable number of hours required to litigate a comparable case."[102] A rate is reasonable if it is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."[103]

████████████████████████████████████████████████████ ████████████████████The AIPLA survey for 2017 shows that for cases in Texas valued in excess of $25,000,000—which, given SyncPoint's assertions of infringement against the Wii, Wii U, and compatible games, this case certainly was—the average fee up through claim construction was $2,407,000.[104] But this case was on a fast track and in fact by the time it was stayed, fact discovery had closed, the parties had exchanged opening expert witness reports (infringement and damages from SyncPoint and invalidity from Nintendo and PixArt), and trial was only four months away. Thus, Nintendo's fees ██████████ ████████████████████████████████

Another measure of the overall reasonableness of Nintendo's fees is that they ██████ ████████████████████████ During Mr. Hansen's bankruptcy, the Pia Firm put on testimony to describe its fees up to the time of the bankruptcy. According to the Pia Firm's testimony, the Pia Firm expended approximately 9,000 hours of time at a partner-blended

---

[102] *Lumen View Tech. LLC v. Findthebest.com, Inc.*, 811 F.3d 479, 483 (Fed. Cir. 2016) (citation omitted); *see also SUFI Network Servs., Inc. v. United Sates*, 785 F.3d 585, 594 (Fed. Cir. 2015).
[103] *SUFI Network Servs.*, 785 F.3d at 594 (citation omitted).
[104] AIPLA 2017 Report of Economic Survey at I-116 (Ex. AR).

rate of approximately $320 for total fees of over $2,000,000.[105] According to the Pia Firm, its partner-blended rate of $320 was reasonable, and was actually below the commensurate rate for attorneys at that level for this type of case.[106] ███████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████

  Nintendo's fees were also ███████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████. But overall, two broad categories comprise virtually all of Nintendo's attorneys' hours:

- Discovery—████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

- Motion Practice—████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[105] Tr. of Apr. 12, 2017 Bankruptcy Hearing: Aycock Testimony at 8:6-12, 21-25 (Ex. AS).
[106] *Id.* at 9:1-8.



## CONCLUSION

In virtually every way in which a case can stand out, this one did. SyncPoint filed this case when Mr. Hansen knew it could not succeed, and neither Mr. Hansen nor the Pia Firm conducted serious diligence to convince themselves otherwise. Mr. Hansen and the Pia Firm engaged in rampant litigation misconduct, misrepresenting facts to the Court and even manufacturing evidence. There can be no doubt that this case was exceptional, necessitating an award of fees, which equity demands run against Mr. Hansen and the Pia Firm. The fee award Nintendo requests is appropriate. Thus, the Court should (1) find this case exceptional and order fees ███████████████████ and (2) join Mr. Hansen and the Pia Firm as third-party defendants and order that they be jointly and severally responsible for the fees so ordered.

Respectfully submitted,

Dated: February 23, 2018

By: ___/s/ *Grant Kinsel*___
Grant Kinsel

Grant Kinsel (lead attorney)
CA Bar No. 172407
Email: gkinsel@perkinscoie.com
Kyle M. Amborn
Wash. St. Bar No. 48340
Email: kamborn@perkinscoie.com
Kevin A. Zeck
Wash. St. Bar No. 41689
Email: kzeck@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Tel: 206.359.3002
Fax: 206.359.4002

Ryan B. Hawkins
Ca Bar No. 256146
Email: rhawkins@perkinscoie.com
Perkins Coie LLP
11988 El Camino Real, Suite 350
San Diego, CA 92130
Tel: 858.720-5700
Fax: 858.720-5799

Clyde M. Siebman
Siebman, Burg, Philips &
Smith, L.L.P.
Federal Courthouse Square
300 N. Travis Street
Sherman, TX 75090
Tel:   903.870.0070
Fax:   903.870-0066
email: Siebman@siebman.com

Attorneys for Nintendo Co., Ltd.
and Nintendo of America Inc.

## CERTIFICATE OF SERVICE

I certify that all counsel of record who are deemed to have consented to electronic service are being served this February 23, 2018 with a copy of this document via the Court's CM/ECF system.

/s/ *Grant Kinsel*
Grant Kinsel

## CERTIFICATE OF CONFERENCE

I certify that counsel for Defendants Nintendo of America Inc. and Nintendo Co., Ltd. (collectively, "Nintendo") complied with the meet and confer requirement in Local Rule CV-7(h), and that the foregoing motion is opposed by Plaintiff SyncPoint Imaging, LLC. The motion is not opposed by Defendant PixArt Imaging, Inc.

I further certify that, on Thursday, February 15, 2018, a personal conference, by phone, concerning the foregoing motion was held between me, Joseph Pia and local counsel for Plaintiff SyncPoint Imaging, LLC, among others.  During that conference, I provided the grounds Nintendo contends justify exceptional case fees.  At that conference, counsel for SyncPoint would not agree to the requested relief sought by the foregoing motion.

A second personal conference, by phone, concerning the foregoing motion was held on Tuesday, February 20, 2018.  The participants to this conference were Mr. Pia and me. At this second conference, Mr. Pia and I again discussed the requested relief, but not resolution of the issues raised in this motion was reached. As such, discussions between Nintendo and SyncPoint have conclusively ended in an impasse, leaving an open issue for the court to resolve.

/s/ *Grant Kinsel*
Grant Kinsel