# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF TEXAS

## MARSHALL DIVISION

| | |
|---|---|
| SYNCPOINT IMAGING, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>NINTENDO OF AMERICA, INC., et al.<br><br>    Defendants. | Civil Action No. 2:15-cv-00247-JRG-RSP |

**DEFENDANT PIXART IMAGING INC.'S REPLY
IN SUPPORT OF ITS JOINED MOTION FOR ATTORNEYS' FEES
UNDER 35 U.S.C. § 285**

In its Opposition to PixArt's Joinder in Nintendo's Motion for Exceptional Case Attorney Fees under 35 U.S.C. § 285 ("SyncPoint Opp.") [Dkt. No. 307], SyncPoint contends that PixArt has "overlook[ed] reasonable explanations for SyncPoint's actions and distorts facts" to make this case—admittedly "factually unique"—appear extraordinary for the purposes of § 285. SyncPoint Opp. at 1. But in trying to escape sanctions for conduct that clearly makes this case exceptional under the Supreme Court's decision in *Octane Fitness LLC v. Icon Health & Fitness Inc.,* 134 S.Ct. 1749 (2014), SyncPoint reaffirms that it will do or say anything to advance its positions, irrespective of the truth and commonsense. This litigation was, pure and simple, an ill-conceived and poorly executed money grab by SyncPoint, its owner Karl Hansen, and its counsel Pia Anderson. The Court should grant the motions by Nintendo and PixArt and award the fees and costs that they should never have had to incur.[1]

I.   **The Correct Legal Standard**

Interestingly, SyncPoint never addresses the correct legal standard by which its conduct in this litigation must be judged; it never mentions *Octane Fitness* in opposing PixArt's motion, and simply avers that "*Octane Fitness* did not declare open season for fee awards in every case where the defendant prevails" in opposing Nintendo's motion. See Opposition to Nintendo's Motion for Exceptional Case Attorney Fees under 35 U.S.C. § 285 at 3. [Dkt. No. 307]. That standard bears repeating, because this case presents "factually unique" circumstances—by SyncPoint's own admission—that "simply [] stand[] out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." *Id.* at 1756.

---

[1] PixArt joined in Nintendo's Motion for Exceptional Case Attorney Fees Under 35 U.S.C. § 285 [Docket No. 290] ("Nintendo Motion"), and likewise joins in Nintendo's Reply. [Dkt. No. 319].

1

## II. SyncPoint's Opposition Reinforces Defendants' Arguments that the Case Was Frivolous

This litigation was all about SyncPoint, Karl Hansen, and their counsel stepping outside the bounds of reasonable advocacy to try to extract money from Defendants. The projected payoff was so large they were willing to overlook Hansen's multiple admissions prior to commencing litigation that he had no claim against Nintendo or PixArt, and then take a wholly nonsensical infringement position—based on the "invisible cursor" theory—to proceed. Now they are now willing to do whatever it takes to avoid a finding that this was an exceptional case.

### A. SyncPoint Relies on Restated Testimony by Hansen to Disavow His Admission in Bankruptcy Proceedings that SyncPoint Had No Cause of Action Against PixArt or Nintendo

There is perhaps no better example of the continuing charade by Plaintiff and its counsel than their "clarification" of Hansen's statements during the 2012 bankruptcy that his patents had $0 value. At the Meeting of Creditors on July 11, 2012, Hansen responded to a question from the Chapter 7 trustee, Olga Gordon, as follows:

> Q. Okay. Does anyone owe you any money?
> A. No.
> Q. Do you have a right to bring litigation against anyone?
> A. No.

Mathiowetz Decl., Exh. 2 at 4.[2] This testimony was, of course, inconsistent with seeking damages in the present case both as to infringement and breach of contract, so Hansen manufactured the "clarifying" testimony at deposition in this case, responding to questions from Nintendo's counsel as follows:

> Q. But you told the bankruptcy court that the patents were worth zero, didn't you?

---

[2] The transcript was prepared and certified by an AAERT Electronic Certified Transcriber from a recording of hearing.

2

> A. . . . The bankruptcy attorney and the trustee all asked me, what could you get for this if you sold it? And I told them. I've tried, nobody's buying it, I don't know. Do you have any rights to litigate? And I said, "no money."
> . . .
> Q. Well, I just want you to take a quick look at [the certified transcript]. And you can tell me, because I wasn't at the bankruptcy, so does it appear to be accurate with respect to what you actually testified to?
> A. I don't think my response to the basis to bring litigation is accurate, no.
> Q. Oh, you think that's wrong?
> A. I recall saying "no money." Yeah, I did say the word "no," but I believe I said "no money."

SyncPoint Opp., Exh. C at 563:5 – 565:13. Hansen then continued to insist that while he in fact knew in July 2012 that he had a claim against PixArt, it did not matter and he did not disclose it to the trustee because he did not have money to litigate. *Id.* at 565:14-568:23. This wholly new, contrived testimony should be taken for what it is—a desperate but failed attempt by SyncPoint and its counsel to overcome multiple admissions by Hansen that Nintendo did not infringe, and that PixArt did not owe him or SyncPoint any money related to the 2008 License Agreement.

### B. Hansen's Reopened Bankruptcy Necessarily Involved PixArt

SyncPoint now admits that it, not PixArt, reopened Mr. Hansen's bankruptcy, but contends that PixArt has no evidence as to why Hansen (i.e., SyncPoint) sought to have it reopened. SyncPoint Opp. at 4. PixArt cannot possibly know with certainty SyncPoint's motivation unless SyncPoint is willing to disclose it to the Court, which it thus far has declined to do. However, logic dictates that SyncPoint and its counsel were concerned that Hansen's inconsistent testimony put any potential recovery in the district court litigation at risk, and reopening the bankruptcy was likely an attempt to mitigate the effects of the testimony. What is clear is that the trustee, having learned that she had been duped by Hansen into discharging the bankruptcy estate with no payment to the creditors, looked to rectify the situation by clawing back the assets. Her basis for doing so was set forth in the motion to reopen the bankruptcy

(Mathiowetz Decl., Exh. 3) [Dkt. No. 293-1], in the motion for sale of the assets (Mathiowetz Decl., Exh. 5) [Dkt. No. 293-1], and even more explicitly in the complaint she filed to initiate the Adversary Proceeding. (Mathiowetz Decl., Exh. 6) [Dkt. No. 293-1]. There she alleged the following facts, supported by specific and incontrovertible evidence:

> 11. In their Schedules, the Debtors listed their ownership interest in an entity, Brilliant Consulting Service ("Brilliant") which they indicated held three U.S. patents valued at $0.00, see Debtors' Schedule B, line 13 — "stock and interests in incorporated and unincorporated businesses," and listed their individual ownership in one pending patent valued at $0.00. See Debtors' Schedule B, line 22 — "patents, copyrights and other intellectual property."
>
> 12. The Debtors failed to disclose Mr. Hansen's individual ownership interest in the following domestic and foreign patents: US6275214B1, US6952198B2, US7091949B2, EP1200955B1, DE60023900T2, CA2378154C, JP2003504705A (JP4822643B2), AU200057549A (the "Assets").
>
> 13. The Debtors failed to schedule their patent infringement claims against PixArt Imaging, Inc. ("PixArt") and Nintendo of America, Inc. ("Nintendo").
>
> 14. At the Section 341 Meeting, held on July 11, 2012, Mr. Hansen disclosed that he had a licensing agreement in place [with PixArt] concerning certain patents. See Transcript of Section 341 Meeting, attached hereto as Exhibit A, 6:9-6:13.
>
> 15. At the Section 341 Meeting, Mr. Hansen testified that [PixArt] did not break any contract with respect to the licensing agreement, but rather that [PixArt] chose not to renew the licensing agreement, thereby representing that it had no value. Exhibit A, 6:22-7:1; 8:2-8:13.
>
> 16. Contrary to Mr. Hansen's testimony, and as evidenced by the e-mail correspondences, attached hereto as Exhibit B, PixArt was willing to renew the licensing agreement on the same terms as previously agreed to between the parties ($50,000 per year).
>
> 17. Furthermore, at the Section 341 Meeting, Mr. Hansen testified that the Debtors had no basis to bring any litigation, despite the fact the Debtors' claims against PixArt existed at the time of the Debtors' bankruptcy filing. Exhibit A, 4:21-4:23; 8:11-8:13.
>
> 18. As evidenced by SyncPoint Imaging LLC's Second Supplemental Privilege Log, attached hereto as Exhibit C, Mr. Hansen was involved in

>communications relating to potential litigation regarding the Assets in April of 2012, just two months prior to the bankruptcy filing. See Exhibit C, p. 20, April 19, 2012 "work-product" entry. See also, SyncPoint Imaging LLC's First Supplemental Objections And Responses To PixArt's Contract Interrogatories, attached hereto as Exhibit D, p. 4, Interrogatory/Response #1.
>
>19. After the filing of the bankruptcy petition, Mr. Hansen transferred his interest in some of the Assets to SyncPoint Imaging, LLC, ("SyncPoint"), and SyncPoint commenced litigation against Nintendo and PixArt, case no. 2:15-cv-247, District Court for the Eastern District of Texas, Marshall Division, alleging breach of a licensing agreement and patent infringement (the "Litigation"). Mr. Hansen in the sole member owner of SyncPoint.
>
>20. On or about September 1, 2015, Debtors' counsel contacted the Trustee and disclosed the Litigation.
>
>21. In his deposition in the Litigation, conducted on November 19 and 20, 2015, Mr. Hansen testified that he believed that the patents he owned had value at the time of his bankruptcy filing. See Deposition Transcript (redacted), Exhibit E, 353:1-353:12. See also Deposition Transcript (redacted), Exhibit F, 565:5-566:13; 571:7-571:23; 753:18-753:20; 793:18-793:23.

*Id.* at 2-4. Based on those facts, supported by indisputable evidence, the trustee asserted that the transfer of the patent assets by Hansen to SyncPoint was invalid, and that the assets were property of the bankruptcy estate. *Id.*

SyncPoint is correct in asserting that that no order ever issued regarding ownership of the patent and whether Hansen's representations were inaccurate or constituted misrepresentations or fraud, since as the bankruptcy court noted, it was not "required to decide the merits of the Patent Case; rather, the Court's assessment is limited to considering the probability that SyncPoint would succeed on its claims" should it continue the litigation.[3] Mathiowetz Decl., Exh. 8, Memorandum Opinion dated April 25, 2017 [Dkt. No. 293-2]. However, in making that

---

[3] The Adversary Proceeding filed by the trustee would have necessitated findings as to the ownership and whether Hansen had made misrepresentations in the bankruptcy proceeding, but SyncPoint/Hansen foreclosed that possibility by filing their own Adversary Proceeding to challenge the trustee's right to proceed, then resolving the dueling Adversary Proceedings by agreeing that the Bankruptcy Court would decide whether the proposed sale to PixArt would be authorized.

5

assessment, the Bankruptcy Court considered PixArt's contention that SyncPoint should and would be judicially estopped from pursuing its breach of contract based on the statements of Hansen in the bankruptcy proceedings, and concluded that would be the likely result. It concluded:

> PixArt makes a strong argument that the Debtor should be estopped from claiming damages in the Patent Case when he failed to disclose that claim in his bankruptcy case and in fact took a positon in his bankruptcy case that was inconsistent with the position he and SyncPoint now take in the patent case. [Citations omitted].

*Id.* at 15-16. In the end, Hansen's misrepresentations were a significant (although not exclusive) factor in the court's determination that SyncPoint would not succeed in its claims against PixArt, and that the bankruptcy estate was better served by selling the assets to PixArt.

SyncPoint also asserts that PixArt was not "forced" to litigate Hansen's personal bankruptcy, therefore it cannot be said that SyncPoint "expanded the litigation" by detouring to bankruptcy court. Indeed, it was not until several months after SyncPoint surreptitiously reopened the bankruptcy that PixArt became aware that it had done so. While PixArt was not a party to the bankruptcy, it was clearly implicated by Hansen's claim that PixArt owed SyncPoint no less than $28 million to Hansen for breach of the 2008 License Agreement, <u>an asset that the trustee now claimed belong to the estate</u>, and because ownership of the '214 patent was in dispute. SyncPoint voluntarily opened this new front in the litigation to resolve the inconsistency between Hansen's testimony in 2012 and subsequent statements and actions, including filing this lawsuit.[4] PixArt intervened to protect its interests, and the court's decision

---

[4] SyncPoint expresses bafflement with respect to PixArt's contention that SyncPoint made no effort to submit a counterbid to secure ownership of the assets. SyncPoint Opp. at 5. Although SyncPoint stipulated that if the Bankruptcy Court allowed it to hold ownership of the patent assets, it would pursue its claims against PixArt and the creditors and the trustee would be paid from the net proceeds, it never offered a monetary counterbid to PixArt's offer to buy the assets.

6

to allow the trustee to sell the assets to PixArt—based at least in part on Hansen's misrepresentations during bankruptcy—confirmed that its decision to do so was the correct one.[5]

      C.      **SyncPoint's Refusal to Dismiss the Action Against PixArt Following Claim Construction Prolonged the Litigation and Necessitated Resolution of the Bankruptcy Action**

As discussed more fully in Nintendo's Motion, SyncPoint recognized the futility of its claims and gave up trying to demonstrate literal infringement against Nintendo following claim construction. (Nintendo Motion at 7-10). SyncPoint's infringement expert Dr. Russ acknowledged that, given the Court's claim construction, the Nintendo Wii could not literally infringe. Nintendo Motion at 7, fn. 24, citing Infringement Report of Dr. Russ (Exh. H to Declaration of Kevin Zeck in Support of Nintendo Motion). While he offered opinions suggesting infringement under the doctrine of equivalents to satisfy the external (and optical) cursor limitations, Dr. Russ neglected to address and consider the fact that the external cursor limitations had been amended during prosecution of the '214 patent, and prosecution history estoppel therefore precluded application of the doctrine of equivalents. Therefore, SyncPoint could not prove direct infringement by Nintendo under the Court's claim construction. And, with no direct infringer, there could also be no infringement by PixArt, which merely supplied a

---

*See* Mathiowetz Decl., Exh. 4 [Dkt. No. 293-1], Exh. 8, Memorandum Opinion dated April 25, 2017 [Dkt. No. 293-2]. Had SyncPoint offered even $1 more than PixArt, right up through the close of the April 12, 2017 hearing, the trustee would have been required to accept the offer. The decision to <u>not</u> pay more than $150,000 circumstantially, at least, confirms that SyncPoint, Hansen, and their counsel did not believe their case had real merit.

[5] SyncPoint further contends that its standing to sue in the district court litigation would not have been jeopardized in light of the stipulation it and Hansen reached with the trustee, which it recites in part. SyncPoint Opp. at 5-6. But by referring to SyncPoint's ownership of "all right, title and interest, at all relevant times to pursue all causes of action," the trustee was only confirming that SyncPoint, not Hansen, was claiming to own such rights based on the purported assignment, <u>not</u> that the trustee was giving up her claim that the rights belonged to the bankruptcy estate.

component used in the accused products. Nonetheless, SyncPoint refused to dismiss its case against PixArt.

SyncPoint then sought, and was granted, a stay of this case in order to resolve the ownership issue in the New Hampshire Bankruptcy Court. There SyncPoint argued that it was still entitled to recover damages against PixArt for breach of contract irrespective of the fact that the patent-in-suit had been invalidated through an IPR filed by PixArt and an *ex parte* reexamination filed by a third party. Mathiowetz Decl., Exh. 4 [Dkt. No. 293-1], Exh. 8, Memorandum Opinion dated April 25, 2017 [Dkt. No. 293-2]. According to SyncPoint, it was entitled to recover damages that had accrued prior to the patent being invalidated. That is a legal issue upon which the parties disagree. *Id.* But it is also irrelevant, because SyncPoint had no claim for infringement against PixArt; its claim to damages for breach of contract still required proof of direct infringement by Nintendo, which SyncPoint had abandoned (literal infringement) or was precluded from recovering (doctrine of equivalents).[6] Thus, its efforts in the bankruptcy court to preserve the patent assets for the sole purpose of suing PixArt for breach of contract were misguided and unnecessary.

## III. Conclusion

Nothing SyncPoint has set forth in its response can erase the fact that SyncPoint and its counsel filed this case notwithstanding Karl Hansen's understanding and belief that he had no infringement case against either defendant and had no action for breach of contract against PixArt. The actions by SyncPoint and its counsel, both in filing the case without reasonable

---

[6] PixArt could not be held liable for direct infringement (even if the chip itself was an accused product, which it was not) or contributory infringement since the undisputed evidence was that PixArt made its sales to Nintendo and delivered its CMOS devices to Nintendo outside the United States. The only potential infringement claim against PixArt was for induced infringement, which required underlying direct infringement.

basis and in maintaining the action until the trustee sold the assets to PixArt, make this case stand out from the typical patent infringement case and satisfy the standard set forth in *Octane Fitness*. Accordingly, the Court should find this case exceptional under 35 U.S.C. § 285 and award Defendants their fees and costs.

Dated:  April 19, 2018                                          Respectfully submitted,

*/s/ Duane Mathiowetz*

Duane H. Mathiowetz (CA Bar No. 111831)
   *(admitted in the E.D. Texas)*
Rick C. Chang (CA Bar No. 209515)
   *(admitted in the E.D. Texas)*
FOLEY & LARDNER LLP
555 California Street, Suite 1700
San Francisco, CA 94104
Tel:     (415) 434-4484
Fax:    (415) 434-4507
dmathiowetz@foley.com
rchang@foley.com

Attorneys for Defendant
PIXART IMAGING, INC.

## **Certificate of Service**

On April 19, 2018, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

>        */s/ Nancy Li*
>           Nancy Li