# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| SYNCPOINT IMAGING, LLC, | |
| Plaintiff, | No. 2:15-cv-00247-JRG-RSP |
| vs. | |
| NINTENDO OF AMERICA INC., et al., | [REDACTED VERSION FILED PURSUANT TO PROTECTIVE ORDER] |
| Defendants. | |

**Nintendo's Post-Hearing Brief in Support of its Motion
for Exceptional Case Attorney's Fees**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

1.  The Assignments.................................................................................3

   1.1   The Pia Firm intentionally fabricated the Pia Version................4

   1.2   Mr. Hansen backdated the Hansen Version and spoliated
         evidence. ................................................................................10

2.  Mr. Hansen Knowingly Misrepresented Venue Facts .........................14

3.  SyncPoint Provided No Credible Evidence Of Any Pre-Filing
    Investigation ....................................................................................18

4.  SyncPoint Is Karl Hansen and Karl Hansen Is SyncPoint. .................20

5.  The Pia Firm Is Responsible For This Case's Exceptional Nature.......22

CONCLUSION..........................................................................................23

## TABLE OF AUTHORITIES

Page

**Cases**

*Flores v. Bodden*, 488 Fed. Appx. 770 (5th Cir. 2012) ...................................21

*Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826 (E.D. Tex. 2017) ..........21

*Minnesota Mining & Manufacturing Co. v. Eco Chem, Inc.*,
   757 F.2d 1256 (Fed. Cir. 1985) ..................................................................21

## INTRODUCTION

The evidence at the hearing showed that this case is exceptional even if the Court believes Mr. Hansen and the Pia Firm's excuses. But if the Court does not believe their excuses, then the case is something much worse. In either scenario, the Court should award Nintendo's full fees.

The hearing touched on several issues raised in Nintendo's briefing, and as to each, Mr. Hansen and the Pia Firm offered excuses unmoored to any evidence. The Pia Firm's excuse for the production of a fake assignment was to blame a paralegal who supposedly "came across" a signature page, attached it to a Word document, and inserted a long-past signed-on date. Yet, even if this story was somehow true—and the Pia Firm offered *no* evidence supporting it—this would still be an admission that the Pia Firm created and produced a fake patent assignment. Surely, such conduct makes this case stand out from others. But as the evidence at the hearing showed, the Pia Firm's excuse of innocent mistake was not credible, as it is now indisputable that the Pia Firm had a genuine version of the assignment in its possession on the day it created and produced the fake version. But as the evidence also showed, the genuine version of the assignment had errors in it that could have deprived SyncPoint of standing. So, rather than produce the genuine document—and risk SyncPoint's standing—the Pia Firm elected to remove the signature page from the genuine assignment and attach it to a *different* Word version of the assignment that did not have these standing-related errors. The evidence, thus, showed that creation and production of the phony assignment was not a mistake—it was an intentional act calculated to deceive and an attempt to preserve standing. If, therefore, the Court does not believe the Pia Firm's excuse—and the Court should not—then this case is far

worse than exceptional.

Mr. Hansen's backdating his assignment is similar in character. Mr. Hansen provided the Court with any number of excuses for why, despite all appearances, he had not backdated his assignment. None of these excuses was supported by evidence other than Mr. Hansen's uncorroborated and self-serving testimony. By contrast, the record evidence showed that Mr. Hansen could not possibly have signed his assignment on February 18 as he testified in Court because he did not receive the document from which he created the assignment until February 19. Perhaps more disconcerting is that the evidence also showed the Pia Firm appears to have long understood that Mr. Hansen's assignment was not legitimate. Notwithstanding that knowledge, the Pia Firm elicited testimony from Mr. Hansen on "facts" not even the Pia Firm can credibly believe are true. Thus, if the Court does not believe Mr. Hansen and the Pia Firm's excuses, this case is, again, much worse than exceptional.

Their other excuses were similarly not credible. Mr. Hansen's excuse for misrepresenting to the Court that SyncPoint had "employees" was that he really meant they were unpaid personal friends who either said they *might* pick-up the mail at SyncPoint's office or explicitly told him that they could not help at all. This is exceptional even if the Court believes Mr. Hansen's statements. Similarly, Mr. Hansen and the Pia Firm's excuse for falsely alleging in the Complaint that SyncPoint had "its principal place of business in the Eastern District of Texas" was that SyncPoint always "intended" to take over a lease from one of the Pia Firm's other clients. But the evidence shows that the Pia Firm made no effort to get a lease for SyncPoint until six days after a meet and confer in which Nintendo

demanded evidence of a principal place of business in the District. And Mr. Hansen's misrepresentation to the Court that he and SyncPoint's lawyers engaged in "500 hours" of prefiling diligence when SyncPoint's interrogatory response identified virtually none is exceptional too.

In the end, what the hearing showed was that Mr. Hansen and the Pia Firm are willing to say or do just about anything, perfectly exemplifying why the case was, at a minimum, exceptional, and in all likelihood, far worse.

## 1.    The Assignments.

Mr. Hansen attempted to assign his patents to SyncPoint in November 2014, but the assignment was defective because it did not assign the right to sue for past damages or for breach of contract.[1] The significant and demonstrated misconduct that followed flowed from trying to rectify this mistake.

On February 18, 2015, Mr. Pia sent Mr. Hansen Word versions of two new assignments.[2] One assignment would assign the rights from SyncPoint to Mr. Hansen, and the other would assign Mr. Hansen's rights back to SyncPoint.[3] Mr. Hansen claims he printed out the signature pages from these assignments on February 18, hand-signed them, took photos of them, and then on February 18 at around 7 p.m., emailed the photos to Mr. Pia.[4]

Mr. Hansen testified that he understood the SyncPoint-to-Hansen assignment needed to be signed first. But neither the signatures pages themselves nor the images of the signature pages could be used to establish that the documents were executed in the proper order.[5] Thus various "versions" of the critical

---

[1] 6/14/2018 Hearing Tr. at 10:11-18.

[2] *Id.* at 17:5-15.

[3] *Id.* at 12:6-19.

[4] *Id.* at 24:8-20 (discussing NX4 at KARLH002008).

[5] *Id.* at 25:3 - 26:6.

SyncPoint-to-Hansen assignment were created in an attempt to establish evidence of this order of execution.

The evidence at the hearing showed that there were three "versions" of the SyncPoint-to-Hansen assignment. The first version, described at the hearing as the "Erroneous Version," included Mr. Hansen's signature page with a digital Adobe signature. The Erroneous Version was identified as NX26 at the hearing and was shown in its native form as SYNCPOINT003537. This version, as the evidence showed, had errors in it. Among other things, it identified Mr. Hansen as the assignor, when he should have been the assignee.[6] The second version of the assignment, described at the hearing as the "Hansen Version," is the version of the assignment Mr. Hansen claims he edited on February 18 to correct the errors in the Erroneous Version. Even though Mr. Hansen contends he corrected and digitally executed this document on February 18, it is undisputed that he did not send the document to Mr. Pia until two days later, on February 20.[7] The Hansen Version was identified as NX6 and was discussed in its native form as BRILLIANT010206. And the third version, described at the hearing as the "Pia Version," is the version of the assignment the Pia Firm later created and, on the same day, produced to Nintendo as the supposedly authentic assignment. This document was identified as NX7.

## 1.1   The Pia Firm intentionally fabricated the Pia Version.

It is now indisputable that on July 8, 2015—the day the Pia Firm produced the phony Pia Version to Nintendo—a Pia Firm attorney emailed a *complete* nine-page, *signed* copy of the Erroneous Version of the assignment to a Pia Firm

---

[6] NX26 at 9.
[7] 6/14/2018 Hearing Tr. at 37:16-23.

paralegal, Ms. Butler.[8] Nintendo's expert compared the metadata of the document attached to the July 8 email to Ms. Butler with the metadata of the Erroneous Version, and found they were a perfect match. Mr. Montegudo, a former Irving, Texas computer forensics detective, summed it up as follows:

| SUMMARY OF BUTLER000009 & Erroneous Version | | |
|---|---|---|
| Metadata Field | 7/8 PDF (BUTLER00009) | Erroneous Version (SYNCPOINT003537) |
| Filename | 2015-02-18 Signature version SyncPoint Assignment to Hansen-Signed (2) | 2015-02-18 Signature version SyncPoint Assignment to Hansen-Signed.pdf |
| Page Count | Nine | Nine |
| Created | 2/19/2015 9:01:42 AM | 2/19/2015 9:01:42 AM |
| Modified | 2/18/2015 9:06:48 PM | 2/18/2015 9:06:48 PM |
| Application | PScript5.dll Version 5.2.2 | PScript5.dll Version 5.2.2 |
| PDF Producer | Acrobat Distiller 11.0 (Windows) | Acrobat Distiller 11.0 (Windows) |
| PDF Version | 1.6 (Acrobat 7x) | 1.6 (Acrobat 7x) |
| File Size | 613.99 KB (628,722 Bytes) | 613.99 KB (628,722 Bytes) |
| ¶ 0.1 | "inventor and owner" | "inventor and owner" |

Mr. Moneguido's conclusion is consistent with how Ms. Butler's interrogatory response described the document attached to the July 8 email: "Signed copies in .pdf of assignements [sic] between SyncPoint and Karl Hanse [sic]; author PADRM; 2/19/2015."[9] As a result, it is now beyond any dispute that on July 8—the day the Pia Firm produced the phony assignment to Nintendo—the Pia Firm had in its possession a fully executed copy of the Erroneous Version of the assignment. It is equally indisputable that on July 8, the Pia Firm elected not produce the Erroneous Version. The Pia Firm also elected not to produce the Hansen Version of the assignment, which Mr. Hansen sent to the Pia Firm by email

---

[8] *See* NX19 at BUTLER000001, 09; 6/14/2018 Hearing Tr. at 144:10-21
[9] NX19 at BUTLER000001.

months earlier on February 20.[10] Instead, the Pia Firm elected to create its own, third version of the assignment, which required Ms. Butler to remove the signature page from the Erroneous Version, attach it to a  Word document sent to her by Mr. Pia, create a new .pdf, add a long-past signed-on date, and produce the resulting document as a genuine assignment.[11] Fabricating evidence of ownership is as serious as litigation misconduct gets.

The Pia Firm's excuse for the misconduct does not help. ██████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████[12] Even if the Court credits this story—and the Court should not—this is exceptional conduct justifying an exceptional case finding. There can be no doubt that Ms. Butler *knew* she was attaching a signature page from one document to a draft assignment, and more importantly, that she knew she was producing a document that was not, and could not be, authentic. Thus, even if she somehow believed it was permissible to do this, Ms. Butler's actions were anything but a "mistake" as the Pia Firm characterizes them. Indeed, even seen in the most benign light, this conduct— intentionally producing a fake document—is exceptional. But as the evidence revealed, the Pia Firm's conduct was not benign.

The hearing revealed that the Pia Firm's production-mistake excuse is not plausible for two incontrovertible reasons. First, while the evidence at the hearing showed that Ms. Butler received a complete version of the Erroneous Version via email on July 8, 2015, there is *no evidence whatsoever* of her "coming

---

[10] 6/14/2018 Hearing Tr. at 37:16-23.
[11] *See*, *e.g.*, NX24 at 18.
[12] ██████████████████

across" any other signature pages existing loose by themselves, without being part of an already complete document.[13] No such loose signature page was identified in her interrogatory responses, nor was such a signature page produced in discovery nor offered in evidence during the hearing. Second, even Mr. Hansen agreed that he did not send the digitally signed signature page at issue to the Pia Firm by itself:

> Q. … [D]oes the signature page on this document, on this assignment, appear to be a copy of the—of your signature page from the assignment reflected in Karl 2010?
>
> A. It looks like the signature page on the first set of assignments that I sent to Joe on the 19th.
>
> Q. Okay. And you don't recall ever sending that signature page by itself, do you?
>
> A. I do not."[14]

As a consequence, *the only way* Ms. Butler could have obtained the signature page attached to the Pia Version of the assignment was for someone at the Pia Firm to remove the signature page from the fully executed Erroneous Version. That is the *only way* the Pia Firm ever received it—as part of a fully integrated document. So, whether Ms. Butler removed the signature page from the Erroneous Version to attach it to the Pia Version or someone else did it for her, there is no longer any doubt where the signature page for the Pia Version came from or how it got there.

The hearing also demonstrated *why* the Pia Firm did this.

On July 2, the parties had a meet-and-confer during which, among other

---

[13] Indeed, her deposition revealed her December 21, 2015 interrogatory responses were either significantly misleading or plain false.  6/14/2018 Hearing Tr. at 113:24 - 117:10.

[14] *Id.* at 42:11–18.

things, Nintendo demanded proof of SyncPoint's ownership of the patent.[15] SyncPoint committed to providing that evidence by July 8.[16] On July 8, with the production deadline looming, the Pia Firm was faced with the decision of whether to produce the Erroneous Version of the assignment or the Hansen Version of the assignment. At that time, the firm had both in its possession and both were available for production.[17] But the Pia Firm decided not to produce the Erroneous Version presumably because the Erroneous Version had significant defects that even Mr. Hansen understood could be "an issue,"[18] and those "issues" might have resulted in SyncPoint losing standing. So, from the Pia Firm's perspective, producing the Erroneous Version was a non-starter due to the damage it could do to the case.

As to the Hansen Version, the Pia Firm likely understood long ago what was demonstrated at the hearing: Mr. Hansen backdated his electronic signature.[19] As a result, the Pia Firm decided not to produce that document either. The proof that the Pia Firm in all likelihood knew the Hansen Version was illegitimate— and thus made the conscious decision not to produce it—lies in the Pia Firm's undisputed conduct as to what was not produced. If the Pia Firm believed Mr. Hansen's story—that he executed the Hansen Version on February 18 and did not backdate his signature, *i.e.*, that it was legitimate—then the firm would have simply produced the Hansen Version on July 8, and avoided all that followed. There is no dispute that the Pia Firm had this document as of February 20, and

---

[15] Dkt. 290-23.

[16] *Id.*

[17] NX4 at KARLH002009 (Hansen sent Pia Firm Erroneous Version on Feb. 19, 2015), KARLH002013 (Hansen sent Pia Firm Hansen Version on Feb. 20).

[18] *See* 6/14/18 Hearing Tr. at 33:23-34:1.

[19] *E.g.*, *id.* at 152:4-14 (J. Montegudo testimony).

could have simply produced it.[20] But it did not, and no one from the Pia Firm has ever explained why.[21]

Perhaps more importantly, the Pia Firm had a second shot at this. In November 2015, Nintendo raised concerns about the manufactured Pia Version of the assignment.[22] If the Pia Firm's production of the Pia Version was merely a mistake—as opposed to an intentional act to deceive—and if the Pia Firm actually believed the Hansen Version was legitimate, surely the firm would simply withdraw the Pia Version and substitute the Hansen Version. It did not. Instead, the Pia Firm treated the Hansen Version as if it was radioactive, replacing the manufactured Pia Version with the Erroneous Version and even filing the Erroneous Version with the PTO as proof of ownership.[23] The only rational explanation for this behavior is that the Pia Firm has *always* understood that the Hansen Version of the assignment was illegitimate, which is why the Pia Firm decided to manufacture its own version of the assignment rather than produce the Erroneous Version—that the firm understood had "issues" that could have deprived SyncPoint of standing—or the Hansen Version—that the firm likely knew was backdated.

It is apparent, then, that the creation of the Pia Version and its production was a deliberate act, and not a mistake. Had everything been above board, the

---

[20] NX4 at KARLH002013 (Hansen sent Pia Hansen Version on Feb. 20, 2015).
[21] The answer may lie in the redacted emails that are shown in KARLH002000-2023, emails which the Pia Firm has steadfastly refused to produce, even though they rely on them as evidence purportedly supporting their excuses.
[22] *E.g.*, ██████████████████████████████████████
███████████████████████████████████████████████████
███████████████████
[23] Dkt. 290-3, ¶¶ 34-47, 65-67.

Pia Firm would simply have produced the Erroneous Version or the Hansen Version, both of which were manifestly in the firm's possession on the production date. That the Pia Firm skipped the straightforward path and instead went to the trouble of making the Pia Version shows that this was a deliberate decision. Moreover, not only did the Pia Firm manufacture evidence central to the case by creating the Pia Version of the assignment using a page from the fully executed Erroneous Version, it also elicited testimony from Mr. Hansen that he signed the Hansen Version on February 18, when not even the Pia Firm likely believed that was true.

## 1.2    Mr. Hansen backdated the Hansen Version and spoliated evidence.

The Pia Firm was right not to trust the Hansen Version of the assignment. The evidence revealed that Mr. Hansen could not have digitally signed the Hansen Version of the assignment on February 18, as he claimed, because Mr. Hansen did not receive the document from which he generated that version until February 19. The timeline of events makes this crystal-clear:



As the timeline reveals, on February 18, 2015, Mr. Hansen received a Word

version of the SyncPoint-to-Hansen assignment.[24] That same day, Mr. Hansen noticed errors in the Word version and emailed Mr. Pia.[25] Having not heard back from Mr. Pia, the next day on February 19, Mr. Hansen emailed a *signed copy* of the Erroneous Version to the Pia Firm.[26] Minutes after Mr. Hansen's email sending the Erroneous Version, the Pia Firm sent Mr. Hansen a revised Word version of the SyncPoint-to-Hansen assignment with the filename "2015-02-18 v1 Signature version SyncPoint Assignment to Hansen[1][2].docx."[27] The next day on February 20, Mr. Hansen returned the signed Hansen Version to the Pia Firm.[28] The Hansen Version had Title metadata, which Nintendo's expert testified identified the source document for the PDF, matching the document Mr. Hansen received the previous day: "2015-02-18 v1 Signature version SyncPoint Assignment to Hansen-Corrected.docx."[29]

As the timeline makes clear, Mr. Hansen used the Word document he received on February 19, corrected the spelling of his name—hence the "corrected" added to the PDF title metadata in the Hansen Version[30]—signed the document and then applied a backdated electronic signature to make it appear that the document was signed on February 18 at 9:23 pm.[31] Mr. Montegudo opined that

---

[24] NX4 at KARLH002000 (EM-1), KARLH002002 ("Created: … 16:39"), KARLH002004 ("Created: … 16:44").

[25] *Id.* at KARLH002012 (Email from Hansen to Pia at 7:44 PM on February 18, 2015 has subject line "Question on assignments - looks reversed on one….").

[26] *Id.* at KARLH002010.

[27] *Id.* at KARLH002010, KARLH002012 (9:25 am email); 6/14/2018 Hearing Tr. at 164:7-19 (email in KARLH002010 sent between 9:10 and 9:19 am).

[28] NX4 at KARLH002013.

[29] *See* 6/14/2018 Hearing Tr. at 146:1 - 148:22, 150:23 - 152:14, 156:3-5, 163:6 - 164:19.

[30] *Compare* NX6 (Document Properties, Title Metadata), *with* 6/14/2018 Hearing Tr. at 88:24 - 89:4 ("added a dash corrected" after fixing "typos").

[31] NX6 (Signature Properties, Signing Time).

the signing time was backdated,[32] and that Mr. Hansen could have easily back-dated the assignment by merely changing the system clock on his computer.[33] As Mr. Montegudo made clear, it would have taken only minutes to produce this backdated electronic signature.

In the face of this evidence, Mr. Hansen and the Pia Firm contended, based only on Mr. Hansen's uncorroborated testimony, that Mr. Hansen *independently* created a corrected version of the SyncPoint-to-Hansen Assignment on February 18 and signed the document at that time.[34]

But to believe this story requires too much of the Court. Specifically, to credit Mr. Hansen's story, the Court must believe Mr. Hansen created a document from one file and then saved that file using a different file name format that just hap-pened to be *identical* to the format *independently* used by the Pia Firm the fol-lowing day on February 19. Moreover, the phantom document on which Mr. Hansen's story now hangs was *never* produced in discovery, and was *not iden-tified* in Mr. Hansen's interrogatory responses in which he was required to iden-tify all versions of the assignment, including drafts.[35] Instead, according to Mr. Hansen, the document that could prove his story disappeared into the ether of his employer's computer system, never to be found.[36] Yet, that incredible series of coincidences is not all the Court would have to believe to credit Mr. Hansen's story. The Court would also have to believe that while Mr. Hansen supposedly signed this document on February 18 and confirmed it was correct on February 19, he nonetheless sent the Erroneous Version to the Pia Firm on February 19

---

[32] 6/14/2018 Hearing Tr. at 139:25 - 140:4, 142:18-24.
[33] *Id*. at 142:25 - 143:18.
[34] *Id*. at 39:4 - 40:23.
[35] *See* NX3 at 6-7.
[36] 6/14/2018 Hearing Tr. at 109:1-16.

and waited to send his "corrected" version until February 20. Moreover, the Court would have to ignore the undisputed fact that minutes after Mr. Hansen sent the Erroneous Version to Mr. Pia on February 19, he received a Word document from Mr. Pia whose unique filename format appears in the Title field of the metadata for the Hansen Version.[37]

Mr. Hansen's admitted spoliation of evidence relating to these materials gives further reason to doubt the veracity of his signature story. In December 2015, Mr. Hansen served his interrogatory response that purportedly identified computing devices he used to create the assignments.[38] Nintendo wanted this information because it intended to conduct a forensic examination of those devices. As the hearing showed, both the Erroneous Version and the Hansen Version were generated using a Windows PC Mr. Hansen did not identify in his interrogatory response.[39] When Nintendo asked about this at the hearing, Mr. Hansen admitted to the existence of a previously undisclosed "person[al] laptop that was running probably Windows 7 at the time."[40] Mr. Hansen then made his failure to disclose the existence of this computer worse by admitting that he had "got[ten] rid of" this computer "months" before his interrogatory responses were served because it was "a commodity, like a toothbrush."[41] To put it bluntly, Mr. Hansen admitted to the destruction of relevant, material evidence *while the case was ongoing* and after he and his counsel knew the computer was relevant to the case. That Mr. Hansen admits to spoliation as a partial excuse for not

---

[37] *Id.* at 39:4 - 40:23.
[38] NX4 at KARLH002023.
[39] 6/14/2018 Hearing Tr. at 27:14 - 28:24.
[40] *Id.* at 27:14-19.
[41] *Id.* at 28:6-16.

being able to find the document on which his story now turns, speaks volumes.[42]

The evidence regarding both the Pia Version and the Hansen Version of the assignment demonstrates palpable bad faith misconduct, spoliation, and an intent to deceive. By itself, this evidence is sufficient to justify an exceptional case finding. But the hearing revealed even more evidence of bad-faith conduct by Mr. Hansen and the Pia Firm.

**2.    Mr. Hansen Knowingly Misrepresented Venue Facts**

Although SyncPoint's Sur-Reply Brief suggested that Mr. Hansen might take responsibility for his venue-related misrepresentations,[43] SyncPoint, Mr. Hansen, and the Pia Firm doubled down at the hearing, offering new, frivolous excuses for this misconduct. For instance, in his August 10, 2015 venue declaration, Mr. Hansen discussed his connections to New Hampshire and Massachusetts multiple times to give the impression that he was located in New Hampshire.[44] But Mr. Hansen never mentioned that he leased a home in Utah in July 2015, that he was in California about 80% of the time for his job at Telenav, that he spent weekends in Utah, or that his wife was moving to Utah a mere 20 days after he signed his declaration.[45] Rather than owning up to these material omissions, Mr. Hansen testified that the ends justify the means: "So the purpose of this, I think was to try to overcome your objection to venue … I didn't think that when I created this that I needed to be exhaustive on a day-to-day basis of where I was, when I was, where I was working, and with whom I was working."[46] In short,

---

[42] Due to the spoliation, inferences should be drawn against SyncPoint, Mr. Hansen, and the Pia Firm on the backdating issue.

[43] *See* Dkt. 327 at 7 ("He believed he would 'employ' the for[e]going individuals, and overstated that they were employed.").

[44] NX8, ¶¶ 24, 38, 64, 74, 75, 76.

[45] 6/14/2018 Hearing Tr. at 44:24 - 45:7, 98:20-22.

[46] *Id.* at 46:2-7.

Mr. Hansen conceded that, at best, he obscured important venue-related facts in order to, as he put it, "overcome [Nintendo's] objection to venue."[47]

Mr. Hansen also refused to take responsibility for his false claim that SyncPoint "employed" "consultants" in this District. Mr. Hansen's August 10, 2015 declaration stated that SyncPoint "employs several consultants to conduct business in SyncPoint's Texas Office," and specifically named Ryan Thomas, Dale Buechele, Dave Vance, and Edwin Bland. But at the hearing, Mr. Hansen conceded that these individuals, if they did anything at all, at most picked-up mail, made sure that the one desktop computer in the "office" was still on, and that "the office hadn't just collapsed."[48] Mr. Hansen conceded that none of these so-called consultants were ever paid,[49] and that for three of them, Mr. Hansen was unsure if they ever performed even these modest, informal mail-pick-up-type tasks.[50] Nor could he—or would he—explain how these "consultants" could be "employed" by SyncPoint when at least one expressly told him he would *not* pick-up the mail or otherwise "help [Mr. Hansen]."[51] Yet, Mr. Hansen refused to own up to the falsity of his declaration. Instead, he contended that the mere expression of potential interest to do a personal favor like pick-up mail, transformed Texas residents into SyncPoint "employees" who did "consulting" work relevant for venue purposes. As Mr. Hansen put it: the "express[ion of] a

---

[47] Mr. Hansen's later testimony attempting to explain this misconduct away is not credible. *Id.* at 99:9-11 (contending that he was just "trying to remember things [to] the best of my memory").

[48] *Id.* at 47:4-12.

[49] *Id.* at 48:10 ("I never paid anyone. I didn't have the money.").

[50] *Id.* at 47:14-16 (Dr. Thomas came by office only a couple times); *id.* at 48:6-8 (unknown if Mr. Buechele ever assisted); *id.* at 48:21 - 49:3 (Mr. Bland never assisted).

[51] NX10 at BRILLIANT-SHIRE.0000189; 6/14/2018 Hearing Tr. at 49:16-20.

willingness to do work for me doesn't mean they're not being *employed* by the company as consultants."[52] This makes a stark contrast against SyncPoint's Sur-Reply statement that Mr. Hansen "overstated that they were *employed*."[53]

Mr. Hansen's refusal to provide the Court with straight answers extended to SyncPoint's supposed business office. SyncPoint did not have a lease to a Texas office until August 3, 2015,  six months after SyncPoint represented in its Complaint that it was a Texas LLC with a "principal place of business" in this District, well after Nintendo filed its motion to transfer venue, and just days before Mr. Hansen signed his declaration.[54] More to the point, it was not until July 8—six days after a meet and confer with Nintendo where Nintendo demanded evidence of SyncPoint's place of business in this District—that the Pia Firm, *for the first time*, even made an effort to obtain a lease for SyncPoint.[55]

---

Monday, August 3, 2015 at 3:53:17 PM Mountain Daylight Time

Subject: RE: Pet Aware lease amendment#2
Date:    Wednesday, July 8, 2015 at 3:43:29 PM Mountain Daylight Time
From:    Lannea Butler
To:      'Chitra', Joseph Pia

Chitra,

Can you change the Tenant on this lease to be SyncPoint Imaging, LLC? They will be taking over the PetAware lease.

Thanks,

Lannea

---

When the Pia Firm finally tried to establish a SyncPoint lease, it attempted to do so by having the tenant's name on a pre-existing lease changed from one client

---

[52] 6/14/2018 Hearing Tr. at 50:2-3 (emphasis added).
[53] Dkt. 327 at 7 (emphasis added).
[54] Dkt. 290-35 at SYNCPOINT000926.
[55] NX23 at SYNCPOINT000918.

(PetAware) to another (SyncPoint).[56] The assignment was ultimately signed in early August, just before Mr. Hansen executed his declaration.

But the hearing made these facts worse because Mr. Hansen and the Pia Firm tried to justify the failure to obtain a lease by misrepresenting facts to the Court. Specifically, Mr. Hansen represented to the Court that he paid the rent for SyncPoint's supposed office space while it was in PetAware's name.[57] SyncPoint produced no evidence of this during the case. But to paper over this omission at the hearing, Mr. Hansen and the Pia Firm for the first time presented three personal checks from Mr. Hansen to the Pia Firm (each for $1000).[58] According to Mr. Hansen, these checks were to pay the PetAware lease. But even taking Mr. Hansen at his word, his explanation does not add up—literally.

According to Mr. Hansen and the Pia Firm, the first two checks—totaling $2,000—were for eight months of PetAware's rent, from October 2014 to May 2015.[59] As with most of Mr. Hansen's claims, there was no corroborating evidence—no lease agreement, no retainer agreement between the Pia Firm and Mr. Hansen, no communication between the landlord and Mr. Hansen or between the firm and Mr. Hansen, or even a "memo" on the checks themselves to tie these checks to PetAware's supposed rent. Still, the Court can compare Mr. Hansen's claims against the facts because during discovery Nintendo obtained the Pia Firm's rent checks for the PetAware lease via third-party subpoena. Those

---

[56] ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████
[57] 6/14/2018 Hearing Tr. at 51:5-11.
[58] Plaintiff's Ex. 30.
[59] 6/14/2018 Hearing at 94:9-24.

rent checks demonstrated that the Pia Firm paid▮▮▮▮ for six months' rent[60] with a monthly rate of $275.[61] Thus, if Mr. Hansen's claim that he paid eight months of rent was true, he would have paid $2200, not the $2000 represented by Mr. Hansen's checks. In short, the claim Mr. Hansen made at the hearing—that these personal checks were for rent on SyncPoint's supposed lease—is demonstrably false.

### 3.   SyncPoint Provided No Credible Evidence Of Any Pre-Filing Investigation

As the hearing showed, Mr. Hansen told Nintendo in 2007, Microsoft in 2010, and the bankruptcy court in 2012, that he did not believe the Wii infringed. Indeed, Mr. Hansen testified at his bankruptcy that he had no claim based on his patents, and he explained why he so testified at the hearing. According to Mr. Hansen, in 2012 when he told the bankruptcy court that he had no claim, he was being truthful because it was not until 2013 or '14 that he later concluded he, in fact, might have a claim: "At that point, yeah, in 2013 or '14, there absolutely is a basis; but at the point that I did this testimony [to the bankruptcy court], you know, sadly I had no way to show anything, you know. I had no idea."[62] This is an entirely different story than he told in his deposition:



---

[60] ▮▮▮▮▮▮▮▮▮
[61] NX22 at SP000897 (Nov. 7, 2014 Email Re: PetAware Lease Extension - "$275/month").
[62] 6/14/2018 Hearing Tr. at 64:8–10.



[63]

Whether the Court believes Mr. Hansen's testimony from then or now, the salient point is that after his bankruptcy, Mr. Hansen confirmed that he wanted to "hit it big,"[64] and so he created a new theory of infringement: the invisible cursor theory. That theory, however, had no support in the patent, and the Court rejected it: "There is no lexicography or disavowal that supports Plaintiff's special definition of 'cursor' as an invisible indicator of position."[65]

But now SyncPoint, Mr. Hansen, and the Pia Firm want the Court to believe they seriously considered and complied with their prefiling obligations. So Mr. Hansen testified at the hearing that he and his sons spent, as a "ballpark" estimate, "250 hours or more of research … and then some additional research with the [Pia Firm] lawyers for a total of more than 500 hours."[66] Yet no documents corroborating this purported pre-filing investigation have ever been produced, and the only evidence is directly to the contrary. In fact, the only evidence SyncPoint has ever produced on the subject of its prefiling investigation is an interrogatory response, the substance of which reads in full:

> In 2014, Chris told KH that they should re-evaluate the Wii as a potentially infringing product. Karl Hansen and his sons looked at Internet videos displaying how Wii remote works and showing a little bit of reverse engineering. KH and his sons decided to seek

---

[63] ██████████████████████████████

[64] 6/14/2018 Hearing Tr. at 61:16-17.

[65] Dkt. 290 at 7 (citing Dkt. 230 at 21).

[66] 6/14/2018 Hearing Tr. at 104:19-23.

out a law firm to pursue this litigation.[67]

Faced with this sworn response, Mr. Hansen, predictably, attempted to explain it away, contending "I misunderstood the question. I was focused on the earliest date, and that was the earliest date when Chris came to me and talked to me about it."[68] But this excuse is also not credible, as the question was clear and comprehensive:

> Describe in detail the research and investigation into the facts and patent infringement claims that you alleged in your complaint and that you conducted prior to filing the complaint, including, separately and for each Accused Product, by identifying any analysis of the Accused Product, including the results of any such analysis and the role of each individual involved in the analysis, the earliest date by which you were aware of the Accused Product, the earliest date by which you determined that the Accused Product allegedly infringed any claim of the patent-in-suit, and the facts that you relied on when forming the basis of your claim that the Accused Product infringes the patent-in-suit.[69]

Surely, if Mr. Hansen were telling the truth and there were 500 hours' worth of work done, he would have had much more to say in response to this interrogatory and there would have been some evidence to back him up. But there was none.

### 4.   SyncPoint Is Karl Hansen and Karl Hansen Is SyncPoint.

If any doubt existed going into the hearing that SyncPoint was merely Mr. Hansen's alter ego, no doubt can exist now. At the hearing, Mr. Hansen testified that SyncPoint had no corporate books, no corporate agreements (except the Pia Firm contingency fee agreement, which has never been produced),

---

[67] *Id.* at 106:20 - 107:8.
[68] *Id.* at 107:17-20.
[69] Dkt. 290-9 at 21.

no stock, no investors other than Karl Hansen, no bank account, no money, and only maybe "800, $1500" in corporate assets (a computer, a printer, etc.).[70] Moreover, when Mr. Hansen was asked whether SyncPoint had the ability pay the costs award in this case, Mr. Hansen responded: "Not a chance."[71] Further, the only evidence Mr. Hansen did offer on SyncPoint's funds—his personal checks—demonstrate that there is no separation between SyncPoint and Mr. Hansen: Mr. Hansen paid SyncPoint's expenses directly out of his own pocket. In short, SyncPoint served as a mere shell by which Mr. Hansen could bring this frivolous suit.

Fundamental fairness demands that the Court pierce the corporate veil between Mr. Hansen and SyncPoint, and the Federal Circuit has long approved of doing so for purposes of imposing sanctions under section 285. In *Minnesota Mining & Manufacturing Co. v. Eco Chem, Inc.*, the Federal Circuit affirmed a district court's finding that a corporation was the alter ego of a principal where the principal owned the vast majority of stock, corporate formalities were not observed, and the corporate form was used to thwart recovery of section 285 fees.[72] Fifth Circuit and Texas law are similar.[73] And as Judge Gilstrap held in *Iris Connex, LLC v. Dell, Inc.*, "one cannot abuse the judicial process through the creation of shell entities to facilitate the assertion of otherwise meritless claims as part of a scheme to avoid the risks that Section 285 creates."[74]

---

[70] 6/14/2018 Hearing Tr. at 56:25 - 57:12; 57:20 - 59:13; 60:25 - 62:12.

[71] *Id.* at 59:9-10.

[72] 757 F.2d 1256, 1264-65 (Fed. Cir. 1985).

[73] *Flores v. Bodden*, 488 Fed. Appx. 770 (5th Cir. 2012) (under Texas law "[a]lter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice").

[74] 235 F. Supp. 3d 826, 860 (E.D. Tex. 2017).

Because the evidentiary hearing showed that SyncPoint was a mere empty vessel and there was no distinction between Mr. Hansen and SyncPoint, the Court should pierce the corporate veil finding Mr. Hansen is the alter ego of SyncPoint, and hold Mr. Hansen jointly and severally liable for the damage he has caused.

### 5.   The Pia Firm Is Responsible For This Case's Exceptional Nature.

The Pia Firm is overwhelmingly responsible for this case and the litigation misconduct with which it was suffused. The record shows that the Pia Firm intentionally created false evidence (the Pia Version of the assignment) rather than produce genuine evidence that might have resulted in a loss of standing (the Erroneous Version). Further, the Pia Firm allowed its client—Mr. Hansen—to claim that he executed the Hansen Version of the assignment on February 18, when the evidence shows that the firm likely knew this was not true. That is truly exceptional conduct, and lies at the very heart of what makes this case stand out. Moreover, no evidence was produced showing that the Pia Firm undertook any sort of pre-filing investigation. This too is exceptional, and it is conduct which lies squarely at the feet of the Pia Firm.

The Pia Firm had serious financial incentives to engage in this behavior. The Pia Firm fronted $242,120 in costs and "just a little over two million bucks" in fees,[75] while Mr. Hansen contributed, at best, $3,000 to litigation costs (plus an unknown amount for corporate formation fees, a computer, a printer, and rent on the SyncPoint "office"). Meanwhile the split of any recovery was 60% to the

---

[75] Dkt. 290-48 at 8.

Pia Firm and 40% to Mr. Hansen/SyncPoint.[76] Thus, the Pia Firm had the overwhelming financial interest in, and responsibility for, this case. Neither Mr. Hansen nor SyncPoint have the assets to satisfy even the costs awarded so far, let alone Nintendo's attorney fees. It would be manifestly unfair if the Pia Firm, which had the most to gain from this case and was an eager and willing participant in the misconduct that makes it exceptional, did not share equally in the responsibility for the damage that was done.

## CONCLUSION

Nintendo proved at the hearing the conduct it complained about in its briefing: The Pia Firm and Mr. Hansen intentionally manufactured evidence and made material misrepresentations both to Nintendo and more importantly to the Court. It is difficult to imagine conduct that could be more clearly exceptional. Thus, the Court should enter an order finding the case exceptional and fully awarding Nintendo its requested fees. Moreover, given that Mr. Hansen and the Pia Firm were directly responsible for the conduct that makes this case exceptional, they should be jointly and severally liable for those fees.

---

[76] *Id.* at 6.

Dated: June 25, 2018

Respectfully submitted,

By:  ___/s/ *Grant Kinsel*___
       Grant Kinsel

Grant Kinsel (lead attorney)
CA Bar No. 172407
Email: gkinsel@perkinscoie.com
Kyle M. Amborn
Wash. St. Bar. No. 48340
Email: kamborn@perkinscoie.com
Kevin A. Zeck
Wash. St. Bar No. 41689
Email: kzeck@perkinscoie.com
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Tel: 206.359.3002
Fax: 206.359.4002

Ryan B. Hawkins
Ca Bar No. 256146
Email: rhawkins@perkinscoie.com
Perkins Coie LLP
11988 El Camino Real, Suite 350
San Diego, CA 92130
Tel: 858.720-5700
Fax: 858.720-5799

Clyde M. Siebman
Siebman, Burg, Philips & Smith, L.L.P.
Federal Courthouse Square
300 N. Travis Street
Sherman, TX 75090
Tel:   903.870.0070
Fax:   903.870-0066
email: Siebman@siebman.com

Attorneys for Nintendo Co., Ltd.
and Nintendo of America Inc.

## CERTIFICATE OF SERVICE

I certify that all counsel of record who are deemed to have consented to electronic service are being served this June 27, 2018 with a copy of this document via the Court's CM/ECF system.

/s/ *Grant Kinsel*
Grant Kinsel