**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **SYNCPOINT IMAGING, LLC**,<br>      Plaintiff,<br><br>v.<br><br>**NINTENDO OF AMERICA INC.**, et al.<br>      Defendants. | Civil Action No. 2:15-cv-247-JRG-RSP<br><br>**FILED UNDER SEAL** |

**SYNCPOINT IMAGING, LLC'S POST-EVIDENTIARY HEARING BRIEF ON
DEFENDANTS' MOTION FOR A DETERMINATION OF EXCEPTIONALITY AND
AN AWARD OF ATTORNEYS' FEES PURSUANT TO 35 U.S.C. § 285**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

I.    PROPOSED FINDINGS OF FACT PRESENTED AT THE HEARING ...................... 2

   a.   SyncPoint's behavior regarding the assignments was not exceptional. ......................... 2
      i.   Assignments: Hand Signatures ................................................................... 2
      ii.   Assignments: E-signatures ........................................................................ 6
      iii.   Assignments: Document Production .......................................................... 9
      iv.   Assignments: Production Mistake ............................................................ 10

   b.   SyncPoint did not misrepresent facts relating to venue. ............................................ 14
      i.   SyncPoint's Texas Office ........................................................................ 14
      ii.   Mr. Hansen's Personal Residence ............................................................ 17

   c.   SyncPoint should be found to be legally distinct from Mr. Hansen. ......................... 17
      i.   SyncPoint is legally distinct from Mr. Hansen. ....................................... 17
      ii.   Mr. Hansen and the Firm cannot be held jointly and severally liable with SyncPoint for any attorney's fees award ................................................... 18
      iii.   Mr. Hansen's understanding of infringement developed over time as information of the Wii's function became known. ....................................... 19
      iv.   SyncPoint conducted a reasonable prefiling infringement investigation. ..................... 21
      v.   SyncPoint's infringement position and theory after claim construction was reasonable. ...................................................................................... 22

I.    PROPOSED CONCLUSIONS OF LAW ...................................................................... 23

   a.   There is insufficient evidence to find that any representation as to venue was unreasonable litigation behavior. ................................................................................. 23

   b.   There is insufficient evidence to hold Mr. Hansen jointly and severally liable for any award against SyncPoint. ........................................................................................... 24

   c.   SyncPoint's infringement positions was reasonable and supported by sufficient prefiling investigation ............................................................................................... 24

   d.   The actions surrounding the assignments do not merit a determination of exceptionality under 35 U.S.C 285. ........................................................................... 28

CONCLUSION ................................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*A123 Sys., Inc. v. Hydro-Quebec*,
   626 F.3d 1213 (Fed. Cir. 2010) ........................................................................... 28
*Aspex Eyewear, Inc. v. Miracle Optics, Inc.*,
   434 F.3d 1336 (Fed. Cir. 2006) ........................................................................... 28
*Calypso Wireless, Inc. v. T-Mobile USA Inc.*,
   No. 2:08-CV-441-JRG-RSP, 2015 WL 1022745 (E.D. Tex. Mar. 5, 2015) ........... 26
*Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*,
   858 F.3d 1371 (Fed. Cir. 2017) ........................................................................... 24
*EON Corp.IP Holdings LLC v. Cisco Sys. Inc*,
   No. 12-CV-01011-JST, 2014 WL 3726170 (N.D. Cal. July 25, 2014) ................... 26
*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010) ........................................................................... 27
*Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prod., Inc.*,
   790 F.3d 1369 (Fed. Cir. 2015) ........................................................................... 25
*Goodyear Tire & Rubber Co. v. Haeger*,
   137 S. Ct. 1178 (2017) ........................................................................................ 24
*Iris Connex, LLC v. Dell, Inc.*,
   235 F. Supp. 3d 826 (E.D. Tex. 2017) ...................................................... 23, 24, 26
*Modern Am. Mortg. Corp. v. Skyline Park*,
   614 F.2d 1009 (5th Cir. 1980) ............................................................................. 28
*Neal v. Hardee's Food Sys., Inc.*,
   918 F.2d 34 (5th Cir. 1990) ................................................................................. 28
*NovelPoint Learning LLC v. LeapFrog Enterprises, Inc.*,
   No. 6:10-CV-229 JDL, 2010 WL 5068146 (E.D. Tex. Dec. 6, 2010) ................... 23
*Ortho Pharm. Corp. v. Genetics Inst., Inc.*,
   52 F.3d 1026 (Fed. Cir. 1995) ............................................................................. 28
*Q-Pharma, Inc. v. Andrew Jergens Co.*,
   360 F.3d 1295 (Fed. Cir. 2004) ........................................................................... 25
*Raylon, LLC v. Complus Data Innovations, Inc.*,
   700 F.3d 1361 (Fed. Cir. 2012) ........................................................................... 28
*SFA Sys., LLC v. Newegg Inc.*,
   793 F.3d 1344 (Fed. Cir. 2015) ........................................................................... 25
*Shared Memory Graphics LLC v. Apple, Inc.*,
   812 F. Supp. 2d 1022 (N.D. Cal. 2010) ............................................................... 26
*Small v. Implant Direct Mfg. LLC*,
   No. 06 CIV. 683 NRB, 2014 WL 5463621 (S.D.N.Y. Oct. 23, 2014) ................... 25
*SmartMetric, Inc. v. MasterCard Int'l, Inc.*,
   No. 11-cv-7126, 2015 WL 12582630 (C.D. Cal. Mar. 25, 2015) ......................... 27
*Stone Basket Innovations, LLC v. Cook Med. LLC*,
   No. 16-cv-858, 2017 WL 2655612 (S.D. Ind. June 20, 2017) .............................. 24
*Stragent, LLC v. Intel Corp.*,
   No. 6:11-CV-421, 2014 WL 6756304 (E.D. Tex. Aug. 6, 2014) .......................... 25

*Trover Grp., Inc. v. Dedicated Micros USA*,
   No. 2:13-CV-1047-WCB, 2015 WL 4910875 (E.D. Tex. Aug. 17, 2015)........................ 24, 25

Plaintiff SyncPoint Imaging, LLC ("*SyncPoint*") respectfully submits this supplemental briefing following the evidentiary hearing before the Court held on June 14, 2018 on the motion for exceptionality and attorney's fees under 35 U.S.C. § 285 (Dkt. 290, "*Motion*") submitted by Defendants Nintendo of America Inc, Nintendo Co., Ltd. (collectively, "*Nintendo*") and joined by PixArt Imaging, Inc. ("*PixArt*") (collectively, "*Defendants*").[1] After extensive briefing from all parties and an evidentiary hearing, Defendants have not established any grounds that would entitle them to attorney's fees from any party or non-party. This Supplemental Briefing identifies by citation proposed findings of fact and conclusions of law from the evidence presented at the evidentiary hearing and does not seek to retread the arguments made in the earlier briefing or address arguments not raised at the hearing.[2]

## INTRODUCTION

Nintendo makes five main allegations in its Motion: (1) Mr. Hansen and the Firm manufactured evidence to cover-up a perceived error in standing; (2) Mr. Hansen and the Firm misrepresented evidence regarding venue and jurisdiction; (3) SyncPoint's infringement positions were frivolous; (4) the complaint was filed without a diligent pre-filing investigation; and (5) Mr. Hansen made misrepresentations in his personal bankruptcy that multiplied the proceedings in the patent litigation. In Opposition, SyncPoint responded to each of these allegations, providing facts and law to rebut Nintendo's accusations. Dkt. 313.

Each of these allegations is unsupported by the weight of the evidence: (1) neither SyncPoint nor its principal or counsel had any need to manufacture an assignment, since standing is undisputed; nor has Nintendo put forth any evidence to contradict the declarations, interrogatory responses, and testimony of Ms. Butler and Mr. Hansen other than conjecture of its recently retained expert; (2) SyncPoint did not misrepresent venue facts and provided additional facts and information at the hearing supporting its prior representations; (3) SyncPoint's

---

[1] All citations in the page:line format refer to portions of the transcript of the evidentiary hearing on June 14, 2018, unless otherwise indicated.
[2] Defendants did not present any evidence for many of its allegations, including, for example, the reasonableness of its billings rates and hours worked.

infringement positions were consistent and thoroughly researched and presented by both SyncPoint and counsel; (4) the complaint was filed after an extensive pre-filing investigation amounting to hundreds of hours of work, and maintained upon the opinion of an expert and additional analysis as discovery unfolded; and (5) Mr. Hansen did not make misrepresentations in his bankruptcy proceedings, and importantly no party to this litigation had an obligation to participate in those proceedings—during the stay, no work should have been conducted by the parties and therefore there can be no claim of prejudice.

After all briefing had concluded and just before the hearing, Nintendo focused its position on arguments related to the assignments and venue, attempting to put a microscope on these two issues. As more evidence has come to light and reasonable arguments proffered, Nintendo has backed away from what it once viewed as its strongest positions and recast them in a narrower, more attenuated form, heavy in invective and finger pointing while light on factual and legal support.  Nintendo has also moved markedly away from particularizing SyncPoint's actions, and instead has sought to inappropriately personalize the case into accusations against Mr. Hansen and its counsel.

Such litigation stylings and maneuvers should not be rewarded. Simply put, Defendants have been unable to meaningfully respond to the benign, albeit unusual, circumstances of this case. Defendants' arguments are contrary to the weight of the evidence and, even if true, would have no legal effect or cause any prejudice. For these reasons, Defendants' motions for fees should be denied.

## I.   PROPOSED FINDINGS OF FACT PRESENTED AT THE HEARING

### a.   SyncPoint's behavior regarding the assignments was not exceptional.

#### i.  Assignments: Hand Signatures

1.     On November 19, 2014, Karl Hansen formed SyncPoint Imaging, LLC, a Texas limited liability company. Def. Exh. 1, SYNCPOINT000851.[3]

---

[3] "Pl. Exh." And "Def. Exh." refers to exhibits presented during the Evidentiary Hearing. Exhibits to the parties' briefing are identified by brief.

2.      On November 19, 2014, Karl Hansen, the sole inventor and owner of the '214 patent, prepared and signed an assignment from himself to SyncPoint Imaging, LLC, a Texas limited liability company ("***Original Assignment***" or "***A***"). 8:22-25, 9:9-25.

3.      The Original Assignment sought to transfer all rights from Mr. Hansen to SyncPoint, but it did not include language to sue for past, present, and future damages.  Def. Exh. 2.

4.      By the Original Assignment, Mr. Hansen intended to transfer all rights, including the right to recover damages. 10:6-10 ("I thought I assigned everything.").

5.      On February 18, 2015, to ensure that all rights including the right to sue for past, present, and future damages were conveyed, SyncPoint took the corrective measure of assigning back to Mr. Hansen all rights conveyed in the Original Assignment ("***Cleanup Assignment***" or "***B***"). Pl. Exh. 50; 12:24-13:9; 84:1-19, 85:17-20 (receiving draft from counsel on the 18th and signing on the 18th).

6.      On February 18, 2015, Mr. Hansen then re-assigned all patent rights back to SyncPoint, including the right to sue for past, present, and future damages ("***Reassignment***" or "***C***"). Pl. Exh. 55; 12:24-13:9; 85:21-86:7 (receiving draft from counsel on the 18th, and signing on the 18th).

7.      Mr. Hansen testified that his legal counsel sent to him on February 18, 2015 two assignments in the form of word documents. 17:10-16; 85:17-86:7.

8.      The first of the word documents was named "2015-02-18 signature version SyncPoint assignment to Hansen (1)(6).docx" ("***Draft Cleanup Assignment***"). 23:10-11.

9.      The second of the word documents was a draft of the Hansen assignment to SyncPoint. ("***Draft Reassignment***").

10.     On February 18, 2015, Mr. Hansen recognized three typos ("***Typos***") in the Draft Cleanup Assignment, including that the title of the document included a misspelling of his middle name "Karl Christopher Hansen," that he was listed as "inventor and owner," and that the signature page had the designation of assignor and assignee reversed. 35:10-16.

3

11.     Mr. Hansen fixed the spelling of his middle name in the Draft Cleanup Assignment which, upon signing, resulted in document **B**. 11:23-125.

12.     Mr. Hansen also created another local version of the Cleanup Assignment where he fixed the remaining Typos ("***Corrected Cleanup Assignment***" or "***B1***"). 35:4-16.

13.     Mr. Hansen printed out assignments **B**, **C**, and **B1**. 30:3-9.

14.     Mr. Hansen testifies that he then signed them in order, by first transferring all rights from SyncPoint back to himself (**B**, **B1**), and then back to SyncPoint (**C**). 24:11-18, 25:3-11, 30:3-9.

15.     Mr. Hansen emailed the hand-signed signature pages for assignments **B** and **C** to his counsel on February 18, 2015 at 6:52 p.m. 86:4-7.

16.     Nintendo's expert witness, Mr. Montegudo, agrees that **B** and **C** were signed on February 18, 2015. 152:25-153:4 (Nintendo's Expert: Q: "[T]here's no dispute in your mind that Karl Hansen printed out two copies of the assignments on the 18th and signed them and emailed back his hand signature, is that correct? A. That's correct.").

17.     Regarding **B1**, Mr. Hansen testifies that it was physically signed on February 18. Nintendo's expert calls into question when it was hand-signed but provides no evidence to the contrary.

18.     Mr. Hansen held on to **B1** in case he needed the assignment without any Typos and forwarded it to counsel on the morning of February 20, 2015. 34:15-18; 37:21-23; 38:10 ("That I did sign on the 18th, I sent it on the 20th, yes.").

19.     On February 19, 2015, unaware that Mr. Hansen had fixed the Typos, SyncPoint's counsel emailed him a partially corrected word draft of the Reassignment ("***Unsigned Draft Reassignment***" or "***D***") titled "2015-02-18 V1 signature version SyncPoint assignment to Hansen (1)(2)." Pl. Exh. 59; 23:20-24:7, 89:11-23.

20.     The Unsigned Draft Reassignment fixed the Typos except for the misspelling of Mr. Hansen's middle name. 34:15-23.

21.     Mr. Hansen testified that he did not sign **D**. 89:11-23.

4

22.     Nintendo attempted to draw a conclusion that **D** prepared by counsel on the 19th and the **B1** draft signed by Mr. Hansen on the 18th were the same because both filed contain "V1" in their respective titles. Mr. Hansen dispelled this erroneous theory. 39:20-40:14 ("They're both a V1, but I put V1 in my copy. . . Because every time I create a document that has a date on it, if it's on the same date, I use V's to distinguish between the versions. I've done that for years, and I've submitted some emails that may be shown later that demonstrate that.").

23.     On February 19th, Mr. Hansen briefly viewed **D**, believed that it was the same as **B1**, and indicated to counsel that it was the same as the version he signed the night before and did nothing with it. 34:15-23 ("I got the original two docs. They sent me an updated doc. I compared the assignor information and the owner information and said it matches what I changed, I'm good to go."); 36:23-37:23 ("And I looked at the assignor, assignee, and I looked at the owner and inventor, and those were updated correctly, and I failed to notice that the name was misspelled on the one that he had sent me, so I didn't call it out. . . . that [the firm] and me put the V1 in the same place is happenstance. We had already been working together for several months. Maybe they picked up on how I do things. Maybe I picked up on how they do things.").

24.     Evidencing that this February 19 draft is not the draft that Mr. Hansen signed, this word draft did not correct the misspelling of Mr. Hansen's middle name that he had fixed the prior day in both **B** and **B1**. 36:23-37:15.

25.     On February 20, 2015, the Complaint was filed. Dkt. 1.

26.     There can be no dispute that standing existed prior to the filing of the Complaint, per assignments B and C that were each hand-signed on February 18. 152:25-153:4.

27.     To the extent that there is any question about when **B1** was hand-signed, neither Nintendo nor its expert have provided any counter evidence to Mr. Hansen's testimony. Nintendo has made no argument that there is a legal effect to correcting the Typos.

28.     Mr. Hansen intended there to be a complete assignment through **B** and **C** and "[t]o my understanding, it was a typo, and my understanding of the contract law is a typo doesn't change the meaning of the contract." 38:3-6.

### ii.  Assignments: E-signatures

29.     After Mr. Hansen affixed e-signatures to **B**, **C**, and **B1**, he affixed his electronic signature to the assignments.  Pl. Exh. 49; 86:8-87:8 (e-signing **B** on the 18th); Pl. Exh. 54; 87:18-88:8 (e-signing **C** on the 18th); Pl. Exh. 52; 88:18-89 (e-signing **B1** on the 18th).

30.     Mr. Hansen testified that he took this additional step to "lock the contents so that anybody could go and verify that [] signature was valid." 26:7-15; 87:3-8 (". . . I use it to just verify that the PDF's are signed and locked, and so I did this one . . .").

31.      Mr. Hansen testified as to the order he did things on February 18: "I physically signed them in the correct order. I took pictures and sent pictures of the signature pages, and then I created the PDF's that were certified, and then I fixed the typo that I saw in the one, and I thought fixing a typo doesn't change the meaning of the contract. It's just fixing a typo, and I created a PDF of the fixed version all on the 18th." 30:3-9.

32.     There is no doubt that Mr. Hansen intended to transfer all rights to SyncPoint on the 18th, and took every step that he believed was appropriate to accomplish this task in the correct order. *Id*.

33.     Mr. Hansen testified that he signed the assignments contemporaneously on the 18th. 89:8-10.

34.     With respect to assignment **B**, the metadata shows that it was e-signed at 9:06 p.m. on February 18. 30:10-13; 153:5-23 (Nintendo's Expert: Q. "[T]he metadata on its face shows than an e-signature was applied to the SyncPoint to Hansen assignment at 9:06 p.m., is that correct? A. I believe so, yes.").

35.     With respect to assignment **C**, the metadata shows that it was e-signed at 9:11 p.m. on February 18. 153:11-15 (Nintendo's Expert: "Q. And that the assignment from Hansen back to SyncPoint occurred at 9:11 p.m. on the 18th, is that right? . . . A. On its face, yes.").

36.      With respect to assignment **B1**, the metadata shows that it was e-signed at 9:23 p.m. on February 18. 35:23-36:12; 153:16-23 (Nintendo's Expert: "Q. And that the typo

corrected version e-signature metadata on its face shows that that was created at 9:23 p.m. on the 18th, is that right? . . . A. Yes, yes.").

37.     The timing of the e-signatures shown in the metadata (9:06 p.m., 9:11 p.m., 9:23 p.m.) coincides and corroborates Mr. Hansen's testimony as to the time that he affixed his signatures. 30:3-13, 35:23-36:12; 153:5-23.

38.     Mr. Hansen testified that he had a personal laptop that might have been used to apply the e-signatures. 27:14-19. This computer, which Mr. Hansen considered a "commodity, like a toothbrush" was identified in Mr. Hansen's interrogatory response in the category of "Various, Hotel Business Area Computers." 27:20-28:24.

39.     Nintendo's expert proffered testimony based on circumstantial evidence that it was "possible" or "likely" that Mr. Hansen "could have" altered the metadata on the e-signatures. 161:20-7 ("Q. In conclusion, your opinions are based on what you view to be high probabilities or likelihoods, is that correct? A. That's correct.").

40.     First, Nintendo's expert opined that the metadata for **B**, **C**, and **B1** could have been altered by changing the computer's internal clock, a task that he describes as fairly easy to do. 143:2-8.

41.     Second, Nintendo's expert opined that there are two pieces of evidence that would lead him to believe that it is "likely" that Mr. Hansen altered the metadata on **B1**: the similarity of the titles of the word documents for **B1** and **D**; and the proximity in time as to when **D** was emailed to Mr. Hansen from his counsel, and when he emailed his counsel final hand and e-signed documents **B**, **C**, and **B1**. 157:20-158:3 ("Q. And in order to come up with your conclusion, what you did is you looked at the similarity, that's one thing, and then you also looked at the proximity and timing of emails being exchanged back and forth on the privilege log, is that right? A. That's correct. Q. And it's based on those two bits of information that you conclude it's likely that they're the same document, right? A. Yes.").

42.     This circumstantial evidence relied upon by Nintendo's expert, has nearly nothing to do with his expertise. 141:2-3 (Court: "I will allow him to testify as an expert in the field of computer forensics.").

43.     Regarding the first piece of circumstantial evidence, Nintendo's expert noticed that the titles of the word document of **D** emailed by counsel to Mr. Hansen on the morning of February 19 is similar to the title created of **B1** that Mr. Hansen testified he signed on the 18th and emailed to his counsel on the morning of February 20. 154:22-155:5. Specifically, both titles have "V1, as in version one." *Id.*

44.     Nintendo's expert also identified some differences between the titles of **D** and **B1**. Mr. Hansen added "corrected" to the end of his file name. 155:3-14. And, Mr. Hansen's document also does not have [1][2] appended to the title. 156:1-9 ("A. So on the document from Mr. Pia to Mr. Hansen on February 19th, 9:25 a.m., the title is 2015-02-18 V1 signature version SyncPoint assignment to Hansen [1][2].docx."); 157:1-11 (A. . . . The difference in this . . . is that after the  hyphen there is corrected instead – in place of the bracket one and bracket two, I believe.").

45.     Nintendo's expert recognized that Mr. Hansen testified that he made these changes to the drafts of **B** and **C** sent by his counsel on the 18th and not to **D**.  157:12-19.

46.     Nintendo's expert acknowledged that it was just as possible that Mr. Hansen did exactly as he testified and made the changes to the title of the document himself and independently of the email sent from his counsel the next day. *Id.* ("Q. And it is possible that he named his document with these changes somewhat similarly to a document that was sent to him on the 19th, correct? A. That is possible, yes.").

47.     Regarding the second piece of circumstantial evidence, Nintendo's expert believed that the timing of email correspondence on the morning of the 19th between Mr. Hansen and his counsel supports a conclusion that he used the word document on the 19th. 157:20-158:3, 158:17-160:1.

48.     Nintendo's expert also looked at the metadata on the PDF created by Mr. Hansen for **B1**.  *Id*.  He noted that the modified date was the 18th, but the created date was the 19th.  *Id*.  When asked if this created/modified date difference could occur when the PDF was re-saved on the morning of the 19th, Nintendo's expert testified that this logical possibility could result in the difference.  *Id* at 160:2-18 ("And what about re-saving the PDF or creating a new document, new PDF document that on the 19th that included all of the content from the 18th.  Is that possible? . . . . Q.  Would you know for sure.  A.  I wouldn't.  Q.  So at this point, that's possible, correct?  A.  I suppose.").

49.     Neither Nintendo nor its expert provide any evidence as to what motivation SyncPoint would have in altering the metadata, since **B** and **C** were indisputably signed on the 18th.  Likewise, Nintendo does not provide any evidence as to why Mr. Hansen may have backdated the affixing of his e-signature on **B1** since he sent that to his counsel before the complaint was filed on the morning of the 20th; the complaint was filed late afternoon.  Nintendo does not provide any evidence or argument as to how any of its allegations would affect standing in the case.  Nintendo has made no argument that Mr. Hansen's accused conduct occurred after the complaint was filed.

### iii.  Assignments: Document Production

50.     On July 8, 2015, SyncPoint made a production of documents that included what its paralegal understood to be correct versions of the assignments.

51.     In November 2015, Nintendo put before Mr. Hansen during his deposition a version of C that he did not recognize ("***Production Mistake***" or "***E***").

52.     **E** had the content of the unsigned draft **D** and a copy of the signature page of **C**.

53.     Mr. Hansen testified that he did not sign version **E**.

54.     During the deposition, SyncPoint's counsel was surprised by the document, did not recognize it, identified it as a likely mistake, and immediately went to its file and reprinted **B** and **C** and provided them to counsel for further questioning to mitigate any prejudice.

55.    Mr. Hansen's testimony on the assignments during his deposition has been consistent with his interrogatory responses and cross examination at the evidentiary hearing, despite what has been a repeated battery of questioning on the assignments in a manner that would confuse most witnesses.

### iv.   Assignments: Production Mistake

56.    Nintendo's argument of a "fake assignment" is that on July 8, 2015, SyncPoint's counsel allegedly prepared **E** and sent it to its paralegal for production. It argues that SyncPoint's paralegal (Ms. Butler) did not create **E** independently. Nintendo alleges that SyncPoint's production of the assignment was not a "mistake," and that it was intentionally provided to mislead the parties and the Court into believing that it was the controlling assignment.  160:21-25.

57.    Ms. Butler testified to the following in relation to the production on July 8, 2015:

a.  Her interrogatory responses are true and correct. 121:15-122:6.

b.  She stands by her interrogatory responses. 119:6-9.

c.  She is still comfortable with her responses. 119:17-21.

d.  She spent many hours, up to a day in preparing her responses in December 2015, shortly after the issue was raised. 119:10-16 ("Q. Why is it that you're confident in that response? A. Because I remember when we were – when we had to prepare these interrogatories, I was told to go back and, in essence, retrace my steps, and I remember I spent hours and hours, if not an entire day, trying to piece back together the events that occurred that night.").

e.  She read through all of the relevant emails in preparing her response. 134:2-5.

f.  She testified that, "[i]n her search for the final-executed version of this assignment, she came across a signed signature page from Karl Hansen that was for a different assignment." 118:18-25.

   i.  She did not log every document in her office. 118:9-11.

   ii.  She did not log every document in the firm's files. 118:1-8.

     iii.   She remembers seeing signature pages by themselves. 120:13-15.

     iv.   She possibly found a signature page that was not sent via email. 119:2-5.

     v.   She has in the past received signature pages separate from legal documents and compiled them together. 131:17-132:1.

     vi.   She received on average 50-75 emails a day, and on a production day like July 8, 2015, she would receive more. 120:16-21.

     vii.   She could have easily mixed up some of the assignments because they look similar. 130:11-17.

g.   She did not take a signature page from a complete document (such as from a document attached to Joseph Shapiro's email) and attached it to a different document. 119:22-120:2.

     i.   No attorney asked her to separate a completed assignment and take the signature page and put it with another document.. 120:6-12.

     ii.   It would have stood out to her if an attorney had asked her to do this. 120:6-9.

     iii.   She does not remember what documents were attached to Mr. Shapiro's email, and that it could have been any of the assignments, and may not have been the assignment that she produced in the case. 132:20-133:10.

h.   Ms. Butler testified that she used her best efforts to do a good job. 132:2-4.

i.   During the production, she tried to do her best to produce accurate documents. 132:5-7.

j.   She believed the document she was producing contained the correct underlying document with the correct signature page. 132:8-11.

k.   The day of the production, she did something out of the ordinary by adding the date herself. 132:12-14.

58. Regarding assignment **E**, Ms. Butler testified:

   a. That the underlying document Ms. Butler used was possibly the draft unsigned word document **D**. 126:17-127:22.

   b. **D** includes a misspelling of Mr. Hansen's middle name, Christo**hp**er. 127:9-22.

   c. **E** includes a misspelling of Mr. Hansen's middle name, Christo**hp**er. 124:1-9.

   d. **E** includes the date "18" that she added to the document, and no one instructed her to add that date. 124:10-125:3.

   e. The signature page on **E** is darker and more grainy than the signature page on **B** and **B1**. 125:12-18, 125:19-126:4 (testifying that she had come across a signature page from Karl Hansen that was for a different assignment.); 129:22-25.

   f. She appended that signature page to **D**. 126:5-8.

   g. She remembers that she created **E** on July 8, 2015 at around 5:41 p.m., shortly before the 6:00 p.m. production of documents; the associated metadata confirms this fact. 134:6-135:3.

   h. She only vaguely understands what metadata is. 130:18-131:16.

   i. She is by no means a meta data expert. *Id.*

   j. She would not know how to modify metadata. *Id.*

   k. She was not asked to modify metadata.  *Id.*

   l. She did not modify metadata. *Id.*

59. In response to SyncPoint's question, "is it possible that Lannea Butler's testimony is completely true, that she did not use Mr. Shapiro's email that he had forwarded in her production," Nintendo's expert testified that it "could be possible." 161:20-7.

60. Nintendo's expert admitted that "I don't know what she had" in her files.  161:1-7.

61.     Nintendo's expert acknowledged that he had heard "Ms. Butler's testimony that there were, in her memory, signature pages floating around in her files." 161:4-7.

62.     Mr. Hansen testified that he sent signature pages by themselves.  41:7-9. \

63.     Nintendo's expert conceded that his entire testimony was based on probabilities and likelihoods as opposed to actual evidence. 161:20-7 ("Q. In conclusion, your opinions are based on what you view to be high probabilities or likelihoods, is that correct? A. That's correct.").

64.     Neither Nintendo nor its expert have identified any reason that Ms. Butler would have for lying, particularly now that she is a third-party witness no longer working for the firm.

65.     Nintendo walked Ms. Butler through a series of questions that compared a table/log of emails she received on July 8, 2015 with her interrogatory responses.

   a.   Ms. Butler did not remember preparing the table. 122:7-9.

   b.   Ms. Butler understands that the table purports to identify all emails from July 8, 2015 that she received. 122:22-24.

   c.   The table does not include all of the emails she received on other days. 122:25-123:6.

66.     She relied on an assumption that Nintendo's counsel had made in testifying earlier that portions of her interrogatory response appeared to be false. 135:4-11.  That assumption was "that the signed signature pages from Mr. Shapiro were the only signed assignment[s] that [she] had ever received." 135:12-16. And, in giving her responses she was "relying on Mr. Kinsel's assumptions about the content of the table" that identified an email from Mr. Shapiro. 135:17-21. That in going back through each of the statements and in examining the documents one by one, she does not believe that any of her statements in the interrogatory response were false. 135:22-136:1. Nintendo's counsel sought to clarify the issue, and Ms. Butler confirmed that she was relying on Nintendo's assumptions in stating that certain portions of her response were allegedly false:

"Q. You weren't rely[ing] on any assumptions from me, were you? In answering those

questions, you weren't relying on any assumptions that I was making, were you?

A. Well, you are the one that was connecting . . . the dots and asking me to agree with

you.

Q. Right, And I think what we established was that if we agree that the table is correct,

the statements that we talked about in your interrogatory response are false.

A. Like I've said before, I remember putting this together [referring to the written

response]. I'm confident in what I said here was an accurate representation of the facts. . .

. [B]ut I don't' recall this table. I don't' recall putting it together, so I can't speak to this."

136:15-137:1.

67.     Nintendo's counsel made other incorrect representations on the record and asked

Ms. Butler to rely on those in providing subsequent answers. 121:3-8 ("I'm going to leave the

question[ing] open[] . . . I'll represent to you they produced three documents to us, to Nintendo

that day totaling about 30 pages and that they were produced to Nintendo at 3:16 p.m.); 137:2-8

("I want to correct the record on something that I said. I had represented to you that you had

produced some documents at like 3:00 or 4:00 o'clock in the afternoon. . . . I was mistaken about

that, so I want to correct the record on that.").

68.     Objections to Nintendo's counsel's assumptions imbedded within questions were

properly made on the record as objections to the "form." Such questions and answers should be

stricken as improperly eliciting testimony that is not reflective of the witness's knowledge.

    b.  **SyncPoint did not misrepresent facts relating to venue.**

        i.  **SyncPoint's Texas Office**

69.     SyncPoint Imaging, LLC was formed in Texas in November 2015. Dkt. 290-38,

Certificate of Formation for SyncPoint. Def. Exh. 1.

70.     Mr. Hansen confirmed during his testimony that at that time, he and his sons had

multiple personal and professional connections to Texas. 89:24-91:17; *see also* Decl. of Karl

Hansen at ¶¶ 5-21[4]; (Decl. of Adam Hansen at ¶¶ 6, 9-16; Decl. of Chris Hansen at ¶¶ 6, 9; Decl. of Mark Hansen at ¶¶ 10-11.)

71.     Mr. Hansen testified that in late 2014, SyncPoint secured office space 17740 Preston Rd. Suite #200, Dallas, TX 75252. 92:1-8. Although this office space was under the lease of another company, PetAware, Mr. Hansen understood this to be an office dedicated to SyncPoint. 92:19-25.

72.     17740 Preston Rd. Suite #200, Dallas, TX 75252 is located within the Eastern District of Texas.

73.     Mr. Hansen provided testimony that in late 2014, he and his sons travelled to Texas to set up SyncPoint's principal office. 50:10-12; 92:1-18; (*see also* Decl. of Karl Hansen at ¶ 50; Decl. of Adam Hansen at ¶ 18; Decl. of Chris Hansen at ¶ 10; Decl. of Mark Hansen at ¶ 8.) This involved purchasing and moving equipment such as a server, back-up drives, an uninterrupted power supply, and a printer into the office. *Id.* Mr. Hansen moved his prototypes into the office. *Id.* Mr. Hansen also stored his research materials, patent-related documents, records of PixArt communications and licensing negotiations, archives of licensing negotiations with other companies, and research and development hardware and software in the office and set up the SyncPoint website. *Id.*; (*see also* Decl. of Karl Hansen at ¶¶ 52-54.)

74.     Mr. Hansen testified that SyncPoint began paying $250/month in rent for the Texas office in November 2014. 50:13-51:15; 93:10-94:24; Pl. Exh. 30. Initially, SyncPoint was subleasing the office from a different company, so SyncPoint sent its rent checks to SyncPoint's counsel who, in turn, sent checks to the landlord until the previous tenant's lease expired. (*Id.*; 60:25 – 61:6.) This was done to minimize SyncPoint's costs and to avoid an expensive early termination and new signing of a lease. *Id.*; Decl. of Karl Hansen at ¶ 49.

75.     On February 20, 2015, several months after SyncPoint established its Texas office, it filed a complaint in the Eastern District of Texas. Dkt. 1. SyncPoint's Complaint stated

---

[4] All Declarations are exhibits to Dkt. 113.

that, "SyncPoint is a Texas Limited Liability Company with its principal place of business in the Eastern District of Texas." *Id.* at ¶ 1.

76.     Mr. Hansen further testified that once the lease of the previous tenant of the Texas office expired, SyncPoint signed a new lease for the same office space in August 2015 and began paying its rent directly to the landlord. Dkt. 290-36; 51:5 -52:5; 94:24-95:18.

77.     During his testimony, Mr. Hansen confirmed that when SyncPoint signed its own lease for the same Texas office on August 1, 2015, it agreed to cover any gap between the end of the previous tenants' lease and the start of SyncPoint's lease. (*See* Decl. of Karl Hansen at ¶ 59.) As such, the SyncPoint's lease became retroactive to June 1, 2015. 51:16-20; Dkt. 290-35.

78.     Mr. Hansen and his sons made subsequent trips to the Texas office to conduct business and schedule meetings with potential licensing parties. 92:9-11; 93:1-9; Decl. of Karl Hansen at ¶¶ 51, 55-57, 63; Decl. of Adam Hansen at ¶¶ 7-8; Decl. of Chris Hansen at ¶¶ 7-8; Decl. of Mark Hansen at ¶ 13.

79.     In response to his questioning at the hearing, Mr. Hansen testified that SyncPoint attempted to employ consultants in the Eastern District to perform various tasks for the company. 47:3-9; 48:5-50:3. These offers were rejected and the consultants ended up doing less work for SyncPoint than originally anticipated. *Id.* Mr. Hansen characterized these professional relationships in his declaration as: SyncPoint employs several consultants to conduct business at SyncPoint's Texas office, including Texas residents Ryan Thomas, Dale Buechele, Dave Vance, and Edwin Bland, who perform a variety of services as needed." Decl. of Karl Hansen at ¶ 61.

80.     Nintendo identified and subpoenaed two of Mr. Hansen's sons, Adam Hansen and Mark Hansen, to testify at the hearing. Exh. A, attached hereto. Both of Mr. Hansen's sons attended the hearing and were prepared to provide testimony that would corroborate and confirm Mr. Hansen's testimony concerning their Texas contacts.

81.     The Court did not rule on the merits of whether venue for this case was appropriate in the Eastern District of Texas. On February 27, 2017, the Court entered an Order

denying without prejudice Nintendo's venue related motion in view of the Court's previous order staying the case. Dkt. 253.

### ii.  Mr. Hansen's Personal Residence

82.     Mr. Hansen testified that in 2014, he lived in New Hampshire. 95:19-96:5.

83.     Mr. Hansen testified that in July 2015, Mr. and Mrs. Hansen signed a lease on a condo in Orem, Utah. 44:24-45:1. The Utah condo was intended to be a separate residence for Mrs. Hansen while Mr. Hansen resided in New Hampshire. 43:10-22.

84.     This separate residence was intended for Mrs. Hansen as the couple were separated at that time. 96:17-97:2.

85.     Mrs. Hansen testified that he did not move into the Utah condo until September 2015. 45:2-10. After moving, Mrs. Hansen continued to travel back to New Hampshire and Massachusetts to visit family. *Id.*

86.     Mr. Hansen's testimony is that while residing in New Hampshire, Mr. Hansen stayed for extended periods in California for his job at Telenav and in Boston for contract work. 43:23-44:23; 95:23-96:5; 98:11-22.

87.     In September 2015, SyncPoint argued in its Sur-Reply to Defendants' Motion to Transfer that it would be more convenient to try the case in the Eastern District because "Mr. Hansen resides in New Hampshire." Dkt. 133 at 5.

88.     When Mr. Hansen was deposed in November 2015, he testified that he had "just moved" to Utah. Dkt. 290-29, November 20, 2015 Deposition of Karl Hansen at 6:11-12; 43:7-22. Even then, Mr. Hansen continued to reside in New Hampshire where he received medical treatment and visited his daughter. 43:7-22; 98:5-10. Mr. Hansen would visit Mrs. Hansen in Utah on some weekends. 45:2-10; 95:23-96:5; 98:5-22. However, Mr. Hansen retained his New Hampshire driver's license, still had storage, automobiles and most of his personal belongings in New Hampshire, and still received mail in New Hampshire. 42:22-43:22.

### c.  <u>SyncPoint should be found to be legally distinct from Mr. Hansen.</u>

#### i.  SyncPoint is legally distinct from Mr. Hansen.

89.     Mr. Hansen testified that SyncPoint was intended to be a profitable company, whose primary business was to secure licensing revenue for the '214 Patent and related intellectual property. 57:7-11; 59:9-13; 91:6-14.

90.     Mr. Hansen's sons, Chris Hansen, Mark Hansen, and Adam Hansen, were "SyncPoint partners." (*See* Decl. of Karl Hansen at ¶ 63; Decl. of Adam Hansen at ¶ 7; Decl. of Chris Hansen at ¶ 8; Decl. of Mark Hansen at ¶ 13.)

91.     Mr. Hansen explained in his testimony that the SyncPoint partners performed various work to establish and run the company, including researching possible infringement, setting up the office, and attending business meetings. 68:6-69:4, 70:22-71:3, 79:11-82:9, 92:9-11, 103:19-23; (*see also* Decl. of Karl Hansen at ¶¶ 51, 55-56, 63; Decl. of Adam Hansen at ¶¶ 7-8, 18; Decl. of Chris Hansen at ¶¶ 7-8, 10; Decl. of Mark Hansen at ¶¶ 8, 13.)

92.     Mr. Hansen testified that he loaned startup funds to SyncPoint with the expectation that SyncPoint would repay the loan once the business generated revenue. 57:7-11.

93.     Mr. Hansen testified that he viewed SyncPoint as distinct from himself. This distinction included treating property or funds given to SyncPoint to be SyncPoint's exclusive property. 57:13-23.

94.     Mr. Hansen testified that he performed duties in his role as governing person of SyncPoint, including purchasing the domain and setting up SyncPoint's website. 58:15-18.

95.     Mr. Hansen's sons, Adam Hansen and Mark Hansen, were present at the hearing, had been identified and subpoenaed by Nintendo as its witnesses, and were prepared to provide testimony that would corroborate and confirm Mr. Hansen's testimony concerning SyncPoint's business goals. *See* Exh. A.

### ii. Mr. Hansen and the Firm cannot be held jointly and severally liable with SyncPoint for any attorney's fees award.

96.     Mr. Hansen and the Firm are not parties to this lawsuit. Dkt. 344 at 1 ("[S]cheduling an evidentiary hearing on Nintendo's motion did not grant Nintendo's informal

request to join Hansen. For one thing, the request was not a formal motion. A mere request within a brief supporting a larger motion is not a proper means to obtain joinder of a non-party.")

97.      Nintendo was not precluded from presenting evidence regarding the joint and several liability theory at the evidentiary hearing. *Id.* Nintendo was permitted to seek testimony from any non-party who was subpoenaed to testify at the hearing or who chose to attend. *Id.*

98.      Attorneys from the non-party Firm were present at the evidentiary hearing.

99.      Nintendo did not call any attorney of the Firm to testify or introduce any prior testimony from those attorneys.

100.      Mr. Hansen testified that "SyncPoint would get 40 percent" of any recovery. 60:12-14. No evidence was obtained to contradict that the remaining 60% was to be split among the several firms and lawyers involved in SyncPoint's representation, with the Pia Firm having only a 22.5% stake. *See* Dkt. 327 at 9, n.4.

### iii.  Mr. Hansen's understanding of infringement developed over time as information of the Wii's function became known.

101.      Mr. Hansen testified that he came up with or "created" the term "external cursor" in the '214 patent to "simply [] distinguish between the fact that we've got a cursor that's inside the computer, and that cursor can be turned on and off at will. It can be visible or not, and it just shows where something is going to happen when you inject a character or when you inject a mouse click." 78:1-15.

102.      Mr. Hansen further testified that he has extensive experience using infrared light in relation to the "external cursor" that he developed. (78:16-79:10.) Mr. Hansen testified that it was his understanding and intent that the "external cursor" claimed in the '214 patent would include non-visible infrared light. *Id.*

103.      Mr. Hansen testified that in 2007 information concerning the Wii "was incredibly sparse" but he read an "internet article that said, Hey, the Wii remote has an infrared pointer in it." (64:21-65:5.) Thinking that the Wii remote had an infrared pointer he then believed that the Wii infringed some of the claims the '214 patent. *Id.*

104.    Mr. Hansen testified that after he bought a Wii and found that the remote did not include an infrared pointer, his understanding of infringement changed. 64:8-17; 78:12-25.

105.    Mr. Hansen testified in November 2007 that he sent an email to Nintendo suggesting that "[t]he addition of a low-intensity infrared laser pointer to the Wii remote would enable much greater accuracy for the determination of aim point.  that the cost-benefit of integrating a [his] patent into the Wii remote is almost a no brainer." 53:5-15.

106.    In 2012, Mr. Hansen's bankruptcy testimony confirmed that he was not in possession of the necessary facts to determine infringement as he did not understand the functional relationship between the Wii remote with the PixArt CMOS sensor and the Wii. 63:8-64:17.

107.    Mr. Hansen testified that it wasn't until sometime in 2013 or '14 that "reverse engineers published on the internet what the protocol was between the Wii remote and the Wii that [he] found out that what's actually going on is that the PixArt sensor is analyzing and tracking, identifying how large the spots are, identifying how many spots there are, and then the Wii remote is transmitting all that information to the Wii." 63:8-64:17.

108.    Mr. Hansen testified that in 2012 and 2013 his son Christopher Hansen had taken "a course at the university where they studied intellectual property." 68:2-13. He further explained that his son "became very interested and started researching the precise language of the claims in the '214 patent[]." *Id*. His son "then found a couple of websites that people did blogs on the information that was available on the Wii, and on one of the blogs … it actually broke down the protocol of the messages being sent from the Wii remote to the Wii console. And those messages showed explicitly that there are dot counts, the locations of the dots, the relative locations of the dots, tracking history, how big the dots were, and that kind of information is core technology of the '214" patent. 68:14-22.

109.    Mr. Hansen testified it wasn't until his discussions with his son Christopher and discovery of the internet information that his opinion changed as to the infringement of his '214 patent by the Wii. 68:23-70-3.

110.    Mr. Hansen testified "right around the same time" as his discussions with his son, he "had calls from two companies [he] had not contacted asking to buy the [']214] patent[]." 70:6-20. Mr. Hansen testified the contact by these two companies confirmed his new opinion of infringement as "other companies that ha[d] analyzed these patents, and they think there's a there there, and what Chris [his son] ha[d] brought [him] show[ed] [him] there's really a significant probability that the infringement is either all on PixArt or shared between PixArt and Nintendo…." 70:9-71:3.

111.    Mr. Hansen's testimony confirmed that during the period of time he learned that the Wii remote did not include an infrared pointer and before his discussions with his son, learning of the newly available information from the internet, and contact by the two companies that he "really had no idea" of infringement. 77:12-25.

112.    Nintendo identified and subpoenaed two of Mr. Hansen's sons, Adam Hansen and Mark Hansen, to testify at the hearing. Exh. A. Both of Mr. Hansen's sons attended the hearing and were prepared to provide testimony that would corroborate and confirm Mr. Hansen's developing opinions and understanding of infringement.

### iv.  SyncPoint conducted a reasonable prefiling infringement investigation.

113.    Mr. Hansen testified that before this lawsuit was brought that he and his sons conducted extensive research and testing of the Wii product and compared that to the claims of the '214 patent. 79:11-81:1. They "started digging and looking at … how different [Wii] games behave. What happens with the sensor bar if you set the Wii remote on a table and start moving the Wii. … [They] put the Wii remote on a table and rotated the senor bar and checked to see … does the Wii think you're rotating the Wii remote. It did." 79:15-23. He further testified that they also preformed "a bunch of other tests. [He] used visible light sources and shined them to see if the Wii remote could pick them up, and it does. [He] knew the Wii remote has a, quote, infrared blocking filter in it, but the thing about a, quote, filter, there is no perfect filter. So, yeah, it might

block 80 to 90 decibels of the intensity of the light, but it still lets visible light through, and the Wii remote sees visible light." 79:24-80:6.

114.   Mr. Hansen testified that before the lawsuit was brought that he and his sons worked on their infringement analysis "two to three times a week, three to four hours each time. Easily 200, 150 hours or more." 80:7-11. He further testified that he and his sons conducted a "claims comparison, and so [they] went down the '214 and said, Here's what I think is taking place, and Chris, Mark, and Adam and I all worked on that and worked on what are the different things -- different features that we think are key." 80:18-22.

115.   After this research, Mr. Hansen testified that they reached out to and met with potential counsel. 80:12-14; 81:2-4. He further testified that he and his sons then met with an intellectual property attorney in Utah that his son Mark had previously worked with as a missionary in Chile. 81:5-10. This attorney, however, "had no ability to consider anything on a contingency basis" as he was incredibly busy. So this attorney recommended and referred the Hansen's to the Pia Anderson firm sometime in September or October of 2014." 81:11-21.

116.   Mr. Hansen's testimony at the hearing also confirmed that after engaging the Firm in the fall of 2014 and before the filing of the lawsuit on February 20, 2015, he and his sons and his attorneys continued an extensive infringement analysis of the '214 patent. 81:22-82:9.

117.   Specifically, Mr. Hansen described this infringement analysis with his attorneys as going "through the analysis that my sons and I had done, and then we got work prepared for us that we reviewed and verified for accuracy, and then we submitted more information that went to the Pia Anderson firm, and then we had an attorney down in Texas Sandy Seth that did a lot of the claim analysis and -- and Joseph Shapiro. It was easily, you know, four or 500 hours. It was a ton of time." 82:2-9.

> **v.   SyncPoint's infringement position and theory after claim construction was reasonable.**

118.    Mr. Hansen testified that after the Court construed the term "external cursor" to be "visible," that he still believed that at least claim 25 of the '214 patent could be infringed by the Wii. 82:10-83:7.

119.    Mr. Hansen explained that after the Court's claim construction, his:

> son sat down with [him] and said, you know, I think there's still something going on here because these other claims, you know, its talking about what's going on inside the system and not talking about, you know, what is being projected on the display.

> So I think with those still working, and then subsequent discussions I realized that claim 25 was one that basically says the system just has to be capable of doing these kinds of things in order to infringe, and we had already demonstrated exhaustively that the Wii remote combo was absolutely capable of detecting visible light and operating with visible light of sufficient intensity.

*Id.*

120.    On January 5, 2016, the Court entered its Claim Construction. Pursuant to the Eastern District's P.R. 3-6, SyncPoint had the right to serve Amended Infringement Contentions "not later than 30 days after service by the Court of its Claim Construction Ruling."

121.    The Court's Claim Construction Order rejected Defendants' argument that claim 25 is invalid as indefinite or, in the alternative, that the "instruction for" terms should be construed as a means plus function limitations. Dkt. 230 at 43-49.

122.    The Court's Claim Construction Order also recognized claim 25 is a Beauregard claim and cited numerous cases that held that "§112, ¶6 does not apply to the claim term "computer readable program code configured to cause a computer to [perform a function]"). Dkt. 230 at 48-49.

## II.    PROPOSED CONCLUSIONS OF LAW

### a.    <u>There is insufficient evidence to find that any representation as to venue was unreasonable litigation behavior.</u>

123.    Venue-related facts that were not considered by the Court should not factor into a determination of exceptionality. "In making these decisions herein, the Court has not considered the argument that Dell has raised that Iris Connex's efforts to establish venue in this district

amounted to a sham. While Dell may have had a viable argument for transfer under Section 1404, the Court stayed this case to pursue its mini-Markman before venue was considered. As a result, any venue-related facts have not been factored into the Court's determinations herein." *Iris Connex, LLC v. Dell, Inc.*, 235 F. Supp. 3d 826, 863 n. 16 (E.D. Tex. 2017).

124.    The Eastern District has ruled that incorporating four months prior to the filing of the complaint is not "recent," under Federal Circuit precedent. *NovelPoint Learning LLC v. LeapFrog Enterprises, Inc.*, No. 6:10-CV-229 JDL, 2010 WL 5068146, at *4 (E.D. Tex. Dec. 6, 2010).

### b. <u>There is insufficient evidence to hold Mr. Hansen jointly and severally liable for any award against SyncPoint.</u>

125.    The Court has found that "[s]cheduling an evidentiary hearing on Nintendo's motion did not grant Nintendo's informal request to join Hansen. For one thing, the request was not a formal motion. A mere request within a brief supporting a larger motion is not a proper means to obtain joinder of a non-party." Dkt. 344 at 1.

126.    Defendants' argument that "that *Iris Connex* illustrates that the creation of an 'empty shell' to serve as a plaintiff in a patent case is alone sufficient to make the case 'stand out' as exceptional" is misplaced. *Stone Basket Innovations, LLC v. Cook Med. LLC*, No. 16-cv-858, 2017 WL 2655612, at *6 (S.D. Ind. June 20, 2017) (internal citations omitted). "Nothing in the *Iris Connex* decision supports such a broad interpretation and a simple reading of the case reveals that the shell corporation was only one of many factors in finding exceptionality, but was not alone determinative." *Id*. "In the instant case, even assuming that [SyncPoint] is a shell corporation, [Nintendo] has failed to set forth any evidence of the additional factors that gives rise to a finding of exceptionality; therefore, its *Iris Connex* argument must fail." *Id.*

127.    "Attorneys' fees must have been caused by the conduct that renders the case exceptional." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186–90 (2017).

### c. <u>SyncPoint's infringement positions was reasonable and supported by sufficient prefiling investigation.</u>

128.    "[F]or a case dismissed before trial to be designated exceptional, evidence of the frivolity of the claims must be reasonably clear without requiring a 'mini-trial' on the merits for attorneys' fees purposes." *Charge Lion LLC v. Linear Tech. Corp.*, 6 No. 6:12-CV-00769 (E.D. Tex. Aug. 25, 2014); *see also Trover Grp., Inc. v. Dedicated Micros USA*, No. 2:13-CV-1047-WCB, 2015 WL 4910875, at *3 (E.D. Tex. Aug. 17, 2015).

129.    SyncPoint's "motivation to implement the statutory patent right by bringing suit based on a reasonable belief in infringement is not an improper motive." *Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1375 (Fed. Cir. 2017).

130.    "And an infringement analysis can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter." *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1302–03 (Fed. Cir. 2004).

131.    "In the course of litigating a complex case, it is not unusual for one or both parties to make some arguments that stretch the limits of plausibility. Were fee awards to be made in response to every argument that the Court regards as clearly mistaken, fee awards would become the rule, not the exception." *Trover Group, Inc.*, 2015 WL 4910875, at *4.

132.    "[F]ees are not awarded solely because one party's position did not prevail." *Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prod., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015).

133.    Exceptional case determination depends on the "substantive strength of the party's litigating position . . . not the correctness or eventual success of that position." *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015).

134.    "In hindsight, [the plaintiff's] validity argument was certainly not a winning position, but the disputes between the parties over invalidity and related claim construction questions were certainly real and substantial. . . . [T]he mere fact that a party makes losing arguments is not relevant to the awarding of attorney's fees." *Stragent, LLC v. Intel Corp.*, No. 6:11-CV-421, 2014 WL 6756304, at *5 (E.D. Tex. Aug. 6, 2014).

135.    "[W]here a party has set forth some good faith argument in favor of its position, it will generally not be found to have advanced 'exceptionally meritless' claims." *Small v.*

*Implant Direct Mfg. LLC*, No. 06 CIV. 683 NRB, 2014 WL 5463621, at *3 (S.D.N.Y. Oct. 23, 2014).

136.    "For reasons explained in the SJ Order, the Court agrees that EON's infringement contentions lack merit. But that by itself is not enough to render a case 'extraordinary.' Patent litigants often disagree about whether a plaintiff has viable infringement contentions after an adverse claim construction, and one side is usually wrong. Defendants argue that EON's post-claim construction infringement argument … is one that no reasonable patentee would pursue. Obviously, the Court rejected it. The argument is, in the Court's view, quite stretched, such that few patentees would pursue it. But the Court cannot quite conclude that no reasonable patentee could see an opening in the Court's claim construction order through which the argument could be squeezed. The Court believes, as it said in the SJ Order, that 'it should have been plain enough from the surrounding context and the Court's actual construction that intentional user intervention is not part of the claimed system.' But the claim construction order did include some language that EON could have read otherwise." *EON Corp.IP Holdings LLC v. Cisco Sys. Inc*, No. 12-CV-01011-JST, 2014 WL 3726170, at *5 (N.D. Cal. July 25, 2014) (internal citations omitted).

137.    Denial of a fee award is proper where the plaintiff relied on its expert in making unsuccessful arguments regarding how a person of ordinary skill in the art would understand disputed terms. *Calypso Wireless, Inc. v. T-Mobile USA Inc.*, No. 2:08-CV-441-JRG-RSP, 2015 WL 1022745, at *4 (E.D. Tex. Mar. 5, 2015).

138.    "Adverse claim construction rulings do not, standing alone, make the continued pursuit of patent infringement claims 'extraordinary' for purses of fee shifting under § 285." *Sportstar Athletics, Inc., v. Wilson Sporting Goods Co.*, No. H-15-1438 at 4 (S.D. Tex. Feb. 18, 2018).

139.    "Foremost, despite that Defendants contend the evidence was clear they should have been dismissed, Defendants never moved for summary judgment. Instead, Defendants moved to dismiss based on insufficient pleadings. And given this case was ultimately resolved

by way of PTAB proceedings, even now there has been no finding as to the merits of Defendants' noninfringement position. The Court is simply faced with Defendants claiming they never infringed, and [plaintiff] proceeding with the litigation according to the Court's schedule. That does not weigh in favor of an 'exceptionality' finding." *DataTreasury Corp. v. Fidelity Nat'l Information Services, Inc.*, No. 1:13-cv-00432 at 4 (E.D. Tex. Nov. 13, 2017).

140.    The Court can *sua sponte* enter an Order setting an early and targeted claim construction on claims which it deems to be case dispositive. *See Iris Connex, LLC*, 235 F. Supp. 3d at 832-33; *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022, 25 (N.D. Cal. 2010) (Nintendo moved to compel supplemental infringement contentions).

141.    "The Court does not find it an 'extraordinary' case for [plaintiff] to have pursued an argument in the face of a negative claim construction outcome. Moreover, '[m]erely losing at summary judgment is not a basis for an exceptional case finding,' because '[i]f so, every party prevailing on summary judgment would be entitled to attorney fees—a result inconsistent with the Supreme Court's holding that an exceptional case 'stands out from others.'" *SmartMetric, Inc. v. MasterCard Int'l, Inc.*, No. 11-cv-7126, 2015 WL 12582630, at *3 (C.D. Cal. Mar. 25, 2015) (internal citation omitted). "Importantly, the Court did not find that [plaintiff's] infringement case lacked any legal or factual basis, and moreover, Defendants never brought a motion asserting these deficiencies at that stage of the litigation. Additionally, the Court did not find that [plaintiff's] claim construction arguments were frivolous or without merit." *Id.*

142.    "More importantly, the Court rejects Defendants' argument that the continuation of this litigation after the Court rejected [plaintiff's] construction of 'local access number' is indicative of any misconduct or bad faith. 'Although in this case, claim construction was indeed determinative of the issue of infringement when considered on summary judgment, the claim construction order itself did not legally determine the issue. [Plaintiff] presented reasonable, but unconvincing, arguments at claim construction.' *Kaneka Corp. v. Zhejiang Med. Co.*, 11-cv-2389 MRP, 2014 U.S. Dist. LEXIS 91659 (C.D. Cal. May 23, 2014). As the court in *Kaneka* explained, 'claim constructions, issued separately from other motions, do not analyze issues of

infringement or validity,' and thus, to address these issues on appeal a party needs to pursue a case dispositive motion. Id. at *8.'" *SmartMetric, Inc.*, 2015 WL 12582630, at *3.

143.    Claim 25 of the '214 patent is a "computer readable medium" ("CRM") or Beauregard claim. Unlike a method claim, a CRM claim is infringed if the claimed instructions are present on the CRM of the accused device as computer code even if the instructions are never or rarely executed, because "an accused device need only be capable of operating in the described mode." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1203–04 (Fed. Cir. 2010); (Dkt. 230, Claim Construction Order at 43-49.).

144.    The Federal Circuit has held that "[r]easonable minds can differ as to claim construction positions and losing constructions can nevertheless be nonfrivolous." *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1368 (Fed. Cir. 2012).

145.    P.R. 3-6 provides:

   **a) Leave not required.** Each party's "Infringement Contentions" and "Invalidity Contentions" shall be deemed to be that party's final contentions, except as set forth below.

   **(1)** If a party claiming patent infringement believes in good faith that the Court's Claim Construction Ruling so requires, not later than 30 days after service by the Court of its Claim Construction Ruling, that party may serve "Amended Infringement Contentions" without leave of court that amend its "Infringement Contentions" with respect to the information required by Patent R. 3-1(c) and (d).

146.    The reasoning in these cases is persuasive and support that Defendants' claims for attorneys' fees and costs pursuant to 35 U.S.C. §285 be denied.

   **d.   The actions surrounding the assignments do not merit a determination of exceptionality under 35 U.S.C 285.**

147.    When a patentee has transferred all substantial rights of the patent, the transferee will be deemed the effective patentee under the statute and will have standing to bring suit. *See Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1030 (Fed. Cir. 1995).

148.     To determine the legal effect of an agreement to transfer patent rights, a court "must ascertain the intention of the parties and examine the substance of what was granted." *A123 Sys., Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1218 (Fed. Cir. 2010) (quoting *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1340 (Fed. Cir. 2006)).

149.     "Under general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990) (*citing Modern Am. Mortg. Corp. v. Skyline Park*, 614 F.2d 1009, 1012 (5th Cir. 1980).

## CONCLUSION

For the reasons stated above:

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that Defendants' claims for attorneys' fees and costs against SyncPoint under 35 U.S.C. § 285 should be granted.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that SyncPoint lacked the requisite standing to initiate this lawsuit.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that there was any legal significance to the Typos that Mr. Hansen corrected.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that there was any intentional wrongdoing regarding production of the assignment.

- The evidence presented in the briefing and at the evidentiary hearing was insufficient to establish that any individual backdated any metadata.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that Ms. Butler's sworn statements are false or misleading, or was otherwise instructed to make her production mistake.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that the production mistake was the result of any bad faith, unreasonable litigation behavior, fraud, or forgery.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish any prejudice caused to Defendants by the receipt of the production mistake.

- Defendants' argument for a determination of whether venue for this matter is appropriate in the Eastern District of Texas is not properly before the Court at the post-judgment phase of litigation.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that SyncPoint and the Firm misrepresented SyncPoint's principal place of business in February 2015.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that Mr. Hansen misrepresented his personal residence in his August 2015 declaration in support of Plaintiff's Memorandum in Opposition to Defendants' Motion to Change Venue.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient establishes that Mr. Hansen misrepresented his personal residence in his November 2015 deposition.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that SyncPoint's Texas office was not the principal place of business for SyncPoint or that SyncPoint was not "at home" in this District for purposes of maintaining venue in this District.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that SyncPoint is the alter ego of Mr. Hansen so as to pierce the corporate veil and expose him to the debts and liabilities of SyncPoint.

- The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that Karl Hansen and the Firm should be held joint and severally liable.

• The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that SyncPoint and its counsel did not conduct a reasonable prefiling investigation.

• The evidence presented in the briefing and at the evidentiary hearing is insufficient to establish that SyncPoint's infringement positions were frivolous or that they were not reasonably maintained through the pendency of the case.

• The evidence presented in the briefing and at the evidentiary hearing is insufficient to demonstrate that PixArt was involuntary brought into Mr. Hansen's personal bankruptcy or that it incurred unnecessary fees or prejudice as a result.

Dated: June 25, 2018                                  Respectfully Submitted,

/s/ Joseph G. Pia
Elizabeth L. DeRieux
State Bar No. 05770585
ederieux@capshawlaw.com
CAPSHAW DERIEUX, L.L.P.
114 East Commerce Avenue
Gladewater, Texas 75647
Telephone: (903) 845-5770

Joseph G. Pia
State Bar No. 24093854
joe.pia@pamhlaw.com
PIA ANDERSON MOSS HOYT LLC
136 E. South Temple, 19th Floor
Salt Lake City, Utah 84111
Phone: (801) 350-9000
Fax: (801) 350-9010

*Attorneys for Plaintiff SyncPoint Imaging, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2018, I caused the foregoing **SYNCPOINT IMAGING, LLC'S POST-EVIDENTIARY HEARING BRIEF ON DEFENDANTS' MOTION FOR A DETERMINATION OF EXCEPTIONALITY AND AN AWARD OF ATTORNEYS' FEES PURSUANT TO 35 U.S.C. § 285** to be served on opposing counsel by electronic mail.

*/s/ Joseph G. Pia*
Joseph G. Pia

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

I hereby certify that the foregoing document is being filed under seal pursuant to the Protective Order entered in this matter.

*/s/ Joseph G. Pia*
Joseph G. Pia