IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| SYNCPOINT IMAGING, LLC, § | |
| § | |
| *Plaintiff*, § | Case No. 2:15-cv-00247-JRG-RSP |
| § | |
| v. § | |
| § | |
| NINTENDO OF AMERICA INC., et al.; § | |
| § | |
| *Defendants*. § | |
| § | |

**MEMORANDUM OPINION AND ORDER**

This patent infringement lawsuit was originally about whether a patent owned by SyncPoint Imaging, LLC, is infringed by Nintendo of America, Inc., and PixArt, Inc., through their development and sale of the Wii game system. The case is now a battle over attorneys' fees. Nintendo and PixArt, the prevailing parties, want more than $2.5 million in attorneys' fees for what they contend was a frivolous lawsuit. The court does not agree that merits of the lawsuit were frivolous or the suit should be declared exceptional. However, some of the filings in connection with the motion to transfer venue raise serious issues, as will be discussed below.

**BACKGROUND[1]**

The Patent Office granted Karl Hansen United States Patent No. 6,275,214 in August of 2001. The '214 patent describes a system and method for "remotely controlling a computer in a similar manner as performed by a conventional pointing device." '214 patent 1:52-55. The system

---

[1] This opinion includes the court's findings of fact and conclusions of law as required by Federal Rules of Civil Procedure 54(d)(2)(C) and 52(a)(1) (On a motion for attorneys' fees, "[t]he court must find the facts and state its conclusions of law as provided in Rule 52(a).").

1

does this by "optically tracking and synchronizing a wireless optical pointer with a projected image of the computer screen." *Id.* 1:6-10.

The patent describes an embodiment featuring a computer, a projector, a pointing device such as a laser pointer, and a camera:



*Id.* at Abstract; Fig. 1. The projector outputs what is displayed on the computer screen to the projector screen. The laser pointer works much like a mouse except that it functions as an "external cursor." The user points the laser at an object on the screen and enters a command, such as selecting and moving the object, by pressing buttons on the laser pointer. The camera captures where the laser is pointing, along with the command, and the computer aligns this process with the computer's own "internal cursor."

Central to the patent—and the source of much controversy here—is the "external" or "optical" cursor recited in the claims. Defendants argued that the '214 patent is limited to an external or optical cursor that can be seen by the human eye (the dot from a laser pointer, for example). *See* ECF No. 290 at 5-6. Otherwise, the camera described in the patent would not be

able to capture the external cursor's location. The Wii remote, by contrast, does not point anything visible at the screen.

Hansen thought the same thing, at least initially. Though Hansen's first impression was that the Wii was covered by the '214 patent, *see* ECF No. 290-4 at 3, he eventually concluded that it was not, ECF No. 290-5 at 3. He even told Nintendo that the Wii could be improved with a "low-intensity laser pointer," but that this improvement would require a license to the '214 patent. *Id.*

Hansen later changed course. After looking at Internet videos explaining how the Wii remote works, one of Hansen's sons allegedly told him "that they should re-evaluate the Wii as a potentially infringing product." ECF No. 290-9 at 22. According to Hansen, he and his sons spent around 250 hours investigating the Wii, and Hansen eventually concluded (after further consultation with his counsel) that the '214 patent covered the Wii. Hr'g Tr. 104:19-107:20, ECF No. 354.[2]

Hansen and one of the defendants, PixArt, had entered into a license that included rights to practice the '214 patent in 2008. Compl. ¶ 37, ECF No. 1. The license lasted for four years until 2012 when PixArt decided not to renew it. *Id.* ¶ 40.

Hansen formed SyncPoint in November 2014 and assigned to SyncPoint his rights to enforce to the '214 patent. *See* ECF No. 290 at 9-10. However, Hansen was told the assignment was defective because it did not assign SyncPoint the right to sue for past damages. *Id.* So SyncPoint assigned the rights back to Hansen, and then Hansen reassigned the complete rights back to SyncPoint. *Id.* Nintendo now contends that the assignments were signed in the wrong

---

[2] Citation to hearing transcript page numbers are to the ECF numbers. The official transcript does not include any other page numbers.

3

order, and that Hansen, SyncPoint, and the Pia firm tried to cover it up by changing dates on assignment documents after they had already been signed. *See id.*

Around the same time, SyncPoint found an office in Plano, within the district's boundaries. The rent was $250 per month. Hr'g Tr. 94:6-10, ECF No. 354. Clients of the Pia firm had been leasing this same office for years. *Id.* 50:23-51:11. In it was a computer, a server, some back-up drives, an uninterrupted power supply, a printer, and other basic office supplies—all purchased with Hansen's own money. *Id.* 92:13-18. Hansen also took some prototypes, business records and books to the office. *Id.*

With SyncPoint established, SyncPoint sued PixArt and Nintendo for allegedly infringing the '214 patent. The complaint charges that PixArt infringed the patent by selling object-tracking technology (formerly covered by the license) to Nintendo, who in turn integrated it into the Wii. *Id.* ¶ 41. The infringement theory was that the Wii had an "external cursor" (an invisible, infrared one) because the Wii sensor bar projects infrared light away from the display screen, which the Wii remote then detects, allowing the remote to control the game. *See* ECF No. 189-1 ("The external light bar generates two 'spots' of infrared light . . . . These two light spots are an external cursor when detected on the imaging array of Wii remote . . . .").

Several months after the complaint, Nintendo moved to transfer the lawsuit to the Western District of Washington. ECF No. 97. SyncPoint responded to the motion by emphasizing its ties to Texas and the inconvenience to Hansen if he were forced to travel to Washington. *See, e.g.*, ECF No. 133 at 5. According to SyncPoint, Washington would be inconvenient for Hansen because he "resides in New Hampshire." *Id.*

SyncPoint's statement was based on Hansen's declaration, signed August 10, 2015, under penalty of perjury:

4

> Around the time that PixArt terminated the license, my wife was diagnosed [with] cancer and began treatment. Insurance costs soared and our budget was severely hurt. At the same time, SmartStart suspended my contract for several months, so we had no income, and were deeply in debt due to the combination of unfortunate events.
>
> In 2014, my daughter's senior year at high school, we had to leave what we had planned to be our homestead.
>
> Our budget is still incredibly tight; I make about 1/3 what I used to make in 1999 prior to relocating to New Hampshire; but it enables me to provide for my family. My wife is still unable to travel much, and would like to relocate to Texas where the warm climate will be better for her health.
>
> If this case is transferred to Washington, it would be a huge expense and would negatively impact the already fragile emotional and physical state of my wife. Travel from Texas to MA only takes 3-4 hours. Travel from Washington to MA takes 6-10 hours depending on airline and stops.

K. Hansen Decl. ¶¶ 72-75, ECF No. 290-28.

Nintendo deposed Hansen's wife, Lisa. As she recalled, they had bought a home in Orem, Utah a month before Hansen signed his declaration in August. And they had moved to Utah (permanently) by September:

> Q. And your address?
>
> A. [redacted], Orem, Utah 84057.
>
> Q. And when did you move to Orem, Utah?
>
> A. September.
>
> Q. Is that September of this year?
>
> A. Yes, 2015.
>
> \* \* \*
>
> Q. But at some -- some point, then, you moved either -- moved from New Hampshire or Massachusetts to Orem, Utah, correct?

5

>  A. Yes. We got -- we -- we got our home in Orem, Utah July 1st . . . [redacted]. And I would see Karl, and he would come and visit wherever I was.
>
>  Q. Okay. So as of July 1st you had intended to move to Utah, correct?
>
>  A. Correct.

L. Hansen Dep. 6:3-8, 171:9-13, ECF No. 290-3.

    Mr. Hansen offered an explanation at the hearing. He said that he and his wife were actually separated when he signed the venue declaration, that he was employed by a company in California that let him work remotely 30-40% of the time, and that generally, he was all over the country when he signed the venue declaration—New Hampshire, Massachusetts, San Jose, Texas, Utah—staying in different houses, hotels, and even his Ford Excursion:

>  Q. Okay. Mr. Hansen, where do you live?
>
>  A. Right now [at the 2018 hearing] we are working on maybe purchasing a home in Lehi, Utah.
>
>  Q. In November of 2015, where did you live?
>
>  A. In November 2015, I lived in New Hampshire. I was working in San Jose and Texas, and I got email in New Hampshire and Utah and Texas and San Jose. Not email, I got regular mail.
>
>  Counsel: Your Honor, we only have one copy of Mr. Hansen's deposition exhibit -- deposition transcript with us. Would it be all right if I put a section up on the camera?
>
>  Court: That's fine.
>
>  Q. (By Counsel) Mr. Hansen, do you recall being deposed in November 2015?
>
>  A. I do.
>
>  Q. And let me just pull up this. In November 2015, I asked you the same question, where do you live. You said you just moved to [redacted] Orem. Do you see that?
>
>  A. I do.

6

Q. That was true at the time, wasn't it?

A. We had leased a condo. We were moving some stuff to the condo, but I still resided in New Hampshire. I still had my driver's license. I still had cars in New Hampshire. I still had tons of storage. Ninety-five percent of my personal products were in New Hampshire. And my wife and I had gone through a separation, and at the time, this was a trial that we would see how it worked out at this condo [redacted . . . in Orem, Utah].

Q. Did you in November 2015 work for Telenav?

A. I did.

Q. And the job at Telenav was a job which you needed to be physically present; is that true?

A. No. They allowed me to work as much as 30 to 40 percent of the time off-site.

Counsel: Your Honor, I'd like to put up another portion of Mr. Hansen's deposition transcript, page 17, lines 18 to 24.

> Q. (By Counsel) When were you working -- when you were working, you've been working at Telenav?
>
> A. Uh-huh.
>
> Q. Question, That's a position for which you need to be physically present.
>
> A: Yes.

A. (Hansen at hearing): I understood your question just now was a hundred percent of the time, and so the answer I gave is consistent with my deposition. I was on-site 60 to 70 percent of the time, and I worked off-site 30 to 40 percent.

Q. All right. And when you were living -- or when you were working at Telenav physically, you sometimes stayed in a hotel, but oftentimes stayed in your car; correct?

A. After separation, I needed to save money, and so I stayed in hotels maybe every couple of weeks so that I could get some good shampoo and get a good meal, and the rest of the time I lived in the back of my Excursion.

7

> Q. Okay. And you had -- at the time of your deposition, you had leased a home in Orem, Utah, in July 2015; correct?
>
> A. Yes. No, no, no, no, no. We had leased a condo.
>
> Q. Okay. And by September 2015, had you, in fact, moved to Utah?
>
> A. Lisa moved to the condo in September, and I was still getting treatment by doctors in New Hampshire. When Lisa was in Utah, I would spend some weekends in Utah, but Lisa also would go back to New Hampshire sometimes. We had a daughter [redacted].
>
> Q. All right. Turn to tab eight of your notebook, please. Do you recognize that document as your declaration that you filed in this case?
>
> A. I do.
>
> Q. Turn to page 15. Is that your signature?
>
> A. It is.
>
> Q. You signed this document on or about August 10th; is that right?
>
> A. Yeah, and then I certified it.
>
> Q. You would agree with me that you didn't disclose in this declaration that you were working for a California company and that you had had at least a lease on property in Utah; correct?
>
> A. I haven't read this in several years, so I would have to refresh my memory.

Hansen's declaration said other things about Hansen and SyncPoint's alleged ties to Texas.

It said this about SyncPoint's Plano office:

> SyncPoint employs several consultants to conduct business at SyncPoint's Texas office, including Texas residents Ryan Thomas, Dale Buechele, Dave Vance, and Edwin Bland, who perform a variety of services as needed.

K. Hansen Decl. ¶ 61, ECF No. 290-28.

In truth, Ryan Thomas and Edwin Bland had both rejected Hansen's offer (paid or otherwise) well before Hansen signed the venue declaration. Thomas was actually a full-time

8

suburban dentist and family friend from the Dallas area. Hr'g Tr. 46:22-25, ECF No. 354. Hansen described SyncPoint's needs in an email to Thomas:

> Hi Ryan,
>
> Sounds pretty wild! Hope it all goes well. The trip should be later in the month than that, I'll let you know as it firms up.
>
> For helping us [SyncPoint], basically just pick up any mail at the office every couple weeks or so, and check to make sure the computer is running and is on the network. You can check the computer both remotely (i.e. can you access it from your house) and at the office (is it able to connect to the internet). I will set you up a login on the computer, and show you the stuff to check when we are in town. All told, should not be more than a couple hours each time.
>
> The key is to give you the ability to honestly say you are doing work for SyncPoint Imaging, even if it seems trivial, because it is an essential part of keeping the office up and running. Because you are established in Texas, combined with me having been born in Texas and having worked there several times, it makes it very difficult for any parties in the lawsuit to try to change venue to some other more favorable-to-them district.
>
> Looking forward to seeing you and your family.
>
> Best Regards,
>
> Karl

ECF No. 290-34. Hansen testified at the hearing that Dr. Thomas "came to the office a couple of times, and then in a subsequent email, he said that he didn't think he was going to be able to do it." Hr'g Tr. 47:14-16, ECF No. 354.

Edwin Bland declined Hansen's offer in April 2015, nearly four months before Hansen stated under penalty of perjury that Bland was employed as a consultant by SyncPoint. The offer and rejection were also in email:

> Hi Edwin,
>
> [redacted]

9

> Hey, I'm looking for someone who can drop by the office for SyncPoint Imaging when we are not in town and pick up any mail and make sure the server is running. I thought you might be interested. The guy I had doing it won't be available after the end of April. It doesn't involve much, part time, swinging by the office maybe once per week and checking the server and picking up any mail. Either me or one of my boys (or all of us sometimes) will be in Dallas periodically and we would meet you for lunch or wherever and get any accumulated mail. The pay is not much until the lawsuit with Nintendo settles out, but I could for sure cover your expenses plus a bit per week until it is all over, and then we would be able to back up and pay for your time.
>
> Let me know if you are interested, and we can work up a deal.
>
> Best,
>
> Karl
>
> \* \* \*
>
> Hi Karl,
>
> [redacted]
>
> I've taken a look at the office location. I won't be able to help you this time. It's considerably outside of my normal commute & I believe I'd likely get stuck in traffic trying to drive up to it. I also have a PO Box for our rental business .... It's only 4 miles from my home ... but it's a big pain in the back side to remember to pick up the mail ... even once or twice a month ...
>
> I hope all goes well with the lawsuit for you. I can imagine something like that could drag out for years.
>
> I wish you the best of success with it.
>
> Regards,
>
> Edwin

ECF No. 290-33.

As for the other two SyncPoint consultants, only Vance ever apparently visited the SyncPoint office. Hr'g Tr. 49:16-50:3, ECF No. 354. Hansen said this about Buechele: "I don't

10

know if he ever came to the office, but I talked to him several times about it, and he indicated a willingness, and then I don't think he ever ended up coming to the office." *Id.* 48:5-8.

The venue motion was never decided, and the court never relied on Hansen's declaration. The scheduling order was entered in May 2015 but the venue motion was not filed until July, and was not fully briefed until September. ECF Nos. 138-39. The claim construction hearing in October was when the court first indicated that the '214 patent was not consistent with SyncPoint's invisible, infrared cursor theory. *See* Hr'g Tr. 24:4-10, ECF No. 184.

On December 31, 2015, SyncPoint filed an emergency motion to stay the case. ECF No. 220. The motion was based on the Hansens' bankruptcy proceedings. *Id.* at 1. The bankruptcy is a saga of its own. Suffice it to say that Hansen ended up losing the '214 patent—to PixArt. *See id.* at 1-2. Having completed a claim construction order by then, the court entered that order, ECF No. 233 (Jan. 5, 2016), and then stayed the case, ECF No. 233 (Jan. 7, 2016).

While nothing noteworthy happened after the stay, a dispute eventually arose about how the lawsuit should be dismissed. Two years after the stay was entered, the bankruptcy was final. PixArt now owned the '214 patent, and everyone agreed the lawsuit should be dismissed. The question was whether it should be with or without prejudice.

SyncPoint said it should be without prejudice because SyncPoint, having lost the patent to PixArt, lacked standing. SyncPoint obviously could not have sued anyone else with a patent owned by PixArt. But SyncPoint wanted a dismissal without prejudice to avoid defendants becoming "prevailing parties" with a right to seek attorneys' fees. Defendants said the dismissal should be with prejudice, obviously to earn "prevailing party" status and pursue a claim for attorneys' fees.

The court dismissed the case with prejudice. As the court explained, even a lack of standing can result in a dismissal with prejudice, and the defendants did not need a favorable judgment on

the merits to be considered prevailing parties. *See* ECF No. 279 at 2; *see also Raniere v. Microsoft Corp.*, 887 F.3d 1298, 1302-08 (Fed. Cir. 2018).

Nintendo's motion for attorneys' fees came shortly thereafter. ECF No. 290. PixArt later joined this motion. ECF No. 292. Defendants emphasize the assignment problem, the lack of a pre-suit investigation, the alleged frivolousness of the lawsuit, the litigation misconduct (including Hansen's venue declaration and SyncPoint's venue response), among other things. *See id.* Nintendo wants $2.5 million in attorneys' fees. ECF No. 290 at 30. PixArt requests fees but has not specified an amount. *See* ECF No. 292-1 (proposed order).

One problem, as even Hansen readily admits, is that "SyncPoint has no money." Hr'g Tr. 62:3, ECF No. 354. Yet the defendants want more than a nominal declaration of exceptionality. They want the court pierce the SyncPoint corporate veil and hold Hansen and the Pia Firm jointly and severally liable for their fees. ECF No. 290 at 21-27.

## DISCUSSION

In most civil cases, the American Rule precludes the winner from recovering attorneys' fees from the loser. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). Congress has deviated from that rule in patent cases. *See* 35 U.S.C. § 285. The Patent Act allows district courts, in "exceptional cases," to "award reasonable attorney fees to the prevailing party." *Id.*

An exceptional case is—by definition—rare. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). It is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* District courts

are supposed to decide whether a case is exceptional "in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.*

The standard is not as difficult to implement in practice as it sounds. Under a similar fee-shifting provision in the Copyright Act, courts consider a nonexclusive list of factors, including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)). These and other factors have led this court to declare some cases exceptional and others not. *See, e.g.*, *My Health, Inc. v. ALR Techs., Inc.*, No. 2:16-cv-00535-RWS-RSP, 2017 WL 6512221, at *1 (E.D. Tex. Dec. 19, 2017) (exceptional); *Effective Expl., LLC v. BlueStone Nat. Res. II, LLC*, No. 2:16-CV-00607-JRG-RSP, 2018 WL 466246, at *2 (E.D. Tex. Jan. 18, 2018) (not exceptional).

### I. The Assignment Issue Does Not Make This Case Exceptional.

Defendants amassed a significant amount of evidence about the assignment issue and spent the overwhelming majority of the evidentiary hearing addressing it. Hansen testified that he physically signed both corrective assignments, the one from SyncPoint back to Hansen and vice versa, on the same day, February 18, 2015. Hr'g Tr. 13:17-20, ECF No. 354. He also said he signed the assignments in the correct order. *Id.* 25:11. This portion of Hansen's testimony was not directly contradicted. The question is less about whether Hansen physically signed the assignments correctly and more about whether he appended additional (and unnecessary) e-signatures correctly.

Even if there was a mistake in the second round of assignments and problems with the e-signatures and dates, one point is clear enough: Hansen had no reason to doctor the assignments. There is no dispute that Hansen is the rightful inventor of the '214 patent and that he had the power to assign his rights to SyncPoint. No innocent third party was involved, standing was never an

13

issue (until bankruptcy), and neither Nintendo nor PixArt was prejudiced by the assignments. If the assignments had been signed in the wrong order, the obvious solution would have been to do it a third time and get it right. There was no reason to lie about it when the mistake could have been corrected with far less effort. At that time, there had been no charge of inaccuracy.

Nor was there any reason to go through what seemed to be an extraordinary effort to change a computer's internal clock before appending an e-signature so that it would look like the assignment had been electronically signed before it actually was. This was the theory of defendants' data and computer forensics expert, John Montegudo. Hr'g Tr. 139:13-152:15, ECF No. 354. Montegudo was clearly qualified, and there are unquestionably some issues with the metadata behind the assignments. *See* ECF No. 335 at 5. But it is difficult to believe that Hansen would have gone through that kind of effort when there was a simple fix.

Montegudo's opinion concerning the computer clock was, he admitted, based on probabilities and likelihoods. *Id.* 162:8-10. Without the original computers used to append the e-signatures, Montegudo could not be entirely confident. Naturally, Nintendo tried to get the original computers. Nintendo asked SyncPoint to list all of their computers during discovery. *Id.* 27:22-24. SyncPoint listed some, but omitted Hansen's laptop. Hansen said he frequently used either a hotel computer or his laptop for business. *Id.* 27:14-17. Unfortunately, and despite Hansen's supposedly modest means, computers are a commodity to him, something he purchases frequently, "like a toothbrush." *Id.* 28:5-18. So the laptop he might have used is gone, and no one can identify any hotel computer he might have used.

Defendants also played the deposition of a former Pia firm paralegal, Ms. Butler, apparently to prove that the paralegal switched a signature page in an assignment with a page from some other document bearing Karl Hansen's signature. *See* Hr'g Tr. 113:23-137:16, ECF No. 354.

The Court found her demeanor and testimony to be entirely credible, and there is not adequate evidence to find that she intentionally altered an assignment in any material way. Nintendo's counsel asked her to assume that the only documents from which she could have obtained Hansen's signature were on SyncPoint's privilege log. But it is possible that there were other documents, or more likely that the paralegal was simply confused about the entire issue, much like the court. The Court finds the testimony of Hansen and Butler on the assignment issue to be more credible and persuasive than that of Montegudo. Again, there is no question that Hansen owned the '214 patent and had the power to assign it.

## II. The Lawsuit Was Neither Frivolous Nor Objectively Unreasonable.

Hansen is an independent inventor, with an impressive education in computer, mechanical and electrical engineering.[3] He has been successful in the field of image processing. He enlisted his sons to help him investigate the Wii, *see* Hr'g Tr. 79:15-80:22, ECF No. 354, and he encountered many problems along the way, *see id.* 98:20-22 ("probably 80 percent of the time I was in San Jose living in my Excursion").

Hansen's lawsuit was not successful, but it was not frivolous. Hansen testified that he and his engineer son spent hundreds of hours investigating the Wii. Hr'g Tr. 104:19-107:20, ECF No. 354. He may not have initially considered the Wii to be an embodiment of his invention, given the claims' emphasis on external and optical cursors, but his later change in course was grounded in facts and had at least a reasonable prospect of prevailing.

---

[3] Like many inventors, he is persistent, even reminiscent of Robert Kearns, the inventor and pro se litigant who mounted a successful campaign against the major auto-manufacturers to recover damages for their use of the intermittent windshield wiper. See, e.g., *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1543 (Fed. Cir. 1994) (affirming Kearns' $18.7 million judgment against Chrysler); *see also Flash of Genius* (Universal Pictures 2008). Like Kearns, Hansen came across as a dreamer.

Hansen's invisible, infrared cursor theory was based on Hansen's own experience with "hyperspectral imaging." Hr'g Tr. 78:18-80:10. The patent's embodiments all relied on visible light, but other light, including infrared light, can be "optical" or "external" inasmuch as it can be projected and detected on a screen. *See id.* More important, the '214 patent does not focus on the type or wavelength of light used. In theory, the inventive concept would work as well with infrared light as it would with visible light.

Ultimately, it was the word "cursor" that doomed Hansen's theory. "Cursor," as the court found, was defined by extrinsic dictionaries as an object that can be seen with the human eye. *See* ECF No. 230 at 20-21. These definitions were most consistent with the patent's description, which describes the external cursor as a visible object, such as the dot from a laser pointer. *See id.* While Hansen's theory was not adopted, it was not frivolous, and (at least before claim construction) had reasonable prospect of prevailing. In sum, Hansen's ordinary enforcement of his valid patent rights does not make the case exceptional. *See Checkpoint Sys., Inc. v. All-Tag Sec. S.A.*, 858 F.3d 1371, 1375 (Fed. Cir. 2017), *cert. denied*, 138 S. Ct. 650, 199 L. Ed. 2d 531 (2018).

### III.  SyncPoint's Venue Response.

SyncPoint's response to Nintendo's venue motion stated that Hansen "resides in New Hampshire." From a legal domicile point of view, this may have been technically correct. But candor means more than technical accuracy. *See Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1367 (Fed. Cir. 2012). In light of Hansen's testimony about his flexible whereabouts during the relevant time, his declaration should not have emphasized the inconvenience that would be caused by requiring him to litigate in the Western District of Washington. This argument overlooked the fact that Hansen had leased a condo in Utah one month before the declaration was signed. It also omitted that at the time Hansen signed his declaration he

16

was employed by a company that required him to be in San Jose, California 60-70% of the time. San Jose is much closer to Washington than to Marshall.

Most troubling is the part of the declaration about SyncPoint's consultants. There is no way around the conclusion that there really were no consultants. At best, only one of the four people identified in Hansen's declaration (Vance) ever even visited SyncPoint's office. In the words of Hansen's own email, the point was simply to make it "very difficult for any parties in the lawsuit to try to change venue to some other more favorable-to-them district." ECF No. 290-34. SyncPoint's office in Plano would have carried little weight in the transfer analysis, given its recent origin and very limited contents, but for the claim that SyncPoint employed various consultants at that office. Not only did Hansen's declaration include these misrepresentations, SyncPoint continued to rely on the declaration well after it was called into question. In the very first sentence of the sur-reply to the venue motion, for example, SyncPoint stated that "Nintendo has ignored and failed to contradict Mr. Hansen's declaration establishing the legitimate business purposes for SyncPoint's incorporation and office set-up in Plano." ECF No. 133 at 1.

### IV.   The Proper Deterrent Remedy Should be Tailored to the Misconduct.

This case bears very few of the marks of an exceptional case within the meaning of § 285. The lawsuit had a plausible infringement read against a carefully targeted defendant. PixArt considered Hansen's patent seriously enough to take a license for four years. Hansen had long and carefully been considering whether the Wii infringed his claims. Until he became convinced, he did not make a claim. Neither SyncPoint nor Hansen had patent speculation or volume litigation in mind. The '214 patent had only been asserted in litigation once, against Nintendo and PixArt. There is no evidence of "exploiting the high costs to defend complex litigation to extract a nuisance settlement." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011).

Further, even if the case were to be considered exceptional, there is an absence of causation. The only arguable basis for an exceptionality finding is litigation misconduct, and the misconduct is concentrated around venue. Aside from spending time investigating venue facts, which the defendants would likely have done even without the misrepresentations, SyncPoint's venue representations did not cause the defendants to incur substantial attorneys' fees. *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186-90 (2017) (explaining but-for causation requirement for determining attorneys' fees).

The best solution to this problem, in the court's view, is to identify the responsible parties and craft an appropriate remedy. The record is not clear on either point. Before making any conclusion, Messrs. Pia and Hansen must be given an opportunity to be heard. The utmost candor will be expected, and any sanction will likely depend on their credibility. An appropriate show cause order will issue shortly.

## CONCLUSION

Accordingly, Nintendo's motion to declare the case exceptional and for attorneys' fees, ECF No. 290, is denied. The motion for a declaration of no privilege, ECF No. 291, is denied as moot. Nintendo's motion to join Hansen and the Pia firm as parties, ECF No. 358, is denied as moot.

**SIGNED this 9th day of July, 2018.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE